IN THE SUPERIOR COURT FOR THE COUNTY OF

FLOYD, STATE OF GEORGIA

| | | |
|---|---|---|
| STATE OF GEORGIA | : | CRIMINAL ACTION |
| VS. | : | |
| WINFORD REECE ELLIS | : | NO. 01-CR-16704-3 |

# V E R D I C T

(RAPE)

    We the Jury find the Defendant *Guilty*

(BURGLARY)

    We the Jury find the Defendant *guilty of theft by taking.*

    This *17TH* day of May, 2001.

*J. Kevindvester*
FOREPERSON

FILED IN OFFICE

MAY 1 7 2001

*Virginia W Hailey*
CLERK

*10:55 am*

FINAL DISPOSITION    SC-6    CASTLEBERRY CO. COVINGTON GA 30014

# THE SUPERIOR COURT OF *Floyd* COUNTY, GEORGIA   FINAL DISPOSITION

CRIMINAL ACTION NO. *01 CR 16784-3*

**THE STATE**
**VS.**

*Winford Reece Ellis*

OTN: *83397276 / 83401865*

OFFENSE(S) 1/ *Rape*
2/ *Agg. Stalking*
3/ *Burglary*

*May*   TERM, 20 *01*

### PLEA:
NEGOTIATED
GUILTY ON COUNT(S) _____
NOLO CONTENDERE ON
COUNT(S) _____
TO LESSER INCLUDED
OFFENSE(S) _____
ON COUNT(S) _____

☑ JURY
☐ NON-JURY

### ✓ VERDICT:
GUILTY ON
COUNT(S) *1*
NOT GUILTY ON
COUNT(S) _____
GUILTY OF INCLUDED
OFFENSE(S) OF *Misdemeanor* ON COUNT(S) *3*

☑ OTHER DISPOSITION
☐ NOLLE PROSEQUI ORDER ON
COUNT(S) _____
☐ DEAD DOCKET ORDER ON
COUNT(S) _____
*Theft By Taking*
(SEE SEPARATE ORDER)

☐ DEFENDANT WAS ADVISED OF HIS/HER RIGHT TO HAVE THIS SENTENCE REVIEWED BY THE SUPERIOR COURTS SENTENCE REVIEW PANEL.

### ✓ FELONY SENTENCE    ☐ MISDEMEANOR SENTENCE

WHEREAS, the above-named defendant has been found guilty of the above-stated offense, WHEREUPON, it is ordered and adjudged by the Court that: The said defendant is hereby sentenced to confinement for a period of *1/ 15 years*

*3/ 12 months Concurrent* in the State Penal System or such other institution as the Commissioner of the State Department of Corrections or Court may direct, to be computed as provided by law. HOWEVER, it is further ordered by the Court.

☐ 1) THAT the above sentence may be served on probation *for serious violent felony pursuant to OCGA*

☑ 2) THAT upon service of *10 years* of the above sentence, the remainder of *Sentence 12-12-6.1* on probation PROVIDED that the said defendant complies with the following general and other conditions herein imposed by the Court as a part of this sentence.

### ✓ GENERAL CONDITIONS OF PROBATION

The defendant, having been granted the privilege of serving all or part of the above-stated sentence on probation, hereby is sentenced to the following general conditions of probation:
1) Do not violate the criminal laws of any governmental unit.
2) Avoid injurious and vicious habits - especially alcoholic intoxication and narcotics and other dangerous drugs unless prescribed lawfully.
3) Avoid persons or places of disreputable or harmful character.
4) Report to the Probation-Parole Supervisor as directed and permit such Supervisor to visit him/her at home or elsewhere.
5) Work faithfully at suitable employment insofar as may be possible.
6) Do not change his/her present place of abode, move outside the jurisdiction of the Court, or leave the State for any period of time without prior permission of the Probation Supervisor.
7) Support his/her legal dependants to the best of his/her ability.
8) Probationer shall, from time to time upon oral or written request by any Probation Officer, produce a breath, urine, and/or blood specimen for analysis for the possible presence of a substance prohibited or controlled by any law of the State of Georgia or of the United States.

### ✓ OTHER CONDITIONS OF PROBATION

IT IS FURTHER ORDERED that the defendant pay a fine in the amount of *$1,000* _____ plus $50 or 10%, whichever is less pursuant to O.C.G.A. 15-21-70, and pay restitution in the amount of _____ *$23 one* Probation Fee _____ Court Costs *Reimb* Attorney's Fees.

Payments are: *Defendant shall have no contact with the victim Carol Ellis)*

IT IS THE FURTHER ORDER of the Court, and the defendant is hereby advised that the Court may, at any time, revoke any conditions of this probation and/or discharge the defendant from probation. The probationer shall be subject to arrest for violation of any condition of probation herein granted. If such probation is revoked, the Court may order the execution of such sentence which was originally imposed or any portion thereof in the manner provided by law after deducting therefrom the amount of time the defendant has served on probation.

The defendant was represented by the Honorable *James Wyatt* Attorney at Law, *Floyd* County, by ☐ Employment ☐ (Appointment).

By the Court *May 17* 20 *01*

So ordered this *17* day of *May*, 20 *01*    *Robert L. Watkins* Judge, *Floyd* Superior Court

### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this Sentence of Probation has been delivered in person to the defendant and he/she instructed regarding the conditions as set forth above.
This _____ day of _____, 20 _____

_____
Probation Officer

Copy received and instructions regarding conditions acknowledge.
This _____ day of _____, 20 _____

_____
Probationer

White-Clerk   Canary-District Attorney   Pink-Probation Office   Goldenrod-Defendant

STATE'S EXHIBIT 33

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

DEFENDANT'S EXHIBIT

25
79-1N
5-2N
11-3S
16-4S
9-MFD

#1   6-26-01

# Rome - Floyd County
# 911

Department __F.C.P.D.__

OPERATOR(S) __43-Mann__ ON DUTY __1500__ OFF DUTY __2300__ DATE __01-11-00__ DAY __Tues__

| TIME SENT | STATION OPERATOR | UNIT NO. | RADIO MESSAGE LOG SHEET |
|-----------|------------------|----------|--------------------------|
| 1839 | | 71 | 10-23 51B Preacher Smith |
| 1843 | | 65 | 10-23 2228 Calhoun Rd |
| 1843 | | 79 | 1038 red jeep cherokee 261TP w/ Technology |
| | | — | new section |
| 1846 | | 79 | 108 |
| 1851 | 39 65 | | 108 10 25/11 500' from 118 Morrow Lake Rd |
| 1854 | | 71 | 108 |
| 1857 | | 65 | 10-23 Morrow Lake Rd |
| 1859 | | 65 | 10-8 10104 |
| 1901 | | Test | 05, 79, 71, 65, 39 |
| 1902 | | ALL | BOLO 10-49: Irwin - 101 - Passing Pleasant Valley - outbound   E16 R52 |
| 1905 | | 56 | 10-8: 10-56 3242, Blacks Bluff Rd |
| 1906 | | 39 | 10-76 3242 Blacks Bluff Rd |
| 1909 | | 10 | 1046 Old C1town Cv. Sp. Pd 10-21 77-7-7168 Ronnie @ Body Shop |
| 1911 | | 79 | 10-25 2901 Garden Lakes Blvd: Ref trouble if spectator |
| 1913 | | 79 | 10-15A 3 Redfox Dr. |
| 1917 | | 79 | 10-23 3 Renfoe Dr: Silver HHA 829TG |
| 1919 | | 56 | 10-23 3242 Blacks Bluff |
| 1919 | | 71 | 10-50I 275 @ Alcan |
| 1921 | | 79 | 10-8 |
| 1921 | | 39 | 10-23 w 56 |
| 1922 | | 71 | 10-22: 10-50I in city |
| 1925 | | ALL | BOLO: HHA - Blue - Passing Kawasaki Shop 10-49: 28's 3591B0B |
| 1927 | | 020,18 | 10-8 Autry: 10-6 Gordon Co. |
| 1931 | | 39 | 10-8 |
| 1931 | | 10 | 10-8 |
| 1931 | | 56 | 10-8 10-95 10-76 Co. |

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

DEFENDANT'S EXHIBIT ONE

JOSEPH S. WATKINS
28 PARKWOOD CIRCLE NE
ROME GA  30161-2133

**AIRTOUCH**
Cellular

PAGE 7

**BILLING ACCOUNT# 6109224**
**INVOICE# RO 6109224-020100**

STATEMENT DATE:   02/01/00

**AIRTOUCH**
Cellular

PAGE 8

**BILLING ACCOUNT# 6109224**
**INVOICE# RO 6109224-020100**

## AIRTIME USAGE

### (706) 506-1457

| DATE | TIME | TO/FROM LOCATION | NUMBER CALLED | FEAT | MIN | CHARGE |
|------|------|------------------|---------------|------|-----|--------|
| 01/14 | 11:30A | ROME        GA | 706 234 8303 | | 2.0 | 0.00 |
| 14 | 11:32A | ROME        GA | 706 234 8303 | | 1.0 | 0.00 |
| 14 | 11:33A | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 14 | 11:34A | ROME        GA | 706 234 8303 | | 1.0 | 0.00 |
| 14 | 1:59P | 1ST INB MIN | 000 000 0000 | | 2.0 | 0.00 |
| 01/14 | 2:55P | ROME        GA | 706 234 8303 | | 1.0 | 0.00 |
| 01/14 | 2:57P | ROME        GA | 706 234 8303 | | 1.0 | 0.00 |
| 01/14 | 8:38P | 1ST INB MIN | 000 000 0000 | | 6.0 | 0.00 |
| 01/14 | 8:59P | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 01/15 | 11:50A | 1ST INB MIN | 000 000 0000 | | 3.0 | 0.00 |
| 01/15 | 12:05P | ROME        GA | 706 232 2632 | | 1.0 | 0.00 |
| 01/15 | 12:22P | ROME        GA | 706 232 2632 | | 3.0 | 0.00 |
| 01/15 | 12:37P | 1ST INB MIN | 000 000 0000 | | 2.0 | 0.00 |
| 01/15 | 12:49P | ROME        GA | 706 232 2632 | | 1.0 | 0.00 |
| 01/15 | 4:09P | 1ST INB MIN | 000 000 0000 | | 3.0 | 0.00 |
| 01/15 | 5:55P | ROME        GA | 706 506 8496 | | 2.0 | 0.00 |
| 01/15W | 6:11P | ROME        GA | 706 234 1313 | | 22.0 | 0.00 |
| 01/15W | 7:38P | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 01/15W | 9:02P | ROME        GA | 706 295 5960 | | 4.0 | 0.00 |
| 01/15W | 11:37P | 1ST INB MIN | 000 000 0000 | | 4.0 | 0.00 |
| 01/16W | 2:52P | ROME        GA | 706 506 8496 | | 3.0 | 0.00 |
| 01/16W | 5:17P | ROME        GA | 706 234 8104 | | 1.0 | 0.00 |
| 01/16W | 5:18P | ROME        GA | 706 368 1289 | | 1.0 | 0.00 |
| 01/16W | 5:19P | 1ST INB MIN | 000 000 0000 | | 3.0 | 0.00 |
| 01/16W | 5:44P | ROME        GA | 706 295 8009 | | 1.0 | 0.00 |
| 01/16W | 9:46P | ROME        GA | 706 238 6688 | | 1.0 | 0.00 |
| 01/16W | 9:50P | ROME        GA | 706 234 6596 | | 1.0 | 0.00 |
| 01/17W | 5:52A | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 01/17W | 3:25P | ROME        GA | 706 234 8303 | | 2.0 | 0.00 |
| 01/17W | 8:52P | ROME        GA | 706 232 2632 | | 1.0 | 0.00 |
| 01/17W | 8:52P | ROME        GA | 706 234 1313 | | 1.0 | 0.00 |
| 01/17W | 9:03P | ROME        GA | 706 234 8104 | | 1.0 | 0.00 |
| 01/17W | 9:04P | ROME        GA | 706 234 6596 | | 2.0 | 0.00 |
| 01/17W | 9:06P | ROME        GA | 706 238 6688 | | 1.0 | 0.00 |
| 01/17W | 9:19P | 1ST INB MIN | 000 000 0000 | | 2.0 | 0.00 |
| 01/17W | 9:22P | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 01/17W | 9:35P | ROME        GA | 706 234 1313 | | 18.0 | 0.00 |
| 01/17W | 11:18P | ROME        GA | 706 234 6596 | | 1.0 | 0.00 |
| 01/17W | 11:28P | CEDARTOWN   GA | 770 748 1209 | | 3.0 | 0.00 |
| 01/18 | 10:41A | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 01/18 | 10:52A | ROME        GA | 706 234 8303 | | 1.0 | 0.00 |
| 01/18 | 12:02P | 1ST INB MIN | 000 000 0000 | | 3.0 | 0.00 |
| 01/18 | 1:42P | ROME        GA | 706 506 8496 | | 2.0 | 0.00 |

## AIRTIME USAGE

### (706) 506-1457

| DATE | TIME | TO/FROM LOCATION | NUMBER CALLED | FEAT | MIN | CHARGE |
|------|------|------------------|---------------|------|-----|--------|
| 01/18 | 1:59P | 1ST INB MIN | 000 000 0000 | | 2.0 | 0.00 |
| 01/18 | 3:32P | ROME        GA | 706 506 8496 | | 2.0 | 0.00 |
| 01/18 | 3:34P | ROME        GA | 706 506 8496 | | 1.0 | 0.00 |
| 01/18 | 4:09P | ROME        GA | 706 506 8496 | | 2.0 | 0.00 |
| 01/18 | 4:27P | ROME        GA | 706 234 8303 | | 3.0 | 0.00 |
| 01/18 | 8:10P | SUMMERVILLE GA | 706 857 1787 | | 2.0 | 0.00 |
| 01/18 | 8:29P | ROME        GA | 706 506 8496 | | 2.0 | 0.00 |
| 01/18 | 9:08P | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 01/18 | 10:29P | ROME        GA | 706 234 8104 | | 1.0 | 0.00 |
| 01/18 | 10:44P | ROME        GA | 706 234 8104 | | 4.0 | 0.00 |
| 01/18 | 10:57P | CEDARTOWN   GA | 770 748 1209 | | 2.0 | 0.00 |
| 01/19 | 1:05P | 1ST INB MIN | 000 000 0000 | | 3.0 | 0.00 |
| 01/19 | 2:15P | ROME        GA | 706 234 4266 | | 1.0 | 0.00 |
| 01/19 | 2:16P | ROME        GA | 706 233 6867 | | 1.0 | 0.00 |
| 01/19 | 2:37P | ROME        GA | 706 295 8009 | | 1.0 | 0.00 |
| 01/19 | 2:52P | ROME        GA | 706 234 8303 | | 1.0 | 0.00 |
| 01/19 | 3:04P | 1ST INB MIN | 000 000 0000 | | 2.0 | 0.00 |
| 01/19 | 4:02P | ROME        GA | 706 234 8303 | | 2.0 | 0.00 |
| 01/19 | 5:32P | ROME        GA | 706 802 0300 | | 7.0 | 0.00 |
| 01/19 | 6:23P | ROME        GA | 706 234 6596 | | 3.0 | 0.70 |
| 01/19 | 7:24P | 1ST INB MIN | 000 000 0000 | | 4.0 | 1.05 |
| 01/19 | 7:28P | 1ST INB MIN | 000 000 0000 | | 4.0 | 1.05 |
| 01/19 | 7:36P | ROME        GA | 706 234 6596 | | 1.0 | 0.35 |
| 01/19 | 8:17P | ROME        GA | 706 232 8154 | | 1.0 | 0.35 |
| 01/20 | 2:45A | CEDARTOWN   GA | 770 748 1209 | | 1.0 | 0.35 |
| 01/20 | 2:46A | CEDARTOWN   GA | 770 748 1209 | | 2.0 | 0.70 |
| 01/20 | 2:48A | ROME        GA | 706 232 8154 | | 1.0 | 0.35 |
| 01/20 | 2:55A | CEDARTOWN   GA | 770 748 1209 | | 1.0 | 0.35 |
| 01/20 | 2:56A | ROME        GA | 706 232 8154 | | 1.0 | 0.35 |
| 01/20 | 2:56A | ROME        GA | 706 232 8154 | | 1.0 | 0.35 |
| 01/20 | 3:00A | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 01/20 | 3:02A | ROME        GA | 706 232 8154 | | 1.0 | 0.35 |
| 01/20 | 12:59P | 1ST INB MIN | 000 000 0000 | | 5.0 | 1.40 |
| 01/20 | 2:36P | 1ST INB MIN | 000 000 0000 | | 3.0 | 0.70 |
| 01/20 | 3:02P | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 01/20 | 3:02P | 1ST INB MIN | 000 000 0000 | WAITG | 3.0 | 0.70 |
| 01/20 | 6:37P | ROME        GA | 706 506 8496 | | 2.0 | 0.70 |
| 01/20 | 6:41P | 1ST INB MIN | 000 000 0000 | | 1.0 | 0.00 |
| 01/20 | 7:35P | 1ST INB MIN | 000 000 0000 | | 2.0 | 0.35 |
| 01/20 | 9:34P | CEDARTOWN   GA | 770 748 7793 | | 1.0 | 0.35 |
| 01/20 | 9:54P | CEDARTOWN   GA | 770 748 1209 | | 1.0 | 0.35 |
| 01/20 | 9:56P | CEDARTOWN   GA | 770 748 1209 | | 1.0 | 0.35 |
| 01/20 | 10:02P | ROME        GA | 706 234 6596 | | 2.0 | 0.70 |

**SEE LAST PAGE FOR A DESCRIPTION OF THE FEATURE CODES**
**✦ 1 MINUTE CREDITED FOR DROPPED CALL WHICH IS REDIALED WITHIN 5 MINUTES,**
**WITHOUT AN INTERVENING CALL.**
**W WEEKEND CALL**

**DEFENDANT'S EXHIBIT**

#2  6-29-01

OSEPH S. WATKINS
8 PARKWOOD CIRCLE NE
OME GA  30161-2133

**AIRTOUCH** Cellular

PAGE 5

**BILLING ACCOUNT# 6109224**
**INVOICE# RO 6109224-020100**

STATEMENT DATE:  02/01/00

**AIRTOUCH** Cellular

PAGE 6

**BILLING ACCOUNT# 6109224**
**INVOICE# RO 6109224-020100**

## AIRTIME USAGE

(708) 506-1457

| DATE | TIME | TO/FROM LOCATION | NUMBER CALLED | FEAT | MIN | CHARGE |
|---|---|---|---|---|---|---|
| 8W | 12:41A | 1ST INB MIN | 000-000-0000 | | 1.0 | 0.00 |
| 8W | 10:47A | CEDARTOWN GA | 770-748-1209 | | 5.0 | 0.00 |
| 8W | 1:24P | 1ST INB MIN | 000-000-0000 | | 5.0 | 0.00 |
| 7/08W | 1:34P | 1ST INB MIN | 000-000-0000 | | 4.0 | 0.00 |
| 01/08W | 3:22P | 1ST INB MIN | 000-000-0000 | | 4.0 | 0.00 |
| 01/08W | 3:59P | 1ST INB MIN | 000-000-0000 | | 1.0 | 0.00 |
| 01/08W | 11:10P | ROME GA | 706-233-6867 | | 1.0 | 0.00 |
| 01/08W | 11:10P | ROME GA | 706-233-6867 | | 1.0 | 0.00 |
| 01/08W | 11:11P | SUMMERVL GA | 706-619-1006 | | 1.0 | 0.00 |
| 01/08W | 11:12P | 1ST INB MIN | 000-000-0000 | | 2.0 | 0.00 |
| 01/08 | 11:12P | MOB-MOB100% | 000-000-0000 | | 1.0 | 0.00 |
| 01/08W | 11:26P | 1ST INB MIN | 000-000-0000 | | 1.0 | 0.00 |
| 01/08W | 11:27P | CEDARTOWN GA | 770-748-1209 | | 1.0 | 0.00 |
| 01/08W | 11:28P | CEDARTOWN GA | 770-748-1209 | | 2.0 | 0.00 |
| 01/09W | 3:44P | ROME GA | 706-233-6867 | | 1.0 | 0.00 |
| 01/ | 3:44P | ROME GA | 706-233-6867 | | 1.0 | 0.00 |
| 01/ | 4:23P | CEDARTOWN GA | 770-748-1209 | | 2.0 | 0.00 |
| 01/09W | 4:32P | ROME GA | 706-295-9159 | | 1.0 | 0.00 |
| 01/09W | 10:46P | CEDARTOWN GA | 770-748-1209 | | 2.0 | 0.00 |
| 01/09W | 11:13P | CEDARTOWN GA | 770-748-1209 | | 7.0 | 0.00 |
| 01/10 | 11:47A | 1ST INB MIN | 000-000-0000 | | 4.0 | 0.00 |
| 01/10 | 3:13P | ROME GA | 706-233-6867 | | 1.0 | 0.00 |
| 01/10 | 3:13P | 1ST INB MIN | 000-000-0000 | WAITG | 1.0 | 0.00 |
| 01/10 | 3:13P | ROME GA | 706-233-6867 | | 1.0 | 0.00 |
| 01/ | 3:22P | ROME GA | 706-232-2632 | | 2.0 | 0.00 |
| | 4:44P | CEDARTOWN GA | 770-748-1209 | | 3.0 | 0.00 |
| 0. | 9:43P | ROME GA | 706-234-6596 | | 1.0 | 0.00 |
| 10 | 10:04P | CEDARTOWN GA | 770-748-1209 | | 2.0 | 0.00 |
| 01/11 | 11:33A | ROME GA | 706-506-8496 | | 2.0 | 0.00 |
| 01/11 | 11:33A | MOB-MOB100% | 706-506-8496 | | 1.0 | 0.00 |
| 01/11 | 3:42P | AUTO ACCESS | 256-509-1851 | FORWD | 5.0 | 0.00 |
| 01/11 | 7:15P | CEDARTOWN GA | 770-748-1209 | | 5.0 | 0.00 |
| 01/11 | 7:21P | ROME GA | 706-234-6596 | | 1.0 | 0.00 |
| 01/11 | 7:22P | CAVE SPRING GA | 706-777-8725 | | 2.0 | 0.00 |
| 01/11 | 7:23P | GAYLESVL AL | 256-422-3787 | | 1.0 | 0.00 |
| 01/11 | 7:27P | ROME GA | 706-234-6596 | | 2.0 | 0.00 |
| 01/11 | 7:35P | CEDARTOWN GA | 770-748-1209 | | 3.0 | 0.00 |
| 01/11 | 9:44P | ROME GA | 706-233-6867 | | 2.0 | 0.00 |
| 01/12 | 6:34A | ROME GA | 706-232-2632 | | 3.0 | 0.00 |
| 01/12 | 6:59A | CEDARTOWN GA | 770-748-1209 | | 2.0 | 0.00 |
| 01/12 | 11:27A | AUTO ACCESS | 256-509-1843 | FORWD | 1.0 | 0.00 |
| 01/12 | 11:56A | ROME GA | 706-234-8303 | | 4.0 | 0.00 |
| 01/12 | 11:12P | 1ST INB MIN | 000-000-0000 | | 1.0 | 0.00 |
| 01/12 | 2:14P | ROME GA | 706-236-0350 | | 1.0 | 0.00 |
| 01/12 | 2:27P | CEDARTOWN GA | 770-748-1209 | | 1.0 | 0.00 |
| 01/12 | 2:32P | CEDARTOWN GA | 770-748-1209 | | 1.0 | 0.00 |
| 01/12 | 2:33P | TUCKER GA | 770-743-8559 | | 1.0 | 0.00 |
| 01/12 | 2:36P | SUMMERVL GA | 706-619-1006 | | 1.0 | 0.00 |

## AIRTIME USAGE

(706) 506-1457

| DATE | TIME | TO/FROM LOCATION | NUMBER CALLED | FEAT | MIN | CHARGE |
|---|---|---|---|---|---|---|
| 01/12 | 2:36P | SUMMERVL GA | 706-619-1006 | | 1.0 | 0.00 |
| 01/12 | 2:37P | 1ST INB MIN | 000-000-0000 | | 3.0 | 0.00 |
| 01/12 | 2:43P | CEDARTOWN GA | 770-748-1209 | | 3.0 | 0.00 |
| 01/12 | 3:28P | 1ST INB MIN | 000-000-0000 | | 6.0 | 0.00 |
| 01/12 | 3:48P | 1ST INB MIN | 000-000-0000 | | 1.0 | 0.00 |
| 01/12 | 4:58P | ROME GA | 706-234-6596 | | 2.0 | 0.00 |
| 01/12 | 9:04P | TUCKER GA | 770-743-8559 | | 1.0 | 0.00 |
| 01/12 | 9:05P | 1ST INB MIN | 000-000-0000 | | 5.0 | 0.00 |
| 01/12 | 9:11P | CEDARTOWN GA | 770-748-1209 | | 7.0 | 0.00 |
| 01/12 | 10:12P | CEDARTOWN GA | 770-748-1209 | | 2.0 | 0.00 |
| 01/13 | 10:48A | 1ST INB MIN | 000-000-0000 | | 1.0 | 0.00 |
| 01/13 | 11:40A | CEDARTOWN GA | 770-748-1209 | | 1.0 | 0.00 |
| 01/13 | 11:40A | CEDARTOWN GA | 770-748-1209 | | 2.0 | 0.00 |
| 01/13 | 12:46P | SUMMERVL GA | 706-619-1006 | | 1.0 | 0.00 |
| 01/13 | 1:08P | TUCKER GA | 770-743-8559 | | 1.0 | 0.00 |
| 01/13 | 4:29P | ROME GA | 706-234-8303 | | 4.0 | 0.00 |
| 01/13 | 4:42P | ROME GA | 706-295-4872 | | 1.0 | 0.00 |
| 01/13 | 4:42P | ROME GA | 706-291-4872 | | 1.0 | 0.00 |
| 01/13 | 4:59P | ROME GA | 706-234-9799 | | 2.0 | 0.00 |
| 01/13 | 5:01P | ROME GA | 706-234-8303 | | 6.0 | 0.00 |
| 01/13 | 6:15P | ROME GA | 706-234-9799 | | 2.0 | 0.00 |
| 01/13 | 6:16P | ROME GA | 706-292-0483 | | 8.0 | 0.00 |
| 01/13 | 7:00P | ROME GA | 706-234-9799 | | 1.0 | 0.00 |
| 01/13 | 7:12P | ROME GA | 706-506-8496 | | 6.0 | 0.00 |
| 01/13 | 7:43P | 1ST INB MIN | 000-000-0000 | | 2.0 | 0.00 |
| 01/13 | 7:51P | TUCKER GA | 770-743-8559 | | 1.0 | 0.00 |
| 01/13 | 7:52P | 1ST INB MIN | 000-000-0000 | | 3.0 | 0.00 |
| 01/13 | 8:46P | 1ST INB MIN | 000-000-0000 | | 4.0 | 0.00 |
| 01/13 | 10:21P | CEDARTOWN GA | 770-748-1209 | | 2.0 | 0.00 |
| 01/13 | 10:30P | 1ST INB MIN | 000-000-0000 | | 2.0 | 0.00 |
| 01/14 | 7:25A | CEDARTOWN GA | 770-748-1209 | | 1.0 | 0.00 |
| 01/14 | 7:27A | 1ST INB MIN | 000-000-0000 | | 2.0 | 0.00 |
| 01/14 | 9:58A | ROME GA | 706-234-8303 | | 2.0 | 0.00 |
| 01/14 | 10:56A | TUCKER GA | 770-743-8559 | | 1.0 | 0.00 |
| 01/14 | 11:03A | ROME GA | 706-234-8303 | | 1.0 | 0.00 |
| 01/14 | 11:06A | 1ST INB MIN | 000-000-0000 | | 2.0 | 0.00 |
| 01/14 | 11:07A | ROME GA | 706-232-2632 | | 1.0 | 0.00 |
| 01/14 | 11:09A | TUCKER GA | 770-743-8559 | | 1.0 | 0.00 |
| 01/14 | 11:16A | ROME GA | 706-233-6867 | | 1.0 | 0.00 |
| 01/14 | 11:17A | ROME GA | 706-233-6867 | | 1.0 | 0.00 |
| 01/14 | 11:20A | TUCKER GA | 770-743-8559 | | 1.0 | 0.00 |
| 01/14 | 11:27A | ROME GA | 706-234-8303 | | 3.0 | 0.00 |
| 01/14 | 11:27A | 1ST INB MIN | 000-000-0000 | WAITG | 3.0 | 0.00 |

SEE LAST PAGE FOR A DESCRIPTION OF THE FEATURE CODES
* 1 MINUTE CREDITED FOR DROPPED CALL WHICH IS REDIALED WITHIN 5 MINUTES,
WITHOUT AN INTERVENING CALL.

DEFENDANT'S EXHIBIT TWO

SEPH S. WATKINS
PARKWOOD CIRCLE NE
ME GA  30161-2133

**AirTouch** Cellular

PAGE 13

BILLING ACCOUNT# 6109224
INVOICE# RO 6109224-020100

STATEMENT DATE:  02/01/00

**AirTouch** Cellular

PAGE 14

BILLING ACCOUNT# 6109224
INVOICE# RO 6109224-020100

## ROAMER AIRTIME CHARGES

**(706) 506-1457**
CHARGES INCURRED WHILE ROAMING IN ANNISTON,AL (A)

| DATE | TIME | TO/FROM LOCATION | | NUMBER CALLED | FEAT | MIN | CHARGE |
|---|---|---|---|---|---|---|---|
| | 12:38P | INCOMING | | 000 000 0000 | | 2.0 | 1.18 |
| | 12:38P | LOCAL TAXES | | | | | 0.02 |
| 5 | 12:42P | ROME | GA | 706 232 4031 | | 2.0 | 1.18 |
| 05 | 12:42P | LOCAL TAXES | | | | | 0.02 |
| 01/05 | 1:40P | ROME | GA | 706 232 4031 | | 4.0 | 2.36 |
| 01/05 | 1:40P | LOCAL TAXES | | | | | 0.04 |

| **ROAMER AIRTIME SUBTOTAL** | | **(706)506-1457** | | | | **8.0** | **4.80** |

**(706) 506-1457**
CHARGES INCURRED WHILE ROAMING IN SCOOTEBORO,AL (A)

| DATE | TIME | TO/FROM LOCATION | | NUMBER CALLED | FEAT | MIN | CHARGE |
|---|---|---|---|---|---|---|---|
| 01/11 | 1:44P | ROME | GA | 706 234 8303 | | 1.0 | 0.59 |
| 01/11 | 1:44P | LOCAL TAXES | | | | | 0.01 |
| 01/ | 2:42P | INCOMING | | 000 000 0000 | | 4.0 | 2.36 |
| 01/ | 2:42P | LOCAL TAXES | | | | | 0.04 |
| 01/12 | 10:27A | INCOMING | | 000 000 0000 | | 1.0 | 0.59 |
| 01/12 | 10:27A | LOCAL TAXES | | | | | 0.01 |
| 01/12 | 11:27A | ROME | | 706 234 8303 | | 3.0 | 1.77 |
| 01/12 | 11:27A | LOCAL TAXES | | | | | 0.03 |

| **ROAMER AIRTIME SUBTOTAL** | | **(706)506-1457** | | | | **9.0** | **5.40** |
| | | **TOTAL ROAMER AIRTIME** | | | | **17.0** | **10.20** |

## ER TOLL CHARGES

**6) 506-1457**
CHARGES INCURRED WHILE ROAMING IN ANNISTON,AL (A)

| DATE | TIME | TO/FROM LOCATION | | NUMBER CALLED | FEAT | MIN | CHARGE |
|---|---|---|---|---|---|---|---|
| 01/05 | 12:42P | ROME | GA | 706 232 4031 | | 2.0 | 0.80 |
| 01/05 | 1:40P | ROME | GA | 706 232 4031 | | 4.0 | 1.60 |

| **ROAMER TOLL SUBTOTAL** | | **(706)506-1457** | | | | **6.0** | **2.40** |

**(706) 506-1457**
CHARGES INCURRED WHILE ROAMING IN SCOOTEBORO,AL (A)

| DATE | TIME | TO/FROM LOCATION | | NUMBER CALLED | FEAT | MIN | CHARGE |
|---|---|---|---|---|---|---|---|
| 01/11 | 1:44P | ROME | GA | 706 234 8303 | | 1.0 | 0.40 |
| 01/12 | 11:27A | ROME | GA | 706 234 8303 | | 3.0 | 1.20 |

| **ROAMER TOLL SUBTOTAL** | | **(706)506-1457** | | | | **4.0** | **1.60** |
| | | **TOTAL ROAMER TOLL** | | | | **10.0** | **4.00** |

---

| TAXES AND/OR SURCHARGES | CHARGE |
|---|---|
| FEDERAL EXCISE TAX | 3.29 |
| STATE TAX | 2.13 |
| LOCAL OPTION TAX | 0.53 |
| FED UNIV FUND CHARGE | 0.10 |
| **TOTAL TAXES AND/OR SURCHARGES** | **6.05** |

STATE, LOCAL OPTION, SPECIAL, EDUCATION AND HOMESTEAD TAXES ARE CHARGED ONLY ON THE MONTHLY ACCESS FEE.  IF YOU HAVE A SERVICE PLAN WHICH INCLUDES AIRTIME WITH THE MONTHLY ACCESS FEE, THE CHARGE FOR TAXES IS THE LESSER OF THE ACCESS CHARGE OR $20.00.  IF YOU DO NOT HAVE A SERVICE PLAN WITH INCLUDED AIRTIME, THE APPLICABLE ACCESS FEE IS SET FORTH ON THE ACCOUNT SUMMARY PAGE.

### FEATURE CODE LEGEND

3-WAY = THREE WAY CALLING     WAITG = CALL WAITING     FORWD = CALL FORWARDING

**DEFENDANT'S EXHIBIT**



**AIRTOUCH™**
Cellular

This page intentionally left blank.

**AIRTOUCH™**
Cellular

**HOW TO REACH AIRTOUCH**
If you have a question, please call your Customer Service Representative at the number shown on your bill. Customer service calls may be monitored to ensure service quality. Please use the following address for all written correspondence:

AIRTOUCH CELLULAR
P.O. Box 468569
Atlanta, Ga 31146-9929

Specific sections of your monthly statement are outlined below with an explanation.

- **Previous Balance** - Charges billed on prior services for which payments have not been received.

- **Payments** - Payments received and posted by AirTouch prior to the invoice date. Multiple payments appear as a single amount.

- **Previous Unpaid Balance Due** - Previous month's balance after payment has been applied.

- **Late Charge** - Payments received more than 30 days after payment due date will incur a late charge.

- **Monthly Access** - A Fixed monthly fee charged in advance for access to the cellular network. Monthly access is charged for each mobile unit. Access is prorated to cover initial month of services.

- **Custom Calling Features** - The following Custom Calling Features are provided to you automatically, at no additional monthly charge. Call Waiting, Call Forwarding, Busy Transfer  Additional airtime may apply.

- **Other Charges & Credits** - This section of the bill includes any credits or debits issued during the prior billing period.

- **Airtime Usage** - Charges incurred for actual time used in either placing or receiving calls during the billing period. Usage on each call is rounded up to the next minute for billing purposes. You pay for the time used while making calls on the cellular network. This includes the length of your conversation and the additional seconds it takes to set up and disconnect  your call from the network.

- **Additional Service Charges** - Charges for all calls to directory assistance will appear in this section.

- **Service Area Charges** - Charges resulting from calls placed to destinations outside the AirTouch Cellular Service, but within the Southern Bell calling areas.

- **Roamer Airtime Charges** - The airtime charges for use of a system outside your home service area.

- **Roamer Toll Charges** - The long distance charges incurred while roaming on a system outside your home service area.

- **Long Distance Toll** - Charges for 1 + dialing using AirTouch Long Distance service.

- **Taxes and Fees** - The following tax items will appear on your bill only when tax charges are incurred: federal excise tax, state/county sales tax.

- **Total Amount Due** - Amount due and payable to AirTouch Cellular upon receipt of bill by the customer.

- **Attention: TTY Users.** Currently available digital wireless phones do not work with TTY devices even to make 911 calls. A number of wireless analog phones are available that are compatible with many TTY devices.  A TTY is a special text telephone for those with hearing or other disabilities.

DEFENDANT'S EXHIBIT THREE



IN THE MAGISTRATE COURT OF FLOYD COUNTY

STATE OF GEORGIA

THE STATE

vs.

JOSEPH SAMUEL WATKINS
TIMOTHY MARK FREE

*    NO:   00WR16352A
*              00WR16352B
*
*    CHARGE:   Murder
*

---

## APPEARANCES OF COUNSEL

Bobby Lee Cook, Esq.
L. Branch S. Connelly, Esq.
Rex Abernathy, Esq.

William O'Dell, Esq.

ALSO PRESENT:   Christina Wright

---

The EXAMINATION UNDER OATH of JOSHUA BRYAN FLEMISTER;

before Lenora M. Duck, Certified Court Reporter and Notary

Public:   Commencing at 1:10 p.m.; Monday, January 22,

2001; in the offices of Cook & Connelly; 128 South

Commerce Street; Summerville, Georgia.

---

*Lenora M. Duck*
*Certified Court Reporter*
*6667-A Martha Berry Highway*
*Armuchee, Georgia  30105*
*(706) 235-1765*

1         MR. COOK:  This is going to be the sworn

2   statement of Mr. Josh Flemister taken in my office,

3   the offices of Cook & Connelly, on January the 22nd,

4   2001, beginning at 1:10 p.m.  Present, of course, is

5   the court reporter, Lenora Duck; Mr. Rex Abernathy;

6   Mr. Bill O'Dell; and Christina Wright; and myself; and

7   Mr. Connelly, my partner.

8   ---------------------------------------------------------------

9   WHEREUPON, AFTER FIRST HAVING BEEN DULY SWORN, JOSHUA BRYAN

10  FLEMISTER TESTIFIED AS FOLLOWS:

11                EXAMINATION:  By Mr. Cook

12     Q:   Josh, my name is Bobby Lee Cook, and I am a

13  lawyer that works with Mr. O'Dell, and Mr. Abernathy, and

14  Mr. Connelly, of course.  And all of us are interested in

15  and represent Joseph Samuel Watkins, a defendant who is

16  charged presently with murder of Isaac Dawkins.  And I'm

17  going to ask you a number of questions.  If you will, speak

18  up loudly and clearly in answering my questions, I will

19  appreciate it.  Okay?

20        MR. CONNELLY:  Mr. Cook, I need the record to

21  reflect Bill represents a separate individual.

22        MR. O'DELL:  Mark Free.

23     Q:   Yes.  Mr. O'Dell represents Timothy Mark Free.

24        MR. CONNELLY:  It is separate.  He is here as,

25  obviously, an interested party.

                         2

1    Q:   (Mr. Cook)  But don't nod your head.  Answer out.

2  Will you do that?

3    A:   Yeah.

4    Q:   Okay.  What is your full name.

5    A:   Joshua Bryan Flemister.

6    Q:   And where were you born, Joshua?

7    A:   Here in Rome.  Rome, Georgia.

8    Q:   What is the date of your birth?

9    A:   6/10/80.

10   Q:   How old are you now?

11   A:   Twenty.

12   Q:   How old?

13   A:   Twenty.

14   Q:   Twenty.  Tell me a little bit about your

15  education, how far you went in school.

16   A:   I made it to the second semester of my senior

17  year, and I got kicked out.

18   Q:   Second semester of your senior year where?

19   A:   Model High School.

20   Q:   At Model High School.  So you almost graduated.

21   A:   Yes.

22   Q:   And when was it that you got that far in school?

23   A:   About two years ago.

24   Q:   And what have you been doing since then?  Have

25  you been working?

3

1   A:   Been working off and on.

2   Q:   What type of work have you been doing?

3   A:   I tile floors, building schools.

4   Q:   Now, I understand that -- and I'm not trying to

5 embarrass you, but I thought that maybe you had a drug

6 problem at one time.   Is that correct?

7   A:   Yes.   I still do.

8   Q:   What kind of drugs did you take?

9   A:   Pretty much all of them.   Not the heavy ones, but

10 -- you know.

11   Q:   Okay.   You're not on any drugs today, are you?

12   A:   No.

13   Q:   Do you know why you're here today?

14   A:   Yes.

15   Q:   In your own words, tell us why you're here.

16   A:   Because the statement that I've already gave I

17 lied about, and I'm here to straighten it out.

18   Q:   That statement that you gave to who?

19   A:   Stanley Sutton, Bill Shiflett, and the other

20 Shiflett.   I guess there's two Shifletts.

21   Q:   Until today had you ever met me?

22   A:   No.

23   Q:   Had you and I even spoken before you sat down in

24 that chair and took an oath?

25   A:   No.

4

1     Q:   What about Mr. Abernathy?  Did you know Mr.

2 Abernathy before today?  The gentleman here (indicating).

3     A:   No.

4     Q:   Did you know Mr. Connelly, my partner, before

5 today?  My law partner.

6     A:   No.

7     Q:   But I believe you do know Mr. O'Dell.  You knew

8 him before today.

9     A:   One time.

10     Q:   One time.  You understand that all I want you to

11 do and all any of us want you to do is to just tell us the

12 truth.  Do you understand that?

13     A:   Yes.

14     Q:   No one has offered you any money or any reward

15 for being here to give this statement.

16     A:   No.

17     Q:   And you are here on your own free will to do what

18 you feel is right, to correct a false statement that you

19 gave to Stanley Sutton and Mr. Bill Shiflett; is that

20 correct?

21     A:   Yes.  Yes.

22     Q:   And the false statement that you gave, it was in

23 connection with the murder charges against Joseph Watkins

24 and Timothy Free; is that correct?

25     A:   Yes.  Yes.

5

1    Q:  Do you know Joseph Watkins?

2    A:  Yes.

3    Q:  Do you know Timothy Free?

4    A:  A little bit.

5    Q:  How long have you known Joseph Watkins?

6    A:  Three or four years.

7    Q:  And in what capacity do you know him; and do you

8  consider him a close friend, a moderate friend, or an

9  acquaintance, or what?

10    A:  He was one of my best friends.

11    Q:  One of your best friends.

12    A:  And how were you and Joseph Watkins acquainted?

13    Q:  How did we meet?

14    A:  Yeah.  He used to live right up the street from

15  me when I moved down here.

16    Q:  Okay.  You've known him how long?

17    A:  Three or four years.

18    Q:  I asked you did you know Mr. O'Dell, and I

19  believe you said that you had seen him on one occasion.

20    A:  Yes.

21    Q:  Would you tell us what that occasion was and how

22  it came about that you saw Mr. O'Dell.

23    A:  It was last week.  And he wanted to talk to me

24  about the statement I had given.

25    Q:  He wanted to talk to you about the statement you

6

1  had given.  You are talking about the statement to Mr.

2  Sutton and to Mr. Shiflett.

3     A:   Yes.

4     Q:   Did he contact you, or did you contact him?

5     A:   I was contacted.

6     Q:   Beg your pardon.

7     A:   I was contacted.

8     Q:   And how were you contacted?

9     A:   Through Christina.

10     Q:   By telephone?

11     A:   Yes.

12     Q:   And what did he say in the telephone

13  conversation, as best as you can remember it.  I don't mean

14  word for word, but generally speaking.

15     A:   That he just wanted to meet with me to clear

16  up a --

17     MR. ABERNATHY:  Mr. Cook, for the record, I

18     believe he said Christina contacted him by telephone,

19     not Mr. O'Dell.

20     MR. COOK:  Who?

21     THE WITNESS:  Christina.

22     MR. COOK:  Oh, Christina contacted you by

23     telephone.  I beg your pardon.  Thank you, Rex.

24     Q:   (Mr. Cook)  Christina contacted you by telephone

25  and told you that Mr. O'Dell wanted to speak with you about

<center>7</center>

1    the case.

2          A:    (The Witness)   Yes.

3          Q:    Then did you contact Mr. O'Dell?

4          A:    No.  I went down there.

5          Q:    You walked into his office.

6          A:    Yes.

7          Q:    Unannounced?

8          A:    It was pretty much like a meeting a set up.

9          Q:    But Christina had made the arrangements for you

10   to see him.

11         A:    Yes.

12         Q:    Christina is your girlfriend?

13         A:    No.

14         Q:    Okay.  All right.

15         A:    Just a friend.

16         Q:    Who is Christina?

17         A:    She's a friend.

18         Q:    She's a friend.  Well, she's a pretty friend.

19   And then, you walked into Mr. O'Dell's office.

20         A:    Yes.

21         Q:    When would that have been?  Today is January the

22   22nd.  How long ago would that have been that you went to

23   Mr. O'Dell's office?

24         A:    The end of last week.  Thursday, Friday.

25         Q:    In the daytime?

8

1  A: Yes.

2  Q: And who was there when you talked to Mr. O'Dell?

3  A: Just the three of us:  Christina, me, Mr. O'Dell.

4  Q: Did Mr. O'Dell promise you anything?

5  A: No.

6  Q: Did he threaten you in any way?

7  A: No.

8  Q: And were you sober then?

9  A: Yes.

10  Q: You were not on drugs?

11  A: No.

12  Q: And you were not under the influence of alcohol

13 or any other mind-altering substance?

14  A: No.

15  Q: All right.  And how long did you talk to Mr.

16 O'Dell?

17  A: Thirty, 45 minutes.

18  Q: And that was a question and answer session,

19 somewhat such as this, but he didn't have a court reporter

20 present.

21  A: Yes.

22  Q: And I take it that the answers that you gave to

23 Mr. O'Dell's questions were true and accurate.

24  A: Yes.

25  Q: And truthful in every respect.

1      A:   Yes.

2      Q:   All right.  And then, after that, have you talked

3  to him again after that?

4      A:   No.

5      Q:   Tell me, if you will, the first time that you

6  were contacted by either Mr. Stanley Sutton or by Mr. Bill

7  Shiflett, or both of them together.

8      A:   Tommy Shiflett actually came to my house.  I'm

9  not sure on the exact date, but it was before I started

10  working out of town.

11     Q:   Tommy Shiflett, who is he with?

12     A:   He's with Stanley Sutton, same office.

13     Q:   All right.  And who is Bill Shiflett with?

14     A:   Same office.

15     Q:   And when did Tommy Shiflett come to your house,

16  approximately?

17     A:   He said he was coming as a friend and not as a

18  police officer, but I don't know the exact date.  We had

19  just --

20     Q:   How long ago would it have been approximately

21  from today backwards?

22     A:   Could have been four to five months.

23     Q:   Okay.

24     A:   Because I've been working out of town.

25     Q:   You remember that Mr. Dawkins, that Isaac Dawkins

10

1  was killed on January the 11th of 2000.

2      A:   Yes.

3      Q:   That was on a Tuesday.

4      A:   Yes.

5      Q:   And it would have been four or five or six months

6  ago that Tommy Shiflett came to your house.

7      A:   Yes.

8      Q:   Did he call you, make an appointment with you?

9      A:   He tried to contact me many times, but I wouldn't

10 ever return his calls.

11     Q:   Tried to do what?

12     A:   He tried to contact me through my dad, through my

13 dad's girlfriend, and many times; and I wouldn't ever

14 return his call.

15     Q:   So, until he showed up at your house, you

16 personally had never talked to him.

17     A:   No.

18     Q:   What did your dad say?  Did your dad say he

19 talked to him?

20     A:   Yeah.  He said he wanted to talk to me about a

21 lot of things, but he said what.

22     Q:   And what did your dad tell you?  Did your dad

23 tell you to talk to him?

24     A:   Yeah, he told me to talk to him; but I didn't.

25 Not until they showed up at my house.

1    Q:   So Tommy Shiflett came to your house.   And was

2  anyone with Tommy Shiflett?

3    A:   No.  He said he was coming as a friend to the

4  family.

5    Q:   By himself?

6    A:   Yeah.

7    Q:   And tell me when he got there, the best that you

8  can remember, exactly what he said.

9    A:   He just said that he wanted me to come downtown

10  and talk about the Isaac Dawkins killing.

11    Q:   Okay.  And what did you say?

12    A:   I told him I'd have to get a shower and that I'd

13  ride down there.

14    Q:   Do what?

15    A:   I told him I'd have to get a shower, and then I'd

16  ride down there.  And he gave us gas money to go down

17  there.

18    Q:   He gave you what?

19    A:   He gave a friend of mine gas money so we could

20  make it to the police station.

21    Q:   And who was the friend that he gave the gas money

22  to?

23    A:   Daniel Hammond.

24    Q:   Daniel who?

25    A:   Hammond.

12

1     Q:   And was Daniel Hammond there when you were having

2  the conversation with Tommy Shiflett?

3     A:   At my house?

4     Q:   Yes.

5     A:   Yes, but he sat out in the lobby at the station.

6     Q:   Sat out in the lobby.  He did not hear the

7  conversation?

8     A:   No.

9     Q:   I take it it was a short conversation.

10    A:   Yeah.

11    Q:   There at the house.

12    A:   Yeah, it was pretty quick.

13    Q:   Was that in the daytime or the nighttime?

14    A:   Daytime.  It was in the morning.

15    Q:   In the morning.  Did you go down to the police

16  headquarters?

17    A:   Yes.

18    Q:   Where is the police headquarters located?

19    A:   Behind Broad Street.

20    Q:   And who did you see there?

21    A:   I saw Stanley Sutton, Tommy Shiflett, and Bill.

22    Q:   Bill Shiflett, Tommy Shiflett, and Stanley

23  Sutton.

24    A:   I'm not sure that Bill's last name is Shiflett.

25  I just know his first name is Bill.

<center>13</center>

1        Q:   Okay.  But Bill somebody?

2        A:   Yeah.

3        Q:   And did you go in a room?

4        A:   Yeah.  I went in Stanley's office.

5        Q:   Just the three people -- those three and yourself

6   in the room?

7        A:   Well, in the office, in Stanley's office, it was

8   just Tommy, and Stanley, and me.

9        Q:   Tommy and who?

10       A:   Stanley and me.

11       Q:   Tommy?

12       A:   Shiflett.

13       Q:   Shiflett.

14       A:   Stanley Sutton.

15       Q:   And Sutton.  This Bill was not there?

16       A:   No.

17       Q:   All right.  And who did the talking?

18       A:   They asked me a bunch of questions.

19       Q:   Yeah.

20       A:   Said that I knew something, that I needed to tell

21   them what I knew.

22       Q:   What did they tell you that they thought you

23   knew?

24       A:   They just said that I knew something about this

25   case that would help it out.  I kept telling them I didn't

14

1  know anything.

2        Q:    You told them you didn't know anything.

3        A:    Uh-huh.

4        Q:    How long did the conversation last?

5        A:    Before they took me in the other room where the

6  tape recorder was?

7        Q:    Uh-huh.

8        A:    Maybe 20 minutes.

9        Q:    And did you keep on telling them that you didn't

10  know anything about the killing?

11        A:    Yeah.

12        Q:    And what did they say to you?

13        A:    They said that they thought I was lying.

14        Q:    Thought you were lying.

15        A:    Because everybody had come to them and told them

16  that if anybody was going to say anything that he would

17  have said it to me, if Joey's was going to say anything.

18  And they kept saying that I knew something.

19        Q:    All right.  And that lasted about how long?

20        A:    Probably about 30 minutes.

21        Q:    And during that period of time, you denied

22  knowing anything about the case.  And then, you say you

23  went in another room?

24        A:    Yeah.

25        Q:    How did that come about?

15

1      A:   They wanted to get my statement on tape.

2      Q:   Wanted to get it on tape that you didn't know

3  anything?

4      A:   Yeah.

5      Q:   And then you got in the other room.   Who was in

6  the other room?

7      A:   Bill was there.   Tommy Shiflett was there.

8  Stanley Sutton was in there.   And then, they had some other

9  lady standing at the door.   While the actual tape recorder

10 was going on, it was just me and Stanley -- or Tommy.

11     Q:   The tape recorder, where did they put the tape

12 recorder?

13     A:   It was in the middle of the table.

14     Q:   And who was there when the tape recorder was

15 turned on?

16     A:   The first time, it was just me and Tommy

17 Shiflett.

18     Q:   Just you and Tommy Shiflett?   Where was Stanley

19 Sutton?

20     A:   I guess they were running around in the hallway,

21 because the door was shut.   But when they played it back,

22 everybody came in there.

23     Q:   So who asked the questions?

24     A:   Tommy did.

25     Q:   And how long did the tape recording last?

16

1    A:    Probably about 15, 20 minutes; but it felt like

2  30.

3    Q:    And in the tape recording that was made, in the

4  room, did you deny that you knew anything about the

5  killing?

6    A:    About the killing, yeah.

7    Q:    What did you say?

8    A:    They were just like asking me questions.  I mean

9  I really don't remember what was asked or what was said.

10   Q:    What kind of questions would they ask?

11   A:    About the dog, about the dog getting killed, and

12  about other little things.

13   Q:    About the dog getting killed.  Were you doped up

14  then?

15   A:    I had -- I was drinking.  And they said they

16  smelled alcohol on me.  And I was on Xanaxes.

17   Q:    You were drinking.  What were you drinking?

18   A:    Beer and alcohol.

19   Q:    And you were on Xanax.  How much Xanax had you

20  taken?

21   A:    Two purples -- two blues.

22   Q:    What?

23   A:    Two blues.

24   Q:    Two blues.  When had you taken them?

25   A:    That morning when we got up.

17

1    Q:    Do you remember what was said there?

2    A:    Where at?

3    Q:    In that room when the tape recorder was on.

4    A:    No, not really.  I don't really remember the

5  exact questions that were asked.

6    Q:    Do you remember anything that they said?

7    A:    They said they appreciated my help.

8    Q:    Said what?

9    A:    Like they appreciated me coming forward or

10 something.

11   Q:    Appreciated you coming forward?

12   A:    Yeah.

13   Q:    What did they ask you?

14   A:    Just questions about Joey.

15   Q:    Do you remember any of the questions they asked

16 you, generally?

17   A:    No.  They wanted to know about Joey and Mark and

18 other people.

19   Q:    Did you tell them that you knew anything about

20 the killing?

21   A:    I told them I didn't know anything about it.

22   Q:    You told them that time while the tape recorder

23 was on you denied that you knew anything about the killing.

24   A:    Yes.

25   Q:    They were telling you things about the killing;

18

1  right?

2        A:    In Virginia, like --

3        Q:    No, no.  Let's don't go to Virginia yet.

4        A:    Oh, then.  No, no.

5        Q:    All right.  Okay.  So, in this conversation, you

6  denied that you knew anything about the killing?

7        A:    Yes.  They did show me pictures of the wreck, of

8  the truck.

9        Q:    Showed you pictures of the truck?

10       A:    Yes.  And the highway that it took place on.

11       Q:    Who showed you that?

12       A:    That was when I was in Stanley's office with him

13  and Tommy.  They showed me the pictures, and then they

14  showed me the reward thing and truck.

15       Q:    After the -- you say the recording session where

16  they had the recorder, tape recorder, on the table, that

17  lasted 15, 20 minutes.

18       A:    Probably.

19       Q:    And Tommy Shiflett was the only one there talking

20  to you at that time.

21       A:    Yes.

22       Q:    Then did you say a minute ago that the others

23  came in when they played it back?

24       A:    Yes.  The door stayed open and everybody stood

25  around listening.

19

1     Q:    And Stanley Sutton came in.

2     A:    Yes.

3     Q:    And this Bill came in, and the lady came in.

4     A:    Yeah.

5     Q:    And there wasn't any taping done then.

6     A:    No.

7     Q:    And what did they do:  Play the tape back?

8     A:    Yeah, to see if they had asked everything they

9  wanted to ask.

10    Q:    And what do you remember the conversation was

11 then?

12    A:    After the tape had been played?

13    Q:    Uh-huh.

14    A:    Really wasn't much conversation.  They changed

15 the subject to the shirt I had on and started taking

16 pictures and stuff.

17    Q:    Took pictures of you?

18    A:    They kind of made like little jokes and stuff,

19 because I had like a crazy shirt on that said something.

20 And they wanted Stanley Sutton to put it on so they could

21 get pictures with him in the shirt.

22    Q:    What did the shirt say?

23    A:    From what I remember, it said, "I'd rather be

24 masturbating."  It's a shirt I had bought in Town Center.

25    Q:    Well, that would fit Mr. Sutton pretty well;

20

1  wouldn't it?

2       A:    I don't know.

3       Q:    Then did you leave then?

4       A:    Yes.

5       Q:    At that time, were you threatened?

6       A:    I kind of felt threatened from the beginning,

7  because I didn't know anything, and they kept coming to me

8  saying that I knew something, that everybody keeps telling

9  them I know something.  They kept coming back.

10      Q:    After that, you left and went home?

11      A:    Yes.

12      Q:    When was the next time that you saw or heard from

13 either of these individuals?  That is, Stanley Sutton,

14 Tommy Shiflett, Bill, or the lady, or any other law

15 enforcement officers?

16      A:    Tommy had called my house a few times leaving his

17 pager number saying that I needed to contact him again and

18 that he wanted to talk to me again or something; if I ever

19 come up with anything else, I needed to call him.  He left

20 that through my dad, though.  Or through somebody in my

21 house.

22      Q:    But you didn't have a conversation with him?

23      A:    No.

24      Q:    When was the next time that you personally saw or

25 met with or talked to any of these individuals that you've

21

1   just named?

2        A:    When the three of them come up to Virginia.

3        Q:    What were you doing in Virginia?

4        A:    I was working.

5        Q:    What part of Virginia was it?

6        A:    It was right outside of Richmond.   It was a -- I

7   can't remember.   It was a couple of exits past Richmond.

8        Q:    Couple of what?

9        A:    Exits past Richmond.

10       Q:    And what period was that, time-wise?

11       A:    It was right after we got off work.   I guess it

12  had just got dark.   About eight or nine.

13       Q:    Where were you working?

14       A:    We were working on a Bojangle's.

15       Q:    On a what?

16       A:    It's a restaurant, doing tile floors.

17       Q:    Who were you employed by?

18       A:    Wilson Tile.

19       Q:    Who?

20       A:    Wilson Tile.

21       Q:    Wilson Tile?   Out of Rome?

22       A:    Yeah.

23       Q:    Yeah.   I know Wilson Tile.   And how long had you

24  been in Virginia working at this job?

25       A:    Probably about a week.

                              22

1    Q:   About a week.  And did you know they were coming,

2  or did they just show up?

3    A:   No.  They showed up.  And they had watched us

4  work all day and everything else.  And then, as soon as I

5  sat down in my hotel room, they stormed the room and asked

6  me to come with them.

7    Q:   They did what?

8    A:   They barged into the room and asked me to come

9  with them.

10    Q:   You were in a hotel room?

11    A:   Yes.

12    Q:   What was the hotel?

13    A:   Best Western.

14    Q:   What?

15    A:   I think it was a Best Western.

16    Q:   Best Western.  And that was where?

17    A:   In Virginia.

18    Q:   What part of Virginia?

19    A:   Right outside of Richmond.

20    Q:   Outside of Richmond.  And you say they busted

21  into the room.

22    A:   Well, everybody else was still getting out of the

23  trucks.  And they come up asking where I was at.  And then,

24  they came into my room and asked me to come with them.

25    Q:   Did you knock on the door?

23

1       A:   The door was open.   And Tommy come in there

2   screaming, "Where's Josh Flemister at?   We need to talk to

3   him."

4       Q:   And who was in the room when Tommy came in

5   screaming?

6       A:   Two other people I work with.

7       Q:   And who were those people?

8       A:   Mickey and Kojak.

9       Q:   Who?

10      A:   Mickey and Kojak.

11      Q:   Kojak.   Do you know their last names?

12      A:   No.

13      Q:   Were they from Rome?

14      A:   Yes.

15      Q:   Okay.   And was Tommy Shiflett the only one you

16   saw right at that moment?

17      A:   Yes, at the beginning, till I walked out of the

18   room.

19      Q:   Where were the others?

20      A:   Stanley was sitting, talking to my boss.   And

21   then, I guess Bill was in the back seat of the car.

22      Q:   What happened then?

23      A:   They asked me to go to the hotel room with them

24   and talk to them.

25      Q:   Go to their hotel?

24

1    A:   Yeah.  Which was right across the street, because

2  they wanted me to hear some tapes they had brought with

3  them.

4    Q:   Okay.  And what did they say to you?  Did you go

5  to the hotel room?

6    A:   Yes.

7    Q:   And that was Bill, Tommy, and Sutton?

8    A:   Yes.

9    Q:   About what time of the day or night was that?

10    A:   Eight-thirty, nine-thirty.  It was in between,

11  because I had just got off work, just got back in my room.

12    Q:   Now, today is January the 22nd, 2001.  About how

13  far back was that that they came to Virginia?  Do you

14  remember the month?

15    A:   I don't remember the month.  I'd say about two or

16  three months ago.

17    Q:   About two or three months ago.  November the

18  11th; does that sound like a right date?

19    A:   Yes.

20    Q:   All right.  And tell me as best as you can

21  remember, Joshua, what happened in the room.  Who said

22  what, and who did most of the talking?

23    A:   They pretty much all talked at me.  And they kept

24  telling me that depending on what I said would depend on

25  whether or not when I got back into Rome whether they would

25

1   take a warrant out for my arrest or not.

2        Q:   Okay.

3        A:   And, you know, what I said, when I got to the

4   room, then they started asking me questions.  And after

5   they asked me a lot of questions, they put it on the tape.

6        But they kept saying, "Tell us what we want to know,

7   and we'll take you back to your hotel room."

8        Q:   They said what?

9        A:   "Tell us what we want to know, and we'll take you

10  back to your hotel room."

11       Q:   Who said that?

12       A:   They all three did.  They kept saying, "Tell us

13  what we want to know, and we'll take you back."

14       Q:   What did they want to know?

15       A:   Apparently, they wanted to know something I

16  didn't know.  So what I told them I made up so I could go

17  back to my room.

18       Q:   What did they tell you they wanted to know?

19       A:   They wanted to hear that Joey and Mark had done

20  it.  And I mean I don't know what they wanted to hear, but

21  I guess they wanted me to say that I knew that they did it,

22  but --

23       Q:   Were you afraid that they were going to arrest

24  you if you didn't lie to them?

25       A:   Yeah.  Yeah.

26

1    Q:   Did they tell you that if you didn't tell them

2  what they wanted to hear that they were going to arrest

3  you?

4    A:   They said that if depending on what I said or

5  what I didn't say that a warrant could be served for my

6  arrest by the time I got back to Rome.

7    Q:   Okay.  And then, they turned on a tape recorder?

8    A:   Yes.

9    Q:   And then, what happened?

10    A:   I pretty much made up a story.

11    Q:   What story did you make up?

12    A:   I told them I was in the truck.

13    Q:   Told them you were in which truck?

14    A:   Or in a car, whatever it was.

15    Q:   In the car or truck with whom?

16    A:   Joey and Mark.

17    Q:   Was that a complete, total fabrication and lie?

18    A:   Yes.

19    Q:   Did you even know what truck or car they were in?

20    A:   No.

21    Q:   Did they tell you?

22    A:   No, I just said it was a truck.

23    Q:   What else did you tell them?

24    A:   I told them that -- the asked me what happened

25  afterward.  And I told them that the truck went off into

27

1    the woods.

2         And then, they stopped the tape, and they were like,

3    "Well, there's no way, because the truck went back across

4    the other side of the road."

5         Q:   So they stopped -- when you told them that, they

6    stopped the tape.

7         A:   They were stopping the tape off and on.

8         Q:   Stopping it off and on.   And you remember

9    distinctly when they stopped the tape then; then they told

10   you there was no way that could have happened because of

11   what?

12        A:   The truck went to -- because I said the truck

13   went on the right side of the road.   And they said that if

14   flew back across the other side.

15        Q:   All right.   And did they turn the tape back on?

16        A:   Yes.

17        Q:   Did they frequently turn the tape off and on?

18        A:   Yes.

19        Q:   When they would turn the tape off, would they

20   tell you that you had made a mistake, that it needed to be

21   corrected, that it couldn't have happened that way?

22        A:   Maybe once.   Maybe twice.   I mean I know it

23   wasn't more than that.   See, when they played the tapes for

24   me that they had brought with them, they didn't play but

25   one tape, and they didn't even play the whole tape, because

                                28

1  they played so much of it, and then they stopped it and

2  said -- they said that the two confessions they had had

3  from somebody else --

4      Q:   Two what?

5      A:   The two confessions they had had from somebody

6  else on the tape that they brought with them, that they had

7  said that if Joey got in trouble, I said that I would have

8  been in trouble.

9      Q:   You said what?

10     A:   Two people on the tape that they brought, they

11 told me that they said that if Joey got in trouble, I

12 turned around and said I would get in trouble, too.

13     Q:   What tape did they play for you?

14     A:   I think they played Lacy Lambert's tape.

15     Q:   Lacy.  Is that a boy or girl?

16     A:   That's a girl.

17     Q:   Lacy Lambert.  And who else?

18     A:   The other tape was Shana Walker, but they didn't

19 play it.

20     Q:   Lacy Lambert.  And who is Lacy Lambert?

21     A:   They were just two girls -- there was actually

22 three of them.  But two of them, we used to go to their

23 house all the time and get drunk and smoke.

24     Q:   What did Lacy Lambert say on the tape that you

25 heard?

29

1     A:   They didn't play the whole thing.

2     Q:   What part of it did they play?

3     A:   They just played maybe the first five minutes.

4     Q:   And what did she say, best as you can remember?

5     A:   Really, I don't know, because I had been doing

6  what I usually do every day.  And that's smoking and

7  drinking.  Or not drinking, but smoking.

8     Q:   On the day you made your statement, you had been

9  smoking marijuana?

10    A:   Yes.

11    Q:   Pretty heavy?

12    A:   All day long.

13    Q:   What?

14    A:   All day long.

15    Q:   All day long.

16    A:   And I don't see how they didn't see that, because

17 they said that they sat there and watched us work, because

18 they said that we worked real hard.

19    Q:   They said what?

20    A:   They told us -- they told me that we worked real

21 hard all day long.  So I don't see how they wouldn't have

22 saw that.

23    Q:   So, if they watched you all day long, they would

24 have seen you smoking marijuana?

25    A:   Yeah.

30

1    Q:   Were you pretty much out of it?

2    A:   Yeah, I pretty much stay out of it.

3    Q:   When I say out of it, do you even remember

4 everything that you said?

5    A:   Huh-uh (indicating negative).

6    Q:   Did you tell them that you had been smoking

7 marijuana that day?

8    A:   No.

9    Q:   How long did the conversation last?

10    A:   Maybe an hour, hour-and-a-half.

11    Q:   Did you tell them that you saw the shooting?

12    A:   Yes.

13    Q:   And what did you tell them?  Do you remember what

14 you told them?  Best you can remember.

15    A:   Like I said, I just told them that I was in the

16 car, and I didn't know nothing about the gun till somebody

17 slipped up and said, well, Mark had a nine millimeter and

18 the other gun.  And I knew that the other gun was a .22

19 because of rumors that were going around.  So that's pretty

20 much what I put in it.

21    Q:   So, you were told that -- they told you that it

22 was a nine millimeter?

23    A:   Yeah.  They slipped up and -- Tommy was talking

24 to Stanley and said something about it.  And that's where I

25 got that from.

31

1    Q:   Did you even know what kind of gun it was before
2   they told you?

3    A:   I was never certain on any gun.

4    Q:   What?

5    A:   I was never certain on any gun, except what I had
6   heard from a .22 -- about a .22.

7    Q:   And that conversation last how long?

8    A:   Maybe an hour, hour-and-a-half.  I know I was
9   gone for a good while from my hotel room.  When I got back,
10   half the beer was gone, so I know I was gone for a pretty
11   good while.

12    Q:   Did there come a point in time to where you got
13   concerned about the fact that you had lied about something
14   this important?

15    A:   Yes.

16    Q:   When was that?

17    A:   When I got back into town.

18    Q:   When what?

19    A:   When I got back in town.  See, up there, they
20   kept telling me that, you know, no matter what I said, if
21   anybody got arrested, it wouldn't be on my statement.  But
22   I get back in town, and I hear that they had got locked up,
23   and that it was based on what I had said.  And they told me
24   it didn't matter what I said, they were going to be locked
25   up anyway soon as they got back in town.

32

1    Q:   Did any of them at this meeting in Virginia ever

2  tell you that they had been listening to people talking on

3  the telephone?

4    A:   Yes.   They told me they had telephone recordings

5  of me talking with Samantha Dawkins and Brianne Scarbrough.

6    Q:   Talking with who?

7    A:   Brianne and Samantha.

8    Q:   Did they tell you about any other conversations

9  that they had been listening to on the telephone?

10   A:   No.

11   Q:   Was the conversation with Lacy Lambert, was that

12  on a telephone conversation?

13   A:   No.   That was at the station.

14   Q:   That was at the station.   But they told you they

15  had listened to you talking to who?

16   A:   Samantha and Brianne on three-way.   We were all

17  three on the phone.   That's when I called Samantha's house

18  and said that Joey was --

19   Q:   Did he tell you what you had been saying?

20   A:   No.   Pretty much -- I couldn't remember what I

21  had told them, because I had been drinking that night.   And

22  that's what gave me the idea to call, because she was

23  blaming Joey for it.   So I called and told him that there's

24  no way he could have done it, because he was with me.

25   Q:   How long did you -- when they left, how did they

33

1   leave you?  When did they say to you when you left -- when

2   they left Virginia?

3        A:   I was just real -- you know, I was kind of upset.

4   And they just kept reassuring me of all different things,

5   that it would all work out for the better and stuff like

6   that.

7        Q:   Who was doing most of the talking?

8        A:   Well, Tommy's the only one that -- Tommy, he's

9   the one that drove me back to my hotel room.

10       Q:   What about Sutton?

11       A:   Him and Bill stayed in the room.

12       Q:   And you stayed up there what, a week or 10 days

13   later?

14       A:   Yes.

15       Q:   And then came home?

16       A:   And then came home.

17       Q:   And after you came home, have you talked to them

18   again?

19       A:   No.  I won't talk to them again.

20       Q:   That's the last time you've talked to them?

21       A:   Yes.

22       Q:   Either by phone or otherwise?

23       A:   Yes.

24       Q:   And anything that you may have told them about

25   knowing something personally about the shooting or the

                              34

1    killing of Josh Flemister would have been an absolute,

2    total lie?

3        A:   About Isaac?

4        Q:   I said Flemister.  Isaac.  Isaac Dawkins.

5        A:   Yes.  That whole statement was a lie.  And when I

6    got back from Virginia, I was staying at my grandmother's,

7    and Tommy showed up beating on my door.  I guess he came

8    about four times, but I was asleep, so I never answered the

9    door.  But my grandmother -- my other grandmother called

10   and said I needed to come over there because they wanted to

11   talk to me and they wanted the DA to be there when they

12   talked to me.  So I go into my grandmother's, called them

13   up, got them over there to my grandparent's house across

14   from where my dad lives, and they said -- I got them over

15   there and I told them everything I told them in Virginia

16   was a lie.

17       Q:   You told them that when?

18       A:   When I got back from Virginia.  The day I got

19   back, they come over to my grandmother's house, and I --

20           MR. CONNELLY:  What DA was present; do you know?

21       A:   (The Witness)  I told them not to bring the DA.

22   They were like -- see, when I called Tommy --

23       Q:   (Mr. Cook)  Did they record that?

24       A:   No.

25       Q:   Who was there?

35

1      A:    My grandmother --

2      Q:    When you told them that everything you said in

3  Virginia was a lie.

4      A:    Tommy Shiflett, Bill, my grandmother, my

5  grandfather, my dad, and my little cousins.

6      Q:    Who is your grandfather and grandmother; what's

7  their name?

8      A:    Betty and Harry Flemister.

9      Q:    And what's your dad's name?

10     A:    Glenn Flemister.

11     Q:    And who else was there?

12     A:    My little cousins.  They were too young to --

13     Q:    How old?

14     A:    The oldest one's like 13, but he wasn't even in

15  the room.

16     Q:    How long did that conversation last?

17     A:    Probably about an hour, because I kept trying to

18  tell him that everything I told him in Virginia was a lie,

19  and that I just didn't want to be around them, that if they

20  come all the way from Virginia and -- I just wanted to go

21  back to my room.

22     Q:    What did they say about that?

23     A:    Before they left, they said that I needed to

24  stick to my story that I had already gave them in Virginia.

25     Q:    Did they give you any other information about the

36

1  shooting?

2      A:  No.

3      Q:  And that conversation lasted an hour?

4      A:  Yeah, because they kept asking me why I lied and

5  all this.  And then, at the end, they just said I should

6  stick to what I had already told them.

7      Q:  Said you'd better stick with it?

8      A:  They said I should stick to the story I had

9  already said.

10     Q:  They didn't record any of that?

11     A:  No.

12     Q:  And then, after that, have you had any further

13  contact with them?

14     A:  No.  I won't talk to them.

15     Q:  You have not talked to them since then?

16     A:  No.

17     Q:  Well, let's go back.  Let's go back to January

18  the 11th of 2000, that Tuesday, that Tuesday night.  Do you

19  remember when the killing occurred now?  When did you first

20  hear about the killing?

21     A:  Couple of days later.

22     Q:  What were you doing on the 11th, 2000 -- January

23  11th?  Were you working?

24     A:  See, that was my first day at Red Lobster, and I

25  had worked up until about five.  I got off, went home --

37

1    Q:   Red Lobster where?

2    A:   In Rome.  I went home, stayed there for a little

3 while, and I think I went to a party.  But I've got phone

4 records of where I had hit star 69.

5    Q:   Was that on a cellular phone?

6    A:   No, it was on a cordless phone.

7    Q:   On a what?

8    A:   Cordless phone.

9    Q:   On a cordless.

10   A:   Home phone.

11   Q:   That's what I'm talking about.

12   A:   Yeah.

13   Q:   A cell phone.

14        MR. CONNELLY:   No.

15   A:   (The Witness)  No.  It was a home phone.

16   Q:   (Mr. Cook)  Oh, a home phone.  Okay.  Was that

17 your dad's phone?

18   A:   Yes.

19   Q:   What is that number?

20   A:   It's been changed two other times.

21   Q:   What was it then?

22   A:   234-9799.

23   Q:   234 what?

24   A:   9799.

25   Q:   And you say you hit star what?

38

1      A:    Star 69.   It shows up it came up twice on the

2  phone bill where I had hit star 69.

3      Q:    And when did you hit star 69?

4      A:    I think it said I hit it once in between 6:45 and

5  7:00; then again at 7:15.

6      Q:    You hit it at 7:15 and six when?

7      A:    It was probably about 7:00.   It was in between

8  6:45 and 7:00, because I had went across the street to eat.

9  And I had come back to my dad's and checked to see who the

10 last call was, because I didn't have caller ID.

11     Q:    And your dad has still got those phone records?

12     A:    Yes.

13     Q:    Did you ever tell them that?

14     A:    Yes.

15     Q:    You told Shiflett --

16     A:    Yes, they know.

17     Q:    Tommy Shiflett and Stanley Sutton that?

18     A:    I never talked to Stanley, but Tommy does know

19 that.

20     Q:    When did you tell him that?

21     A:    I think my dad told him the next day.

22     Q:    The next day of when?

23     A:    After they had come to my grandmother's and I

24 told them that I lied.

25     Q:    And what was their reaction about that?

39

1       A:   Very upset.

2       Q:   What?

3       A:   They were very upset.

4       Q:   Very upset.  I bet they were.  Where did this

5  shooting -- has anyone told you where the shooting

6  occurred?  They would had to have told you, or you would

7  had to have found out about it somewhere.

8       A:   They never told me the exact place.  But when I

9  told them in Virginia, I said it was between Floyd College

10 and a certain gas station.  But I never knew the exact

11 spot.

12      Q:   How far away is that from your home, where you

13 were living?

14      A:   Fifteen minutes.  Ten or 15 minutes.  But if you

15 hit red lights, it takes longer than that.

16      Q:   I understand.

17           MR. CONNELLY:  What time exactly were the star

18      69s?

19           THE WITNESS:  I know one of them was at 7:15.

20      But the first one, I'm thinking was at 7:00, because I

21      had just -- I went across the street.  And every time

22      I went across the street and came home -- like, I go

23      eat at my grandparents', and when I come home, I'd

24      always hit star 69 to see who the last person was that

25      called.

                              40

1        MR. CONNELLY:  Now, whose phone?  Was this your

2    granddad's phone, you say?

3        THE WITNESS:  No.  It was my dad's phone.

4        MR. CONNELLY:  Your dad's phone.  Does he use

5    star 69?

6        THE WITNESS:  No.  He got onto me because I used

7    it so much, and it's like 75 cents every time you use

8    it.  And that's all I used to hit, because we didn't

9    have caller ID.

10   Q:   (Mr. Cook)  On this evening, you say you went

11   over to eat.

12   A:   (The Witness)  Yes.

13   Q:   Where did you go eat.

14   A:   My grandparents'.

15   Q:   At your grandparents'.

16   A:   I eat dinner there every night, because they

17   cook.

18   Q:   Eat dinner what?

19   A:   I eat dinner over there every night, because they

20   would cook.

21   Q:   And what time would you have eaten dinner there

22   the night of January 11th, 2000?

23   A:   After I got off work.  Six.  I was probably there

24   from 6:00 to 6:45, and then went home and took a shower and

25   did all the stuff, and then went to a party.

41

1     Q:   Where did you go to a party?

2     A:   There's no telling.  I mean that's a year ago.

3   So, I mean --

4     Q:   I understand.

5     A:  But I mean I know if there was a party, I mean,

6   I'm pretty sure I was there, because I would always have

7   them at my house.

8     Q:   You know nothing about this killing.

9     A:   Just rumors.  Just what everybody thinks that

10   they know.

11     Q:   I understand.  I understand.

12   --------------------------------------------------------------

13              EXAMINATION:  By Mr. Abernathy

14     Q:   Josh, did you ever tell Stanley Sutton or Tommy

15   Shiflett or any of the police that this was done with a

16   nine millimeter?  How did that come about that you knew a

17   nine millimeter was involved?

18     A:   In Virginia, when Tommy said something to Stanley

19   across the room.

20     Q:   What did he say?

21     A:   He just said that Mark had the nine millimeter.

22     Q:   So he told you the nine millimeter was used.

23     A:   He was telling Stanley that, and I heard it.

24     Q:   And you heard it.

25     A:   I was sitting right there.

42

1    Q:   Was that the first you had heard about a nine

2 millimeter?

3    A:   Yes.  I thought it was just a .22.  And that's

4 just from what I had heard from some of the other people.

5    Q:   And that was in Virginia about November the 11th,

6 you think.

7    A:  Yes.  It was when I was in Virginia.

8    Q:   Now, back to this October the 3rd conversation

9 you had in Rome, Georgia, before you went to Virginia,

10 where did you say that took place, down at the police

11 headquarters when they taped you?

12    A:   Yes.

13    Q:   Fifteen or 20 minutes?

14    A:   Yes.

15    Q:   You said after they turned the tape off and

16 everybody came around, they thanked you for helping them.

17 Do you recall how you helped them?  What did you tell them

18 on that occasion?

19    A:   I really -- it's hard to say, because it's like I

20 said, I'd been drinking all night the night before, and

21 that day, too.  They told me they smelled the alcohol on

22 me, so even they knew I was drinking.

23    Q:   Did you ever tell them that Joey Watkins or Mark

24 Free told you they were going to do this?

25    A:   No.

43

1   Q:   Never told them that?

2   A:   No.  They kept asking me if I knew all these

3   people.

4   Q:   What people were they asking you if you knew?

5   A:   They were asking me if I knew a person named

6   Micah, Johnny.  They asked me if I knew Mark.  And they

7   knew I knew Joey.

8   Q:   Did you ever tell them -- was it on this first

9   occasion, or did you ever tell them that Joey Watkins had

10  said to, if they come around asking you questions, say you

11  were with him?  Say he was with you on that night at

12  Boomer's?

13  A:   No.  I think I told them I did that on my own.

14  Q:   You made that up on your own?

15  A:   I did.  I mean I think I told them that.

16  Q:   You told them that on your own?

17  A:   Because I told them I called Samantha when I got

18  drunk and told her that.

19  Q:   You said you were on a three-way with Brianne and

20  Samantha?

21  A:   Yes.

22  Q:   And because Samantha, did you say, because she

23  was accusing Joey --

24  A:   Yes.

25  Q:   -- you had told her he couldn't have done it; he

44

1   was with you?

2       A:   Yes.

3       Q:   And is that how all this came about?

4       A:   Yes, because I got tired of hearing Joey being

5   accused for this.

6       Q:   So, then, the police came around and questioned

7   you about that?

8       A:   Yeah.  And they kept telling me that if anybody

9   was going to know anything it would be me, because I was so

10  close with him.

11      Q:   And did you, in fact, know anything?

12      A:   No.

13      Q:   Didn't know a thing about this killing?

14      A:   No.  Just what people had been saying that wasn't

15  -- that nobody really knew.

16  ------------------------------------------------------------

17                   RE-EXAMINATION:  By Mr. Cook

18      Q:   Let me ask you this:  After Mr. Shiflett, Tommy

19  Shiflett, and Stanley Sutton were told that there were

20  phone records showing that star had been punched in -- star

21  69 -- on these two times on January the 11th, did they ask

22  to see these records?

23      A:   They never said nothing about it.  They never

24  even contacted me again.

25            MR. O'DELL:  You offered to show them the

                              45

1  records, though; didn't you?

2       THE WITNESS:  Yes.

3    Q:  (Mr. Cook)  What did they say when you offered --

4    A:  (The Witness)  See, my dad might have showed them

5  the records.  I don't know.  Because after this happened, I

6  left.

7    Q:  When you offered to show them the records, what

8  did they say?

9    A:  When I told them about it?

10   Q:  Yeah.

11   A:  See, I don't know.  My dad -- after they left is

12  when my dad starting looking for phone records, because he

13  knew I hit star 69 all the time.  He found it later on that

14  night.  So I don't know if he took it to Tommy the next day

15  or where he took it.  But I mean he's got the phone

16  records.  And they haven't asked me or called me or talked

17  to me since.

18  -----------------------------------------------------------

19       RE-EXAMINATION:  By Mr. Abernathy

20   Q:  Josh, after you told the police that you were

21  with Joey that night on this first meeting, did you ever

22  tell Joey that you told them this story?

23   A:  I told Joey I told Samantha that.

24   Q:  And what did he say?

25   A:  That I was -- the I shouldn't have done that,

46

1   that that was dumb.

2        Q:   He told you that was a stupid thing to do?

3        A:   Yeah.

4        Q:   That was dumb?

5        A:   Yeah.

6        Q:   He knew nothing about that?

7        A:   No.

8        Q:   You made that up and --

9        A:   He never knew I was doing it.

10       Q:   And you told the police officers it was a story,

11  that was a lie and not true?

12       A:   Uh-huh, yes.   Another thing, when I got back from

13  Virginia, see, my pager wouldn't pick up all the way up

14  there, but I've got voice mail.   And on my voice mail,

15  Samantha was on there, leaving all her numbers for me to

16  get in touch with her.   But I never called her back because

17  of the tape recorder stuff.

18  -------------------------------------------------------------

19            EXAMINATION:   By Mr. O'Dell

20       Q:   Do you remember the date or the approximate date

21  of when you told either of the Shifletts or Sutton that all

22  of these stories were lies?

23       A:    I could get the date, but it was the day I got

24  back from Virginia, because I had slept for a couple of

25  hours and then got up.

                                47

1    Q:   Do you know what month that was?

2    A:   It was in November.

3    Q:   Is that the same occasion you gave this taped

4  statement to them in November, about being in the car with

5  them?

6    A:   That wasn't the same day.

7    Q:   So, this is a different occasion?

8    A:   Yeah.   This is when I got back into town from

9  Virginia.   And Tommy had called my grandmother saying he

10  wanted to meet with me so the DA could talk with me.

11 ------------------------------------------------------------

12           RE-EXAMINATION:   By Mr. Cook

13    Q:   The time that you were in Virginia, that was the

14  last time that you gave a taped statement; wasn't it?

15    A:   Yes.

16 ------------------------------------------------------------

17           RE-EXAMINATION:   By Mr. O'Dell

18    Q:   So, you actually told them after -- was this

19    after Joey was arrested?

20    A:   Yes.   That's when I called and -- you know, I

21  realized what had happened.

22        MR. COOK:   Did your conscience bother you after

23    you recognized that you had lied and thought about it?

24        THE WITNESS:   Yes.   I mean it bothered me when I

25    went back to the room, because I told the people I

48

1    worked with what I had did, and they were like, "Well,

2    that's very stupid," because I could end up in jail,

3    too.

4    --------------------------------------------------------------

5            RE-EXAMINATION:  By Mr. Abernathy

6        Q:   You told people you had lied?

7        A:   The people I worked with, yeah.  I told them

8    immediately.

9        Q:   Who did you tell immediately that you had lied?

10       A:   I told the two I was rooming with, which was

11   Kojak and Mickey.  And then --

12       Q:   Are they from Rome, Georgia?

13       A:   Yeah.  And then, there was another person I told.

14   And that was Junior, another guy that was rooming one room

15   away.

16       Q:   Junior, do you know his name, other than Junior?

17       A:   James.

18       Q:   Is he from Rome, also?

19       A:   Yes.

20       Q:   Who was he rooming with?

21       A:   His father, the road manager.

22       Q:   Who was the road manager?

23       A:   I'm trying to think of his name.  I think his

24   name was James, also.  That's what they called him Junior.

25   His son Junior.

49

1    Q:   Did you tell the police at any point about

2  telling these other folks?

3    A:   No.

4    Q:   You haven't mentioned that to them?

5    A:   No.  But everybody that was up there on the trip,

6  I told, you know, pretty much, because I kept talking about

7  it, because I was so stressed out about it.

8    Q:   Have you ever known or seen Joey Watkins with a

9  pistol?

10    A:   No.  A paintball gun, but never a pistol.

11    Q:   You've never known of him owning a nine

12  millimeter pistol?

13    A:   No.

14    Q:   Or his parents?

15    A:   No.  I mean paintball guns, but, you know, it's

16  different.

17  -------------------------------------------------------------

18              RE-EXAMINATION:  By Mr. O'Dell

19    Q:   What did either of the Shifletts or Sutton say to

20  you if you did not stick -- say they would do to you if you

21  did not stick with your original story about being in the

22  vehicle with Joey and Mark?

23    A:   When they came to my grandparents' house that day

24  and I told them I'd lied?

25    Q:   Uh-huh (indicating positive).

                              50

1    A:   I don't think they ever said, really, what would

2   happen.  They just said I should stick with my story;

3   otherwise, you know, I could be in trouble, too.

4   ------------------------------------------------------------

5              RE-EXAMINATION:  By Mr. Abernathy

6    Q:   You said your grandparents were there.

7    A:   Yes.

8    Q:   Did they hear you tell the police this was all a

9   lie?

10    A:   Yes.  My grandmother got very upset with them,

11   too, because they kept, you know, going on about it.

12    Q:   Have you ever told anyone you knew anything about

13   this?

14    A:   No.

15    Q:   Other than the police?

16    A:   No.  I told them I -- I mean I've been telling

17   everybody that whoever is telling them that I know

18   something needs to keep their mouth shot, because

19   everything I know is hearsay, nothing is the truth.

20    Q:   Everything you've told us this afternoon is the

21   truth?

22    A:   Yes.

23    Q:   All we've asked you to do is tell us the truth?

24    A:   Yes.

25              MR. COOK:  That's all I've got.

51

1        MR. O'DELL:  You do understand the statements you

2   are giving today are under oath?

3        THE WITNESS:  Yes.

4        MR. COOK:  Okay.  That ends it.

5             (OFF THE RECORD DISCUSSION)

6        MR. COOK:  Let the record show that I terminated

7   a minute ago, and then we started talking casually

8   with Josh.  Tell me about your acquaintance with the

9   police.  Do you have a record?

10       THE WITNESS:  Yes.

11       MR. COOK:  Tell us what it is.

12       THE WITNESS:  I've got two DUIs, underage -- I've

13  got three underages, four underages.  And I've got, I

14  think, two revoked license.

15       MR. COOK:  And you're on probation now?

16       THE WITNESS:  Yes.

17       MR. COOK:  What for?

18       THE WITNESS:  All that.

19       MR. COOK:  All of that.  How much probation are

20  you on?

21       THE WITNESS:  I've been on there almost close to

22  three years.

23       MR. COOK:  Are you reporting to your probation

24  officer?

25       THE WITNESS:  Yes.

52

1          MR. COOK:  Did they mention that to you?

2          THE WITNESS:  No.  They never said nothing about

3     that.  They knew I was into all that trouble.

4          MR. COOK:  Okay.  Thank you.

5                         (CONCLUSION)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

COUNTY OF FLOYD)

STATE OF GEORGIA)

I, Lenora M. Duck, the undersigned, a duly commissioned and qualified Notary Public and Certified Court Reporter within and for the State of Georgia, do hereby certify that before the giving of his aforesaid examination under oath, the witness was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth; that the foregoing is the examination under oath given at said time and place by said witness; that I am neither a relative of nor attorney for any of the parties to this case, and have no interest in the results of the case; and that said examination under oath was transcribed under my directions and supervision.

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Rome, Georgia, this __16th__ day of __February,__ 2001.

LENORA M. DUCK, CCR
Notary Public
B-340

My commission expires:     March 23, 2004

54

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

DEFENDANT'S EXHIBIT FOUR



DEFENDANT'S
EXHIBIT
5



Here goes

(Our very first picture)

Yo
SU
U
CK





EAT SOMETHING

TOOTHPICK







# Will You Marry Me?

Keeping It In the Family





# Our Second Dance



# PLEASE ~~DONT~~ Do CUT YOUR HAIR

cause you damn sure need



napy hair

Our
Relationship Was
So Funny.





Spend
It
by your
self



Case 4:12-cv-00299-HLM Document 7-15 Filed 01/28/13 Page 83 of 141

# BACK?
# WARDS



Is That the way Everbody Else liked cause I damn sure woser got any.



Who arn't

until doing?



LAST

nothing !

One a day
for
Each.

I Told you
Things did'nt
fit right. I didnt
lie.

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

DEFENDANT'S EXHIBIT FIVE

DEFENDANT'S EXHIBIT SIX

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

**BeachGirl3738100:**   Still talking to joey I here!?!

**KMarie4:**   I dont see how that is ANY of your business

**BeachGirl3738100:**   Well get ready to see form you on MISTAKES

**BeachGirl3738100:**   Your*

**KMarie4:**   okay -- bye now

**BeachGirl3738100:**   Maybe you  will stick with him through the Murder trial

**KMarie4:**   you need to get a life and leave him alone

**BeachGirl3738100:**   If he allows me to keep mine that long

**KMarie4:**   oh please

**KMarie4:**   that is the most ridiculous thing I've ever heard

**BeachGirl3738100:**   Like I said I gave you a wanring

**KMarie4:**   okay, now leave me the hell alone

**KMarie4:**   goodbye

**BeachGirl3738100:**   You think..... Why don't you ask Issac sister

**KMarie4:**   GOODBYE

**BeachGirl3738100:**   Or me for that matter

**BeachGirl3738100:**   He total my car

**KMarie4:**   you need to move on girl

**BeachGirl3738100:**   I have

**KMarie4:**   why dont you try obsessing about your own boyfriend

**BeachGirl3738100:**   I m just tring to herp you

**BeachGirl3738100:**   Help you

**KMarie4:**   gee, I appreciate that -- now go away

**BeachGirl3738100:**   Like I said you were warned

**KMarie4:**   like I said. go away

DEFENDANT'S
EXHIBIT

6

DEFENDANT'S EXHIBIT SIX





**A. ELECTRIC EMPLOYEES OF**
**... ... ERAL CREDIT UNION**
2010 Re... ... Cir.          247... ...rthwest Blvd.
Rome, GA 30165            New...n, NC 28658

266 Nelson St.            1504 Dean Ave.
Cartersville, GA 30120    Rome, GA 30161

DEED... ...BIT
D-7

# LOANLINE
## NOTE AND DISCLOSURE STATE...

BORROWER NAME (Last - First - Middle Initial) AND ADDRESS (Street - City - State - Zip C...

CAMP THOMAS D.
75 NORTH DR NE
ARMUCHEE   GA   30105

| DATE | NOTE NUMBER | ACCOUNT NUMBER |
|---|---|---|
| 17NOV98 | 98-20036 | 6801-5 |

In this agreement "you" and "your" mean each person who signs this agreement. The "credit union" means the credit union whose name appears above and a to whom the credit union transfers its rights under this agreement. The terms on the reverse side are part of this agreement. Boxes checked below apply to this agree

### TRUTH IN LENDING DISCLOSURE

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | |
|---|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid when you have made all payments as scheduled. | e means an estimate **Prepayment:** If you pay off early y... not have to pay a penalty. **Required Deposit:** The Annual Pe... age Rate does not take into ac... your required deposit, if any. |
| 9.88 % | $ 638.98 | 4000.00 | 4607.92 | |

| Your Payment Schedule will be: | Number of Payments | Amount of Payments | When Payments Are Due | Property Insurance: You may obtain property insurance f... anyone you want that is acceptable to the credit union. get the insurance from the credit union you will pay $ |
|---|---|---|---|---|
| | 35 AT | 131.00 MO. BEG. | 01JAN99 | |
| | 1 at | 102.92 | 01DEC2001 | |

**Security:** Collateral securing other loans with the credit union will also insure this loan. You are giving a security interest in your shares and/or deposits in the credit union; and    the goods or property being [X] purchased;   [ ] Other (Describe)

**Late Charge:** A late fee of 4% (North Carolina) or 5% (Georgia) of the payment amount will be charged on loans that are 10 days past due.

| Filing Fees | Non-Filing Insura... |
|---|---|
| $ 18.00 | |

See your contract documents for any additional information about nonpayment, default, and any required repayment in full before the scheduled date.

### ITEMIZATION OF THE AMOUNT FINANCED

| ITEMIZATION OF AMOUNT FINANCED OF | AMOUNT GIVEN TO YOU DIRECTLY | AMOUNT PAID ON YOUR ACCOUNT | PREPAID FINANCE CHARGE |
|---|---|---|---|
| $ 4000.00 | $ 3982.00 | $ 0.00 | $ 20.00 |

| Amount Paid to Others on Your Behalf | | | |
|---|---|---|---|
| $ 18.00 | To G E CREDIT UNION | $ | To |
| $ | To | $ | To |
| $ | To | $ | To |

### NOTE AND SECURITY AGREEMENT   CONTINUED ON REVERSE SIDE

This Note is governed by the laws of ...

**Promise to Pay:** You promise to pay $ 4000.00 to the credit union plus interest on the unpaid balance at 9.89 % per until what you owe has been repaid.

**Collection Costs:** You agree to pay all costs of collecting the amount you owe under this agreement including court costs and reasonable attor... fees not to exceed 15% of the unpaid debt.

**Security Offered:**

| | MODEL | YEAR | I.D. NUMBER | TYPE | VALUE |
|---|---|---|---|---|---|
| CHEVROLET SILVERA 1500 | | 1988 1GCDC14H2FF338976 | | PU | 4200.00 |

**Other (Describe):** Used Automobile

You Pledge Shares and/or Deposits of   $          Acct. #          $          Acct. #

**SIGNATURE:** If you agree to make and be bound by the terms of this Note and Security Agreement sign below. *If you are not a borrower but an owner of the colla... for this loan, sign below and check the box for "Owner of Collateral". By doing so you agree only to the terms of the Security Agreement.* **CAUTION: IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS CONTRACT BEFORE YOU SIGN IT.**

| Borrower 1 X | Date 17NOV98 | Borrower 2 [ ] Owner of Collateral (other than a Borrower) X | Date 17NOV9... |
|---|---|---|---|
| Borrower [ ] Owner of Collateral (other than a Borrower) X | Date 17NOV98 | Witness X | Date 17NOV9... |

### CREDIT INSURANCE APPLICATION/SCHEDULE

"You" or "Your" means the member and the joint insured (if applicable).

Credit insurance is voluntary and not required in order to obtain this loan. You may select any insurer of your choice. You can get this insurance only if you check "yes" and sign your name and write in the date. The rate you are charged for this insurance is subject to change. You will receive written notice before any increase goes into effect. You have the right to stop this insurance by notifying your credit union in writing. Your signature means you agree to this insurance.
• If you elect insurance, you authorize the credit union to add the charges for insurance to your loan each month.
• You are eligible for insurance if you are working for wages or profit for 25 hours a week or more

on the date of the initial advance. If you are not, you will not be insured until you return to w... and complete an application for insurance. If you are off work because of temporary layoff, s... or vacation, but soon to resume, you will be considered at work.
• If you are a homemaker, retiree or student, you are eligible for Credit Life insurance only if are performing all of the usual duties of a homemaker, retiree or student in the normal mar... on the date of the initial advance and you are not receiving disability benefits from any sou...
• Are you presently actively at work?   [ ] Yes   [ ] No
• You are eligible for insurance up to the Maximum Age for Insurance. Insurance will stop w... you reach that age.

| YOU ELECT THE FOLLOWING INSURANCE COVERAGE(S) | YES | NO | PREMIUM SCHEDULE | INSURANCE MAXIMUMS | | DISABILITY | LIFE |
|---|---|---|---|---|---|---|---|
| SINGLE CREDIT DISABILITY | | | $          e | MAX. MONTHLY TOTAL DISABILITY BENEFIT | | $ 600 | N/A |
| SINGLE CREDIT LIFE | | | $ 48.84    e | MAX. INSURABLE BALANCE PER LOAN ACCOUNT | | $30,000 | $30,000 |
| JOINT CREDIT LIFE | | | $          e | MAXIMUM AGE FOR INSURANCE | | 66 | 71 |
| | | | | SECONDARY BENEFICIARY (If you desire to name one) | | | |

UNDER "TOTAL DISABILITIES NOT COVERED" THE PRE-EXISTING CONDITIONS ARE WAIVED.

| | | DATE OF ISSUE OF THIS CERTIFICATE | TERMINATION DATE OF THIS CERTI... |
|---|---|---|---|

If you are totally disabled for more than 30 days, then the disability benefit will begin with the 31st day of disability

| DATE 17NOV98 | SIGNATURE OF BORROWER ELIGIBLE TO BE INSURED (Be sure to check the boxes above.) X | BORROWER'S DATE OF BIRTH 23JUN65 | SIGNATURE OF JOINT INSURED (CO-BORROWER) (Only required if JOINT CREDIT LIFE coverage is selected) X | CO-BORROWER'S DATE OF BIRTH |
|---|---|---|---|---|

APP. 825-1193GA   ©CUNA MUTUAL INSURANCE SOCIETY, 1980, 82, 84, 86, 89, ALL RIGHTS RESERVED      MEMBER COPY   Thank You For Borrowing At Your Credit Union   NGA337  6...

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

DEFENDANT'S EXHIBIT SEVEN



1        [The jury leaves the courtroom, and the trial is

2   completed.]

3        *********************************************

4                    C E R T I F I C A T E

5   STATE OF GEORGIA

6   COUNTY OF FLOYD

7        The foregoing transcript of the proceedings was taken by

8   me as a certified court reporter for the State of Georgia and

9   reduced to typewriting by me or under my direction, and I

10  hereby certify that it is a true and correct transcript of

11  said proceedings.

12       This August 7, 2001.

13  (Lines 4 through 25 on page 20 through line 6 on page 73,

14  page 217 through line 10 on page 415 and page 559 through

15  line 13 on page 1177 and pages 1417 through page 1474.

16

17                              _____

18                              Brenda G. Watson, CCR B-264

19

20

21

22

23

24

25

                              -1472-

```
 1

 2

 3

 4                    *******************************************

 5                         C E R T I F I C A T E

 6       STATE OF GEORGIA

 7       COUNTY OF FLOYD

 8            The foregoing transcript of the proceedings was taken by

 9       me as a certified court reporter for the State of Georgia and

10       reduced to typewriting by me or under my direction, and I

11       hereby certify that it is a true and correct transcript of

12       said proceedings.

13            This August 7, 2001.

14       (Page  1 through line 3 on page 20 and lines 7 through 25 on

15       page 73 through page 216 and lines 11 through 24 on page 415

16       through page 558 and lines 14 through 25 on page 1177 through

17       1416.

18                              _____

19

20                              Melodie E. Taylor, CCR B-1057

21

22

23

24

25
```

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15     [OPENING STATEMENTS AND CLOSING ARGUMENTS WERE NOT REQUESTED

16     UNTIL THE ENTIRE TRANSCRIPT HAD BEEN COMPLETED, THUS THE

17     REASON FOR IT BEING ADDED AT THE END OF THE TRANSCRIPT]

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### OPENING STATEMENT BY MS. COLSTON

As I told you, I am Tami Colston, and it is my privilege and my pleasure to try the case that you have now been empaneled to hear.  The judge told you that the opening statement of the attorneys, Mr. Abernathy and myself, for Mr. O'Dell and whoever makes the opening statement is not evidence, and he is right.  It is not to be considered as evidence.

Anything that I say, Mr. Abernathy, Mr. O'Dell says, that is not evidence and it is not to be considered as such.  This is our opportunity to tell you where we expect the case to go, where we expect, as the judge said, a road map.  I will tell you right now that in this case right here, if you have ever been through the mountains between Helen and Hiawassee, you will know exactly what kind of road map you are going to get, because it is going to go like this  [indicating].  It is going to be that way all the way through the trial.

I expect it to be a very difficult trial.  I will try to make things as simple as possible, as clear as possible, and I am sure that the defense will as well.  But I like to begin with the indictment.

The indictment is not evidence and is not to be considered evidence by you, but this is the formal mechanism that we use to charge a person with a crime.

-1475-



1    The elements of the crime are contained in the charge

2    itself.  You have heard a little bit about that in voir

3    dire, about the element of a crime.

4        So I like to begin there because this is where you

5    will end.  You will have this indictment out with you,

6    even though it is not evidence at the end of this case

7    and in your deliberation.  You will be looking at the

8    specific charges in this indictment to determine your

9    verdict on each and every charge.

10        This indictment charges, in the name and behalf of

11    the citizens of Georgia, we charge and accuse Joseph

12    Samuel Watkins with the offense of murder, for that the

13    said accused on the 11th day of January, 2000, in the

14    county aforesaid, being Floyd County.  And incidentally,

15    you will hear me prove that with a witness that it

16    happened in Floyd County -- did unlawfully then and there

17    and with malice aforethought caused the death of Isaac

18    Dawkins, a human being, by shooting said person with a

19    gun, contrary to the laws of this state, the good order,

20    peace and dignity thereof.

21        That is the first count.  It is malice murder.  And

22    then it is alleged in a slightly different way.  There is

23    two different ways that you will hear about at the end of

24    this case; that this case is charging murder.  Count Two,

25    and the Grand Jurors aforesaid in the name and behalf of

-1476-



1   the citizens of Georgia further charge and accuse Joseph

2   Daniel Watkins with the offense of murder for that the

3   said accused on the 11th day of January in the county

4   aforesaid did unlawfully then and there during the

5   commission of a felony, to wit, aggravated assault, cause

6   the death of Isaac Dawkins, a human being, contrary to

7   the laws of this state, the good order, peace and dignity

8   thereof.

9        You will hear the explanations about the law at the

10   end of the case.  This isn't the time that we are allowed

11   to do that.  Just understand there are two different ways

12   that you can allege murder.  One is malice murder and one

13   is felony murder.  They are both felonies.  It is not

14   really  -- you know, it is just a different way in which

15   it is committed.

16        The evidence in this case will be related to both of

17   these, but you will hear specific instructions at the end

18   of the trial.  We are not allowed to argue law and stuff

19   to you at this point.  So just hang tight.  It will come.

20   Don't worry.

21        Count Three, and the Grand Jurors aforesaid in the

22   name and behalf of the citizens of Georgia further charge

23   and accuse Joseph Daniel Watkins with the offense of

24   aggravated assault, for that the said accused on the 11th

25   day of January, 2000, in the county aforesaid did

-1477-

1   unlawfully then and there make an assault upon the person

2   of Isaac Dawkins with a handgun, a deadly weapon,

3   contrary to the laws of this state, the good order, peace

4   and dignity thereof.

5        Count Four charges the defendant with possession of

6   a firearm during the commission of a crime for that the

7   said accused on the 11th day of January, 2000, in the

8   county aforesaid did unlawfully then and there have on

9   his person a firearm during the commission of a felony;

10  to wit, murder and aggravated assault, said crime being

11  against and involving the person of another, to wit,

12  Isaac Dawkins, and which crime was a felony, contrary to

13  the laws of this state, the good order, peace and dignity

14  thereof.

15       The last count of this indictment is stalking.  The

16  defendant in this case, Joseph Daniel Watkins, is accused

17  of stalking, for that the said accused in the county

18  aforesaid on the 11th day of January, 2000, did

19  unlawfully then and there follow and place under

20  surveillance and contact Isaac Dawkins without the

21  consent for the purpose of harassing and intimidating

22  said person, contrary to the laws of this state, the good

23  order, peace and dignity thereof.

24       As I stated to you, I expect this case is going to

25  be difficult for everyone involved.  It is going to be

-1478-



1    difficult for the family.  It is going to be difficult
2    for the defendant, his family.  It is going to be
3    difficult for the lawyers, and it is going to be
4    especially difficult for you.  I am going to tell you why
5    in just a minute.  But I believe it is your decision, and
6    it is only your decision, and the judge has told you to
7    decide this case decide the credibility of the witnesses,
8    the believability of the witnesses.  Nobody can do it but
9    you.  No one can do it but you.

10         But I think the evidence will be uncontroverted to a
11   certain degree.  If not, I am certain that the defense
12   will correct me when they get up, but I believe it will
13   be uncontroverted that on January 11th in the year 2000
14   here in Floyd County, Georgia, on Highway 27, there will
15   be no question that Isaac Dawkins was shot.  There will
16   be no question that Isaac Dawkins was shot in the back of
17   the head as he drove down the road after he left Floyd
18   College.  The bullet came through the back windshield of
19   his truck, and it entered his head.

20         He went off the road coming north toward town from
21   Floyd College.  He went off the road, down through the
22   median, into the oncoming lane of traffic and then
23   crossed the road, hit a guardrail, flipped over several
24   times.  Everyone thought at first it was a wreck.

25         It was a wreck until Isaac Dawkins got to the

                              -1479-



hospital, and I believe the evidence will be
uncontroverted that at that point when they got to the
hospital and after a little while, Dr. Carl Herring, a
neurosurgeon we are very blessed to have here in Floyd
County, saw this is a bullet hole.  You will see two
punctures that Isaac Dawkins had in the back of his head.
One of them was a bullet.  One of them was just a
puncture from something he hit, from being thrown around
inside the car.  Only one bullet struck him.

I think the evidence will show though that two shots
were fired, and I think the evidence will show also that
it was shot from a 9mm handgun.

Now I think the evidence will be uncontroverted as
well that that bullet that entered Isaac Dawkins' head
was fired from another vehicle on the road that night
from someone who was seen maneuvering with him and acting
a little strange on the roadway and being stopped at one
point and then speeding up and going through -- like
chasing Isaac.

I believe the evidence will be that they got up, and
I want you to listen to the little details.  I heard a
defense lawyer say one time, and I have used it several
times since, the devil is in the details sometimes.  And
that is how this case is going to be, little details that
I ask you to listen for, little small things that one

-1480-



1    witness knows and another witness knows that don't know

2    each other, little small things like that, where this

3    occurred and what was the terrain of the road where it

4    occurred, what was the area, things such as that, the

5    vehicles and what they looked like, how they were

6    maneuvering with each other.   These are things when you

7    meet Mr. Benson, who was the eyewitness to the wreck, and

8    he is the one that called 9-1-1, when Mr. Benson takes

9    the stand and he tells you that he saw that and what he

10   saw.  You need to be listening to him to judge his --

11   judge the credibility of another witness that quite

12   frankly, I don't know what to tell you about him.

13        His name is Barry Mullinax, and just because the

14   State puts up a witness, we are not vouching for

15   anybody's credibility.  We are just putting up a witness

16   for you to decide what you are going to decide.  But the

17   only way you are going to be able to decide about the

18   credibility of some of these witnesses and whether they

19   are telling the truth or not is looking for those little

20   details that they wouldn't know otherwise unless they

21   were telling the truth.

22        That is what I am going to ask you to do, is to look

23   at those.  I will try to emphasize them the best I can

24   where I know that they are, but you are going to pick up

25   on things that I haven't even picked up on, for and

-1481-



1   against the State's case.  That is just the way it is.

2   That is the process of a trial.

3       Now I think the evidence will be uncontroverted that

4   Isaac Dawkins once he got to the hospital at Floyd

5   Medical Center and once they realized that Isaac had been

6   shot, there was no brain activity whatsoever.  And his

7   family was told that there was no brain activity, and

8   they needed to be thinking about what to do.  The next

9   day at 12:25 they were talked to about being an organ

10  donor.  At 12:25 the next day he was pronounced dead.

11      I think it will also be uncontroverted that Joey

12  Watkins at the table here, the defendant in this case was

13  on Highway 27 around the same time -- the same time that

14  Isaac Dawkins was shot.  I think the evidence will show

15  you that through cell phone records -- there is going to

16  be a lot of talk about cell phone records.  There is

17  going to be -- wanting you to interpret them one way and

18  interpret them another way, but there is really -- it is

19  going to be, here it is.  This is the time he made the

20  call.  This is the approximate vicinity he was in.  He

21  could have been here, and he could have been there.  It

22  will be up to you to decide where he was at 7:15.

23      7:19 the ambulance was called.  Well, Mr. Benson

24  picked up the phone, his car phone, and called 9-1-1 at

25  7:20.  So that is going to be the critical time.  Where

-1482-



1    was Joey Watkins at 7:20.  His cell phone records are

2    going to put him on Highway 27, and that is going to be

3    something that you need to look at very carefully and

4    scrutinize very carefully.

5         Another thing that I am going to ask you to look at,

6    the evidence in this case is going to show you that Joey

7    Watkins also proceeded to tell some stories.  He went to

8    his girlfriend's house later that evening.  He said -- he

9    told the police when he talked to the police that he went

10   to his girl -- he got home from fishing in Alabama that

11   day, which I no doubt he was fishing in Alabama.  I don't

12   think we are even going to bother with that earlier in

13   the day.

14        But he said he got home and he went to his

15   girlfriend's house, and he left his house, I think he

16   said, around 7 -- I have forgotten -- 7:15, 7:20.  Let me

17   see if I have got it written down here.

18        I left Alabama between 6:30 and 6:45, got home

19   between 6:45 and 7:00, and that his girlfriend called and

20   she was sick.  Little bitty things, little small things I

21   am going to ask you to look for.  Aislinn Hogue was his

22   girlfriend at the time.  She will tell you that he was

23   supposed to come to her varsity basketball game that

24   night.  She was sick as a dog.  I mean sick, sick, sick,

25   throwing up, had been sick all week.  She had -- they put

-1483-

1    her in the game earlier in a regular game.  She could not

2    stay for the second game.  She left school.  Her dad came

3    and picked her up and took her home.

4         She said she got home between 6:30, ten till 7:00.

5    Joey was supposed to come to her game but since she was

6    so sick and she couldn't stay for the game, she called

7    him and told him to come to the house.  Joey told the

8    police that he called his girlfriend when he got home and

9    she was sick.  Aislinn will tell you she called him the

10   minute she walked in the door.  Small thing, but then it

11   goes on from there.

12        She remembers very little about Joey's visit that

13   night because she was so sick.  She slept a lot during

14   the evening, but her father was there too.  And he does

15   remember it.  Joey said that he went straight to

16   Cedartown.  Now Aislinn said that she talked to him no

17   later than ten till seven, and he was on there.  In fact,

18   when she called the house, the evidence is going to be

19   that Tim Hughes -- now I know this cast of characters is

20   going to get difficult to understand.  But Tim Hughes is

21   the boyfriend of the defendant's sister.  Okay?  So he

22   was at the house when Joey Watkins left the house that

23   evening that Isaac Dawkins was killed.

24        Tim Hughes answered the phone when Aislinn called.

25   She calls between 6:30 and ten till 7:00, at the very

                              -1484-

latest ten till 7:00.  Joey was already on his way, and
Tim had to go out and get him and tell him to come back.
He had already left to go to his car.  He came back to
the phone and talked to her for a minute.  He was on his
way at that time, but Aislinn will tell you that he
didn't arrive until 8:00, until 8:00.

Now Mr. Watkins told the investigators that, oh,
yeah -- he said, I saw the -- well, immediately Mr.
Watkins right after that -- there is a Josh Flemister
going to testify.  Now Josh Flemister has told a couple
of different stories, and I don't know whether he will
tell one of those or tell another one when he gets here.
I have no idea, but one thing he did do the evidence is
going to show that Josh Flemister went around telling
people, and he told several people that he went with Joey
Watkins to Aislinn's house that night.  That he was with
him.  He even told the sister of the victim there,
Samantha, that he was with him.   But that fact was not
true.  Aislinn will tell you that was not true.

There is other evidence going to be that Joey
Watkins told several people, well, I saw the wreck on my
way to Cedartown.  Other people he told, I saw the wreck
on my way back from Cedartown; and other people he told,
oh, I don't have a thing to worry about.  I was in
Florida when that happened.

-1485-

1      These are things that he has said along the way.

2   The police -- when they talked to him, he said that he

3   saw the wreck on the side of the road, and he thought it

4   might be Isaac's truck.  The reason he thought it might

5   be Isaac's truck was because it had a distinctive brush

6   guard on the front of it.  He picks up his phone and he

7   called his sister, called home to his sister.  The cell

8   phone records show he made a couple of calls home, not

9   just one, a couple of calls home, one before the police

10  arrived and another after the police arrived.

11      But he made a couple of calls home.  But he says he

12  called his sister and said, I think Isaac has had a

13  wreck.  You might want to call his sister and tell her.

14      Now the evidence is going to show that Isaac -- that

15  Joey Watkins hated Isaac Dawkins.  I think the evidence

16  is going to show that Joey Watkins is the only person

17  that hated Isaac Dawkins.  The evidence is going to show

18  the reason that he hated Isaac Dawkins so badly is

19  because Isaac had started dating Joey's long girlfriend,

20  Brianne Scarbrough.

21      Brianne, a cute little girl, had been dating Joey

22  Watkins off and on for several years, but she had broke

23  up with Joey.  And Isaac's sister, Samantha, and her

24  boyfriend, Paul, got Brianne and Isaac together.  Isaac

25  wanted to date Brianne.  He asked Samantha about it, hey,

-1486-

1   you know, can you fix -- I would like to date her.

2       Well, Joey Watkins didn't like that.  He didn't like

3   it one little bit, and he told numerous people and he

4   told them over and over, I am going to get him.  I am

5   going to whip him.  I am going to kill him.  This went

6   over a period of six months.  Even after Isaac and

7   Brianne had quit dating, he still was doing that.  The

8   evidence is going to show that he chased Isaac Dawkins

9   down.  He would chase him every time he saw him.  He

10  would try to catch him.  He would try to run him off the

11  road.  He would try to make him wreck.  This happened

12  over and over during the six-months prior to Isaac

13  Dawkins' death; that this was a constant thing.

14      Now Joey Watkins was saying that he was concerned

15  that Isaac had had a wreck.  He was on the side of the

16  road.  You might want to call his sister and let her

17  know.

18      The evidence is going to show from photographs that

19  it was impossible for Joey Watkins to know that was Isaac

20  Dawkins' truck after the wreck.  It would be impossible

21  for him to recognize that as Isaac Dawkins' truck enough

22  that he would pick up the phone and call and say, I think

23  Isaac has had a wreck.

24      Now Mr. Hogue remembers the night very well that all

25  this happened.  That is Aislinn's dad, the girl that Joey

-1487-

was dating in Cedartown. He goes on to Cedartown. He stops and calls Aislinn again. Well, he doesn't stop and call her. He calls her on the cell phone when he gets into the Cedartown calling area and says, can I bring you anything. Since she is sick, she wanted some Gatorade. The evidence will show that he stopped at some store and he came on to the house and about 8:00 he got there.

Mr. Hogue remembers him being there very well. He will tell you at first he thought that Joey was trying to be -- that he was okay, but, you know, really he knew something was wrong. When he looked back, he said he was just trying not to act nervous, but he was nervous. And he is not the only one that is going to testify that Joey Watkins in the hours and days following this shooting was nervous as a cat on a hot tin roof. It was several other people that were with him like the next day and the day after, friends of his who will testify that he was real nervous and they are going to suspect me. They are going to suspect me. They are going to suspect me. The police are wanting to talk to me.

The police drove by a house he was at the night after all this happened. When the police drove by, he left. He was scared.

I think the evidence is going to show that no matter what Josh Flemister says now, I think that you are going

-1488-

1    to be able to conclude that Joey Watkins asked Josh

2    Flemister to provide him with the alibi; that he went to

3    Aislinn's house with him that night.

4        I believe that the evidence is going to show that he

5    asked Josh to tell everyone that, and Josh got himself

6    into some trouble by doing so.

7        Mark Free is the co-defendant that is not involved

8    in this trial.  He has got a separate proceeding

9    altogether, but the State will prove that the two were

10    together when all this happened, Joey Watkins and Mark

11    Free.  The State is going to prove that beyond a

12    reasonable doubt to you, because number one, Joey Watkins

13    didn't do anything unless he had a buddy to ride along

14    with him.  He usually liked to have two or three to even

15    up the odds against somebody.  But Joey Watkins, the

16    evidence is going to show he was with Mark -- he went and

17    picked up Mark Free somewhere, or they met up somewhere.

18        How is the evidence going to show that?  I am going

19    to show Mark Free as a witness.  I am going to tell him

20    that anything he says in this trial will not be used

21    against him in his trial, promise him that that won't be

22    used.  That doesn't mean he is not going to be

23    prosecuted.  He will be.  What it means is that he will

24    take the stand and anything he says here cannot be used

25    against him so he could tell us the truth, if he wanted

to.  And if he ever even admitted it, it couldn't be used against him.

I don't expect that will be the case, but that is what is going to happen.  We are going to call him and we are going to see, because this is a search for the truth. We are going to call witnesses, and we are going to bring witnesses, and I am telling you right now you have got a tough job.  You have got a tough job figuring who is friends with who and who is covering for who and whose not and who is telling the truth now and who told the truth then and who might tell the truth next week. You have got a tough job.

I believe though at the end of this case when you hear all this evidence and then you hear the motivation and all the things that are behind why a person might be saying something and also -- and a lot of the State's witnesses -- a lot of the State's witnesses, and I am going to give you two examples.

Winford Reese Ellis, you are going to meet him.  He is an inmate at the Floyd County Jail, and James Paul Cooley, he is an inmate at the Floyd County Jail.  There were rewards posters put up, and they were put up at the jail.  That was to get people to come forward if they knew anything.  And also you have got people that are going to say, well, I wanted -- I told the truth; I

-1490-

didn't tell the truth.  I didn't --

Winford Ellis is one.  He gave the police a statement.  He gave the police a statement that he was in the cell with Joey Watkins, and Joey Watkins told him about this crime.  He gave several details.  After that James Paul Cooley -- he is a shady character I guarantee you.  I don't -- I will tell you right now.  I am not going to try to hide that; he's shady.  He came forward, and he has had a conspiracy for murder case himself, and that is what he is in jail for.

He came forward and he said, I heard him tell Reese Ellis this, and I heard him tell it through the vent, and I asked him about it; and he gave some more detail.  Now Reese Ellis -- I don't make deals.  You know, Reese Ellis will testify, and I think hopefully he will testify -- say something truthful.  He will say that I told him that I don't make deals.  Either you come in here and you tell the truth or you come in here and you lie, but it is not right for me to promise somebody favor if they will testify against somebody else, anymore than it would for me to do it to you.  How would you like it if somebody did it to you?

Well, Reese Ellis got mad because unfortunately a couple of weeks ago he was tried and convicted of rape and my office prosecuted it.  So I go out to see him and

-1491-

all of a sudden he won't talk to me, but he did talk to the defense and he gave them a statement that everything that he said was a lie.

Y'all will get to hear it first hand, live and in technicolor, and then James Paul Cooley will come in and he still says it is the truth.  He hasn't been tried yet. I don't know what to tell you, but the devil is in the details again.

I ask you to listen carefully to what they say and the details that they give.  What they said -- what they are going to tell you -- what -- you know, what Reese Ellis is going to tell you is that he got his details from going in and reading the transcript from the preliminary hearing.  The preliminary hearing was in December, but he gave some details of some things that didn't happen until afterwards.

Just listen very carefully.  I expect to have an enjoyable time cross-examining my own witnesses as well as Mr. Abernathy's all the way through this trial and likewise I am sure.  We are both going to be doing that and quite a bit of it.  But when everything is settled -- when the dust settles, I can tell you that I expect that the State will have proven that Joey Watkins is the only person that had any motivation to kill Isaac Dawkins; that Joey Watkins was the person who was on the road the

-1492-

same night with the same time as Isaac Watkins; that Joey Watkins told other people besides the two jailhouse people that he committed this crime and he has bragged about it as they typically do; that Joey Watkins tried to provide -- to give himself an alibi, and that there is no other -- other reasonable person or reasonable probability or reasonable hypothesis or reasonable anything other than Joey Watkins murdered Isaac Dawkins because Isaac Dawkins had messed with his girlfriend.

He said he was going to kill him. He promised him he was going to kill him, and he did kill him and I believe that all that will be clear to you at the end of this case, even though you have got to get through a lot of stuff to get there. But at the end of this case, I believe you will believe that after you have sorted out in your mind, you think about it, you keep your notes, you take care -- you pay attention to everything. You will believe that and you will understand that beyond a reasonable doubt. I will come back to you at the end of this case and I will ask you for a verdict of guilty. Thank you.

THE COURT: Mr. Abernathy.

-1493-

honor, and I am going to tell you exactly what the case is going to show. I am going to tell you some things that Ms. Colston has not told you about. I am going to tell you a lot of things during this trial that Ms. Colston has not told you about.

First of all before we get lost, let me introduce to you -- you have all seen him, but my client that I am proud here to represent, Mr. Joey Watkins. His grandparents are seated in the audience. That is what the case is about, and it is about poor Mr. Dawkins who is seated in the audience, and it is a sad case. It is as sad as any I have ever seen, poor Isaac Dawkins shot down January 11th, 2000.

In my opening statement I am going to try to give you a little introduction and tell you about the parties and the scene and what happened. I am going to tell you what the issues are in the case, and I am going to tell you a little story of what happened. I am going to tell you what the evidence is going to tell you what happened. I am going to tell you all the evidence. And then I am going to give you a basis of why Mr. Watkins is not guilty, why he is not guilty. Then I am going to conclude and sit down and then you will hear the evidence from the witness stand. So you remember what Ms. Colston has told you is not evidence. But I am going to remind

-1495-

1    you of some things later of what she has told you.

2        Now, Ladies and Gentlemen, I want you to think about

3    January 11th of '99.  That is when this awful act

4    occurred, terrible, heinous act out on Highway 27 from

5    Floyd College.  Isaac Dawkins left -- I don't know -- he

6    got out of class somewhere around seven o'clock, and he

7    left, maybe talked to some people, and was driving his

8    pickup truck, had a brush guard on it, some fog lights

9    and different lights.

10       Joey Watkins knew his truck and knew what it looked

11   like, and he spotted it that night and knew it.  Now I

12   don't know -- I can't tell you what the evidence will be,

13   what the State's theory is because they have so many, and

14   you didn't hear Ms. Colston tell you and tie herself to a

15   theory in her opening statement because the jail people

16   that are striking deals, the evidence will be that they

17   are all trying to strike a deal and they are trying to

18   get that $15,000 reward that they took out and hung up in

19   the jail and called people out of their cell begging them

20   to talk.  That is what they did, all the jail people, and

21   that is what this case is going to be about, because

22   there is no -- there is going to be some scientific

23   evidence, and I expect Ms. Colston will bring her expert

24   in.  We have certainly got ours.  That is what the case

25   is really going to hinge on.  That is going to be the tap

                              -1496-

root of this case, the scientific evidence, because it is going to prove -- the evidence is going to prove that Joey Watkins couldn't have committed this act.

Now, Ladies and Gentlemen, on January 11th when Isaac Dawkins left, he was driving toward Rome, Georgia, on 27 out by the Coke plant and some of you all know the area. I think in voir dire Mr. O'Dell asked some of you about it. But he was driving the area.

Now before we get to exactly what happened, the shots happened somewhere -- I don't know -- it may be a little contradicted. But I will predict to you it is going to be somewhere around 7:18, 7:19, 7:20. Ms. Colston is going to present evidence to you and try to have it happening as late as she can, 7:20, something like that. There is going to be a Rome Police Department 9-1-1 log that says the call was given at 7:19 in the evening on January 11th, 7:19.

That is going to be important. I want you to listen to those details, and there is going to be a lot of law that says 7:20. That is about when this happened. What is important there is going to be a witness, Mr. Benson, Wayne Benson. I want you to remember Mr. Benson. I have not been able to talk with him, but I expect he is going to come in here and take the stand. I have read the police report and know about what the facts are.

-1497-

1    Mr. Benson is going to take the stand, and I expect
2    the evidence will show that he was following some
3    distance behind Mr. Isaac Dawkins.  And up in front of
4    him -- up in front of him was a car he will describe as a
5    little blue Honda, something like a little blue Honda.  I
6    think later on he even told the police he might have seen
7    fire come out of -- like a shot was fired.  That was
8    later on, and that is all right, because the evidence
9    will show that Joey Watkins was not in a Honda.  He was
10   driving his pickup truck, his white pickup truck that he
11   always drives in this period of time.
12      Ladies and Gentlemen, the evidence is going to show
13   that Mr. Benson before this call was made at 7:19,
14   somewhere thereabouts, was following these cars.  He
15   watched a little road rage going on, followed them down.
16   They came to a close stop, and then they sped back up.  I
17   don't know if it was thirty seconds or a minute or two,
18   but this was going on somewhere after he left the
19   college, getting out of class, 7:15 to 7:20, somewhere in
20   there.
21      The evidence is going to show that someone shot him.
22   It may have been in that blue car.  He veered off,
23   crossed over the median and into the southbound traffic
24   and rolled over in the ditch on the east side.
25      Ladies and Gentlemen, the evidence will also show,

-1498-

1    and I don't know if Ms. Colston is going to call them,
2    but there was another witness coming heading north,
3    headed out toward the college, Mr. Raiford -- I think
4    Mark Raiford.  He said he was the first one on the scene.
5    I think that is what the evidence will show.  He was the
6    first one there, and he was following along and there was
7    a white van.  He saw Mr. Dawkins' truck veer across the
8    road, crash there, and he pulled over immediately and
9    stopped and said he thought the white van stopped.

10        He will say he went up to render aide to see what he
11   could do.  Mr. Benson came up with his cell phone to call
12   someone.  Then he actually got the phone -- Mr. Raiford
13   got the phone and talked to someone on 9-1-1, told them
14   there had been an accident.  That is what the evidence is
15   going to show, Ladies and Gentlemen.  That is what
16   happened, that terrible event that happened that day and
17   that night.

18        Ms. Colston told you she is going to prove to you it
19   happened in Floyd County.  I stipulate now that this is
20   all in Floyd County.  It happened here and she can prove
21   that.  This is where the evidence is going to start to
22   veer off.  The evidence is going to be solid and strong
23   that Joey Watkins went fishing.  My client went fishing
24   this day, January 11th, and he went fishing somewhere
25   around 11:30 or so -- 11:30 or 12:00.

                              -1499-

1      He lived out here -- Joey Watkins lived with his

2   family out toward Kingston, out beyond the connector, the

3   bypass, out 411 back in that area close to Bartow County

4   where there is a Kingston tower, a cell tower. This is

5   what Ms. Colston didn't tell you about. I think she is

6   going to call her expert, but the evidence is going to be

7   that Joey Watkins had planned to go fishing. He had been

8   fishing a day or two within the last few weeks, and he

9   bought him a temporary fishing license. He had been

10  fishing. He was fishing with his Uncle Toby Garrison who

11  runs the Pit Stop.

12      Ladies and Gentlemen, this is not some defense

13  lawyer's tale. This is what the evidence is going to

14  show you. I expect the evidence to show not only had he

15  fished a few days prior to that, he was fishing on

16  January 11th. He had a date with his girlfriend, Aislinn

17  Hogue, in Cedartown that night. They had been having no

18  problems. She was, in fact, sick.

19      The evidence will show that there was a call made at

20  3:42 that afternoon, 3:42 to 3:44, somewhere right in

21  there. The time is going to be important in this case,

22  but on that call, 3:42 or 3:44, he had called her. They

23  had made arrangements for him to go watch her play ball

24  that night. She was playing ball in Cedartown with the

25  school. She said, I am not feeling good. I am sick.

-1500-

1    She played the ball game, but she was going home.

2    She said, I am not feeling good.  Just come over to my

3    house.  She had an upset stomach.  So he had made

4    arrangements to go to her house.  But the evidence will

5    show that Joey Watkins left and there will be

6    uncontradicted evidence that he left there Alabama time

7    now, which is one hour behind Georgia time.  Just keep up

8    with that, because I expect there will be some folks

9    trying to fool you with that.

10    They left Alabama time somewhere around five, five-

11    fifteen, somewhere in there.  That would have been six,

12    six-fifteen in Georgia.  Lake Wiess, most of you know

13    where it is at.  Mr. O'Dell asked you in voir dire,

14    straight out 20 going into Alabama, going out Turner-

15    McCall, out through Coosa and everything, going out

16    there.  He went fishing out there with his Uncle Toby

17    Garrison who runs the Pit Stop.  They will testify what

18    time he left that day.

19    Not only that but  he left and he got home somewhere

20    around 6:45.  That is what the evidence is going to show,

21    Georgia time, which would have fit.  If he had left there

22    at five, five-fifteen, it would have been six, six-

23    fifteen here.  He was on a motorcycle.  He had a

24    motorcycle, and he drove home.  He went to his house out

25    in the Kingston area, Floyd County.  He beeped his

-1501-

1   girlfriend Aislinn Hogue just as he got in.  He got home.

2   His sister was there, Tandi.  Her boyfriend there was Tim

3   Hughes.  His parents were not in.

4       He went in; said, I have got to take a shower.  I am

5   going to see my girlfriend in Cedartown.  He got home and

6   the evidence will show and it will be uncontradicted by

7   scientific evidence and phone records that Aislinn Hogue

8   called him, and this call was precisely on the phone

9   records at 6:48 p.m.

10       The evidence will be that Tim Hughes answered the

11   phone.  Now there is going to be a little bit of

12   discrepancy in the evidence, but it is not as cynical as

13   Ms. Colston would had you believe.  What the evidence is

14   going to be that the detectives didn't talk to  Aislinn

15   Hogue for months, and the evidence will be they went over

16   there telling that Joey Watkins was a murderer, got the

17   entire family upset with him.  That is when the trouble

18   started.  That is what the evidence is going to be, over

19   there telling these people these things; that he was

20   never in Alabama fishing.  That is what the evidence is

21   going to be.

22       He went over there and told his girlfirend, he is a

23   murderer and he wasn't in  Alabama.  He wasn't over there

24   fishing.  The evidence will show you that he was in

25   Alabama fishing.

-1502-

 1          And then when she called at 6:48 and talked to Tim

 2     Hughes, they will forget who said what, but the phone

 3     call is one minute.  She didn't talk long, one minute.

 4     She talked to Tim Hughes and he said he had just got in

 5     the shower.  Said tell you he was on his way, something

 6     to that effect.

 7          The evidence will be confusing in some areas,

 8     because people forget when they don't talk to police for

 9     a long time.  But the evidence is going to be that Joey

10     talked to the police.  He got his lawyer.  They were

11     hounding him, and he gave a statement.  He gave a

12     statement without the benefit of his phone records, but

13     he sat down and talked to Detective Key that had talked

14     to Detective Sutton.   The evidence will be he talked to

15     him and he told him everything he did.  He went fishing

16     in Alabama.  He told him about the call, going to his

17     girlfriend's.

18          I will tell you what the scientific evidence now

19     will be that Ms. Colston didn't tell you about.  There is

20     going to be phone records in this case, Ladies and

21     Gentlemen.  There is going to be cell phone towers

22     involved, and that evidence is going to be that Joey

23     Watkins made a few calls on his cell phone.  And he told

24     the police in advance without the benefit of these calls,

25     and you are going to see the evidence.  You are going to

-1503-

1   hear testimony by perhaps two experts.

2       He told the police in his initial statement without

3   the benefit of a phone call that he got home somewhere

4   around seven.  And I think it was actually the detectives

5   putting words, oh, it must have been about this 7:15 when

6   you left.  He said, yeah, somewhere in there.  He didn't

7   tell them that.  They picked that time, but the evidence

8   will be that he did leave about 7:15 because he told

9   them, he called his girlfriend.

10      The phone records are going to show you he called

11  his girlfriend at 7:15, Aislinn Hogue.  It is going to be

12  her number.  It is going to be his cell phone.  He called

13  her at 7:15.  The evidence is further going to be that

14  this cell phone call was picked up by the Kingston tower

15  that put him over at his house in Kingston where he said

16  he was, where there is no evidence to contradict that.

17  He was there at 7:15, and the expert is going to tell you

18  that.

19      That is why we were asking you in voir dire, do you

20  know about cell phones?  He left his house -- that phone

21  call lasted four minutes and twenty-three seconds to his

22  girlfriend on the Kingston tower at 7:15.  There are

23  going to be a lot of things blown out of proportion on

24  this to make you think he has done something because

25  these kids are fussing.  The scientific evidence is

-1504-



1   going to show you that at 7:15 the phone call lasted four

2   minutes and twenty-three seconds.

3        Testimony from the experts will further tell you, at

4   least that is what they have told me, Ms. Colston's

5   expert, is that this 7:15 call could have been anywhere

6   from 7:15 01 on up to 7:15 and 59 seconds, just somewhere

7   in that 7:15 time frame.  So let's just give them the

8   benefit of the doubt.  It happened at 7:15.  He talked

9   for four minutes and twenty-three seconds.  That was 7:19

10  and twenty-three seconds, almost 7:20.  He was still on

11  the Kingston tower talking, and the shooting and the

12  chase and when they go with their own evidence, Mr.

13  Benson out there was happening, and then he told the

14  police, yes, I was going to Cedartown.  It happens to be

15  going out there where Isaac was coming from school.

16       He said, I saw Isaac's truck, but what Ms. Colston

17  has not told you, he also made a couple of other calls.

18  He called at 7:21, called his house back.  And the

19  evidence will show you where that call was picked up.  He

20  called at 7:21 after he got off the phone immediately

21  with that four minutes and twenty-three second, around

22  7:20, he dialed the phone and made another phone call.

23  He called home and asked his family, what is my uncle's

24  number over there?  I am going to take Tim fishing.

25       When he was at home, taking a shower, getting ready

-1505-

1   to go, Tim is going fishing with him the next morning on

2   the 12th.  He is going to take him fishing.  So they

3   didn't know.  So he made another call.  That call didn't

4   last hardly any time, forty-three seconds, because they

5   didn't know the number.  He picked up the phone called

6   back and talked to his grandmother.  His grandmother knew

7   the number.  She gave him the number.

8        So then he called Alabama.  It is going to be on the

9   records, called at 7:23.  Said, Uncle, I am bringing Tim

10  fishing with me.  Will it be all right tomorrow?  Sure.

11  And then he is traveling on.  He is getting down about

12  the accident scene now.  Of course, it has already

13  happened.  And he makes a phone call at 7:27.  Ladies and

14  Gentlemen, this is where he called back home again and

15  told his sister, Tandi, said, Tandi, said, it looks like

16  Isaac has had a wreck or something.

17       His truck is very identifiable.  It has got a big

18  brush guard on it.  A lot of people talk about that brush

19  guard throughout these statements.  It looks like he has

20  been in a wreck.  You might want to call his sister.

21  Said, well, I am not calling her.  There were feuds going

22  on, but there is going to be other evidence that I

23  suspect the State is not presenting.  We are going to do

24  our best to present it.  There is going to be other areas

25  that they have seemed to have forgotten about.

-1506-

1    I will tell you what they didn't tell you.  There

2    was another drive-by shooting that night out there on 27.

3    The evidence is going to show they took a police report

4    on that.  It happened somewhere in the same area, same

5    time area.  The police report says eight or eight-thirty,

6    but I think they have got an excuse for that.  They don't

7    make mistakes when they are dealing with a lot of things,

8    but sometimes they make mistakes.

9        The police report says there was another drive-by

10   shooting around eight or eight-thirty.  They are going to

11   ignore that.  Do you know what kind of car it was?  They

12   have got a description of a blue Honda, the same as used

13   in this case.  The evidence is going to be that Mr.

14   Sutton --

15       MS. COLSTON:  I am going to object at this point,

16   Your Honor.  He is mischaracterizing what the evidence is

17   going to be in this case tremendously.

18       THE COURT:  Well, it will be up to the jury to

19   determine that.

20       MR. ABERNATHY:  Thank you, Judge.

21       THE COURT:  Call it to the jury's attention.

22       MR. ABERNATHY:  Thank you.  Ladies and Gentlemen,

23   the evidence is going to be that other drive-by shooting

24   happened and the same description of the car, at least

25   that is what the record will show.  Also, the record is

-1507-

going to show that the police took Mr. Watkins' sister's car because it happened to be a little Sunfire or Spitfire or -- I think a Sunfire, a little aqua color. They carried it out to Mr. Benson months later and said, doesn't this look like the car? This is it. They tried to put Mr. Watkins in this little greenish, aqua colored car of his sister's. He didn't have time to change cars. He went home on his motorcycle. He got in his truck, and he went straight away to Cedartown.

Now all these jail people looking for the reward and looking for the money and a deal to get themselves out of jail, they start telling all kinds of stories. He has had two or three people with him. They went and got this car and went and got that car. I don't know which tale they are going to tell, but I guarantee they are going to be a bunch of them they bring as witnesses in here, because they have told more stories trying to get this money and work a deal for themselves. They have told more stories than I have ever seen.

Ladies and Gentlemen, not only perhaps Mr. Watkins was on the phone when this shooting happened, but he never had time -- he never had time and that brings me to this indictment. Now the judge is going to tell you and Ms. Colston has read it and wants to talk about all this murder, and the judge has told you it is not evidence.

-1508-

1   He has pled not guilty to everything on here.  They want

2   to read these murder -- they read this indictment.  You

3   know it is not evidence.

4       Well, let me just start in reverse, Count Five,

5   stalking on January 11th, they say that my client, Mr.

6   Watkins, was out there harassing, intimidating and

7   following without consent, placing under surveillance

8   Isaac.  He wasn't doing that.  I told you what the phone

9   records is going to show, and it is going to be

10  uncontradicted that he didn't go out to the college and

11  put anybody under surveillance.  He didn't follow

12  anybody, didn't stalk anybody.  He not only didn't have

13  time, his whereabouts are going to be accounted for.

14      The evidence is going to be this happened I told you

15  January 11th, some ten months later, November.  He was

16  arrested by Mr. Sutton after his investigation, but the

17  evidence is going to be in the police report that the

18  jail people, all of them were looking for deals and

19  unreliable.  It is in their police reports.

20      They were telling so many stories they can't keep up

21  with them, and they can't present to you a theory in this

22  case.  Now they are going to bring to you this fellow, I

23  think they said Mr. Barry Mullinax.  It was dark -- keep

24  in mind that 7:20 on January 11th -- I think it gets dark

25  somewhere around 6:15.  We can get on the Internet and

                          -1509-

1    find out, I guess, but it was dark.

2        The accident report says non-lighted, and they are

3    going to bring in this Barry Mullinax, who I will predict

4    they know is not reliable who said he was following a

5    couple of cars and he looked through the rearview mirror

6    at night and saw it was Joey Watkins in this bluish car.

7    And then the evidence the detectives -- he said somebody

8    was with him, his girlfriend, Tina Proux, p-r-o-u-x, said

9    Tina Proux was with him, and they went and talked to her

10   and she said, he is a lie.  This didn't happen.  It is

11   going to show that he is trying to work a deal himself.

12   He has got problems of his own.

13       Everybody started hearing -- and there is a lot of

14   rumors about this, and everybody is getting involved.

15   That is what the evidence is going to show you.  Ladies

16   and Gentlemen, she mentioned -- and I didn't think she

17   would call that fellow, but it is not true.  The evidence

18   will show you that he is a liar.

19       Now they want to ignore Mr. Benson's testimony.  He

20   said that it wasn't Watkins' sister's car.  They have no

21   car.  So then the evidence is going to show you that Mr.

22   Sutton will go out and pull somebody out of jail and talk

23   to them to try to get another story, and he got a lot of

24   stories.  He got plenty of stories.  And what was

25   happening, all these kids, all these children had this

                              -1510-



1    rivalry or they wanted to point fingers, and there is

2    also going to be some statements they talked to some kids

3    and they pointed fingers at some of the other children,

4    pointed fingers at some of the others.  That was ignored.

5    I hope we can get the fellow here.  I think he was in the

6    military, but we are going to try to bring you a witness

7    in if we can get him, and this witness is going to tell

8    you -- he is going to contradict a lot of things, a lot

9    of things that all these stories started about that it

10   was probably Joey.  He was fussing with him.  He was like

11   -- Joey Watkins had not gone with Brianne Scarbrough

12   since the summertime.  This was January -- since back in

13   July and August.

14        She had dated many people, and he had dated a couple

15   of other girlfriends, and the evidence will be also in

16   this case and what Ms. Colston didn't tell you a fellow

17   named Paul Allen, one of her star witnesses, is going to

18   come in here, I expect, and take the stand.  He was

19   dating Isaac Dawkins' sister, Samantha Dawkins.  Isaac

20   didn't like it one bit.  As a matter of fact, the family

21   didn't like it.  They had made them stop seeing each

22   other.  That is what the evidence is going to be from the

23   transcripts, made them stop seeing each other.  She snuck

24   around.  They got back together a few weeks later when

25   she went out and lived for a couple of weeks.  The

                              -1511-

1    evidence is going to show you that she lived a couple of

2    weeks with Paul Allen.

3         MS. COLSTON:  I object to this, Your Honor, as to

4    what relevance would anything that had to do with Isaac's

5    sister have to do with this?  And he gets to the point

6    where he just arguing the evidence, Your Honor, and I am

7    going to object to that as well.

8         THE COURT:  Stick to what you expect the evidence to

9    prove, please, sir.

10        MR. ABERNATHY:  And I expect to show you -- I expect

11   to show that the evidence will show you -- not me -- the

12   evidence will show you that Isaac Dawkins -- Ms. Colston

13   told you he didn't have anymore enemies.  He had enemies.

14   Paul Allen went out there -- excuse me -- Isaac Dawkins

15   went out there and removed Paul Allen from living with

16   her, moved his sister out and separated them.

17        Something was going on, and he got her out of there.

18   The evidence will be also that they have not pursued

19   this.  The evidence will show you that there was another

20   witness telling the police they ought to look at Paul

21   Allen.  And another fellow, Adam Elrod, made a phone

22   call.  There were people asking all kinds of questions

23   about Isaac and where he was at.  It wasn't Joey Watkins.

24   That is what the evidence is going to be.

25        There is going to be a lot of things that we don't

1    want to hear.  Ms. Colston has not put forth these

2    theories to you, but there is going to be some things,

3    and it is going to be iffy and questioned about

4    credibility.  She talked to you about credibility of the

5    witnesses.  The scientific evidence in the case is I have

6    already told you the phone calls and the records.  You

7    are going to hear from Dr. Steffus, our expert, who

8    generally by the way testifies for the prosecution.  I

9    don't know that he has ever testified for the defense.

10   He is going to tell you and he is a doctor and a

11   professor down at Georgia Tech.  He is going to tell you

12   about these cell phone towers, and he is going to tell

13   you that everything that Joey Watkins told the police --

14   everything he told the police without the benefit of

15   these records is consistent and true with what happened,

16   and their own expert, I suspect, will tell you -- if they

17   don't, Dr. Steffus will tell you that there is no way --

18   no way that that 7:15 call that Joey Watkins made to his

19   girlfriend in Cedartown could have been made out there

20   even in Rome or out toward the college.  He is going to

21   say zero percent.  He might say one percent if there are

22   some helicopters up there shooting and beaming it off.

23   He is going to say it is impossible, didn't happen.

24        Ladies and Gentlemen, that is what the evidence is

25   going to show you.  There is going to be evidence ignored

                              -1513-

about the other drive-by. There is also going to be, and I am not trying to predict what is involved in these other things, Ladies and Gentlemen. I am just going to -- there is going to be another lady they were interviewing about a gang out there, a motel where this happened. Was she involved in a drive-by shooting, or did she have to shoot someone to become a queen?

That is why Mr. O'Dell has asked you about the gang. But, Ladies and Gentlemen, they are going to try to ignore the scientific evidence, and they are going to try to ignore their own witnesses at the scene; and they are going to try to ignore these phone calls and these records that she didn't talk about in opening, and I am going to remind you about it at closing.

The uncontradicted evidence is going to be Mr. Watkins has not committed any of these offenses as alleged in this indictment. He was not in a car like that. He was in a truck. His whereabouts is accounted for. He was on the phone when it happened. The mere fact the case -- their evidence is going to be the mere fact that he was in the vicinity, but he told them -- they want to make out like it is some big secret. They just didn't happen to discover -- the evidence is going to to show you they didn't discover he was in the vicinity. He told the police early on, he said, I saw it. He went

-1514-





1    got his lawyer and talked to them.

2         He wouldn't talk to some of the police because of

3    the way they were acting, but he got his lawyer and he

4    agreed to talk to Mike Key.  And he sat down and told him

5    everything he knew.  They have got it on tape.  And he

6    told the truth, and you will hear it.

7         In all this case the evidence is going to be this:

8    the State's evidence is going to be bringing a lot of

9    children in here talking about the conflict between Isaac

10   and Joey and the State is going to do all they can to say

11   that is all the problems there were.  That is what the

12   evidence is going to be, and then the scientific evidence

13   is going to show that he couldn't have done it and he

14   didn't do it.  And the devil is in the details.  The

15   devil is in some of these people out there in jail and

16   some of these people trying to work deals.

17        Ladies and Gentlemen, I apologize if I talked too

18   long and become compassionate, but this is serious

19   business and a serious duty.  There is going to be some

20   other things that perhaps I forgot to tell you that is

21   going to help my client, Mr. Watkins.

22        I ask you to listen to all of it, and when we are

23   through you will see that he has not committed any of

24   these offenses.  Neither can they connect him -- Ms.

25   Colston said in her opening statements they connected

-1515-

1    Mark Free and he together -- neither can they connect

2    them together.  They were not together.  There were no

3    phone calls.  The records won't show any.  They were not

4    together that day.  They didn't even see each other.

5    That is what the evidence is going to be.  And she told

6    you that she has offered him immunity and she is going to

7    put him up here.

8         Well, the evidence is she has offered Mr. Watkins

9    immunity too, but they can't take it.  They didn't do it.

10   If I was Mr. Free sitting out there waiting to go to

11   trial, I would take immunity like Ms. Colston has offered

12   and I would take the stand and tell on him, but he can't

13   do it because he is not going to do it.  He is not going

14   to tell them something that he doesn't know.  When she

15   puts her star witness, Josh Flemister, up there, he has

16   told so many stories -- and I will tell you why he told

17   it.

18        The evidence is going to show you this.  He was

19   friends with Joey.  He was friends with Brianne.  He was

20   friends with all these people, and it was all rumors and

21   talking about who did it.  That is what the evidence is

22   going to be, and Brianne was so mad she was pointing the

23   finger at Joey unjustly.  She was pointing the finger,

24   and the evidence is going to show you that Josh started

25   saying, well, I was with him.  He didn't do this.  And he

                              -1516-



started making up -- he admitted he made it all up.  And
the police went up to Virginia where he was working, and
the evidence will be that they drug him back down here
and he is going to tell you, I told that.  Leave me
alone.  I told these stories.  But the evidence is going
to show you that it couldn't have happened the way
anybody described it happened, and everybody told a
different story.

The facts and the experts and the evidence, Ladies
and Gentlemen, I thank you for your time.  I appreciate
it.  I have said it, and I don't know if I told you at
the beginning, but jury duty is the highest honor and
service you can pay your country in peace time.  We thank
you for being here.  It is going to be a long week, and I
am going to try to keep it direct and get there.  Thank
you for your time.  Thank you for being here.  I look
forward to presenting this case and representing my
client, Mr. Watkins.  Thank you so much.  Judge, thank
you, Ladies and Gentlemen, Ms. Colston.

＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊

-1517-

## CLOSING ARGUMENT BY MR. ABERNATHY

Thank you, Your Honor, and if it pleases the Court, His Honor, Ms. Colston with the district attorney's office, my client, Mr. Watkins, Ladies and Gentlemen of the jury, most of all you, I have already told you and I will not belabor the point, but I think you so much for your service this week. I have already told you that I think the highest duty one can pay to their country in peace time is serving on a jury duty. You are exhausted. You have been here all week. I thank you in advance. I appreciate your service regardless of what your verdict is. I am going to ask you to return a verdict that speaks the truth, but I thank you now in advance for your time in putting up with a couple of lawyers.

Now our system, Ladies and Gentlemen -- I am going to talk to you -- let me say I told you in the beginning the cases have a way of evolving. We started out with voir dire. We asked you some questions and then opening statements. But what you have heard over the last week as evidence is what has come from the witness stand and what has been submitted by the lawyers. I want you to keep in mind that is the evidence.

What I say is not evidence and certainly what Ms. Colston says is not evidence. So keep that in mind, but I want you to understand that ours is an adversarial

-1518-

1    system.  It is one of challenges.  You think sometimes

2    maybe it is Mr. Abernathy against Ms. Colston or both of

3    us against the judge or the judge against us.  It is not

4    anything to do with that.  The only person who has

5    anything to lose or gain here today is Joey Watkins.

6        He has been charged in this indictment.  You have

7    heard it read to you, and I am going to go over in my

8    closing the law, the facts and the evidence, and then I

9    am going to give you a basis because I believe in the

10   innocence of my client, Mr. Watkins, and he is not

11   guilty, and there has certainly, certainly been no

12   evidence from this witness stand or submitted that he has

13   committed any of these crimes.

14       There has been a character assassination all week

15   about the trouble all these children were having, but

16   there is no evidence in this case.  Before I get into the

17   facts and evidence, I told you in my closing I want to

18   talk to you about the law and what I think applies

19   specifically to this case and what I think the judge is

20   going to give you that applies to this case.

21       At the end of our argument, the judge will charge

22   you as to the law.  Now, Ladies and Gentlemen, I told you

23   ours is an adversarial system.  But there is one thing

24   that bounds us all together and thank God, the

25   Constitution of these United States and the Bill of

-1519-

1   Rights is all of our rights.  Ladies and Gentlemen, I am

2   not here to argue some technicality to get my client off,

3   because it is not a technicality.

4       This Bill of Rights has been -- it is the most

5   sacred document ever ordained by a free society, and it

6   is what separates our society from all other societies.

7   I wish we could take a journey and go back and talk about

8   these Bill of Rights and the Constitution because it

9   protects our most sacred rights, the right to worship or

10  not worship as we see fit; a right to a fair, impartial

11  trial by people such as yourselves; a jury to examine and

12  scrutinize the evidence that has been put up in this

13  case.

14      Ladies and Gentlemen, it is not a technicality.

15  Some of you -- most of you are like me, not old enough,

16  but I remember my dad and people have died and spilled

17  their blood on the beaches of Iwo Jima and in Vietnam and

18  on down to protect and enshrine these rights and separate

19  us from all other countries.  I know in Scotland they

20  have three verdicts: guilty, innocent and not proven.

21  Here in the United States we have the same thing.  We

22  have got guilty and not guilty, and that is the same as

23  not proven, Ladies and Gentlemen.  There is no evidence

24  to prove anything in this case.

25      I submit to you both factually and legally --

                        -1520-

1    factually and legally the case -- the State's case is

2    predicated solely and exclusively on the horrible fact

3    that there has been a terrible, terrible death.  And I

4    wish I could have a moment of silence for Mr. Dawkins and

5    his family.  It was a terrible, terrible death and a

6    terrible killing.  And we have never contested that there

7    has been a killing.  The State told you and they have

8    proved there has been a killing, but there is no evidence

9    to connect Joey Watkins to this killing.

10          So, Ladies and Gentlemen, I am not in favor of

11   crime, and I don't want the Dawkins to think that, and I

12   don't want you to think that.  I am not in favor of

13   murder.  And it has been a terrible, terrible thing that

14   happened.  But I want to tell you, Ladies and Gentlemen,

15   again there is nothing to connect my client.  I want to

16   talk to you about these evidence, but I want to talk to

17   you dispassionately and unequivocally what the evidence

18   is.

19          I want you to understand that there has been no

20   proof to a moral and reasonable certainty, and don't

21   listen to what I say but listen to what the judge says.

22   Now as I start, let me talk to you -- I think the judge

23   will charge you on these legal principles.  I want to

24   tell you what they are.  Ladies and Gentlemen, you are

25   going to hear the judge charge you with the presumption

                            -1521-