of innocence.  And, Ladies and Gentlemen, he is going to tell you that no person shall be convicted, unless and until -- unless and until the State comes forth with credible evidence, not impeached evidence, not lies and not what may have happened.  And I want to remind you right now as each of you sit here before we start our argument, not what I say and Ms. Colston, but right now -- you have watched the evidence all week, and right now you don't know what the State claims happened.

You don't know.  You know Joey left in his white truck.  He arrived in Cedartown in his white truck, and you know you have got Mr. Benson over there watching this blue car follow Isaac Dawkins.  There is no evidence to put Joey Watkins in any blue car.  As a matter of fact, there is evidence that they showed the only blue car in the family that belonged to Tandi Watkins to Mr. Benson and he said unequivocally that is not the car.

But, Ladies and Gentlemen, I want to talk to you still without getting into the facts about these principles.  The judge is also going to charge you on the burden of proof.  There are three standards, three weights of evidence in our court system.  And you remember in voir dire, Mr. O'Dell asked you, do you all -- will you all hold the State to their burden of proof.  Will you follow the American system of justice?  And we

-1522-

asked you had any of you sat on the jury before.

Ladies and Gentlemen, it is very important because there are three weights of evidence. First of all, and the judge is going to charge you. Don't listen to what I say or what Ms. Colston. You listen to the judge. That is what I am asking you to do on these legal principles.

In our system of justice, we have a preponderance of the evidence, and if I walked up to the jury box on this rail and this is the center of the rail right here, a preponderance simply means to tilt the scales one way or the other. That is what is required in a civil case, if you sue someone in an automobile accident. The lawyers have to carry their burden to a preponderance, just tilt the scales.

There is a second standard that doesn't apply in this case, clear and convincing. That is what DFACS have to have to come and take your kids from you. They have got to have clear and convincing evidence that you have done something wrong, and it gets away from just to the left or right of the scale. It moves on over to clear and convincing before they can take your children. But that is not the standard in this case.

In a criminal case and we all asked you -- Mr. O'Dell asked you in voir dire, he asked you to follow the

-1523-



1   law.  You promised you would.  And in a criminal case,

2   Ladies and Gentlemen, the proof must be beyond a

3   preponderance, beyond clear and convincing and all the

4   way to proof beyond all reasonable doubts.  Any

5   reasonable doubt, and the judge will tell you proof

6   beyond a reasonable doubt.  If you find any reasonable

7   doubt the judge is going to tell you that the  State has

8   to prove each and every element alleged in the indictment

9   that they have charged.  They have got to prove each

10  element beyond a reasonable doubt.

11      If you have any waivering, any thoughts, then you

12  must acquit.  Don't listen to me.  Listen to the judge,

13  and he will charge you.  He is also going to charge you

14  on direct and circumstantial evidence, Ladies and

15  Gentlemen, and I want you to remember this principle of

16  law.  This is a circumstantial case.  They have no direct

17  evidence against Joey Watkins.  They have a lot of

18  impeached testimony that we are going to go over in a

19  moment when I talk to you about the evidence and the

20  facts.

21      They have got a lot of rumors and speculation and

22  innuendos.  That is what this case is based on.  Ladies

23  and Gentlemen, you are going to listen to the judge and

24  when he says circumstantial evidence, I want you to pay

25  close attention.  He is going to tell you not only -- not

-1524-

only does the State have to prove their case beyond all reasonable doubt but on a circumstantial case, they must exclude -- the State must exclude every other reasonable theory or probability.

Ladies and Gentlemen, they have not done that at all.  And the burden never shifts to the defense.  We can sit over there silent and not say a word, and the burden would never shift to Mr. Watkins to prove anything.  But he has cooperated with the police.  He has given a statement that you are going to have, and he has proven his case that he is not required to prove.

The judge is going to listen [sic] and charge you. I want you to listen to the judge.  He is going to charge you on credibility of witnesses.  He is going to tell you it is up to you to judge the credibility of the witnesses.  When I start talking about the facts of this case, we are going to talk about some of those credibility issues.

He is going to tell you about -- the judge giving you the law and the jury, you.  You are the fact finder. You decide the facts based on the evidence given in this courtroom, not speculation and theory and innuendo of what could have happened or might have happened.  It is not enough that you think Joey because of all these children running around and fussing that he is a bad boy.

-1525-

It is not enough that you think he did it.  It is not even enough that you think he probably did do it.  I am not putting forth that argument because I don't think he did it.  He is innocent, because there is no evidence.

But they put forth this character assassination and want you to find Joey guilty because of all these issues he has had with these people, but you remember there are other issues that come up, issues that the State didn't bring forward, and we are going to talk about that too when we get into the facts.

The judge is also going to charge you with intent.  He is going to tell you that that is an essential element of every crime.  Now, Ladies and Gentlemen, I want you to remember these principles, and I want you to remember presumption of innocence because, Ladies and Gentlemen, I have tried cases, many cases, but this case is not about me.  It is about Mr. Watkins, but I want to tell you right now the presumption of innocence seems to me that it has gotten lost.  It is just the title of a book or movie, and I am going to tell this principle, presumed innocent, is what anchors us and separates us from all other nations.

This is not some recent Leftist doctrine that I have come up with as a defense attorney.  It is what has been enshrined in our Constitution, these Bill of  Rights, I

-1526-

1   am talking to you about that ties all these principles
2   the judge is going to tell you about -- ties it all
3   together and it is what bounds this entire courtroom
4   together.  It binds the audience together and the judge
5   and you the jury and it protects the salinity of these
6   trials.

7       Ladies and Gentlemen, it is not a Leftist doctrine
8   that has just come up by me.  It has been around.  It is
9   rooted in the Bible in the book of Deuteronomy and in
10  ancient Roman and English law, and it has come on down
11  through our system, and I could see the time when every
12  nation -- it is just America right now, but every nation
13  that bears truth and religion and credibility anchors
14  this principle.

15      Now, Ladies and Gentlemen, there is a couple of
16  issues also in the law, and then I am going to move on to
17  the facts and evidence in this case.  But there are a
18  couple of issues that the judge is going to tell you
19  about, and I want you to pay close attention other than
20  the circumstantial evidence and proof beyond all
21  reasonable doubt.  I want you to listen to him when he
22  talks to you about guilt by mere association.  He is also
23  going to tell you about that principle of law.  And he is
24  going to tell you that mere association by persons other
25  than persons involved in the commission of a crime

-1527-

1    without more would not authorize the verdict -- you must

2    acquit.  He is going to tell you about guilt by mere

3    association.  He is also going to charge you on the

4    principle of law that is applicable in this case.  I

5    believe he is going to charge you on mere presence at the

6    scene of a crime.  Mr. Watkins was not present, and the

7    expert -- both experts have come into this courtroom and

8    proven that to you, both of them.  But the judge is going

9    to tell you even if he was in the area of the crime, mere

10   presence at the scene of a commission of a crime without

11   more is not enough.

12        Ask yourself right now, do you know -- do you know

13   what the theory what the State has put forth is?  Do you

14   know?  Do you know what kind of car that Mr. Watkins was

15   in and what time the murder was in?  I tell you what: you

16   are going to have to ignore to find Mr. Watkins has done

17   anything wrong as far as this shooting incident, you are

18   going to have to ignore the only credible witness, I

19   think, the State has brought forth.  There are a lot of

20   people that were not brought forth, and I want to talk

21   about them too.  But  the only credible witness, that of

22   Mr. Wayne Benson, and we are going to talk about Mr.

23   Benson.  But before we do, I want to bring a chart

24   forward so we can go over this and you can understand it.

25        You are going to have the evidence and the documents

-1528-

to look at, and I want you to examine them closely.  But I want to show you the chart that brings forth all of these timings by both experts and what the evidence is in this case and what I told you in the beginning.

Ladies and Gentlemen, here is a chart, and I am not trying to mislead you.  I want you to look when you go back and you deliberate -- I want you to look at State's Exhibit Number 31, and I want you to recall there are no Alabama times on here and I want you to recall Ms. Aislinn Hogue who came in here and testified that Investigator Sutton, who never took the stand in this case, the chief investigator -- chief investigator and never took the stand.  He told Aislinn Hogue and it is uncontradicted that he -- that Joey was never in Alabama, and you remember they made up their charts and their own expert says, well, we don't have the Alabama on there. But you recall -- you recall the other evidence we brought in, and you look at it.  You look at the defense exhibits of the phone records.

He was in Alabama fishing just like Toby testified to, but you look at State's Exhibit Number 31 and this is exactly what is on it.  I am not trying to mislead you. I told you in the beginning I was going to present this case with credibility and with honesty and integrity and that is exactly, exactly what I am trying to do, and

-1529-

1     exactly what I have done and you hold me to it.

2          I have made a chart with the dates, time, duration

3     of the calls, the caller, the tower and the person

4     called.  And you look at it, and this is what the

5     evidence from the witness stand has shown.  It is not

6     what Rex says or what Ms. Colston says.  This is the

7     evidence on January 11th.  You look at the documents in

8     their entirety.  This is the relevant times and the

9     relevant call at the time of this tragic incident.  But

10    you look at all the calls and you remember all the

11    subpoenas -- well, I started to say Mr. Sutton, but he

12    didn't take the stand.  You remember -- you remember the

13    investigator that I got up there and he didn't know about

14    subpoenas.  He knew they subpoenaed all these records,

15    and, Ladies and Gentlemen, you are going to hear the

16    judge tell you about evidence or lack thereof or what was

17    shown or what wasn't shown.

18         You keep in mind there has been evidence from the

19    witness stand from an investigator that they did phone

20    taps, secret phone taps.  Not one iota of evidence from

21    those phone taps have come in, and I will submit to you

22    both factually and legally why they haven't come in.  I

23    will tell you why they haven't come in, because they have

24    got no evidence.  They were secretly telephone tapping

25    Joey Watkins' home, all these other people, and they got

                          -1530-

1    no evidence, and they can't bring it to you long before

2    they were arrested.  And do you know why they didn't

3    bring it to you?  Because there is no evidence.

4        MS. COLSTON:  Your Honor, I hate to object and I

5    usually don't in closing argument but he is arguing facts

6    that have not been placed in evidence.

7        MR. ABERNATHY:  Judge, I can comment on what they

8    didn't bring.

9        THE COURT:  He can comment on that.  I will overrule

10   your objection.

11       MR. ABERNATHY:  Thank you, Judge.  But keep that in

12   mind.  Now let's look at this chart, this State's Exhibit

13   31 when you go back there.  January 11th of 2000, Joey

14   Watkins from his cell phone, and you will have it on that

15   exhibit -- I think it is 0457 or something like that, but

16   you have got the exhibit.  You will look at it.  At 7:15

17   p.m. Joey Watkins made a telephone call to Aislinn Hogue.

18   She got on the stand and told you about it.  Do you

19   recall there was a 6:48 phone call, and it is on some on

20   the exhibits, 6:48 phone call she called -- she said she

21   thinks she talked to Joey.  It was a one-minute phone

22   call.

23       Tim said he talked to her, told her he was in the

24   shower, eating a sandwich or something and on his way.

25   Two witnesses took the stand and told you he made a call

                                -1531-

1   to Aislinn, call Aislinn.  Tell her I am calling.  I am
2   on my way.  He calls at 7:15.  It was picked up, Ladies
3   and Gentlemen, by the Kingston tower -- by the Kingston
4   tower, and I will be asking you when you go back there to
5   examine State's Exhibit Number 30.  You have all heard
6   and I expect -- I don't know how to use Mr. Elmo over
7   here, but I expect they will get the pointers out and
8   start pointing.  But I want to remind you what the
9   evidence was from the witness stand, and you are going to
10  have these documents.

11      I want you to look at State's Exhibit 30, and you
12  are going to see the different sectors of this Kingston
13  tower, and you are going to recall that Joey lived way
14  over here up in -- I think it was Parkwood Drive, 28
15  Parkwood Drive, and he drove over and got on the bypass.
16  This call he made at 7:15 when he testified to the
17  police, gave this statement that is in evidence, he left
18  around 7:15 or 7:20 without even the benefit of these
19  calls.

20      You remember that?  And not only did he make the
21  call at 7:15, it lasted four minutes and twenty-three
22  seconds.  And you remember the expert from Verizon, Mr.
23  Bahn, he said, well that 7:15 is somewhere between 7:15
24  and 7:16, by 7:15 59.  It couldn't be 7:14 59, but it
25  could be 7:15, 7:15 01.  Do you remember that?  Talking

-1532-

1    about seconds.   So we know it was at least 7:15.   It

2    could have been 7:15 59.   But let's give them the benefit

3    of a doubt.   7:15, four minutes and twenty-three seconds.

4    That is 7:19 23.   Do you remember both experts

5    testifying, and they said there was no way that call

6    could have happened down here at the crime scene, no

7    way.

8         Now if you -- that is 7:19 23.   He was on the phone.

9    He was on the phone by records, not that the State

10   introduced, but that the Defense introduced after getting

11   the phone records from 9-1-1.   You are going to see it,

12   and I will tell you where you are going to see it.   You

13   are going to see it as the defendant's exhibit number

14   one, Defense Exhibit Number One, and you recall it is

15   going to be 7:19 in the evening, not when this incident

16   happened, 7:19 when 9-1-1 gave it out.   They gave it out

17   to the Floyd County Police Department, and then later

18   they cancelled it because it was in the Rome city limits.

19        You heard testimony from Detective Shiflett, Captain

20   Shiflett, Chief Shiflett, whoever -- you heard testimony

21   they are up there giving out these calls but this is when

22   the unit was sent, 7:19.   And then I want you to also

23   recall Aislinn Hogue's testimony.   I didn't hear any

24   other voices.   I certainly didn't hear any gunshots.

25   Didn't hear anything strange or out of the ordinary.   Do

-1533-

1    you remember that?  That is testimony from the witness

2    stand, not what I say or Ms. Colston says.  I am waiting

3    to hear the theory.  The evidence didn't show it to you.

4         But you have known all along.  That is the first

5    phone call.  The second phone call at 7:21 only lasted

6    forty-three seconds, and you know it was to Tandi.  And

7    you heard Tandi testify he called and wanted his uncle's

8    number, wanted his Uncle Toby's number because he was

9    going fishing, wanted to know if he could bring Tim

10   Hughes.  That is all the evidence in this case.

11        Forty-three seconds.  It was a short phone call,

12   hey, Uncle Toby.  Can I bring Tim fishing with me in the

13   morning?  Yes.  He said they came over there and bought

14   fishing license, was there early in the morning about

15   8:00 Georgia time, I think, seven Alabama time.  It

16   lasted forty-three seconds.  Tandi testified.

17        7:21 -- immediately, and if you add this time up and

18   the time it takes to dial a phone call, he was on the

19   phone immediately.  Now they are going to theorize to you

20   there is some sinister plot going on, but I want you to

21   remember also that out of all these logs, all these

22   subpoenas, all these phone records, there is nothing,

23   absolutely nothing to tie Mr. Watkins to any Mark Free or

24   Josh Flemister or Barry Mullinax or any of these other

25   wild characters, absolutely nothing, no evidence.

                              -1534-

1    That came from the Rome cell.  Now I want you to

2  recall the expert, Mr. -- Dr. Steffus from MIT, who

3  examined these documents, looked at them, and I want you

4  to look at State's Exhibit 30 and 28 and I want you to

5  recall his cross-examination by Ms. Colston. You know,

6  and this is how lawyers do.  I am not talking about Ms.

7  Colston. She is an excellent lawyer.  I think you have

8  all agreed and seen that.  But do you remember on the

9  cross-examination the evidence that came out from  Dr.

10  Steffus?

11    Ms. Colston kept asking him about this dead area at

12  the bypass.  He said, well, no, you know if you look up

13  to the east going down the bypass toward 411 -- I think

14  we had a big discussion about State Route 20, 411 or

15  whatever.  If you are driving toward 411 on the bypass

16  there is a mountain range to the east side which is back

17  toward Kingston.  He said it blocks out the Kingston

18  tower, and do you remember he said the Turner McCall

19  tower was low and there is -- and you look at the

20  evidence.  You look at the evidence.  There is yellow and

21  green spots going down the bypass, green spots, but you

22  remember Ms. Colston was asking him, well, what about

23  this white?  He said, yeah, that is where, you know, you

24  pick up different towers.  He said, that is where the

25  Rome call picked up from the Rome tower.  And you know,

1    Ms. Colston said, well, that is dead spots, dead spots.

2    He said, yeah, that is what they call them.  Don't be

3    confused.  You know, that is what they call them, but you

4    still get calls.  You get calls and it was picked up by

5    the Rome tower just as we look at the close-up coming

6    down the bypass you are going to see this green section

7    way over here from the Rome tower, jumping clean over

8    Turner McCall.

9        Kingston can't get to it because he said this

10   mountain range come down here.  You have got the yellow,

11   the green, coming along the bypass and the green from

12   over here at the Rome tower.  It all fits in a sequence

13   just like they called it, 7:21, 7:22, these short phone

14   calls, Tandi, and then he had to call Toby's grandmother

15   to get the number.  And those calls were made from the

16   Rome tower just like our expert testified coming down the

17   bypass.

18       And you remember also when Ms. Colston was cross-

19   examining him about this dead area, that she called dead

20   area, he said, well, that is what they call it, but it

21   picks up and these mountain ranges that block the

22   Kingston tower allowed this Rome to come over.  Do you

23   remember that?  And then -- and then after he said both

24   of these calls, and we know where they went to.  You had

25   testimony from both Toby and Tandi, and they fit the

-1536-

sequence with the time and you recall Mr. Benson's
testimony.  Joey wasn't way down here, way down here in
the Turner McCall area in this blue down by the college
where the murder scene happened.  It wasn't down there.

So then he gets to the 7:23 phone calls and calls
Toby.  It only lasts twenty-five seconds.  Uncle Toby,
Toby, Uncle Garrett, whatever he called him -- I imagine
Toby.  Toby is not that old.  Can I bring Tim Hughes
fishing with me?  Yes.

Twenty-five seconds.  He hangs up, and then you
recall Tandi said she had a second phone call from him
and it is in Joey's statement that he gave to the police
months before -- months before these records.  Don't be
confused by all these rumors, speculation.  The State
would have you believe that all these things started
because everybody knew something.  They would have you
believe that Joey Watkins committed this horrible act and
then went out and told everybody he ran into.

But we are going to talk about those incredible
witnesses in a moment.  But you know they got their story
-- the jail people before the preliminary hearing, you
remember they didn't have any facts?  They are just
telling the story, yeah, they told me this.  Joey
Samples, for example, Joe Samples -- do you remember the
character that came in here and sat down and said, yeah,

-1537-

1    yeah.  On direct exam by Ms. Colston he was trying to

2    tell you Mr. Watkins admitted to these things.  But you

3    know the hard, cold fact when I got up and said, did he

4    ever admit to anything?  No, he didn't.  He was in there,

5    oh, you need to confess your soul. You need to tell me.

6    You need to tell me, asked him several times, but he had

7    no facts.

8        Then when they started coming forward with facts

9    before the preliminary hearing, all speculation,

10   innuendo, everybody in the jail wanting to make a deal,

11   and remember the people that didn't come and testify, do

12   you remember in opening statement we talked about this

13   character Cooley who never showed up, and I tell you why

14   he never showed up, because he was going to tell the same

15   story.  He didn't show up because Mr. Ellis took the

16   stand and told you the truth what happened.  They plotted

17   and connived to get them a deal.  Think what you want.

18   Ms. Colston asked all the questions, oh, no, we can't

19   promise you anything.  And that is how the police do.

20   They go to interrogate and say, you know, we can't

21   promise you anything.  But, you know, -- you know, tell

22   us what we need to hear.  Tell us what we want to hear.

23   Tell us something.  And they are expecting a deal, and

24   they tell it.  They don't have the tape recorder on.

25       And they get these people to tell these outlandish

-1538-

1  stories but they knew they didn't fit.  You have got a

2  car that Joey was never in.  You have got a lookout by

3  Mr. Benson.  Mr. Benson said he followed the car for five

4  minutes before the call went out at 7:19.  I don't know

5  what time the call came in.  Let's say it came in to

6  9-1-1 at 7:19, but they gave it out at 7:19 also.  Mr.

7  Benson said he followed the car for five minutes.  I

8  said, well, to give you the benefit of a doubt, now it

9  could have been a couple of minutes?  He said -- you

10 remember, they slowed down?  He might have said they come

11 to a complete stop.  I am not trying to fool you.

12 Whatever the testimony is you remember -- you remember

13 it.

14      But he followed that car down between Walker

15 Mountain and all down in there from the college where he

16 thought he saw a spark fly or something he told the

17 police later.  No way -- no way Joey Watkins could have

18 gotten down there and turned around, everybody see him.

19 He goes up there, talking on the phone, makes a shooting,

20 makes phone calls and drives on to Cedartown.

21 Unbelievable.  It is unbelievable, Ladies and Gentlemen.

22      I want you to look at these documents, and I want

23 you to remember also Dr. Steffus, who is as credible as

24 they come, took the stand and said, well, you know, these

25 things are a hundred to three hundred meters.  And when

-1539-

1     you look at these things, look at the little square box.

2     It is computer generated.  The little square box, how

3     they divide areas, computer generated.  Do you remember?

4     He said, well, it is a hundred and three hundred -- a

5     hundred to three hundred meters.

6        There is testimony about maps, various maps

7     generated.  This is the one we have got now, and I want

8     you to look at it.  Mr. Watkins' story fits, and even

9     when I asked Detective Shiflett from the witness stand,

10    well, did you go out and time it?  Did you see if Joey's

11    story fit?  Yeah, it fit.

12       But then you recall there was no more testimony.

13    Nobody got up and asked him about all this, because it

14    fit.  He said it fit.  They didn't want to talk about it.

15    So, Ladies and Gentlemen -- and then -- then this last

16    call after he called Tandi and said, I think -- and it is

17    in his statement -- I think Isaac has been in a wreck.

18    You might want to call his sister.  Said, I ain't

19    calling.  They were not friends.  But he called her and

20    told her at 7:27.  You look in his statement.  He said

21    the ambulance passed by right in front of him.  I suspect

22    the police are going to try to say, well, he said they

23    passed him.  And, you know, they were going to say the

24    ambulance came from Floyd Medical and couldn't have

25    passed him because he was on the bypass.  He didn't say

1    it passed him.  Look at his statement.  He said it passed

2    by in front of me as I was coming down right there where

3    411 comes into 27 and all the interchanges coming out

4    there.  He said it passed right in front of me.  I had to

5    slow down.

6        And do you recall the police said they were there at

7    7:22.  Joey got out there after six minutes, said all

8    this was going on.  He saw it.  He saw it and he knew

9    Isaac's truck and thought it was his.

10       Ms. Colston is going to make a big deal about this

11   brush guard.  Well, it was up in the woods and it

12   couldn't -- he knew it had a brush guard on it.  The

13   police asked him, how did you know?  Well, it had -- it

14   had distinctive markings on it.  And you heard testimony

15   from the police also it was still there when he drove

16   back by.  He saw the truck, and you heard him.  Tandi

17   said -- Aislinn said, well, no, he didn't mention it to

18   me.  I was kind of sick and all, but he told Mom or Dad

19   or somebody that there had been a wreck, been a wreck.

20   And then incredibly, Mr. Hogue came in here and said he

21   said, my friend is dead.

22       Do you remember that is not what he told the police

23   in the beginning?  Scrutinize the evidence and remember

24   where the details are and what is in it and remember the

25   scientific evidence I told you.  I told you before we

-1541-

1    started.

2         So there are the phone calls.  And then at 7:35,

3    7:35, Joey Watkins again calls Aislinn, and Aislinn

4    testified, yeah, bring me some Gatorade.  I am not

5    feeling good.  He stopped at the store, got her some

6    Gatorade.  He went over there, and they said he arrived

7    about 8:00.  And the time fits and the progression fits,

8    and he was on the phone almost the entire time.  He had

9    that lapse at Turner McCall to get out to Cedartown.  You

10   heard the experts say, yes, that is it.  You go out to

11   Cedartown.  I think he said this one tower wasn't there

12   yet.  I don't know if you call it Miller Mountain or

13   whatever.  Some tower was not there, picking up by the

14   Cedartown, a lot of dead spots also.  You look at these

15   State's exhibits of these maps, look at all those dead

16   spots, flip over there to perhaps thirty and you see what

17   they are calling all these dead spots.  But he was picked

18   up by the Cedartown tower at 7:35 because he was going to

19   Aislinn's, and he left his house at 7:15 and the time

20   fits and the sequence fits.

21        But I put a couple of other notes here, Ladies and

22   Gentlemen, and you remember from 11:33 that morning when

23   he was using the cell phone in Rome, going fishing.  His

24   uncle said he arrived there -- I don't know -- you

25   remember the evidence, two o'clock, whatever.  But there

                              -1542-

was no phone calls from the 11:33 to 7:15, about seven
hours and forty-three minutes.  Why?  Because he was over
there fishing with his uncle.

And you remember, it is not on theirs -- it is not
on their evidence, but you look -- you look at the
Defendant's Exhibit Number Three and you will see Joey's
cell phone while roaming in Alabama --  he was over there
fishing -- he received a call Alabama time at 2:42.
Aislinn Hogue says, well, I can't remember, but, yet it
is not unusual for me to call him around that time, 3:42.
And he was in Alabama and Investigator Sutton says he
wasn't over there.  Aislinn says that.  Aislinn says,
yeah, Sgt.  Sutton came over there.  He was hounding and
dogging and they were talking about everything, and
everybody knew what was going on.  They knew about the
gun.  They knew about the stories, and they want you to
think people were just making this incredible -- had some
inside knowledge.

There wasn't any inside knowledge.  Everybody in
jail was talking about this, and they interviewed Joey
and Paul Allen a few days after, read them their rights.
Everybody knew what was involved and all these stories
started.

And then -- let's talk about just a minute Adam
Elrod.  You know, he is the guy that took the stand.  I

-1543-

1    think he had some encounters with Mr. O'Dell and maybe

2    even the Court, but he took the stand and he says, yeah,

3    yeah, I remember the last time Joey had an encounter with

4    Isaac.  I remember the last time.  He said it was -- they

5    are trying to move it back, see.  Adam is talking to

6    Sutton.  We didn't get Sutton's story, but you remember

7.   Adam talking to Sutton.  He says, yeah, I remember he

8    told him eight or nine months later whenever the

9    interview was.  I am not trying to confuse you.  You can

10   look at it or remember it as you remember it.

11        He told it some eight or nine or ten months later,

12   yeah, I was with Joey and he bought a gun and gave this

13   elaborate story, an elaborate story.  And do you

14   remember?  We had to call Detective Moser back to the

15   stand, and I checked -- call the police back to the stand

16   and say, did Adam tell you about this when you

17   interviewed him?  Oh, no.

18        Ms. Colston did a marvelous job on cross-

19   examination trying to -- well, he was hiding and scared.

20   No, he was cooperating, remember, Detective Moser?  No,

21   he was freely talking to me.  I asked him specifically

22   about a gun.  Well, I don't know anything about a gun.

23   But Adam Elrod, speaking of him, now, Ladies and

24   Gentlemen, I appreciate you tolerating us lawyers.  I

25   know it has been a long case, but let's talk about Adam

-1544-

1    Elrod.

2        Do you remember he got up there trying to push back

3    -- said, yeah, Joey had a fuss with him and it was '99

4    around November right before this horrible incident. He

5    testified from the stand and told the police. It is in

6    his statement. Yeah, about that time. He took the

7    stand, got questioned about it, and do you remember he

8    was talking about this '85 or '86, whatever it is,

9    Silverado, and it was Adam that said it. Silverado

10   Chevrolet truck that Joey had that he owned, that his

11   daddy owned, and they sold it to Travis Camp's daddy. I

12   think his name was Dale Thomas Camp, sold it to him.

13       Well, we had to call Mr. Camp in here to say, no, I

14   bought this truck a year earlier, a year earlier and

15   remember, Ladies and Gentlemen -- think about the

16   details. There were no issues in '98 when this truck was

17   sold to Mr. Thomas, no issues between Isaac and Joey.

18   They had some fusses. We are going to talk about those

19   and arguments. But he dated Brianne and said June or

20   July or somewhere in the summer weeks just for two weeks,

21   four weeks or whatever, dated her June of '99.

22       No -- no way this was about any of that. It is

23   stories -- it is stories that people have come in here,

24   all these kids, taken sides, ganging and talking about

25   speculation and rumor. That is what this case is based

-1545-

1   on.  So you remember about the phone taps and the

2   subpoenaed records and the 9-1-1 records that you saw and

3   didn't see.  And then you look at the evidence, the hard

4   evidence and don't speculate.  You look at the scientific

5   evidence.

6        Ladies and Gentlemen, I don't know yet and I don't

7   believe you know what the State's case is.  Ms. Colston

8   is going to tell you when she gets up here and argues it,

9   but it is not going to be from the witness stand.  It is

10  not going to be based on credible evidence that I haven't

11  heard it.

12       So you look at those issues, and I want you to

13  remember the facts and the evidence that can't be

14  ignored.  Aislinn said, I called at 6:48.  He was at

15  home.  He was way up there in the Kingston area.  The

16  evidence fits what they testified to. I want you to

17  remember all the phone calls I have gone over with you,

18  and I want you to remember if the State's case, I suspect

19  -- I don't know how they are going to answer this 7:15

20  Kingston problem.  They are going to try to tell you it

21  is one of those little blips down there, but you remember

22  the blip is still -- they tried to move it down toward

23  Chulio Road and the cross-examination of Ms. -- Dr.

24  Steffus, but you remember he said, no, no.  Y'all look at

25  the map.  Don't believe what I say.  He said, no, no.

1    The little blip -- the last place that you believe it

2    could possibly happen in the one-percent area that is a

3    blip on 411, he said it is up between Chulio Road and on

4    up toward the bypass, right in there, about halfway.

5         You look at that blip. You look at it and see. He

6    was there at 7:15. And for their theory to work if you

7    believe Mr. Benson who is credible and I believe him was

8    following this car somewhere around 7:15, 7:16 while Joey

9    was on the phone. Following that car he would have had

10   to have been down there making that phone call, and he

11   had been following the car up -- he would have had to

12   shoot him while he was on the phone and Aislinn

13   listening. And then he would have had to call about

14   these trips and went on to Cedartown and got back up

15   here, and what did they tell you?

16        Let's talk about those jailhouse people. Y'all

17   remember, and I will just mention their names: David

18   Jones. Fifteen thousand dollars and he is there. You

19   give me that 15,000 reward and Mark Free was there.

20   There is no evidence about Mark Free being anywhere and

21   examine this document, the cell phone records and the

22   telephone records.

23        And you remember Joey Samples before the transcripts

24   didn't know any facts at the jail. Yeah, well -- then I

25   asked him did he ever admit anything. No, no, just

-1547-

1    talking.   Everybody talks in jail about what happened.

2    Yeah, they are accusing me of shooting him.   He had a

3    pistol.   I am afraid they are going to get me with the

4    pistol.   They got this dog.   They are saying we shot a

5    dog.

6         Ladies and Gentlemen, before this trial commenced,

7    there were no charges against Joey Watkins about any dog,

8    about any stalking, about any harassment, none.   And they

9    want you to believe, and I am going to talk about these

10   witnesses, but you have got these jailhouse witnesses.

11   You never heard from Cooley and Beckstine.   You heard the

12   names, but you never heard from them.   Ridiculous stories

13   about all these people and all these acts.   Couldn't have

14   happened.   Do you remember they said -- carried Mark Free

15   -- they remember the time frame, but carried Mark Free

16   way out there he said by the airport at Swan Lake and let

17   him and turned around.   Didn't happen.   Didn't happen.

18   Couldn't have happened.

19        And then you have got the post-transcript people:

20   Ellis over at the jail just heard from him.   Reese Ellis,

21   got his transcript and they introduced all these people

22   that told them they were lying.   Would not tape it when

23   they told -- told them they were lying, and they still

24   come drag them in here and produce their stories.   And

25   then they want to come up here and tell you that all that

                          -1548-

1    was true, but their stories couldn't have happened.  Look

2    at them.    Examine them closely.  They didn't fit

3    together.  Speculation, innuendos.  And then you have got

4    the post-transcript jail people with Cooley and Ellis.

5         Ellis recanted totally.  He told me he read the

6    preliminary transcript.  It was over there at the jail,

7    and he did.  And you remember I asked him about the

8    dates.  They come up with all these outlandish stories

9    and started talking about these things, and then I want

10   to talk to you now about what I suspect the State is

11   going to call their credible witnesses.

12        I think she called herself Vonne Agan, Yvonne Agan.

13   Now this was a most incredible story.  She came in here

14   and testified about she just heard about it Friday I

15   think she told you all, just heard about it Friday.  So I

16   did my duty and called Stanley Sutton.  And she tells you

17   she was like a mother to this young man, Isaac Dawkins,

18   and I don't doubt she wasn't.  But I will tell you what:

19   this never happened, and I will tell you why the evidence

20   is not credible, and you listen to the judge when he

21   charges you on credibility of witnesses and impeachment.

22        She said, well, and I didn't embarrass her and ask

23   her about what she said -- she said she worked out at the

24   state patrol barracks.  She doesn't work there anymore,

25   and she has got charges.  And then she said, I just heard

                              -1549-

1    about this. I was at a wedding with Sutton, some of his

2    relatives. I can't remember if it was his nephew or

3    kinfolk or something. Said, I was out there at the

4    wedding, but, no, I didn't tell him.

5    She had her dear friend, like a child, Isaac come

6    running in that night saying -- she worked with GSP. She

7    never called the police and then tells you, well, he

8    didn't want -- well, who else did you tell? I didn't

9    tell anybody until Saturday before this trial, didn't

10    tell a soul. No witness took the stand to corroborate

11    this incredible story. It is an incredible story. She

12    told you it had nothing to do with her charges, nothing

13    to do with any relations and so forth, the most

14    incredible story I have ever heard.

15    And then you recall also that she didn't tell the

16    parents and she didn't tell the police and didn't tell

17    anyone except Sutton Saturday before this trial.

18    Ladies and Gentlemen, then they bring in Ms. Tiffany

19    Sledge, and you remember Ms. Sledge worked out at Bob

20    Williams where Joey worked? She told the police a few

21    months back, oh, yes, Joey was saying, you know, he was

22    going to get that Isaac Dawkins. He was going to kill

23    him if it is the last thing he does. That is the kind of

24    evidence they are bringing you. But then you remember

25    Ms. Tiffany Sledge -- at first she said there was a lot

-1550-

1    of people around, and there wasn't anybody around, nobody

2    heard it.  She told the police first nobody heard it,

3    something to that effect.

4         Well, other people heard it, but nobody else came in

5    to corroborate this, and when she was asked about --

6    questioned, you remember she admitted: Joey left there in

7    May of '99.  She told the police it happened November of

8    '99.  Again, pushing it back just like that Silverado

9    just happened, you know, right up before the death.

10   There wasn't any of this happening, and she admitted this

11   was the fellow that broke his nose.  Sutton taking the

12   interview on her, listening to this, wanting her to say

13   it.  He knew who broke Joey Watkins' nose.

14        Buddy Vines, another witness, that didn't testify,

15   and, Ladies and Gentlemen, you know, I will tell you

16   something else.  And I will tell you the detail that gets

17   them.  She said, well, you know, Isaac and that gang he

18   is in -- Isaac was a good boy.  I am not up here trying

19   to hurt this family.  Isaac was a good boy.  He wasn't in

20   any gang.  That Vines fellow was in the gang.  Isaac

21   wasn't in any gang, and Joey was not there in December

22   and he was not talking about Isaac.  He had left in May,

23   left working there in May, and she comes in here with

24   this incredible story that she didn't tell anyone.  I

25   think she testified, yeah, her boyfriend or live-in

                              -1551-

1    husband had some issues, but that is not what it is

2    about.

3         And then I have already talked to you about Adam

4    Elrod, Ladies and Gentlemen, talked to you in detail.

5    This case is very troubling.  There are other witnesses

6    -- there are many witnesses.  I have gone down -- I think

7    the State called thirty-six witnesses and tried to jot

8    down everything.  And again, you have had -- Jay Barnett

9    comes in here and talks about Kevin and Joey chasing them

10   and doing all this.  But you remember? it was always

11   Isaac doing the following?  He was just following. He

12   wasn't chasing.  But you better know that if it had been

13   Joey back there behind him, oh, what a chase.  He was

14   shooting and chasing and hollering.  No, no, no.

15        Ladies and Gentlemen, look at the credible evidence.

16   I beg you and I plead with you and I don't mind telling

17   you -- I told you from the beginning, lawyers put a lot

18   of stock in what they do.  I am up here and my belly is

19   churning because I believe in my client, Joey Watkins,

20   and the evidence shows has not done a thing.

21        They want to come in here and assassinate him, his

22   character and tell all about this, all these issues, but

23   they didn't want to talk to you about Paul Allen, and do

24   you remember the detectives that questioned him and read

25   him his rights took the stand and said, yes, yes, he had

                            -1552-

1    an issue.  Isaac was -- Samantha Dawkins was hiding from

2    him, couldn't even let Isaac know where they lived,

3    hiding with Paul Allen.

4        And Paul Allen was a suspect, Ladies and Gentlemen.

5    There are other things that happened. The State is going

6    to get up here and tell you, yeah, we want to blame it on

7    Paul, and we want to bring it on this other shooting that

8    couldn't have happened, talking about timing.  Well, you

9    look at the timing, but I am going to tell you what: the

10   timing doesn't fit Joey Watkins.  They are ignoring the

11   evidence.  The evidence fits into those categories.

12   Jailhouse snitches that know nothing and then tell

13   outlandish stories that couldn't have happened about

14   dropping people off and in the back seat asleep.

15       Look at Wayne Benson.  Look at the telephone calls.

16   Look at the credible evidence, Ladies and Gentlemen, and

17   Jay Barnett. You know, he had to admit, yeah, it was them

18   chasing them.  Talk to you about Tiffany and Paul, and

19   then you have got this barbecue you remember out there?

20   They come in here and talk about two or three incidents

21   and they brought twenty witnesses in here to talk about

22   two or three incidents, two or three incidents, to make

23   you think that this was going on daily every day and they

24   have talked about three or four incidents.

25       Every witness -- every witness told a different

-1553-

1    story.  You have got Barry Mullinax, and Lord knows y'all

2    remember Barry.  And then what amazed me David Jones took

3    the stand, another fellow at the jail.  He said, oh,

4    yeah, I know Barry.  We were over there at the same time

5    when all this was going on, just happened to be there

6    with Barry Mullinax and told this incredible story.  You

7    know first he was with a blonde-headed girl, and then it

8    was three people in the car and then it was his

9    girlfriend and kids.  You never heard from his

10   girlfriend.  It wasn't true, and they put him on the

11   stand.  None of this evidence was true.

12       Detective Sutton was interviewing all these people.

13   He knew it wasn't true.  He tried to find something to

14   hang his hat on and he just kept on.  He didn't

15   investigate anything.  He kept on looking for Joey.  He

16   didn't take the stand to tell you what he got out of

17   these telephone taps and these subpoenas.  Thank

18   goodness, Detective Moser told the truth about this gun

19   and Adam told him he didn't have any idea.  Aislinn Hogue

20   testified for them and told them, yeah, 7:15, talked

21   about fishing on that phone call.  Talked about fishing

22   and then he hung up and called his uncle about fishing.

23       Winford Reese Ellis, I don't have to go over him

24   with you, another jailbird, told an amazing story, and

25   then he told the truth.  He had a few facts.  He just

-1554-

1    knew some things.  He had heard rumors.  He read the

2    transcript and told you about him and Paul plotting, and

3    then Paul Cooley never showed up.  Paul Cooley didn't

4    want to come over here and get in trouble.

5         Ladies and Gentlemen, David Jones.  They are going

6    to talk to you about folks like Meka Rogers, and they try

7    to make it a big deal.  If somebody asked me where I was

8    eight months ago, I wouldn't know, but, yeah, you were

9    trying to cover up for him.  Well, I knew I was with him

10   the next day.  We figured that because he got arrested on

11   the 12th.  We thought back.

12        Oh, no, no, you are trying to cover up for him.

13   Ladies and Gentlemen, that is the kind of speculation and

14   innuendo in evidence they brought to you from this

15   witness stand, and it is troubling.  It is troubling to

16   me, and I am not going to waste your time and go over all

17   this, but you have got a document sealed, Josh Flemister

18   telling the truth, tried to tell the truth with his

19   grandparents.  Was up in Virginia trying to tell them.

20   It is like pulling hens' teeth, but Detective Shiflett or

21   Captain Shiflett, whatever you want to call him, finally

22   said, well, yes, he was trying to tell me the truth.  But

23   they didn't tape it.  They wanted it to be true, and it

24   is not true.  There is the evidence.

25        And then you have got this Chad Redden taking the

-1555-

stand and telling this incredible story.  He didn't to
tell you about -- he didn't want to tell you about
Defense Exhibit Number Five.  He cut up photographs,
throwing in there, cutting Joey out.  Oh, it was all
Joey. We didn't do anything wrong.

Ladies and Gentlemen, this is nothing but children
fighting and fussing and as harsh and mean and terrible
as we think it is, it is not evidence that Joey Watkins
has done a thing on January 11th at 7:17, 7:18, whatever
time Mr. Benson was over there before the 7:19 phone
call, whatever time it happened.

Ladies and Gentlemen, it is very troubling, and
again I have told you my stomach is torn up because I
believe it my client.  Lawyers put a lot of stock in what
they do.  This is the last time -- I am not trying to
harm this family.  They have suffered a great loss, a
terrible loss, but I don't want to double the damage
sending the man off for something he has not done.
Ladies and Gentlemen, this needs to end.

I want you to scrutinize the evidence.  I want you
to look at the details, and I don't want you to turn
aloose the devils over there in jail.  I want you to look
at the details and credible stories, and I want you to
ask yourself, not what Ms. Colston is about to get up and
theorize, but I want you to ask yourself right now from

-1556-

1   the witness stand -- the evidence, do you know who was

2   involved?  Was it Josh? Mark? Joey?  Have they proven

3   anything?  You know Joey left in his white truck, and he

4   ended up in his white truck.  He didn't have time to go

5   to the car lot and switch cars.  He didn't have time to

6   do all these things that they are going to theorize, and

7   the phone calls, theory.  They are going to try to turn

8   it around and work it in reverse.

9        He started out in Kingston, and that is where he

10  ended up.  It is very troubling to me -- it is very

11  troubling to me that they would come in here and Mr.

12  Sutton would not take the stand and answer questions

13  about all these telephone records, all these 9-1-1

14  records and all these logs and all these things.  It is

15  troubling.  It is troubling to me, and this is the last

16  time, Ladies and Gentlemen, the last time anyone is ever

17  going to get to talk to you about Joey Watkins.

18       When you go to sleep and you deliberate and think

19  about this case -- and the case of the State -- the case

20  of the State is exclusively emotional.  That is why they

21  brought the family in here and talked about these dogs.

22  They still are not connected to Mr. Watkins.  All these

23  stories that were in the transcripts that the jailhouse

24  people started, there is no evidence, none, no gun, no

25  nothing.  Ask yourself because this is the last time, and

-1557-

1   I hesitate -- I know it has been a long time.  It is

2   almost an hour.  My time is almost up, but I beg you and

3   I plead you to look at the evidence, look at the true

4   evidence.  Don't be mislead by me.  I have not tried to

5   mislead you throughout this week.  Neither let the State

6   mislead you.  Look at the evidence, examine it closely

7   and don't be affected by emotional impact.

8       There was a tragic death occurred.  We know that.  I

9   told you in the beginning.  There was a murder.   It

10  happened here in Floyd County.  There is no evidence to

11  connect Joey Watkins with it, none at all, and this is

12  troubling to me.  I have told you time and again it is

13  troubling to me.  When you go back there, you listen to

14  the judge's charge.  I have gone over these principles of

15  law about circumstantial evidence, mere presence and

16  things like this.  Pay attention and listen.  I have told

17  you about the weight of evidence, how much it takes.  You

18  remember these things and don't be mislead about the

19  lawyers.

20      Start thinking about the evidence you heard from the

21  witness stand.  When you go back there, look at this

22  indictment and you remember, and I told you in the

23  beginning, talk about this indictment.  Mr. Watkins told

24  Aislinn Hogue he was never in Alabama.  We know he was in

25  Alabama.  We know when he left.  We know when he left his

-1558-

1     home out in the Kingston area close to the Bartow County

2     line.

3          Examine the evidence and look at it, Ladies and

4     Gentlemen, and don't be affected by this emotional impact

5     that they are going to try to put on you because it will

6     be a tragic loss, and this is the last time I will get to

7     speak for Mr. Watkins.  I am going to have to sit down

8     and Ms. Colston is going to get up, and she is going to

9     tell you all these theories of how it happened.  He was

10    on the phone at 7:15 to 7:19 23 at least, maybe even to

11    7:20.  Maybe that is why we brought the documents to show

12    you a call went out at 7:19.  I don't know.  I don't know

13    about Mr. Sutton and what all he found out.  I know he

14    didn't take the stand.

15         Now, Ladies and Gentlemen, I have told you time and

16    time again, this case is troubling to me, and I am going

17    to sit down.  I know you are tired.  I am going to ask

18    you to bear with Ms. Colston, bear with us. She is a fine

19    lawyer, and she is going to talk to you.  I appreciate

20    your service. I appreciate it thoroughly, and I hope we

21    picked an intelligent jury.  And I am not trying to

22    impress you or give you some -- empower you.  You are

23    empowered.  But you are an intelligent jury.  I want you

24    to look at the facts closely and examine them, and I want

25    to tell you something and I will sit down.

1    I have told you how it is troubling me, but it

2    reminds me and it is a hot, hot summer, and I want to

3    share with you just about a one-minute story and I am

4    going to sit down.  One of the most gracious and

5    intellectual, famous judges that ever graced the bench

6    anywhere in this country -- Judge Matthews knows who I am

7    speaking of and Ms. Colston knows who I am speaking of --

8    Justice Learned Hand.  Learned Hand was greatly admired

9    by the Bar, attorneys, judges all over the country.  He

10   was sought out as a speaker because he was a common man.

11   He wasn't highfaluting and at Harvard and so forth.  He

12   was a common man with good common sense, and I ask you to

13   use your common sense in this case.

14        He was sought out to speak one Fourth of July, hot

15   summer day, and I am going to close -- on a hot summer

16   day in New York City and it was sweltering, people out

17   there in their suits, loosening them, and he was talking

18   to a bunch of lawyers that were graduating, and he said

19   -- and they sought after him because he was a common man

20   and had good common sense on the law.

21        And he said, Ladies and Gentlemen, it is dangerous

22   -- it is very dangerous to be right when the government

23   is wrong.  Very dangerous to be right when the government

24   is wrong.  That is where Mr. Watkins finds himself.

25        I have brought you the evidence, and Mr. O'Dell has

-1560-

brought you the evidence.  You think about it and don't
let us fool you.  Listen from the stand.  He said, it is
dangerous to be right when the government is wrong.  And
I will tell you something else he said.  He went on and
he said, Ladies and Gentlemen, the law doesn't live with
these law books.  He said, it lives in the heart and
souls of free men and women, every judge and jurymen like
yourself.  He said it lives in your heart and souls.
Don't let this principle be lost, or we will be lost
forever.

Ladies and Gentlemen, I ask you to go back there and
consider the evidence, not the emotional impact, not
these ridiculous stories that they are going to try to
mix up and match now and tell you how it fits and it is
all recantations.  It is all impeachment.  Listen to the
judge.  Listen to the law.  Don't be carried away with
the emotional impact, because I am telling you my heart
goes out to the family, the Dawkins' family.  My heart
goes out to the Watkins' family, and I don't want you to
be carried away by the lack of evidence, what didn't show
up, any incredible stories that did show up.  Don't be
carried away, Ladies and Gentlemen.

I want to thank you again for your time, your
service. I hope you will bear with Ms. Colston and I beg
you please go back there and pick you a foreperson,

-1561-

1   return a just verdict supported by the evidence and not

2   the emotional impact, not on the past. The judge is going

3   to tell you about similar transactions and how all this

4   stuff is just to show if it does the bad blood between --

5   has nothing to do with what happened on this date and

6   time.  So look at the indictment, look at it, and I ask

7   you to have a good day.  God speed.  Thank you.

8   Thank you, Judge Matthews and Ms. Colston.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     CLOSING ARGUMENT BY MS. COLSTON

2   Let me just begin by saying something that I have

3 been wanting to say all week. Y'all know that what I say

4 is not evidence. You know that. You have been told that

5 over and over and over again. What I said in my opening

6 statement is not evidence. What I say in the closing

7 argument is not evidence, neither are the questions were

8 evidence.

9   This has been a long trial. There has been a lot of

10 witnesses. I am so glad that y'all have been taking

11 notes. The thing that I ask you to please remember,

12 please remember, because it is just so important. It is

13 so important, is to please separate what you -- what the

14 evidence was, what came from the witness stand, what was

15 actually testified to from what the lawyers have said or

16 implied through questions.  That is why we tell you that

17 the evidence comes from the witness stand.

18   If I say anything -- anything at all during the

19 course of this closing argument that is not the way that

20 you remember the evidence, I want you to do something. I

21 want you to totally and completely disregard what I have

22 said because I may not be remembering it correctly. You

23 see what we are doing. You see what we are going through

24 and how we are trying to listen to this and listen to

25 that, make sure a witness is sitting -- witnesses are not

1        in the courtroom, listen to the witness, watch what the
2        other lawyer is doing, all these things going on, taking
3        care of each other's families that we are trying to watch
4        out for.  We may not remember it correctly.  That is why
5        you are here.  That is your job, and I told you at the
6        very beginning of this trial that I didn't envy you.  I
7        didn't envy you at all.  You had a hard job, and this is
8        going to be a difficult case.

9            I have kept my promise, and the State hasn't tried
10       to hide anything from you, and I think you have been with
11       us long enough to know that.  I think you have been with
12       us long enough to see and to understand what -- if we
13       called every witness that was -- like Stanley Sutton, and
14       Stanley Sutton put this case together.  He was the case
15       officer.  He was the one that went out and talked to the
16       witnesses that came and spoke to you.  Did you really --
17       I mean did they really want me to put him back on the
18       stand and let him tell you again what the witnesses have
19       said?  And then let the Defense cross-examine him on what
20       they said.

21           We would be here not just the Fourth of July; we
22       would be here Labor Day.  It is unnecessary, because the
23       evidence is not from Stanley Sutton.  He put the case
24       together.  This is his job.  The evidence came from the
25       witnesses that testified to you, and the evidence comes

                              -1564-

1    from the documents that are submitted in court.

2         What did Mr. Abernathy tell you in his opening: hold

3    us to our opening.  Hold her to her opening.  And I told

4    you several things in my opening, and he did too.  He

5    told you we were going to try to ignore things and hide

6    things, and we were going to ignore the 20 West shooting.

7         The 20 West shooting, after we showed that that was

8    something that was looked at from the get-go, and that

9    the officers talked to the people involved and compared

10   the bullets to the gun used in the 20 West shooting and

11   drove the route and found out it was totally impossible

12   to get from Kawaski Shop to where this happened in the

13   five minutes remaining, and you will see that on the logs

14   too -- from the Kawaski Shop to there.

15        Did you hear them say anything else about the 20

16   West shooting?  Let me explain something.  It is

17   something you don't have to be a lawyer to understand,

18   and I think you probably already understand it.  It is

19   called a smoke screen, a red herring, something that they

20   throw out to try to divert your attention from the facts

21   of the case.

22        I am talking about the facts of the case.  Mr.

23   Abernathy told you in his opening he was going to tell

24   you a story.  I am talking about the facts of this case,

25   and that is what we have brought to you.  And haven't we

                              -1565-

1   brought to you the good, the bad and the downright ugly?

2   Haven't we done that?  Because this is a search for the

3   truth.  That is what we want.  That is what you are to

4   deliver in your verdict, a search for the truth.  In your

5   search for the truth and our search for the truth, we

6   found out good things about the State's case.  We found

7   out bad things about the State's case.

8        I knew Reese Ellis was going to lie.  He had already

9   given a statement to the Defense that he was -- oh, I

10  lied to the police back then.  He had already told them

11  that.  I didn't put Mark Free on the stand to tell you

12  that they shot him.  I put him on the stand so he could

13  lie, because then you could hear from Joey Samples and

14  all the other people that Mark Free has talked to before.

15       I put Barry Mullinax up there.  I don't know how

16  much you know about him, what you think about him.  I

17  don't know.  He says he was there.  He knows some things

18  about where it occurred and trajectory of the bullet and

19  things like that, but you need to hear from him.  I told

20  you I am not vouching for the credibility of any witness.

21  I am bringing to you what has been found in this

22  investigation that has been relevant, admissible evidence

23  in this investigation.  What is relevant and admissible.

24       It is your decision to decide what weight and credit

25  to give it.  I don't know about any of the witnesses,

1    where they were or why they -- where they were before or

2    who they were with or anything like that.  But I know

3    there are certain witnesses that do certain things that

4    they couldn't have known but for being there or somebody

5    having told them.  And those are the little pieces of the

6    puzzle and the details that I asked you to listen for.

7    And that is where the case comes together.  I can't -- am

8    not allowed to stand up there while I am questioning

9    witnesses and explain all that to you.

10        This is where I thought the details made out the

11   case.  The details in this case do make up this case, and

12   now is my final opportunity to speak, to put the details

13   together, because each piece of evidence in a case, in

14   any kind of criminal case or any kind of trial, each

15   piece of evidence is a brick.  Some of the bricks are

16   larger.  Some of them are smaller.  Some of them may

17   crumble.  Some of them are strong.  And then my job in

18   the closing argument is to take the bricks, the evidence

19   that has been brought to you, and show you how it

20   comprises the wall that shows the defendant is guilty

21   beyond a reasonable doubt.

22        Are you ready for that?  I think that we can begin

23   with that.  There has been a lot of names thrown out

24   throughout this trial.  Most of those names was thrown

25   out by the Defense.  Just because a name is thrown out

                          -1567-

1       doesn't necessarily mean they have any information about

2       the case.  Please keep that in mind.  It is the witnesses

3       from the witness stand, and that is what I am going to be

4       addressing.

5            Now what truths do we know about this case?  Let's

6       start there.  What can we definitely say we know about

7       this case.  First of all, we know beyond any doubt

8       whatsoever that Joey Watkins hated, despised Isaac

9       Dawkins.  We agree on that, no doubt about it.  He hated

10      him because he had taken his precious Brianne.  He hated

11      everybody that took Brianne.  You heard the evidence as

12      to what he did with Brianne's other boyfriends.

13           It was a pattern.  It was a course of conduct.  He

14      would threaten and intimidate and harass those people who

15      dared to date Brianne.  He did the same thing with Isaac

16      Dawkins he did with the others.  What's that?  With

17      another trait or truth; that he did stalk, harass,

18      intimidate and threaten Isaac Dawkins.

19           Now the Defense would have you believe that because

20      Jay Barnett tells you on -- and truthfully, good boy,

21      Floyd County police officer, we followed him.  That it

22      was Isaac stalking Joey, but every witness who was there

23      that is not still good friends with Joey Watkins, except

24      for Erica Evans, who said I don't remember what was said

25      -- but everybody who was there: Adam Elrod, Jay Barnett

                              -1568-

1    and Isaac bless his heart can't speak, they told you it

2    was Joey going, come on, follow me.  Follow me.

3         Brianne said that was his trademark.  He always did

4    that.  Follow me.  Follow me.  Little big man.  He had to

5    run out there and get -- run in a service station.  Now

6    that was corroborated through the defense witness that he

7    pulled in the service station and lo and behold he talked

8    to some friends, and they showed up at the house too.

9         Joey Watkins intended to fight Isaac Dawkins at his

10   house that night.  That is the only reason he would have

11   rounded up his buddies.  Right?  The only reason he would

12   have rounded up his buddies.  We know that from the

13   State's witnesses, and we know that from the Defense

14   witnesses.  That is a truth that we can rely on.

15        What else do we know?  Josh Flemister, who didn't

16   want to be here, had lied, had told a couple of different

17   stories, but still maintained -- still maintained he is

18   Joey's buddy, best friends.  He, Mark Free and Joey were

19   the three running buddies.  That is what Josh told you.

20   He is still close, loves Joey Watkins, like a brother to

21   him.  His mother practically raised me.

22        Now this is the witness that told you, well, I

23   didn't lie about that when the question was: did he hate

24   Isaac Dawkins?  Yeah.  Did he talk about Isaac Dawkins?

25   Constantly.  Did he threaten him?  Did he intimidate him?

                              -1569-

1    Did he follow him?  Yes.  And he told the police in his

2    statement that it was Joey's main goal every day to hunt

3    down, find and chase down Isaac Dawkins.  That witness

4    there had been consistent all the way through on that and

5    every other witness that has any credibility in this

6    courtroom has told you the same thing.  That was his main

7    goal every day.

8         Other truths we know: Joey Watkins was in the area.

9    Okay.  In the area.  The Defense would have you believe

10   that these cell phone records prove he could not have

11   done it absolutely, positively, totally.  That is what he

12   told you in opening.  Yes, the times are tight in here.

13   They are.  Think about that.  Because the times are

14   tight, they would have to be to prove he is in the area.

15        He was in the area is the reason the times are

16   tight.  Look at where he is at.  Now, Aislinn told you --

17   Aislinn told you she got home between 6:30 and ten till

18   7:00, and she immediately called Joey because he was

19   supposed to be at her game.  And she called him because

20   she was sick and wanted to tell him that she was at home.

21   She told you that was between 6:30 and 6:50.  Mr.

22   Abernathy keeps saying look at a document.  There is a

23   document up here that says 6:48.  I haven't seen it.

24   Maybe you will see it when you go back in your

25   deliberations, some home phone records.  But how would

1    there be with a Cedartown phone number calling a Rome

2    phone number when it is not long distance if it wasn't a

3    cell phone?

4        It is not on the cell phone records that I see at

5    all.  But look and see, and if there is and if it says

6    6:48, that is fine.  Say, Aislinn called at 6:48,

7    Aislinn told you positively and absolutely that Joey

8    Watkins -- Tim Hughes answered the phone, and Joey

9    Watkins was on his way out the door.  Tim called him

10   back.  She hadn't no doubt about that, none whatsoever.

11   He called him back to the phone.  He was already on his

12   way, and if you take the Defense's time at 6:48 he is

13   already on his way to Cedartown then.

14       Now where was he then between 6:50 -- he lived on

15   Parkwood Circle in Eastdale Estates, just a minute or two

16   off the bypass -- I mean from the bypass off Kingston

17   Road.  I am sure several of you know exactly where that

18   is?  That is where he was living, not way out in

19   Kingston, but just a short piece of the bypass, take him

20   ten or twelve minutes to get to the Texaco at 411 in the

21   bypass, around about, around about.  So where in the

22   world was he between the 6:48 time that Mr. Abernathy is

23   telling you that I say there is no evidence of.  It could

24   have been earlier and it could have been as late as 6:50

25   as Aislinn said.  But between 6:50 and the time of the

                          -1571-

1  first call, 7:15, where was he and what was he doing,

2  because at 7:15 there is no doubt he was picked up on

3  Kingston tower.

4        Now all right.  So here is the Kingston tower, this

5  area here in red.  Everything around here that is red is

6  picked up by the Kingston tower.  The blue area is the

7  Turner McCall tower as the expert testified.  And when

8  you get over to the green are the Rome tower.  You can't

9  see that exceptionally well, but here we are going down

10  411 and here is the bypass, and it comes right through

11  this way.

12        Yes, I called -- and Marc Bahn, the man who designed

13  this system, called the dead area.  Now he did say there

14  is absolutely no chance you couldn't have a call going on

15  through there, but he said there was a high probability

16  that the call could be dropped, a high probability.  Now

17  what did their expert say?  He said fifty/fifty.

18  Fifty/fifty chance that call would be dropped.  So if he

19  left his house over here off the Kingston Highway and

20  then came down the bypass and he is on the phone four

21  minutes with Aislinn, he either completed the call long

22  before that, which he couldn't have or coming down

23  through here, and I will tell you why he couldn't have in

24  just a minute -- because coming down through here he

25  would have dropped the call.   Chances are he would have

-1572-

1    dropped the call.  Not absolute -- not absolute, but

2    chances are he would have.

3         Now where is the next place you can pick up on 411,

4    the Kingston tower?  Take a right on 411 and here it is

5    right here.  This big red area right here, it goes right

6    through it.  You will see the map when you get back

7    there, and it is little -- it will be easier to see where

8    Chulio is from there when you look at it yourself, but

9    you will be able to see the Chulio Road when you get back

10   there.  And it is on down.  This is likely as this expert

11   has testified of that hill between 4 -- between the

12   bypass and the Chulio Road.  That is where he had to make

13   the call to Aislinn.  It is where you are when you hit

14   the send button.

15        He talks to Aislinn four minutes or so.  Now why do

16   we know?  Then we will turn back to mine, because I put

17   on here about the calls were normal.  Marc Bahn told you

18   that none of those calls on the 11th were dropped.  And I

19   put normal on the board.  All those calls were normal,

20   the ones that he made on the 11th.  So at 1915, at 7:15

21   p.m., he makes a call from the Kingston tower to there.

22   How long do you think it would take?  How long does it

23   take?  How far can you get in four minutes and twenty-

24   three seconds from right toward Cartersville from the

25   Chulio Road up on that hill through town at 7:20 in the

                        -1573-

1    evening.

2         You can get very -- all the way just about to Floyd

3    College, but you can't -- that is not what he did.  He

4    saw Isaac Dawkins and he turned around on Isaac Dawkins

5    and he -- that is when he followed him and chased him

6    when he saw him.  Aislinn didn't hear anything in the

7    background, no, but she was sick and she said, I don't

8    remember.  I don't remember anything in the background,

9    not I didn't positively hear it.  I don't remember

10   anything in the background.  I can just see Joey now

11   going down the road.  He was very seasoned.  He had got

12   his buddy.  Got to go.  Hangs up.  There he goes after

13   Isaac, after Isaac.

14        Is it just coincidental -- is it just coincidental

15   that the only time he was not on the phone is in the

16   moments that Isaac Dawkins was killed?  You think that is

17   just coincidental?  And let me tell you something why

18   these times right here are very, very important.  And I

19   don't mean to minimize those, but there is two reasons

20   why you can't absolutely marry yourself to this time and

21   the

22   9-1-1 time, because one reason is they told you -- the

23   experts told you and you are going to see on the cell

24   phone records too that the seconds are not portrayed.

25   When a call was made, it could have been 7:15 and one

                          -1574-

1    second, or 7:15 and fifty-nine seconds.  And there is no

2    way to know which one it is.

3        You have got a whole minute there to play with on

4    every call, on every call.  Now the second reason is, did

5    you hear any testimony whatsoever that 9-1-1 and -- that

6    the 9-1-1 office here in Rome and the Verizon Cell Phone

7    Company have synchronized their clocks together?  No.

8    Now it was the Defense that kept talking about I have

9    been over to 9-1-1, and I have been over to 9-1-1, and I

10   have been over to 9-1-1.  And don't you think they have

11   the same subpoena powers that the State has, the very

12   same.  And all these witnesses he says the State didn't

13   bring, he has the same subpoena powers.  Don't you think

14   you would have heard from them if that was the case?

15   That it was exactly synchronized?  Wouldn't that have

16   been important?

17       So you can't count on these being exact, neither can

18   you count on this because of the fifty-nine seconds that

19   could have happened in between.  That is why the Floyd

20   County log, of course, would say 19 minutes after the

21   hour.  It could have been 19 minutes after the hour and

22   fifty-nine seconds, and this was done in some one

23   person's handwriting, and this one was done in a whole

24   other person's handwriting.  I don't know what they were

25   looking at when they put the time down.  Do you?

                          -1575-

1    Nobody does.  No evidence to that effect, but I will

2    tell you what: the City records say 7:20, and all the

3    cards -- all the cards say, the time came in, time call

4    received 7:20, 7:20, 7:20.  Now he made a big to-do about

5    some missing cards from the County.  I want to ask you

6    something: why would there be a County card to begin

7    with?  This wreck happened in the City.  They dispatched

8    a call on the log and then said, 10-22, which means

9    disregard.

10    There is nobody hiding anything.  It is a red

11    herring.  It is a smoke screen.  It is designed to divert

12    your attention from the truth of this case.

13    Now regardless of -- well, let's get back to the

14    cell phone records, because I don't want to forget that.

15    When Joey Watkins made that call to Aislinn at 7:15,

16    let's go back to that and let's talk about what happened

17    next.  Is it just coincidental, and I might have already

18    said this, that he was on the road with the man that he

19    hated so much during those moments, and he is not on the

20    phone at that time, but he is immediately thereafter?

21    You think that is coincidental?  Immediately thereafter

22    it is bam, bam, bam, calling his family, calling his

23    grandmother, calling his uncle, calling his home and then

24    calling his home again.

25    Let's go through the scenario.  All right.  If he

-1576-

1     made the call right here at the Chulio Road area and he

2     traveled four minutes, and he got down around --

3     somewhere around Floyd College and he saw Isaac Dawkins

4     and turned around like, he is not on the phone at that

5     time.  He hangs up with Aislinn.  He is not on the phone

6     for at least two minutes and we could say possibly three

7     because of the seconds difference that we don't know

8     about.  So he is down here, and he is around through here

9     and he sees Isaac, and he turns around on him.  He is in

10    this Turner McCall calling area at that time.  The wreck

11    happens about -- let me get mine where I marked it --

12    here, about right here.  That is where Isaac left the

13    road, about right there.

14          Now back in here is where Walker Mountain Road is.

15    You are going to see it when -- there it is, Walker

16    Mountain Road right here, right before you get to this

17    green area.  The truck goes off the road right here.  He

18    is not on the phone yet.  The call goes to 9-1-1, 9:20.

19    9:20 they get the call.  They start dispatching cars.

20    Joey Watkins goes on.

21          Now one witness testifies and that was Mullinax that

22    said that he turned around at Parrish Drive and went back

23    toward the scene.  I don't know about what you think

24    about Barry Mullinax, but I will tell you what: that is

25    every probable.  That he went down to the next road past

-1577-

1    Angelica where everybody said it happened and turned

2    around to see, what have I done?  And I don't know -- I

3    can't tell you if he was trying to scare Isaac like he

4    told a couple of people and just shot and killed him and

5    didn't mean to kill him, but he certainly meant to shot

6    -- meant to shoot.  But whether he knew what he was doing

7    and turned around to admire his handiwork, I don't know.

8    But it is very likely he would have gone back to see what

9    happened, gone on by it.  Now that would put him where?

10   In this little green area right here.

11       In that green area right there, I'll be dog, 19:21

12   right after the wreck, he is on the Rome tower.  That is

13   the green area.  Now let me tell you why it has to be

14   just about that area and no other area.   Where is the

15   only other place you can get on that?  You don't get on

16   it right here, because you are going through the white.

17   You take a right.  There is a little blip of it right

18   here -- a little blip of green.  And I would say, okay.

19   He could have made it there.  It is possible.  He could

20   have made it there except for the fact of this: he made

21   two calls that hit the Rome tower, two of them.  Possible

22   to make one maybe, hit that send button in that little

23   blip.  Possible to make two in that little bitty blip

24   area especially when the first one lasted forty-three

25   seconds?  No.  No probability, no possibility.

-1578-

1          He picks up the phone again immediately, talks a
2     minute and fourteen seconds.  When he hit the send button
3     on that one, he was on the Rome tower.  So that puts him
4     in this area right here, Ladies and Gentlemen, and no
5     where else when he made those calls.  Then what happened?
6     Why do I know -- why do we know for sure that he is in
7     this area at the next few minutes?  Look at the calls.
8     Look at the calls.
9          Next one, 1923, one minute later or seconds later or
10    whatever it is, depending on the seconds, Turner McCall.
11    He is on the Turner McCall calling area.  Now two
12    possibilities for that call.  He could have gone straight
13    and he would be back in this Turner McCall area.  He
14    could have gone straight and then gone on to Cedartown.
15    He could have done it, but -- but he made another one on
16    Turner McCall.  And that one wasn't for four minutes
17    later.  He would have been well out of Turner McCall by
18    then and into the next calling area, which was Miller
19    Mountain or it would have been in -- getting on up toward
20    the Cedartown area.  No.  He did exactly that.  He turned
21    around.  He looked to admire this handiwork or to see
22    what had -- oh, Lord, what had happened?  And then he
23    makes two calls, bip, bip, right there.  He turns back
24    around and he is back in that Turner McCall calling area.
25          At 1927, at 7:27, he is calling from that Turner

1    McCall calling area.  Who is the calling?  He is calling

2    his home.  Calling his home twice.  Calling Toby, Uncle

3    Toby, whom he is close to.  Calling his grandmother.  And

4    then at 1935 he is in Cedartown City.

5         So what did he turn around for?  He has to go back

6    toward this way to -- he has got to get out of that car.

7    He has got to let Mark Free go on and get in his truck if

8    he -- when he did that, he went back to Cedartown.  How

9    long did he have?  The Cedartown tower picks up at the

10   County line, and look at the time here.  He is picking up

11   on the Cedartown tower at 1935, 7:35.  That is five, six

12   -- eight minutes to get to the County line.  And we know

13   that is where he was at.  Why do we know that is where he

14   was at when he made that call?  Because both he in his

15   statement and Aislinn Hogue testified that he did not

16   arrive at her house until 8:00.

17        If he was any closer than that Cedartown -- I mean

18   to the Polk County line, he would have gotten to

19   Aislinn's a lot sooner than that.  Now the cell phone

20   records do tell the details.  They do, but not the way

21   the defendant portrayed them.

22        Now what are some other truths that we know?  Other

23   truths that we know.  Remember how many witnesses

24   testified that Isaac Dawkins had no enemies whatsoever

25   other than Joey Watkins?  Remember that?  Not one soul.

-1580-

1    They tried to throw some suspicion on Paul Allen and Paul

2    Allen said, look, you know, I am sure he was not happy

3    with me when I was with Samantha and that happened, but

4    we still talked.  There was no bad feelings.  There was

5    nothing, no evidence whatsoever, none, just a statement

6    of the lawyers, just the questions of the lawyers but no

7    evidence whatsoever.  But what did the police do was make

8    sure -- let's make sure -- let's make sure that Paul

9    Allen told you where he was.  They talked to him.  They

10   checked it out.  Those things have been here.  You know

11   that.  You know all this.  They know all that.

12       Well, if Paul Allen didn't do it, let's see -- I

13   think in his opening statement -- Adam Elrod could have

14   done it or Chad Redden could have done it.  Y'all saw

15   Chad Redden.  Bless his heart, he was so nervous I

16   thought he was just going to fall off the witness stand,

17   but he was just being as honest and as credible and as

18   believable as he could possibly be and telling everything

19   that he knew because look at what he did.  He admitted,

20   yeah, I am not proud.  He wasn't proud of the fact that

21   he cut up those photographs and gave them to Tandi, but

22   he admitted it.  He didn't try to lie his way out of it.

23   He didn't try to.  That didn't have anything to do with

24   this.  That is another one of those red herrings.  That

25   is another part of that smoke screen the defendant wants

                        -1581-

1    to give you.

2         What other truths do you know?  You know, the

3    defendant would have you believe that Isaac was stalking

4    Joey, and that is just totally ridiculous.  Just think

5    about all the times that Brianne and the others testified

6    that it was Joey Watkins that was wanting to find Isaac

7    Dawkins.  It was Joey Watkins that couldn't talk about

8    anything but Isaac Dawkins.  It was Joey Watkins who made

9    it his main goal every day to find down, hunt, chase and

10   fight Isaac Dawkins.

11        What every other jurors -- what other truths do we

12   know?  We know beyond any doubt that poor little Isaac

13   had been chased down just a few weeks before this and

14   shot at when he tried to go home, and he pulled up in his

15   driveway.  There is that defendant right there sitting

16   there with a grin on his face.  I can see it now -- with

17   a grin on his face and then Isaac puts it in reverse and

18   gets out of there.  And what did he tell Vonne?  What did

19   he tell Vonne Agan, his friend, this person that is the

20   mother of one his best friends?  They shot at me, Vonne.

21   They shot at me.  He is shaking.  He is shaking so bad

22   she can't even hardly calm him down.

23        She moves his truck into the back of the yard and

24   throws a blanket over the front so that they couldn't see

25   the chrome on the front of it because there is a brush

                          -1582-

1     guard, and we are going to talk about that brush guard in

2     just a minute, the brush guard that this defendant right

3     here said that he saw when he went by the wreck in his

4     statement.  And that is how he recognized his truck.  We

5     are going to talk about that in a minute and look at the

6     photograph.  But he told Vonne.  He is shooting at who?

7     who, Joey [sic]?  Who?  I mean who Isaac?  Who is it?  It

8     is Joey, Vonne.  It is Joey.  Joey who?  Joey Watkins.

9     Just a few weeks before that.

10         There is no way you can credibly and believably

11     contest Vonne Agan's testimony.  None.  And that is

12     consistent with what we know about Joey Watkins, what

13     Vonne Agan told you.  He wouldn't fight anybody without a

14     big group of buddies with him.  He wouldn't fight anybody

15     without a knife.  He wouldn't fight Jeremy Shuler without

16     a knife.  He held a gun to Brianne's head.  He was a big

17     man when he has got friends or a gun.  He ain't bigger

18     than a peanut, but he is big enough to pull a trigger.

19         Joey Watkins who said in front of Tiffany Sledge

20     that we would get that SOB if I have to kill him. Now the

21     Defense is going to have you believe that some guy named

22     Ronald Vines that she was talking about.  She didn't

23     waiver.  She didn't even flinch.  No, he was talking

24     about Joey Watkins -- I mean Isaac Dawkins.  He was

25     talking about Isaac.  I am going to get him.  I am going

-1583-

1    to get him if I have to kill the SOB.

2        This other name that the Defense is throwing out

3    that is one of those situations is just a name that has

4    been thrown out.  It is just a proposition that has been

5    thrown out, but is there any evidence whatsoever?  No.

6    None.  Y'all have got a hard job separating those two

7    things out, and I am sorry for that.

8        What else do we know for sure?  We know that Mark

9    Free is his best friend.  We know that because Josh

10   Flemister told this.  There were three of them.  They

11   were running buddies, Josh, Mark and Joey.  We know that.

12   We know too that they shot -- that this man and Mark Free

13   shot a dog that was on a chain in a pin right between the

14   eyes, Isaac's dog.  Now how do we know that?  Because

15   Billy Pasley who is still friends of this defendant,

16   still a friend of this defendant, told us that he was

17   talking to the two of them.  Said, Man, I hear you are a

18   hot boy? at the service station that night.  I hear you

19   are hot boy?  And Joey is standing there, and Mark is

20   standing there, and he said, Oh, Man, all we did is take

21   care of the dog.

22        Billy Pasley told you that.  Also, Mark Free told

23   that to Mark Samples.  There were so many people that

24   knew Joey Watkins killed that dog, and I guarantee you he

25   is kicking himself right now because I guarantee you he

-1584-

1   went out bragging about it.  And that is why there are so

2   many people that knew it.  He was bragging about it.  He

3   wanted people to know that he had killed Sally, Isaac

4   Dawkins' beloved pet.  He is proud of that.  He is proud

5   of that.  He is proud of it.

6        I guarantee you he would have loved for people to

7   know that he did this if it wouldn't have hurt him and

8   got caught by it.  And he was torn.  He was torn between

9   wanting to take credit for the job and getting caught.

10       I will tell you why I say that.  This is something

11  that I have deduced from the evidence, and you may not

12  draw the same conclusion.  But why in the world if he had

13  hated Joey -- if he hated Isaac Dawkins so bad, why in

14  the world would he by his own statement say that he

15  called Tandi, his sister, and said, I think Joey -- I

16  think Isaac has had a wreck.  I think you might want to

17  call his sister and let them know.

18       Now he told other people he thought maybe he had

19  just had a flat tire.  He told other people he was on his

20  way to  Cedartown.  He told other people he was in

21  Florida at the time.  You have all that evidence that he

22  told these things.  But he says in his statement a month

23  after this happened -- after he has had the benefit of

24  his own cell phone records that, you know, you had the

25  bill by then -- a month later.  Maybe he didn't.  But I

                            -1585-

1      would think he would.

2          But then at that time he says I called Tandi, and I

3      said, you might want to call Samantha and tell Samantha

4      that Isaac's had a wreck.  Now why all of a sudden has he

5      got all this concern for the Dawkins?  Why would he give

6      a flip?  He wouldn't.  It was a way to call and say --

7      Joey said -- imagine how this would sound to Samantha.

8      Joey said, Isaac's truck is on the side of the road.

9      That he might have had a wreck.  You might want to check

10     on him.  And then if Samantha had picked up the phone and

11     tried to check on Isaac and somebody had answered his

12     cell phone there in the truck and found out that he was

13     in critical condition, oh, she would know Joey Watkins

14     knew that first.  He couldn't stand it.  He wanted

15     somebody to tell them that he saw it happen.

16         I will tell you why else I can say that?  Because of

17     the dog that was left on Isaac's grave.  You remember

18     that testimony?  That they go off to try to get away,

19     this family does.  Nobody knows about this, because Sammy

20     Dawkins kept it quiet.  He kept it a secret because he

21     didn't want his wife to know it.  And they come back from

22     a trip, and he goes to his son's grave and he finds

23     flies, hundreds, and an odor coming up from the grave.

24     And it is obvious when he sees -- finds the -- you heard

25     the story how he went over to the other grave and all

                          -1586-

1    that, and then he sees the dog's carcass in the bag and

2    the flies around it with the same odor and stench.

3        And then a few months later they go back and get

4    that dog where he dumped it and they carry it to the

5    crime lab and what was -- what had happened to that dog?

6    Executed.  Shot right between the eyes and laid on the

7    grave of Isaac Dawkins.  A signature.  A signature.  A

8    calling card.  He couldn't stand it.  He didn't want to

9    get caught.  He didn't want to incriminate himself, but

10   he sure wanted that family to know that he did this.

11       What kind of hatred does that take?  What kind of

12   mind does that take?  The type of hatred that you would

13   have for a person like Jeremy Shuler just for dating your

14   girlfriend and pull a knife on him, that you would hold a

15   gun to your girlfriend's head just because she wants to

16   go out with his sister without him.

17       Now let's talk about those jailhouse witnesses that

18   everybody talked about, and I have not hid the fact one

19   time that the jailhouse witnesses, yeah, that is what

20   they are.  That is what they are, and you have got to

21   judge the credibility of every witness in this case, and

22   you are the only one that can.  The judge is going to

23   tell you that.  He is going to give you the rules for

24   judging the credibility of witnesses.  He is going to

25   tell you that you look at what they -- the facts to which

                          -1587-

1     they testify; their means and opportunity for knowing

2     the facts to which they testify; their interest or lack

3     of interest; their demeanor while on the stand; and if

4     they have made any prior inconsistent statements through

5     impeachment, and he will tell you that if you find that a

6     witness has made a prior inconsistent statement such as

7     like Reese Ellis I submit to you, such as Josh Flemister

8     I submit to you, any of those people, that the judge is

9     going to tell you you can disregard what they said in

10    here and you can believe that first statement.

11        Do you believe it to be the truth?  And that is your

12    call and your call only.  But let me tell you something.

13    Reese Ellis has a motive to lie to you today, and that

14    motive is contained in that certified copy of his

15    conviction where he was mad at the devil because a few

16    weeks ago he was convicted of rape, and he was treated

17    like everybody else that would be convicted of rape and

18    he got serve time, and he is on his way to Jackson to the

19    prison down there for the next ten years at least.   And

20    he is mad at the State.

21        He didn't recant before that.  He was his cellmate,

22    his cell buddy, and he told you some things in that first

23    statement and you heard that first statement that there

24    is no way he could have known except for Joey telling

25    him.  He said, well, I read it in the transcript of the

-1588-

preliminary hearing. Give me a break.  Read it in the
transcript of the preliminary hearing.  Maybe some of it.
I will concede some of it, but what about the Swan Lake,
dragging the Swan Lake?  That was proven it did not occur
till after this transcript -- I mean after the hearing in
the preliminary hearing.  So it wasn't in the transcript.
He couldn't have read about it.  He said, well, oh, I saw
that in the paper.  But the press wasn't called. No press
releases were issued, and  Bill Shiflett tells you that
what was found in that lake -- he gave you three items
and two of the three was scissors and a knife, the same
thing Reese Ellis told you.

Now how would he know that but for Joey doing
exactly what he said?  He is laughing.  He is bragging.
He is going on.  He is saying, hey, man, this is great.
Yeah, they are dragging Swan Lake.  It is in a lake, but
it ain't in that lake.  Popping off, running his mouth,
just like he did at the Home Depot parking lot that night
and somebody overheard him.

I wish some of those people that he had told
directly, some of his friends, some of his running
buddies would come forward, but with Joey I would say
likely the evidence -- from the evidence you have heard,
they are probably scared.

Now the reward.  They are going to say came forward

-1589-

about it because of the reward.  Had people wanting the

reward.  Well, Ladies and Gentlemen, who took that

witness stand and claimed that reward?  How many of them?

None.  Did you hear anybody in this case that is a so

compelling witness that they deserved the reward?  None

of them.  It is all little bits and pieces.  Nobody has

been promised that reward.  There has been no testimony,

no evidence whatsoever that anybody has qualified for

that reward, anybody.

I like Joey Samples -- I mean Barry Mullinax, the

only thing he said I really -- and appreciate it was give

it to the family.  They are the ones that have lost.

They are the ones that have lost him.  Isaac Dawkins and

his family.

Joey Samples, he didn't care about the reward.

After Mark Free testified, well, Joey Samples came in.

Have you ever seen a more credible guy, this Joey

Samples?  I mean he would just tell it like it is.  He

don't have any charges in the office.  He has beat his

charges.  He whupped us.  He got us.  He didn't care.  He

hadn't asked for the reward, and what did Mark Free tell

him?  I ain't saying I did it, and I ain't saying I

don't, but I don't want to incriminate myself.

Are you saying you did it then?  Nah, I am saying I

have got me an alibi.  But he told me about shooting

-1590-

1    Isaac's dogs.  That was the interesting thing about that.

2    I hope some of y'all picked up on that because I was

3    shocked when I heard it.  He said dogs.  I said, plural?

4    He said, yeah, he mentioned something about killing some

5    dogs.  There ain't nobody -- until this courtroom opened

6    up and Sammy Dawkins took the stand except for I told him

7    to warn his wife just beforehand that knew about those

8    dogs other than a couple of the County police officers,

9    Mr. Dawkins who called and told me, and the crime lab in

10   Summerville.  Joey Samples had no way of knowing because

11   this defendant right here and Mark Free didn't even know

12   that the police knew about that, not even a clue.

13       Adam Elrod, the Defense wanted to make him out as

14   being such a big liar, such a terrible liar.  Well, he is

15   such a big liar he said, oh, he was in a Silverado pickup

16   truck.  And they bring in a document, wave it in front of

17   you and say he couldn't have been because he sold that

18   truck.   Well, isn't it just a coincidence that he

19   happened to sell that truck to Travis Camp's daddy?  And

20   wasn't it Adam Elrod's testimony or am I remembering it

21   correctly -- couldn't quite remember who exactly was with

22   him, but he kept saying, I think it was Travis Camp.

23       Just another coincidence, just another coincidence.

24   And they want to say that Adam Elrod is a liar; that Adam

25   Elrod is a liar because he didn't tell Jim Moser about

-1591-

the 9mm.  Well, he didn't, but he also did.  He told him

he had a 9mm. He described it to him, but when Jim Moser

asked him where did he get it or who did he get it from,

he said I don't know.  At that time Jim Moser told you

everybody was circling around Joey.

Johnny Watkins had already told Jim Moser, oh, he

was at home with us all night, me, Tandi and Tim and my

wife.  He is at home with three other people that night.

This was in the beginning of this investigation.  Jim

Moser told you he was getting frustrated.  Everybody was

just reluctant to talk.  Now Adam Elrod talked to him,

but I submit to you he didn't volunteer anything.  And if

he -- if Jim Moser phrased the question, who did he buy

that gun from, Adam Elrod would have said, I don't know

because it was a straggly old man about thirty; wasn't

it?  Thirty years old.  But he didn't know who he was.

You saw Adam.  Adam wouldn't even volunteer anything

to me.  He -- I am up there and he is my witness.  I am

calling him and he is like this.  I got onto for leading.

I was trying to get him to talk.  He is not -- he was not

going to volunteer a bunch of information. You saw that

from the witness stand, and that is part of the thing the

judge will tell you about credibility of witnesses. You

look at their demeanor and the way they testify.  And

that is something that I propose to you that tells you

-1592-

1    that Adam Elrod didn't lie.  He just didn't volunteer

2    anything.

3         Now Joey's alibi: Daddy told Jim Moser that he was

4    at home with him and three other people.  Joey told Billy

5    Pasley that he was in Florida at the time.  Joey told

6    Brad Nolan he was either on the way to Cedartown or on

7    the way back from Cedartown.  But immediately --

8    immediately, Ladies and Gentlemen, Josh Flemister is

9    telling everybody he went with him to Cedartown,

10   immediately.  Now Josh says -- oh, well -- now he says I

11   came up with that on my own.

12        Uh-uh.  Uh-uh.  Because he did it in situations --

13   you remember the testimony about several people getting

14   together over a guy's house the day after -- that night

15   after Isaac died, they got together over there and Joey

16   was there and Josh Flemister told one of those witnesses,

17   and I don't remember if Joey was there at the time or

18   not.  But he told him that night that he was with Joey

19   when Joey went to Cedartown to see Aislinn.  Look back.

20   I hope you have got that in your notes and if you don't,

21   maybe I am mistaken.  But that is the way I remember it.

22   If that is not the way you remember it, please disregard

23   what I say.  But that is the way I remember that

24   statement.  Well -- and Josh even admitted that he was

25   telling people immediately even before the suspicion was

                              -1593-

1   starting to really center on Joey.

2       Josh told the truth in his very first statement. His

3   very first statement to the police was this: Josh told

4   them he told me to tell anybody that asked that I was

5   with him.  First he said Boomer's in Atlanta or something

6   like that.  No, tell them we went to Cedartown.  Josh

7   said in his first statement I said I would.  He is my

8   friend.  I said I would.  Josh didn't believe Joey did

9   this, didn't think anything about it, is going to help

10   his buddy and he started telling that story.  And Josh

11   told that story because he don't mind lying.  He told

12   that story everywhere.

13       Well, then when he told that story, well, the police

14   heard it.  And, of course, when the police heard it, they

15   asked him about it.  Well, he said, umm, I lied.  I

16   wasn't with him.  They knew he wasn't.  They felt like he

17   wasn't, didn't really know what he was going to say.

18   That is what the testimony was, didn't know what he was

19   going to say.  He said, I lied.  Joey told me to say

20   that.  He told me to say that.  But he also then after

21   that started telling people then, if Joey gets arrested,

22   I am going to be in a world of s-h-i-t.  I am going to be

23   an accessory.  I am going to go down for an accessory to

24   murder, all this stuff.  Why would he be saying that

25   except for the fact he was popping off which could be a

1    distinct possibility just in and of itself.

2         But why else would he say that, because he knew he

3    had been covering for Joey Watkins.  And if the police

4    could prove that Joey Watkins committed this crime and he

5    had been providing him an alibi, he would have been in a

6    world of hurt.  Wouldn't he?  He could be charged as an

7    accessory from having helped cover up.  That is what he

8    thought.   So it makes perfect sense he is telling people

9    out there in the community that he was an accessory -- he

10   is going to get in trouble as an accessory.  And then he

11   goes to work in Virginia, and my goodness, the police

12   hear about these comments about being an accessory.  What

13   is he talking about?  He said he was with him?  Now he is

14   saying he was an accessory.  We had better go to Virginia

15   and talk to this boy.

16        And they did and Josh, I guess, knew that they were

17   thinking that he was with them, and he told them, yeah, I

18   was with them, but I didn't do the shooting.  And then he

19   comes back from Virginia and he recants that; says, no,

20   it didn't happen and told the police, it didn't happen.

21   I wasn't with him.  I wasn't there, anything.  Now he

22   gives a statement in Bobby Lee Cook's office saying the

23   same thing and recanting about everything.

24        Josh Flemister knows the words, oh, what a tangled

25   web we weave whenever at first we start to deceive,

1    trying to deceive.  Now there we are.  That is what Josh

2    Flemister did.  He promised Joey Watkins he would help

3    him out and get him an alibi and say he went to Cedartown

4    with him.  And the lie kept getting bigger and bigger and

5    bigger.  But Josh Flemister in his statements remembers

6    some things he said, two shots fired, shot from the back.

7    several things that he knew about this killing of Isaac

8    Dawkins that he would not have known but for either being

9    there or Joey Watkins telling him.

10         We know he wasn't there, because he even told the

11   wrong side of the road.  It didn't even go off on the

12   correct side of the road.  So we know Josh wasn't there.

13   How did he know these things I ask you?  How did he know

14   those things?

15         I want you to look at the cell phone activity on

16   these cell records also on the date following.  You

17   remember the testimony that the doctor testified that

18   Isaac was pronounced dead around 12:25 p.m.  Looking -- I

19   want you to pay some attention to the 12th as well on

20   Joey's cell phone records where he started making calls.

21   There was on at 1:42 a.m. that morning.  I am not

22   considering that part of it.  Then 6:34.  I guess that is

23   when he got up to go fishing or drop the gun in the lake

24   or whatever.  And then at -- a couple after that, and

25   then Isaac pronounced dead at 12:25.  1/12 at 1312 I am

-1596-

just -- I can't see them very well.  So I am just going
to read them off, and you will have it in the jury room
with you.

At 1:12 phone call, 2:14, 2:16, 2:27, 2:32, 2:33,
2:36, 2:36, 2:37, 2:43, 3:15, 3:28, 3:48, 4:56, 4:56,
4:56, 4:57.  Isaac Dawkins is pronounced dead, this guy
he says in his statement he hardly even knows.  You need
to look at his statement real critically.  This guy he
says he hardly even knows, and Joey Watkins immediately
once Isaac is pronounced dead is on the phone bam, bam,
bam, bam, bam, bam, bam, bam.

Now I want to talk about Joey's statement for just a
minute because he says that he left Aislinn's house --
well, he went to Aislinn's house around 7:20.  That is
what he said, and he told you -- he told you in this
statement -- he told us all in this statement that it
looked like Isaac's truck.  He saw what looked to be the
brush guard on the front of Isaac's truck with fog lights
on it, and that is why he called his sister.

I have got all the photographs here that were placed
into evidence.  Can you see the brush guard from that
picture?  Can you see the brush guard from that one?  Can
you see the brush guard from that one?  Can you see the
brush guard from that one?  We are getting closer and
closer.  Can you see the brush guard from this one?  Both

-1597-

sides of the truck are portrayed in this picture, in all these pictures from distance and from close and in not one of these photographs, not one of these photographs can you see a brush guard on the front of this truck.

And he got to Aislinn's house and what did her daddy hear him tell her? A good friend of mine just got killed. Why would -- what is Mr. Hogue's motive for coming in here and telling you that if he didn't hear it. Aislinn doesn't remember much of anything he said that night because he stayed on the phone with is family all night long. Now why in the world would he go to this girlfriend's house and stay on the phone with his family while she is sick laying in bed unless he needed an alibi, unless he needed an alibi. I don't know why.

He also told the police that I have never threatened Isaac. I do not own a handgun. We have disproved that. We have disproved the threat that he has threatened Isaac. I did not kill Isaac's dog. You know better than that now. I have never been to his house other than a friendship basis. Give me a break. I have never seen Isaac's dog. I don't drive my sister's car because I am not on the insurance, and I haven't seen him since the fair. I have not seen Isaac since the fair, and he said I haven't talked to him since he followed me to my house.

You have got his statement. You heard his statement.

-1598-

1    Those are the things that he told you; that he told you.
2    I am running close to the end and I don't want to -- I
3    know I am missing a lot of things because I told you that
4    the devil was in the details; didn't I?  It is; is it
5    not?  It is in the details of this case, and I haven't
6    got anymore time but just a couple, three, four more
7    minutes.  So I am going to have to quit talking about all
8    these details, but you have got your notes.  That is why
9    I asked you to pay close attention to the -- is that I
10   have to rely on you to put these things together that I
11   have not had time to put together for you.  There are
12   several other things that I wish that I could address
13   with you.  But time just does not allow.  I have got to
14   talk about the law.

15       I don't know whether Mark Free shot or Joey Watkins
16   shot.  You are not going to know.  Mark Free told his --
17   the guy -- people that he has talked to that it was Joey
18   Watkins that shot.  And Joey Watkisn has told people that
19   he has talked to that it was Mark Free that shot him.  We
20   will never know, but that is exactly why the parties to
21   the crime law exists.

22       The judge is going to charge you on parties to the
23   crime, and it is going to be -- he is going to tell you
24   that a person is responsible for a crime if they are a
25   party to it.  A party to it is either the person who

                              -1599-

1   directly commits it or helps commit it or advises

2   somebody to commit it or encourages somebody to commit

3   it.  And that is -- Mr. Abernathy said something about

4   mere presence.  We are not talking about mere presence.

5   We are talking about somebody that had a motive, had the

6   opportunity, had every reason in the world, had the gun,

7   had -- was hunting Isaac Dawkins.  This was not mere

8   presence.

9       He and his buddy, Mark Free, pre-planned to get

10  together and do this on Isaac's way home from school that

11  first night of school.  Who was it -- one of the

12  witnesses told us there wasn't but a handful of people

13  that knew this was Isaac Dawkins' first day of school.

14  And it was the girl that walked out with him that said he

15  left school at seven o'clock.  It was pre-planned.

16      THE COURT:  You have five minutes.

17      MS. COLSTON:  Yes, sir.  What is consistent

18  throughout this entire trial?  Look at those

19  consistencies of what people have told you.  Look at Mr.

20  Benson's testimony.  Look at what we have talked about in

21  the different witnesses' statements.  I ask you once you

22  look at all that, you look at the law of parties to a

23  crime, and he did more than just encourage it.  He was

24  the motivating force behind it, that man sitting right

25  there.  And the Defense lawyers would have you believe

-1600-

1  they waived the Constitution, which we all really

2  appreciate, love, respect, admire and we fight for it and

3  we die for it.  Our men have died for it, and now our

4  women will.

5  　　　　That is exceptionally important and part of that too

6  is our sense of justice in this country.  Our sense of

7  justice in the United States is that the guilty are

8  punished and do not go free like Joey Watkins has been

9  telling people in jail he is going to get away with this;

10  that he is going to get away with shooting and killing

11  Isaac Dawkins.  And the Defense would have you believe

12  that reasonable doubt means that I have to jump over the

13  top of this building and down on Tribune Street to prove

14  it beyond a reasonable doubt.  Y'all know that is not

15  true.

16  　　　　Listen to the judge's charge on reasonable doubt.

17  It is the doubt of a fair impartial jury.  You.  It is a

18  doubt -- honestly seeking the truth, a doubt that is

19  based on common sense and reason, not some vague or

20  arbitrary notion.  It is a doubt which your common sense

21  tells you.  There is no doubt in this case.  We have gone

22  to great lengths with great witnesses -- long witnesses

23  to prove to you that there was no other person with a

24  motive.  There was no other shooting in the area.  There

25  was no -- the bullet in the road was fresh.  It didn't

-1601-

-1602-

1    come from the woods.  It didn't come from the 20 West

2    shooting.  It came from one person, one person only, the

3    only person that had any motive, and that is Joey

4    Watkins.  And I ask you to look at all this evidence,

5    forget the red herrings, forget the smoke screens that

6    have been thrown out all week and find this defendant

7    guilty and give Isaac Dawkins and his family the justice

8    that they are looking for.  Thank you.

9                    * * * * * * * * * * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      2         [The jury leaves the courtroom, and the trial is
 2   completed.]
 3           ********************************************
 4                      C E R T I F I C A T E
 5   STATE OF GEORGIA
 6   COUNTY OF FLOYD
 7        The foregoing transcript of the proceedings was taken by
 8   me as a certified court reporter for the State of Georgia and
 9   reduced to typewriting by me or under my direction, and I
10   hereby certify that it is a true and correct transcript of
11   said proceedings.
12        This August 7, 2001.
13   (Lines 4 through 25 on page 20 through line 6 on page 73,
14   page 217 through line 10 on page 415 and page 559 through
15   line 13 on page 1177 and pages 1417 through page 1474.
16
17                        _Brenda G. Watson_
18                        Brenda G. Watson, CCR B-264
19
20
21
22
23
24
25
```

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1

2

3

4       \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

5                    C E R T I F I C A T E

6   STATE OF GEORGIA

7   COUNTY OF FLOYD

8       The foregoing transcript of the proceedings was taken by

9   me as a certified court reporter for the State of Georgia and

10  reduced to typewriting by me or under my direction, and I

11  hereby certify that it is a true and correct transcript of

12  said proceedings.

13      This August 7, 2001.

14  (Page  1 through line 3 on page 20 and lines  7 through 25 on

15  page 73 through page 216 and lines 11 through 24 on page 415

16  through page 558 and lines 14 through 25 on page 1177 through

17  1416.

18                          _____

19

20                        Melodie E. Taylor, CCR B-1057

21

22

23

24

25

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

-1603-

1                   * * * * * * * * * * * * * * * * * *

2                    C E R T I F I C A T E

3    STATE OF GEORGIA )

4    COUNTY OF FLOYD )

5       The foregoing transcript of the proceedings was taken by

6    me as a certified court reporter for the State of Georgia and

7    reduced to typewriting by me or under my direction, and I

8    hereby certify that it is a true and correct transcript of

9    said proceedings.

10      This 13th day of August, 2001.

11      [Pages 1475 through 1602]

12

13             Brenda G. Watson, CCR #B-264

14

15

16

17

18

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

# GEORGIA, _Floyd_ COUNTY

I hereby certify that the foregoing pages hereto attached comprise the original of the Court Reporter's Transcript as filed

in this office on _August 20_, 20 _01_, in the case of _01-CR-16707 JTL WJ_ IV.

_Joseph Samuel Watkins_

_____

**Appellant**

Vs.

_The State of Georgia_

_Vol IV of five Vols_

**Appellee**

Witness my signature and the seal of Court affixed

this the _4_ day of _Sept_, 20 _02_

_Virginia W Hartley_

Clerk Superior Court _Floyd_ County, Ga.

Case No. *SQ3A0034*

*January* _____ Term, 20 *23*

## SUPREME COURT OF GEORGIA

*Joseph Samuel Watkins*

**VERSUS**

*The State*

# TRANSCRIPT OF RECORD

Filed in office _____ SEP 1 0 2002

*Jan Eidson*

## SUPREME COURT OF GEORGIA

1        THE COURT:  You are Mark Free; is that

2  right?

3        MR. FREE:  Yes, sir.

4        THE COURT:  Mr. Free, I need to explain

5  something to you.  I know your attorneys have

6  already talked to you about this, but I want to

7  explain it to you again.

8        MR. FREE:  Okay.

9        THE COURT:  You are indicted and charged

10  with the same offenses that Mr. Watkins is

11  charged with.  Do you understand that?

12        MR. FREE:  Yes, sir.

13        THE COURT:  In a separate indictment?

14        MR. FREE:  Yes, sir.

15        THE COURT:  You are being called as a

16  witness to testify and you have been given what

17  is called the use immunity.  That means that you

18  are required to testify.  You do not have a

19  privilege to refuse to testify.  Do you

20  understand that?

21        MR. FREE:  Yes, sir.

22        THE COURT:  Nothing that you say can ever

23  be used  -- in here in this courtroom today,

24  nothing you say can ever be used against you in

25  any other case at any other time for any other

-774-



1    reason unless you lie.

2        MR. FREE:  Yes, sir.

3        THE COURT:  Then you can be prosecuted for

4    perjury?

5        MR. FREE:  Yes, sir.

6        THE COURT:  Do you understand that?

7        MR. FREE:  Yes, sir, I do.

8        THE COURT:  Now you could admit from the

9    witness stand you shot the Queen of England or

10   poisoned her food or make up anything you want

11   to.

12       MR. FREE:  Yes, sir.

13       THE COURT:  You could admit anything, any

14   criminal act from this witness stand and you can

15   never be prosecuted for that other criminal act;

16   nor could your testimony ever be used against

17   you about that.  Do you understand?

18       MR. FREE:  Yes, sir.

19       THE COURT:  It goes even further than that.

20   That is, if you said that you did something and

21   the police didn't know about it, they can't go

22   out and gather other evidence based on what you

23   say today and use it against you.  Do you see

24   what I am saying?

25       MR. FREE:  Yes, sir.

-775-

1          THE COURT:  It is part of use immunity;

2     that is, they can't use what you say either to

3     convict you or to gather other evidence to try

4     to convict you.

5          MR. FREE:  Yes, sir.

6          THE COURT:  Okay?  Are you with me?

7          MR. FREE:  Yes, sir.

8          THE COURT:  Your lawyers have explained

9     that to you?

10          MR. FREE:  Yes, sir.

11          THE COURT:  You do not have the privilege

12     to refuse to testify, and you must testify.

13          MR. FREE:  Yes, sir.

14          THE COURT:  Do you understand that?

15          MR. FREE:  I do.

16          THE COURT:  Raise your right hand.

17          [Mr. Free is given the oath.]

18          MS. COLSTON:  Thank you, Your Honor.

19               * * * * * * * * * * * * * * * *

20                    **MARK FREE**

21     was called as a witness by and on behalf of the

22     State, and after being first duly sworn, was examined

23     and testified as follows:

24               **DIRECT EXAMINATION**

25     **BY MS. COLSTON:**

                              -776-

1      Q      Just a -- I want to clarify one thing that

2   -- you understand you are still going to be charged

3   with this crime?

4   And you are still going up for trial on this crime?

5   Joey Watkins -- the same thing Joey Watkins is?

6      A      Yes, ma'am.

7      Q      All right.  State your name for us, please.

8      A      Timothy Mark Free.

9      Q      And where do you live at, Mr. Free?

10     A      142 Rising Fawn Trail.

11     Q      Where is that?

12     A      Swan Lake Mobile Home Park.

13     Q      Where is Swan Lake Mobile Home Park?

14     A      It is located off of Old Dalton.  There are

15  a couple of other streets to get to it.  I am not

16  sure of the names of them.

17     Q      Okay.  You are incarcerated right now

18  though at the Floyd County jail; right?

19     A      Yes, ma'am.

20     Q      On this charge?

21     A      Yes, ma'am.

22     Q      All right.  Have you been friends with Joey

23  Watkins?

24     A      Yes, ma'am.

25     Q      How long?

-777-

1       A       About nine years.

2       Q       About nine years.

3       Q       When did y'all become friends?

4       A       I would say about '92, '93.

5       Q       And you have remained friends up until

6   today?

7       A       Yes, ma'am.

8       Q       How close friends are you?  How often do

9   you see each other?

10      A       We are real good friends.  We have our

11  times where we hang out a lot, and then separate

12  maybe two weeks, a month, two months before we see

13  each other again, just going on our way to see other

14  people or different friends that we have.

15      Q       All right.  On or around the time -- you

16  remember when Isaac Dawkins was shot January 11th,

17  2000?

18      A       Yes, ma'am.

19      Q       All right.  About that time what kind of

20  friends were you and Joey?

21      A       We were still good friends, but we hadn't

22  been hanging out much because he was dating a girl by

23  the name of Aislinn Hogue.  I was hanging out with

24  David Brown at the time.

25      Q       So you weren't hanging out much in January

-778-

1   of 2000.  What is not much?  How often would you see

2   him?

3        A    Well, we really didn't start seeing each

4   other again until after the shooting.

5        Q    Until after the shooting?

6        A    Yes, ma'am.

7        Q    Y'all did not hang around together before

8   the shooting for how long?  How long were y'all apart

9   from each other?

10        A    I would say maybe two or three months.

11        Q    Who were you dating?

12        A    Meka Rogers.

13        A    When were you dating Meka Rogers?

14        A    We started talking in October, and then I

15   got arrested November the 2nd of '99.

16        A    So just that one month -- is that 1999?

17        A    We started seeing each other after I got

18   out of jail when I got arrested November 2nd.  I got

19   out December 8th.

20        Q    Is that '99 or 2000?

21        A    That is '99.

22        Q    '99?

23        A    Yes, ma'am.

24        Q    Was that the forgery?

25        A    Yes, ma'am.

-779-

1      Q      Okay.

2      A      I was on probation for that, yes, ma'am.

3      Q      And you are presently on probation for that

4   forgery?

5      A      Yes, ma'am.

6      Q      Mr. Free, were you with Joey Watkins on

7   January 11th, 2000, between seven and seven-thirty in

8   the evening?

9      A      No, ma'am, I wasn't.

10     Q      Were you with Joey Watkins at any time that

11   you saw Isaac Dawkins on January 11th, 2000?

12     A      No, ma'am.

13     Q      Not at all?

14     A      Not at all.

15     Q      You are absolutely certain of that?

16     A      I am positively certain of that.

17     Q      Were you on Highway 27 on January 11th,

18   2000, between the hours of seven and seven-thirty

19   p.m.?

20     A      Yes, ma'am, in Armuchee on my way to my

21   sister's house.

22     Q      You were on 27 at that time going toward

23   your sister's house in Armuchee?

24     A      Yes.   From the West Rome Bypass, hit the

25   bypass, turn left there on 27 to go to Armuchee.

                              -780-

```
 1        Q     What is your sister's name?

 2        A     Lisa Lawson.

 3        Q     Lisa Lawson?

 4        A     Yes, ma'am.

 5        Q     Is she married?

 6        A     Yes, ma'am.

 7        Q     What is her husband's name?

 8        A     Shannon Lawson.

 9        Q     Was he there?

10        A     Yes, ma'am.

11        Q     Who else was there?

12        A     My niece, Ashley Mathis, and my smaller

13  niece, Haley Coots.

14        Q     All right.  Did you give a statement to the

15  county police at one time that you were at home or

16  either at David Brown's house?

17        A     Yes, I did.  I was at David's house.  I

18  left there with Meka, went to my sister's house and

19  then after my sister had left for work, we stayed

20  there for a little while.  I talked with Shannon, and

21  I went home and got me some clothes and I went back

22  to David's house and spent the night with him.

23        Q     So you are saying you were at David Brown's

24  house and you spent the night with him?

25        A     Yeah, yes, ma'am, but that was after nine
```

1    o'clock that night.

2         Q    After nine o'clock that night?

3         A    Yes, ma'am.

4         Q    And you are saying you were with Meka

5    Rogers also?

6         A    Yes, ma'am.

7         Q    And you saw David Brown, your sister, her

8    husband and your niece?

9         A    Yeah, and my dad.  I saw him that night

10   too, because I had to go home and get some clothes.

11        Q    Saw your dad?

12        A    Yes, ma'am.

13        Q    And your dad is Tim?

14        A    Tim Free, yes, ma'am.

15        Q    All right.  Have you told anyone that you

16   were with Joey Watkins on Highway 27 on January 11th,

17   2000, between seven and seven-thirty?

18        A    No, ma'am, I didn't.

19        Q    Not told one soul that?

20        A    Not one soul.

21        Q    When you were in jail on the forgery

22   charge, was it a violation of probation?

23        A    Yes, ma'am.

24        Q    All right.  So when you were in jail on

25   that, did you -- were you in jail with a David Jones?

-782-

1      A    That was after I got -- left the diversion

2  center back to jail till October 5th.

3      Q    So around October, were you in jail with

4  David Jones?

5      A    From August to -- he got moved out of the

6  block I would say in September.  From August to

7  September,  August 12th till September -- probably

8  the middle of September.

9      Q    So you were in jail with David Jones?

10     A    Yes, ma'am.

11     Q    Did you tell him that you were with Joey

12  Watkins and you were in the back seat passed out on

13  pills?

14     A    No, ma'am, I didn't.

15     Q    You never said that?

16     A    No, ma'am.

17     Q    Did you tell David Jones that you woke up

18  and heard gunshots?

19     A    No, ma'am.

20     Q    You never said that?

21     A    No, ma'am, I didn't.

22     Q    Did you tell -- let me ask you if you

23  remember a fellow by the name -- did you tell him

24  that there was another guy in the car too named Brian

25  who was in the front seat --

-783-

1      A    No, ma'am.

2      Q    -- with Joey?

3      A    No, ma'am.

4      Q    Do you know who shot and killed Isaac

5  Dawkins?

6      A    No, I don't.

7      Q    Have you ever told anybody you knew?

8      A    No, I told people I had suspicions of who

9  might have, but I can't prove it.

10     Q    Did you tell anybody you knew?

11     A    No, I didn't tell them I knew who shot him,

12  no, ma'am.

13     Q    Did you ever tell anybody, I know -- Joey

14  and I know who did it, but we are going to keep it to

15  ourselves?

16     A    No, ma'am, I didn't.

17     Q    You never told anybody that?

18     A    No, ma'am.

19     Q    Do you remember a fellow by the name of

20  Joey Samples?

21     A    Yes, ma'am.

22     Q    Did you not tell Joey Samples that you knew

23  who did it?

24     A    No, I didn't.

25     Q    And that you were going to keep it to

                          -784-

1    yourself?

2         A    No, I didn't.

3         Q    Who is Keri Wilkey?

4         A    An ex-girlfriend of mine.

5         Q    A former girlfriend of yours?

6         A    Yes, ma'am.

7         Q    Somebody you are still friends with; isn't

8    it?

9         A    You could say that.

10        Q    You still call her occasionally and get her

11   to pick you up and take you -- take you somewhere and

12   that type of thing?

13        A    Not anymore.  She is with somebody else

14   now.

15        Q    But up until the time that shortly after

16   Isaac's death, you still felt like you could call her

17   and get --

18        A    Yeah, yeah.

19        Q    -- her to do things for you?

20        A    Yes, ma'am.

21        Q    But you were on good terms; correct?

22        A    Yes, ma'am.

23        Q    Did you ever tell Keri Wilkey that you knew

24   -- that you and Joey knew who did it, but you were

25   going to keep it to yourself?

                              -785-

1      A      No, ma'am.

2      Q      You never said that?

3      A      No, ma'am.

4      Q      Did you tell Joey Samples that you shot and

5   killed Isaac -- y'all shot and killed Isaac's dog?

6      A      No, ma'am, I didn't know he had a dog.

7      Q      You didn't know he had a dog?

8      A      No, ma'am.

9      Q      You had never heard that in this case?

10     A      I have heard rumors that a dog had been

11  shot of Isaac's.

12     Q      And you never heard anything about it?  You

13  didn't know -- you have never said anything about

14  being the one to shoot it?

15     A      No, ma'am.

16     Q      You didn't tell Joey Samples that you were

17  worried about that because they -- there was a bullet

18  casing or something found and you were afraid your

19  fingerprints were on it?

20     A      No, ma'am.

21     Q      You never said that?

22     A      I wasn't worried because we didn't do it.

23     Q      Did you tell Joey Samples that you were a

24  sharp shooter in the military?

25     A      Yeah, we talked about old times, high

-786-

1    school, playing football, and I told him I was in the

2    military, told him I wanted to be a patrol officer

3    for Floyd County and thought that might help me.  We

4    just talked about old times.

5         Q    Did you tell him you were an expert with

6    .9mm's?

7         A    Yes, I did.

8         Q    You did tell him that?

9         A    Yes, ma'am.

10         Q    And you are an expert with a .9mm; are you

11    not?

12         A    In the military, yes, ma'am.

13         Q    In the military, you were considered a

14    sharp shooter?

15         A    Expert shot.

16         Q    And you filled out an application with the

17    Floyd County PD and sent them a resume saying you

18    were an expert with --

19         A    Yes, ma'am.

20         Q    -- a sharp shooter?

21         A    Yes, ma'am.

22         Q    Did you tell Joey Samples -- do you

23    remember telling Joey Samples or did you tell Joey

24    Samples that you needed to get out of jail because

25    you had a good alibi, but you didn't know about Joey

-787-

1    and y'all needed to get your stories straight.

2        A    No, I never said nothing about getting no

3    story straight.  There is not a story to get

4    straight.

5        Q    You never said anything to him.  Did you

6    talk to him at all about this case?

7        A    Well, when I got arrested -- the day I got

8    arrested they put reward posters in every block, and

9    I went up to read it and it was about Isaac, you

10   know, the death of Isaac and if anybody had

11   information about it.  I had told Joey Samples that

12   one of my friends had been questioned about it.

13       Q    That one of your friends had been

14   questioned about it?

15       A    Yes, ma'am.

16       Q    And who was that friend?

17       A    Joey Watkins.

18       Q    Joey Watkins.  Did you tell him anything

19   more about it?

20       A    No, ma'am.

21       Q    Nothing else?

22       A    Nothing else.

23       Q    Did you tell him why Joey Watkins was

24   questioned or anything, speculation?

25       A    No, ma'am.

                          -788-

1  Q Then how does he know of the name Brianne?

2  A I don't know.

3  Q You don't have a clue how he knows that?

4  A No.

5  Q Did you tell him about Joey Watkins' father

6 having a car lot and something about having to do

7 with a car lot?

8  A No.  He already knows that.

9  Q Joey Samples already knew that?

10  A He already knew that.

11  Q He already knew that?

12  A He lives in Rome.

13  Q He lives in Rome.

14  A I mean I don't know.  I am guessing --

15  Q So he would know --

16  A -- knowing that they own a car lot.

17  Q So he would just know that from that, from

18 the fact that he lived in Rome and that Joey Watkins

19 was the son of Johnny Watkins who owns the car lot in

20 South Rome?

21  A Yeah.  To my knowledge, yes.

22  Q That is common knowledge in your opinion to

23 90,000 plus citizens of Rome, Georgia?

24  A Yes, ma'am.

25  Q You think that.  Mr. Free, are you denying

-789-

1   having made all these statements to all these people?

2        A    Yes, ma'am, I am.

3        Q    Every one of them?

4        A    Every one of them.

5        Q    Every one of them?  You have never said the

6   things that I had outlined to you?

7        A    I have never said them.

8        Q    Okay.

9             MS. COLSTON:  That is all I have.

10                 ***********************

11                   **CROSS-EXAMINATION**

12   **BY MR. O'DELL:**

13        Q    Mark, I just have a couple of questions so

14   we can clear up a few issues.  First, in August of

15   last year did you at any time speak to a Billy Pasley

16   or Passly at a gas station across from Heritage

17   Nissan on Martha Berry?

18        A    No, sir.  I don't know Bill Pasley.

19        Q    Did you ever tell him that you took care of

20   Isaac's dog?

21        A    No, I didn't know he had a dog.

22        Q    Now this was in August of last year.  Where

23   were you August of last year?

24        A    Up to August 12th I was at the diversion

25   center.  After that, I was put out and went back to

1    jail till October 5th and got out.

2         Q    All right.  So you were in custody the

3    entire month of August?

4         A    Yes, ma'am -- sir.

5         Q    All right.  Either at the diversion center

6    or out them at the jail?

7         A    Yes, sir.

8         Q    And you don't --

9         A    Pretty much the whole year.

10        Q    To the best of your recollection and

11   knowledge, you don't have any friendship or

12   relationship at all with a Billy Pasley?

13        A    No, sir, I don't.

14        Q    Now back in January 11th of last year, were

15   you working?

16        A    I was working part time at Governor's being

17   a bouncer.  I was staying -- I spent a lot of time

18   with David, my other friend, David Brown.

19        Q    David Brown?

20        A    Yes, sir.

21        Q    Did he also work out there?

22        A    Yes, sir, he is the one that helped me get

23   the job there.

24        Q    So it was common for the two of you to

25   spend time together?

                              -791-

1     A     I spent the night over there plenty of

2     nights.

3     Q     Okay.  And you also were dating a young

4     lady at that time; correct?

5     A     Yes, sir.

6     Q     What was her name?

7     A     Meka Rogers.

8     Q     How long had you been dating her?

9     A     We met in October.  We knew each other from

10    way back.  We used to go out eight years ago.  We

11    started talking again in October.  We stayed

12    together, I guess, probably up until the first month

13    of February -- I mean the first couple of days of

14    February.

15    Q     Now did you and Meka socialize at all prior

16    to January 11th with Joey and his girlfriend,

17    Aislinn?

18    A     No.  I didn't know Aislinn until after the

19    shooting.

20    Q     So you didn't even --

21    A     I never even met her till after.

22    Q     So to the best of your knowledge, you don't

23    remember even meeting Aislinn until afterwards?

24    A     Yes, sir.

25    Q     And to the best of your knowledge, you

-792-

1    hadn't even seen Joey in several months; is that

2    correct?

3        A    Yes, sir.

4        Q    You had your girlfriend, and he had his.

5    You were in your world with David Brown.

6        A    Yes, sir.

7        Q    Did you even know what was going on in

8    Joey's world?

9        A    I had no idea.

10        Q    On January 11th at any time did you receive

11    a phone call from Joey Watkins?

12        A    No, sir.

13        Q    Of 2000?

14        A    No, sir, not until after shooting -- we

15    started --

16        Q    Y'all started talking?

17        A    I was wondering why he was a suspect, you

18    know, and we just talked.

19        Q    So you had heard he was a suspect and

20    contacted him?

21        A    Yes, sir.  This was while I was in jail.

22        Q    All right.  So you heard about it in jail?

23        A    Yeah.  As a matter of fact, I called David

24    Brown from jail, and he said that Joey was a suspect.

25    And I was like -- I couldn't believe it.  I mean,

-793-

1     there is no way.

2          Q     Did you at any time call Joey Watkins on

3     January 11th of 2000?

4          A     No, sir, I didn't.

5          Q     So if your phone records -- did you have a

6     cell phone at that time?

7          A     No, sir.

8          Q     Just a regular house phone?

9          A     Yes, sir.

10         Q     Did you have a phone?

11         A     Yes, sir.

12         Q     And that was just a regular house phone?

13         A     Yes, sir.

14         Q     So if your records were subpoenaed by the

15    police and everything, you would feel very

16    comfortable that there would be no call either coming

17    in or going out to Joey Watkins?

18         A     No.  I feel perfectly comfortable with it.

19         Q     Could you have possibly told Keri Wilkey

20    that you had someone that you guys suspected did the

21    killing; that you didn't know who did the killing,

22    but you --

23         A     Right.  I told her that, you know, I had my

24    suspicions.

25         Q     You had suspicions.

                         -794-

1      A      Right.

2      Q      But you didn't --

3      A      Right.  I didn't know -- you know, I

4      couldn't prove it or anything.  I didn't know --

5      Q      So when Ms. Colston asked did you know who

6      did it, you don't know who did it?

7      A      No, I don't know who did it.

8      Q      You have suspicions of who did it?

9      A      Suspicions.

10     Q      Hang on.

11            MR. O'DELL:  That is all I have.  Thank

12     you.

13                    *****************

14            REDIRECT EXAMINATION

15     BY MS. COLSTON:

16     Q      Mr. Free, do you recall asking Meka Rogers

17     if not remember, don't you remember we were together

18     that night Isaac was killed.  You talked to her about

19     that; didn't you?

20     A      I asked her if she remembered.

21     Q      And she doesn't remember; does she?

22     A      I have no idea.

23     Q      She told you she didn't about a hundred

24     times; didn't she?

25     A      No.

                              -795-

1    Q    She didn't?

2    A    No, ma'am.

3    Q    You can't sit here and say that if we bring

4  her in this courtroom that she is going to confirm

5  that; is she?

6    A    Confirm that she told me that a hundred

7  times?

8    Q    No.  She is going to confirm that she was

9  with you?

10    A    If she could remember or not, I don't know.

11  That     is --

12    Q    Are you saying you didn't talk to her about

13  it and you didn't tell her, don't you remember you

14  were with me?

15    A    I told her when we was dating the whole

16  time we was always together.

17    Q    You don't remember -- did you say that to

18  her or not?  Don't you remember, you were with me?

19    A    I said that to her.

20    Q    And she said, no; didn't she?

21    A    She sat there and thought about it.

22    Q    And she said no; didn't she?

23    A    I guess she did.

24    Q    And she did.  Several times; didn't she?

25    A    Once or twice.  I told her to sit there and

-796-

1   think about it for a minute.

2        Q    And then did she sit there and think about

3   it for a minute?

4        A    Yeah.

5        Q    And then she still said no; didn't she?

6        A    Yeah.

7        Q    All right.  Now also David Brown that you

8   supposedly spent the night with that night that you

9   were with, you did the same thing with him; didn't

10  you?

11       A    No, I didn't.

12       Q    Called him up and said we were together;

13  weren't we?

14       A    He knew I was at his house.  I spent a lot

15  of time with him.

16       Q    You were at his house on the night that you

17  were arrested; weren't you?  Arrested for something -

18  - arrested on your probation?

19       A    No, I was at home when I got arrested.

20       Q    You were at home when you got arrested.

21       A    That was the 12th.

22       Q    But weren't you at David's house that night

23  before?

24       A    I was there that day, yeah.  I spent a lot

25  of time over there.

-797-

1     Q     Didn't you talk to David about that and

2     tell him that you were with him the night of the

3     11th, and he recalled it to be the night you were

4     arrested?

5     A     Well, I didn't think nothing about it until

6     Johnny Williams called me the 12th and asked me --

7     Johnny Williams and I were friends and asked me --

8     told me something about Isaac Dawkins being shot.  I

9     was like, who?  Who is that?  Do you remember

10    Samantha Dawkins?  Yeah, I know her through Josh

11    Flemister.

12    Q     When was that?

13    A     When?

14    Q     What are you talking about?  When you got

15    that call, where were you at?

16    A     I was at David Brown's house on the 12th.

17    Q     You were at David Brown's house on the

18    12th?

19    A     Yes, ma'am.

20    Q     Correct?  And that is the night you were

21    with David Brown; right?  Because you were arrested

22    later that evening?

23    A     At home.

24    Q     At home you were arrested later that

25    evening?

-798-

1      A      Yes.  Meka took me home.

2      Q      And that is the date that David Brown says

3  -- will say that you were with him when he comes in

4  that courtroom; isn't it?

5      A      Yeah.  He will say he was with me on the

6  12th.

7      Q      And not the 11th; is it?  You have talked

8  to him about it; haven't you, Mr. Free?

9      A      To my knowledge -- I have read the

10  statements where I got -- about the case, and he said

11  he couldn't remember for sure or not.  But he knows

12  we were hanging out a lot.

13      Q      So you have read all the statements that

14  are in this case?

15      A      I read statements, yes.

16      Q      Okay.  So you have read all the statements

17  in this case, and you knew -- you know what David

18  Brown is going to say when he comes in here.

19      A      I don't know what he is going to say.

20      Q      You know that he has not confirmed that you

21  were with him on the 11th?

22      A      On the 11th, yes, ma'am.

23      Q      And neither has Meka Rogers?

24      A      Yes, ma'am.

25      Q      Only your family; correct?

-799-

1      A      Correct.

2      Q      What time did you get over to your sister's

3  house?

4      A      The 11th or the 12th?

5      Q      The 11th?

6      A      On the 11th, we left David's house about

7  six forty-five, got to my sister's about seven, maybe

8  five after.  She was rushing to go to work.  She

9  works the night shift at the time.  I remember her

10 rushing trying to find her keys because she usually

11 leaves about seven-fifteen or seven-twenty.

12     Q      Was David with you?

13     A      No, ma'am.

14     Q      At your sister's house?

15     A      No, ma'am.

16     Q      You just left out of his house and went to

17 your sister's house and then you went back to David's

18 house?

19     A      No, I went to my home and got some clothes

20 and went back to David's house.

21     Q      Then went to David's house?

22     A      Yes, ma'am.

23     Q      All right.  So at no time were you alone on

24 the 11th?

25     A      No, ma'am.

-800-

1    Q    At no time?

2    A    No, ma'am.

3         THE COURT:  Mr. O'Dell.

4         ********************

5         **RECROSS-EXAMINATION**

6    **BY MR. O'DELL:**

7    Q    Mr. Free, you spent a lot of evenings and

8    days and all with David Brown; didn't you?

9    A    Yes, I did.

10   Q    All right.  It wasn't unusual at all for

11   you to spend the night or y'all work together and go

12   and spend the night at his house, whatever; is it?

13   A    Yeah.  I stayed most of the week with him.

14   I would go home maybe one day a week or so and get

15   some clothes or something.

16   Q    All right.  So you spent a great deal of

17   time at his house?

18   A    Yes, I did.

19   Q    All right.  And during this time, you were

20   doing that?

21   A    Yes, sir.

22   Q    Until the very next day, the 12th, you were

23   arrested that night?  This was for a parole --

24   probation violation?

25   A    Probation violation technicality, yes, sir.

                              -801-

1    Q    What was that technicality?

2    A    Behind on my fine.

3    Q    Okay.  You hadn't paid all your fines.  So

4  they came and picked you up?

5    A    That was the City, yes.

6    Q    And Ms. Colston said you read all these

7  transcripts and statements in this thing.  You have

8  read some of them; haven't you?

9    A    I have read some of them, yes, sir.

10    Q    And that is normal to go over transcripts

11  with your attorneys to see what people are saying

12  about you?

13    A    Yes, sir.

14    Q    So that we can ask you about it?

15    A    Yes, sir.

16    Q    Not to see what someone is going to testify

17  about in court.

18    A    Correct.

19    Q    Now you didn't even become a suspect until

20  a good time later; did you?

21    A    Yeah, it was about -- whenever Stanley

22  Sutton got on and started on the case, that is when I

23  became a suspect.

24    Q    And do you recall why that was?

25    A    To the --

-802-

1    MS. COLSTON:  I am going to object, Your

2   Honor, in that that calls for speculation as to

3   why he would become a suspect.

4    MR. O'DELL:  I will withdraw it.

5   Q [By Mr. O'Dell]:  Now you then were asked

6 to try to remember back several months about every

7 bit of movement that you did that day?

8   A Yes, sir.

9   Q And you're answering to the best of your

10 recollection, these are the things I did?

11   A Yes, sir.

12   Q All right.  And it turns out that you might

13 be wrong about one little twist or one little turn.

14 Would that necessarily surprise you?

15   A It wouldn't surprise me.  I mean, it is a

16 lot to think about back then, and it has been awhile

17 since all that had happened.

18   Q All right.  But you do know the very

19 following day on the 12th you got picked up?

20   A Correct.

21   Q And you knew you got picked up at your

22 house, not at David's?

23   A Yes, sir.

24   Q And you knew you were at David's right

25 around that time.  Did any other things occur right

-803-

1    around the 11th, such as any family situations going

2    on?

3         A    Yeah.  I was at David's house the 11th, and

4    I called my sister's house, Lisa Lawson, and she said

5    that Ashley, my little niece, had skipped school or

6    something and tried to run away.  I said, well, all

7    right, I said, I am going to come over there and talk

8    to her about it.

9         Q    She was sort of a favorite niece of yours;

10   wasn't she?

11        A    Yes, sir.

12        Q    And she listened to you?

13        A    Yes, sir.

14        Q    All right.  What about your grandfather?

15   Was there any problems with him at that time?

16        A    My grandfather?

17        Q    Or did you have any family member in the

18   hospital?

19        A    Oh, yeah, my Paw-Paw Peyton.  He was in

20   intensive care unit at the hospital.  The doctor said

21   he didn't have but a few days to live, but he did

22   beat what -- he caught pneumonia, and he did beat

23   that and came back home.  He wanted to die at home,

24   and he did pass away this past October.

25        Q    And this was going on right at that very

                              -804-

1   same time too; wasn't it?

2        A    Yes, sir.

3        Q    All right.

4             MR. O'DELL:  Thank you.

5             MS. COLSTON:  Nothing further.

6             THE COURT:  All right.  Step down, please.

7             [End of immunity testimony.]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

FILED IN OFFICE
8:59
AUG 08 2002

_April Mashburn_
CLERK

ORIGINAL

_Am 8-8-02_

IN THE SUPERIOR COURT OF FLOYD COUNTY

ROME, GEORGIA

| | | |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| vs | ) | 01-CR-16707-JFLWJM |
| JOSEPH SAMUEL WATKINS, | ) | Murder |
| Defendant | ) | **MOTION FOR NEW TRIAL** |

APPEARANCES:

FOR THE STATE:

Fred Simpson, Esq.
D.A.'S Office
Rome, GA

FOR THE DEFENDANT:

Bobby Lee Cook, Jr., Branch
Connelly, and Rex Abernathy,
Esqs.
Summerville, GA

May 15, 2002

BE IT REMEMBERED, the above-entitled case came on for hearing on this date before the HON. WALTER J. MATTHEWS, Judge of said court when all parties announced ready.

The following proceedings were held and evidence introduced, to wit:

Evidence was heard in a motion for new trial.

Brenda G. Watson
Court Reporter
3 Government Plaza, Ste 212
Rome, Georgia 30124
(706)291-5166, 5120

-1-

RESPONDENT
EXHIBIT
3

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1       THE COURT:  This is the motion for new trial as

2   amended in the case of the State of Georgia against

3   Joseph Samuel Watkins.  Mr. Cook, are you ready to

4   proceed on behalf of --

5       MR. COOK:  Yes, Your Honor, we are ready to

6   proceed.

7       THE COURT:  Mr. Simpson, are you ready?

8       MR. SIMPSON:  Yes, Your Honor, but I do have --

9   okay.  We're ready.

10      THE COURT:  All right, Mr. Cook.

11      MR. COOK:  Your Honor, if I may I would like to

12  make just one or two preliminary inquiries.  I'm sure

13  the Court has looked at and read the amendment to the

14  motion for a new trial, which includes two specific

15  grounds.  One is referred to as the Brady violation and

16  the second ground referred to as the perjury of Yvonne

17  Agan or the Yvonne Agan problem.

18      Certain exhibits have been attached to the amended

19  motion, numbered A through H respectfully.  The two

20  transcripts or portions of the transcript of the

21  Watkins' trial is attached and portions of the

22  transcript in the Free trial are attached as exhibits G

23  and H.  These relate to the testimony of Yvonne Agan.

24      I would ask the Court to take judicial cognizance

25  and judicial notice of the fact that those transcripts

-3-

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

are, in fact, copies of those portions of the transcripts from those two trials. I take that there's no question about that?

MR. SIMPSON: No. No objection. We can stipulate to that.

THE COURT: The rest except for Exhibit E --

MR. COOK: Sir?

THE COURT: Excuse me. Several of these are excerpts from the record and they'll certainly -- additionally they're fine. I think you've got a memorandum and a couple of sworn statements that are not --

MR. COOK: Oh, I agree. I'm referring just to G and H at this time.

THE COURT: All right. Then they're accepted then as tendered.

MR. COOK: All the other exhibits, some of the exhibits, A, B, C, D, E, -- A, B, C and D are portions of what will be in the record itself, of which the Court, I will ask to take judicial cognizance or judicial notice of.

THE COURT: There's no problem with that.

MR. COOK: E, attached E is a sworn statement of James Earl Hudgins.

THE COURT: No, James Arnold Hudgins is F. I have

-4-

1    it as F.

2         MR. COOK:  Yeah, it is F.  That is correct.

3         THE COURT:  E is a memorandum.

4         MR. COOK:  That is correct.  E is a memorandum from

5    Mr. Cox to Mr. Abernathy and I take it that that is a

6    true and correct copy of that.  We can so stipulate to

7    that, can we not?

8         MR. SIMPSON:  Agreed.

9         MR. COOK:  So the only thing -- everything is

10   stipulated to as being true and correct with the

11   exception of Exhibit F, which is the sworn statement of

12   Mr. Hudgins.

13        THE COURT:  Correct.

14        MR. COOK:  And I might be able to short circuit the

15   -- this thing considerably if the Court could inquire or

16   I could inquire of distinguished counsel for the State

17   whether or not they agree or will concede that Mr.

18   Hudgins came to the district attorney's office prior to

19   the trial of Watkins and reported what is stated in

20   Exhibit F.

21        MR. SIMPSON:  I don't know that I can stipulate as

22   a fact that he came in.  I know certainly within the

23   deposition and statements that he says he came there.  I

24   would say this.  I would expect -- Your Honor, I expect

25   to put up some witnesses.

-5-

I would expect Mr. Goldin to say that he does not know whether or not it was before or after trial.

MR. COOK:  Okay.

MR. SIMPSON:  Did that -- but anyway.

MR. COOK:  Okay.  Then I will call only one witness and that would be Mr. Hudgins insofar as it relates to this proceeding.

MR. SIMPSON:  That's fine.

THE COURT:  Is there any other preliminary matters?

MR. COOK:  That's the only one that I can think of, Your Honor.

THE COURT:  All right.

MR. COOK:  Mr. Hudgins.

*****************

JAMES ARNOLD HUDGINS

a witness called on and on behalf of the Defendant, after first being duly sworn, was examined and testified as follows:

## DIRECT EXAMINATION

BY MR. COOK:

Q    Mr. Hudgins, if you will, speak up loudly and clearly where I can hear you as well as counsel for the State and the Court and ourselves over here.  All right?

A    Yes, sir.

Q    What is your full name?

-6-

1    National Guard with him -- for failing to yield the right of

2    way and he finally committed suicide.

3        Q     You're in better shape than I am.   What did Mr.

4    Goldin say to you when you told him that?

5        A     Mr. Goldin didn't tell me nothing.

6        Q     And there's no question but what you told him this?

7        A     I'll take a lie detector test if y'all want me.

8        Q     Now did you also --

9              THE COURT:  Mr. Cook, will you grab that microphone

10    right there and just sort of move it.  I have a feeling

11    it -- I don't know which one is causing this problem and

12    I don't know enough about this sound system to --

13             MR. COOK:  I don't think I need that anyway.

14             THE COURT:  Well, the court reporter does.

15             MR. COOK:  Oh.

16        Q     Did you at a later time talk to Mr. Cox?

17        A     Yes, I did and Ms. Colston.

18        Q     And who?

19        A     Tami Colston.

20        Q     And that was, I believe, after the trial?

21        A     Right, the last day Tami was district attorney.

22        Q     And after Joseph Samuel Watkins had been convicted?

23        A     Right.

24        Q     And approximately how long after the trial was

25    that?

-12-

1          A     I don't remember exactly how long after the trial
2     it was.  I just know I couldn't sleep because of what was
3     going on and there wasn't nothing being done about it.  And I
4     came up and I talked to Tami the last day she was in office
5     and she faxed y'all about it.

6          Q     And Cox was there, Steve Cox?

7          A     And Cox was there.  Steve was there.

8          Q     And what did you tell them?

9          A     I told them the same thing I've told the Court here
10    today.

11         Q     Did you tell them basically the same thing as you
12    had told Mr. --

13         A     Goldin, yes, sir.

14         Q     -- Goldin?  Are you related to anyone in this case?

15         A     No, sir, I'm not.  I don't even know these
16    families.

17         Q     Had you ever known me before or --

18         A     No, sir, I don't.

19         Q     -- Mr. Connelly or Mr. Abernathy or Mr. O'Dell or
20    anyone connected with this case?

21         A     No, sir, I don't.  I don't.  I really don't.  I
22    don't -- there's one person in this courtroom that I know and
23    he's the deputy sheriff back there from Polk County.

24         Q     All right.  Do you know Mr. Sutton there now?

25         A     I know him now.  I didn't know him then.

                              -13-

1    Q    Didn't know him at the time?

2    A    No, sir.

3         MR. COOK:   You may examine the witness.

4         MR. SIMPSON:   Thank you, Mr. Cook.

5         *********************

6         <u>CROSS-EXAMINATION</u>

7    <u>BY MR. SIMPSON:</u>

8    Q    Mr. Hudgins, if you would explain to us the

9    circumstances behind Mr. Boyd saying that he did this?

10   A    Well, I just explained it to you.

11   Q    Well, would you do it again, please, sir?

12   A    I explained to you that he had done away with some

13   guineas of mine and he claimed he got saved and when he

14   claimed he got saved, being a licensed minister, if you get

15   saved, truly get save, God will forgive you; I can forgive

16   you for anything you've done to me.  And I went up there.  He

17   had his baby in his arms and I told him, I said, Joey, if you

18   truly got saved, I can forgive you for doing away with my

19   guineas.

20        I didn't do away with them; I killed them.  And I killed

21   that boy down on the highway the other evening.

22   Q    So just out of the blue he admits, confesses to

23   killing Isaac Dawkins?

24   A    Right.  That's exactly right.

25   Q    But he said Joey Dawkins?

-14-

1      A    Yeah.

2      Q    Did he tell you what it was about?

3      A    He said he was dating his wife.

4      Q    Okay.  Now Mr. Boyd told you that directly?

5      A    That's right.

6      Q    Mr. Hudgins, did you ever tell Investigator Sutton

7 over here that Boyd's wife told him who had done it?

8      A    I told Mr. Sutton that Boyd told me that his wife

9 told him.

10     Q    Well, let me ask you to look at a statement you

11 made back in --

12          MR. COOK:  Now wait just a minute.

13    A    Yeah, wait just a minute.

14         MR. COOK:  Wait just a minute.  I object to you

15 making reference to the fact that that's a statement

16 that he made.  You hand me what purports to be, I

17 suppose, a transcription of a tape recording that I have

18 not been afforded with and I gave you everything in

19 advance two or three weeks and I object to that unless

20 I've had an opportunity to check with the tape recording

21 and to determine its accuracy before you refer to it

22 that it's a statement that he made.

23       This is highly irregular.  I gave you the courtesy

24 of getting a month's advance on everything that I had

25 and now you drop this on me here.

-15-

1          MR. SIMPSON:  Mr. Cook --

2          MR. COOK:  And I don't --

3          MR. SIMPSON:  If I may?

4          MR. COOK:  You may but I don't like it.  It's not

5     fair and I object to it.

6          MR. SIMPSON:  Your Honor, in responding I sent Mr.

7     Cook a letter saying that the district attorney's office

8     had an open file policy.  I asked him due to the volume

9     of the case to send one of its investigators to our

10    office to look at it before this and I've had no contact

11    from Mr. Cook's office since then.

12         THE COURT:  I need to let you go ahead and proceed.

13    This is a motion for new trial hearing, not the trial of

14    the case.

15         MR. SIMPSON:  Yes, sir.

16         THE COURT:  And I need to hear what's -- I need to

17    hear from all of you.

18    A    Now before you show me something, I've got --

19         THE COURT:  No, sir.  No, Mr. Hudgins.

20    A    Sir.

21         THE COURT:  You just answer the questions that are

22    put to you.

23    A    I've got a 40/60 vision, sir.

24         THE COURT:  Okay.

25    Q    [By Mr. Simpson]  Okay, Mr. Hudgins.  This portion

                              -16-

1    right here -- it's on page two, Mr. Cook.

2            MR. COOK:  That's exactly what I'm objecting to,

3        Your Honor.

4            THE COURT:  And what's that?

5            MR. COOK:  He's handing him what purports to be a

6        statement that he has made and there's no evidence that

7        this statement has been made by him under these

8        circumstances.  It's a tape recording that I have not

9        seen and he hands me a transcript that I have not seen.

10           THE COURT:  Well, you need to establish when and

11       where this was --

12           MR. SIMPSON:  I'm trying to.

13           THE COURT:  No, you need to ask him beforehand.

14           MR. SIMPSON:  All right, Judge.

15       Q    [By Mr. Simpson]:  Mr. Hudgins, did you back in

16   August go to the police department and talk to Stanley Sutton

17   over here?

18       A    Yes, I did.

19       Q    And did he take a statement from you?

20       A    He took a statement from me.  Can I say something?

21       Q    Yes, sir.

22       A    Before he took a statement, before he recorded

23   anything, the first thing that came out of his mouth, you're

24   in serious trouble and I know your mother.  She lives in

25   Lindale.

                              -17-

1    said, how do you know?

2         She told me so.   That Mr. Boyd --

3         A    No, sir, I did not say she told me so.

4         Q    I'm asking you to look at that and see, she told me

5    so?

6         A    No, sir, I didn't say that.

7         Q    So if Sgt. Sutton testifies and says that you say

8    that -- said that, that's not true?

9         A    No, it's not.

10        Q    Mr. Hudgins, you have had other information

11   concerning other murders too; have you not?

12        A    I have -- I talked to him about other murders that

13   had happened and I had a little information on it.   Yes, I

14   did.

15        Q    Tell us about one in Carrollton.

16        A    I talked to detectives down there about that.

17        Q    What did you tell them?

18        A    I told them that a Holsey boy had told me he killed

19   that coed down there.

20        Q    All right.   What happened in that case?

21        A    There ain't -- as far as I know, there ain't

22   nothing happened.

23        Q    All right.   Did you have some information

24   concerning the killing of Frank Lott several years ago?

25        A    Yes, sir, and I brought a drawing up here that was

-19-

1   put out in 1974.  They basically laughed at it.  The man that

2   killed Frank Lott was working at Coca-Cola Bottling at the

3   time and living in Aragon, Georgia.

4        Q    So what happened on that?

5        A    A year -- a year or two ago they tried him and

6   turned him loose.

7        Q    Ever had any other cases where you'd given

8   information to the police?

9        A    No, I've asked about some.

10       Q    What kind of cases?

11       A    I asked about the case at the post office, the

12  Men's Den out here and the guy that was burned up out there

13  on Huffaker Road.

14       Q    Well, why were you asking about those?

15       A    Because I'm interested in why the job ain't being

16  done to close them.

17       Q    Well, have you tried to investigate them?

18       A    That's not my job.  I'm not paid by Floyd County.

19       Q    Well, why are you concerned with them?

20       A    Why am I concerned about them?

21       Q    Yes, sir.

22       A    I am a good citizen of the United States.  I took

23  an oath in 1954 to uphold the laws of the United States

24  government and the State of Georgia, sir.

25       Q    Mr. Hudgins, do you know why or do you have an idea

-20-

1    why Mr. Boyd would have told you this?

2         A    I'm assuming that he was feeling guilty.

3         Q    After killing your guineas?

4         A    No, if he truly got saved, born again by God, I'm

5    assuming he felt guilty.

6         Q    But why would he tell you this?

7         A    Because I had went up there and told him I would

8    forgive him for the things that he had done to me.

9              MR. SIMPSON:  That's all I have, Your Honor.

10             THE COURT:  Mr. Cook, any other questions?

11             MR. COOK:  No.

12             THE COURT:  Step down, Mr. Hudgins.  Any other

13        testimony?

14             MR. COOK:  That's the only evidence that we have on

15        the motion.

16             THE COURT:  All right.  Thank you, Mr. Cook.  Mr.

17        Simpson.

18             MR. SIMPSON:  Your Honor, if I might for the record

19        if we could step back for a minute to establish a time

20        line here.  The death of Isaac Dawkins took place on

21        January the 11th of the year 2000.  The Joseph Samuel

22        Watkins trial occurred on or about July the 2nd of 2001.

23        The Mark Free trial --

24             THE COURT:  That was the date of the verdict, I

25        think, was July 2nd.

-21-

1          MR. SIMPSON:  Yes, sir, that's what I mean, on or

2     about.  I'm not sure of the date of the actual beginning

3     of the trial but the verdict would have been on 7-22.

4          THE COURT:  7-2?

5          MR. SIMPSON:  7-2, excuse me, Your Honor.

6          THE COURT:  Right.

7          MR. SIMPSON:  The Mark Free would have ended in a

8     not guilty on February the 22nd of 2002 and let me go

9     ahead and state --

10          THE COURT:  Let me back up.  I think Mr. Watkins --

11     I think the sentence was signed on the 2nd of July.

12     Yeah.

13          MR. SIMPSON:  All right.  I --

14          THE COURT:  I'm not so sure but -- and I don't

15     recall.  Did I sentence him the day the verdict came in

16     or was it later?

17          MR. ABERNATHY:  I think you sentenced him the day

18     of the verdict.

19          THE COURT:  The transcript will show all that.  I'm

20     just trying to --

21          MR. ABERNATHY:  Right.  I think the trial did start

22     in late June.

23          THE COURT:  Right.  It was a several day trial and

24     concluded with a verdict and sentence on July 2nd;

25     correct?

-22-

1          MR. ABERNATHY:  Correct.

2          THE COURT:  Okay.

3          MR. SIMPSON:  That Ms. Colston's last day in office

4     when Mr. Hudgins came in was July the 18th.

5          THE COURT:  That's the date of Mr. Cox's memorandum

6     sent to Mr. Abernathy.

7          MR. SIMPSON:  Yes, sir.

8          THE COURT:  Is that right, Mr. Cook?

9          MR. COOK:  I have no idea of what Ms. Colston's

10    last day in office was.

11         THE COURT:  Well, Mr. Hudgins said that he talked

12    to her on the last -- what he remembered as being  her

13    last --

14         MR. COOK:  That's right.  That's right.

15         THE COURT:  -- and this memorandum is the 18th,

16    so --

17         MR. COOK:  That's right.

18         THE COURT:  So that's what --

19         MR. COOK:  If that's consistent. I don't know other

20    than what he said.

21         THE COURT:  Okay.

22         MR. SIMPSON:  Insofar as Yvonne Agan, the issue

23    there is concerned, I would state to the Court that I am

24    aware and I have asked and there is no existence of any

25    agreement between Ms. Agan and the State concerning her

                            -23-

1    testimony in either of these cases.

2        I will also state for the record that Yvonne Agan

3    was tried on her pending charges on April -- and found

4    not guilty on April the 5th of this year.

5        THE COURT:  Correct.

6        MR. SIMPSON:  And with that, Your Honor, that's all

7    I have by way of the record.  At this time I would ask

8    to call some witnesses.

9        THE COURT:  Proceed.

10       MR. SIMPSON:  We call John Harkins to the stand.

11       \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

12           **JOHN HARKINS**

13  was called as a witness by and on behalf of the State, and

14  after first being duly sworn, was examined and testified as

15  follows:

16          **DIRECT EXAMINATION**

17  **BY MR. SIMPSON:**

18     Q    Tell us your name, please.

19     A    John Harkins.  Excuse me, John Harkins.

20     Q    And what's your occupation?

21     A    I'm the chief investigator with the district

22  attorney's office here in Rome.

23     Q    All right.  In connection with your duties as chief

24  investigator for the DA's office, were you involved with the

25  prosecution of the case of The State versus Joseph Samuel

1    Watkins?

2        A    Yes.

3        Q    In what capacity?

4        A    I aided Ms. Colston.

5        Q    Okay.  Ms. Colston was the prosecutor in the case?

6        A    Correct.

7        Q    During the course of preparing for trial, did the

8    State have an open file policy concerning that case?

9        A    Yes.

10        Q    Are you aware of whether or not Mr. Abernathy came

11    in to view the file?

12        A    I believe Mr. Abernathy and Mr. O'Dell had come in

13    there several times.

14        Q    And as far as you were aware, was he able to have

15    access to our complete file, the DA's file?

16        A    As far as I can remember, yes.  I don't know of any

17    day they were denied any access to the file.

18            MR. SIMPSON:  That's all I have, Your Honor.

19            THE COURT:  Mr. Cook.

20            ************************

21            CROSS-EXAMINATION

22    BY MR. COOK:

23        Q    Did you ever talk to Mr. Hudgins?

24        A    No, sir, I've never seen him before until --

25        Q    You've never seen him before?

-25-

1     A   Until --

2     Q   Have you inspected the file in this case?

3     A   I was fairly familiar with it, yes, sir.

4     Q   Is there anything in the file about the fact that

5 Mr. Hudgins went to Hal Goldin and reported what he has just

6 testified to?

7     A   No, sir.

8     Q   So if Mr. Abernathy had inspected the file, that

9 wouldn't have been in it; would it?

10    A   I don't remember anything that was in there about

11 Mr. Hudgins.  I never saw Mr. Hudgins before until he came up

12 here and talked to Ms. Colston and Mr. Cox.

13    Q   Okay.  That's all I have.

14        MR. SIMPSON:  That's all we have of this witness,

15 Your Honor.

16        THE COURT:  Okay.

17        MR. SIMPSON:  We'll call Hal Goldin.

18        MR. COOK:  Hi, Hal.

19               \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

20                  HAL GOLDIN

21 was called as a witness by and on behalf of the State, and

22 after first being duly sworn, was examined and testified as

23 follows:

24              DIRECT EXAMINATION

25 BY MR. SIMPSON:

-26-

1      Q      Tell us your name, please.

2      A      Hal Goldin.

3      Q      And what's your occupation?

4      A      Assistant district attorney.

5      Q      Okay.  And how long have you been so employed, Mr.

6   Goldin?

7      A      Four years.

8      Q      Mr. Goldin, do you know Mr. Hudgins, James Hudgins?

9      A      Yes, I do.

10     Q      How long have you known him?

11     A      I've known his family for many years.  I've known

12   Mr. Hudgins personally probably for about five years.

13     Q      All right.  Now what were the circumstances of him

14   coming to you and telling you this about Joseph Boyd?

15     A      One day he appeared in my office, which was on the

16   second floor of the courthouse.  He came by, I believe to

17   discuss the impending split of the Tallapoosa Circuit and the

18   possibility that there would be an election or an appointment

19   made in the judicial circuit for district attorney.

20         I reside down in the Tallapoosa Circuit and he had heard

21   my name mentioned as a possible candidate.  He came by to

22   talk to me about that and to tell me what he knew about the

23   office.

24         During the course of the conversation, he at some point

25   and I don't remember the specifics, he mentioned that he had

-27-

1   some problems with a neighbor about some chickens or guineas.

2   And during the course of some conversation with this

3   neighbor, this neighbor had made a statement that he had

4   killed a boy down on the highway and that was basically the

5   gist.

6       Q    Did he ever mention Isaac Dawkins' name to you?

7       A    I don't remember if that name was brought up

8   specifically or not.

9       Q    Do you know when this conversation took place and

10  let me phrase that in context of before or after the trial of

11  Joseph Watkins?

12      A    I don't remember if it was before or after.  It was

13  in close proximity to the trial.

14      Q    And as a result of him relating this information to

15  you, what did you tell him?

16      A    I inquired of him to find out if he had reported

17  this to the police.  He assured me he had already been to the

18  police department and it was being dealt with.  At that point

19  we continued our conversation about the original matter.

20      Q    Now as far as you yourself is concerned -- are

21  concerned, did you have any involvement with Watkins'

22  prosecution?

23      A    No, sir.

24      Q    How many assistant DAs are employed in the Rome

25  circuit?

-28-

1    A    There's nine assistants and then the elected DA.

2    Q    And you had no involvement with the case itself?

3    A    No, sir.

4    Q    While Mr. Hudgins has talked to you either then or

5    on other occasions, has he told you about other murders

6    taking place?

7    A    Yes, he had mentioned that he had been involved in

8    giving information in other murder cases.  I think the only

9    one I specifically remember him alluding to by name was the

10   murder of the sheriff down in Polk County.

11             MR. SIMPSON:  That's all I have, Your Honor.

12             THE COURT:  Mr. Cook.

13             **************************

14                    <u>CROSS-EXAMINATION</u>

15   <u>BY MR. COOK:</u>

16   Q    Very briefly.  Good morning, Hal.

17   A    Good morning.

18   Q    Hal, when you talked to Mr. Hudgins on this

19   occasion, as I understand it, you have no recollection as to

20   whether it was before the trial or after the trial?

21   A    No, sir, I do not.

22   Q    And as I understand it, you do not remember the

23   name of the person that he reported that this man Boyd had

24   killed?

25   A    I don't remember that.

                         -29-

1      Q      One way or the other?

2      A      No, sir.

3      Q      Did you make any report of this to anyone?

4      A      No, sir.

5      Q      And no report was made either in writing or

6      otherwise?

7      A      No, sir.

8      Q      Nothing further.

9             MR. SIMPSON:  Nothing further.  That's all I have,

10     Your Honor.

11            THE COURT:  Step down, please.

12            MR. SIMPSON:  Jim Moser, Your Honor.

13            MR. COOK:  Can I concede and stipulate that Mr.

14     Goldin was not involved directly in the Watkins' murder

15     trial?  However, that makes no difference on the --

16            MR. SIMPSON:  I understand.  I just wanted to, for

17     his sake I just wanted the Court to understand that.

18            MR. COOK:  No question about that.

19            ***************************

20                        JIM MOSER

21     was called as a witness by and on behalf of the State, and

22     after have having been first duly sworn, was examined and

23     testified as follows:

24                     DIRECT EXAMINATION

25     BY MR. SIMPSON:

                              -30-

1      Q    Tell us your name, please.

2      A    My name is Jim Moser.

3      Q    And what's your occupation?

4      A    I work for the City of Rome Police Department.

5      Q    And how long have you been so employed?

6      A    Since January of '86.

7      Q    You're currently assigned to the investigation

8 division; are you not?

9      A    Yes.

10     Q    And were you so assigned back in January of the

11 year 2000?

12     A    Yes.

13     Q    On January the 11th, were you assigned to

14 investigate the death of Isaac Dawkins?

15     A    I was on call that night when that occurred, yes.

16     Q    All right.  Now to lead us up through that, you

17 checked out a number of leads; did you not?

18     A    Yes.

19     Q    Were you yourself ever able to make an arrest in

20 this case?

21     A    No.

22     Q    What happened insofar as the County Police

23 involvement in this?

24     A    I don't know.

25     Q    Okay.  You were out of it at some point?

-31-

1        A    Yes.

2        Q    All right.  During the course of your

3   investigation, did you talk to a Mr. James Hudgins?

4        A.   Yes.

5        Q    All right.  When was that?

6        A    Approximately, the best I recall, April of 2000.

7        Q    All right.  And what did he tell you?

8        A    He told me that he felt that a guy named Joseph

9   Boyd shot, what he said, the boy on the highway.

10       Q    He felt that Joseph Boyd had done it?

11       A    Yes.

12       Q    He used those words?

13       A    No, I can't say that he used those words.

14       Q    All right.  Did he ever come out and say that Mr.

15  Boyd told him he had done it?

16       A    To me, no.

17       Q    All right.  Why did he feel that Mr. Joseph Boyd

18  had done it?

19       A    He relayed that Mr. Boyd -- it was not uncommon for

20  him to be shooting up at his house and something to the

21  effect of he believed, whichever one he used, that Isaac

22  Dawkins was seeing Mr. Boyd's ex-wife.  I believe her name is

23  Crystal.

24       Q    How far is Mr. Boyd's house from the area where

25  Isaac Dawkins was shot?

-32-

1      A      Well, you have to go -- if you went by the old Coke

2   plant there on 27, probably a mile and a half, between a mile

3   and two miles.

4      Q      In your opinion would it be possible for someone to

5   fire a gun at Boyd's house and hit someone on U.S. 27 at that

6   spot?

7      A      Not from where Mr. Dawkins was shot, no, not in my

8   opinion.

9      Q      But he thought that Mr. Boyd did it because he was

10  shooting at his house or shooting around his house.

11     A      Well, he mentioned Mr. Boyd had shot in the past,

12  yes.

13     Q      And as a result of getting this information, what

14  did you do?

15     A      I didn't do -- well, I talked to Crystal Boyd and I

16  talked to Stephen Boyd.

17     Q      Now who are they?

18     A      Crystal Boyd is the ex-wife, I assume ex-wife of

19  Joseph Boyd.   Stephen Boyd was the son of Joseph Boyd and I

20  talked to a Jay Barnett and a couple of other people involved

21  in this incident.

22     Q      All right.   And who is Jay Barnett?

23     A      Jay Barnett was Isaac Dawkins' friend.

24     Q      In talking to all of them -- well, first of all let

25  me ask you, what did Crystal say?

-33-

1      A     She denied ever knowing Isaac Dawkins, denied ever

2  having, of course, a relationship with him and stated she had

3  not been in Rome since November of '99 and didn't believe

4  that Joseph Boyd was a violent person.

5      Q     What did Stephen Boyd tell you?

6      A     He stated that is was not uncommon for them to

7  shoot, him and his dad to shoot up at their house and that he

8  was not familiar with the name Isaac Dawkins, didn't know

9  him, didn't see him, had not seen him in the past so was not

10  familiar with him.

11      Q     What did Jay Barnett and some of Isaac's other

12  friends tell you?

13      A     Never heard of Crystal Boyd, never heard of any

14  relationship from Isaac Dawkins concerning Crystal Boyd.

15      Q     All right.

16      A     No affiliation.

17      Q     All right.  Could you establish any connection

18  between Joseph Boyd and Isaac Dawkins?

19      A     No.

20      MR. SIMPSON:  That's all I have at this time, Your

21  Honor.

22                   * * * * * * * * * * * * *

23                   <u>CROSS-EXAMINATION</u>

24  <u>BY MR. COOK:</u>

25      Q     Good morning, Mr. Moser.

                                -34-

1       A      Good morning.

2       Q      You are a City detective; right?

3       A      Yes, sir.

4       Q      And you were working on this case, on this murder

5    case?

6       A      Yes, sir.

7       Q      And how long did you work on this murder case?

8       A      I worked from January the 11th on and off until

9    November of, I believe it was 2000, once the County Police

10   made the arrest.

11      Q      And so were you the number one person that was

12   assigned to it?  Would you characterize it in that way?

13      A      I reckon so, yes, sir.

14      Q      And you kept a file on this case, of course?

15      A      I did so.

16      Q      And when Mr. Hudgins came to you, he was the same

17   Mr. Hudgins that testified in this case; right?

18      A      I don't know if he testified but I recognize him in

19   the back, yes, sir.

20      Q      Well, you saw him testify; didn't you?  Have you

21   been in the courtroom?

22      A      No, sir.

23      Q      All right.  What's his full name?

24      A      James Hudgins is what I --

25      Q      And you saw him back here in the courtroom?

                              -35-

1    A    Yes.

2    Q    And did you write down anything that he told you?

3    A    A couple of sentences, yes, sir, regarding --

4    Q    A couple of what?

5    A    Sentences, plus or minus.

6    Q    A couple of sentences?

7    A    Yes, sir.

8    Q    Do you have those sentences with you?

9    A    I don't have them on my person, no, sir.

10   Q    And what did you do with them?

11   A    They were in my file.

12   Q    Did you ever turn them over to anybody?

13   A    What happens on our file or our case --

14   Q    My question: did you ever turn it over to anybody?

15   A    I'll answer yes, sir, my supervisor.

16   Q    What?

17   A    My supervisor.

18   Q    Who did you turn it over to?

19   A    That would have been Lt. Burnett.

20   Q    Do you know what he did with it?

21   A    She did with it, no, sir.

22   Q    You don't know?  And what were those two or three

23   sentences that you put in?  Could you get those for us?

24   A    Yes, sir.

25   Q    Would you do that?

-36-

1          MR. SIMPSON: Mr. Cook, if you'll permit me.  Did

2     you leave your stuff back here?

3          MR. MOSER:  My file is by Mr. John there.

4          MR. COOK:  May I just -- if you're going to go --

5          MR. SIMPSON:  Yes.

6          MR. COOK:  Good, I'll wait on you.  May I wait,

7     please?

8          THE COURT:  They're just right here.  They're in

9     the courtroom.  He just doesn't have them with him.

10         Q     [By Mr. Cook]:  He handed you a lot of stuff.  Is

11    that your file?

12         A     Yes.

13         Q     All right.  Get me those two or three sentences

14    that you were talking about.

15         A     [Witness complies.]

16         Q     May I see them?

17         A     Yes.

18         Q     Would you read that?

19         A     It says, heard shots off "x", which is time for me,

20    from area of Joe and Stephen Boyd since one --

21         Q     Heard what?

22         A     Shots off -- that's my abbreviation for time, from

23    area of Joe and Stephen Boyd's.  Since 1-11 heard on -- one-

24    time shot.

25         Q     Well, did you write down anything where he told you

-37-

```
 1    that he felt that Boyd had shot Dawkins?

 2         A    No, sir, I did not.

 3         Q    Did you not consider that important?

 4         A    Yes, sir.

 5         Q    But you didn't write it down?

 6         A    That's correct.

 7         Q    And you didn't report it to anybody?

 8         A    Well, I followed up on what I --

 9         Q    My question is: you didn't report it to anybody?

10         A    No, sir.

11         Q    You kept it to yourself?

12         A    At that time.

13         Q    And you were the chief investigator in this case

14    and Mr. Hudgins told you not in those exact words but to the

15    effect that Boyd had shot the boy Dawkins?

16         A    In what he believed.

17         Q    Yeah.

18         A    Yes, sir.

19         Q    And you made no note of that?  Consider it

20    important but didn't write it down?

21         A    That's correct.

22         Q    And didn't report to a single living soul?

23         A    Well, I can't tell you that --

24         Q    Isn't that correct?

25         A    I cannot tell you if I ever reported -- never
```

-38-

1     reported it later.  I don't recall, no, sir.

2         Q    Well, if you ever reported it later, you've got all

3     the file that he handed you, see if you can find it?

4         A    Well, I would not have written it down as to whom I

5     told what.

6         Q    You would not have written it down to whom I told

7     what?

8         A    That's correct.

9         Q    Is that the way -- is that the general way that you

10    do business in investigating --

11         MR. SIMPSON:  Objection, Your Honor.  That's being

12         argumentative.

13         MR. COOK:  I'm not being argumentative.  Can I

14         finish my question?

15         Q    Is that the general way that you operate, your

16    general modis operandi in investigating a murder case if a

17    citizen comes in and tells you that they believe that so-and-

18    so shot the deceased, that you don't make any entry about it

19    and don't tell anybody about it?

20         MR. SIMPSON:  Same objection, Your Honor.

21         THE COURT:  I'll let him answer the question.

22         A    Well, my entry part, yes, I did not write it down.

23    I cannot tell you that I did not tell my supervisor as to

24    what maybe Mr. Hudgins told.  I did not relay in writing or

25    verbally every time something is said, no, sir.

```
 1        Q   But there's no record -- no record exists as to
 2   what Mr. Hudgins told you concerning the fact that he
 3   believed that Boyd or whatever the words were -- that Boyd
 4   had shot the deceased Dawkins?
 5        A   Written record, correct.
 6        Q   Pardon?
 7        A   Written record, correct.
 8        Q   Did you ever talk to anybody in the district
 9   attorney's office about it?
10        A   Not that I recall, no.
11        Q   Did you ever tell them about Mr. Hudgins coming to
12   see you?
13        A   Not that I recall, no.
14        Q   And that was before the trial; wasn't it?
15        A   Yes, sir.
16        Q   And you didn't consider that important; did you?
17        A   I couldn't corroborate it, no, sir.
18        Q   What?
19        A   I could not corroborate it.
20        Q   I didn't ask you whether you could corroborate it
21   or not.
22        A   Well, I don't know --
23        Q   I asked you whether you considered it important
24   enough?
25        A   I don't have an opinion on that.  I don't have an
```

-40-

1     answer on that.  No, sir.

2          Q     You don't have an opinion?

3          A     No, sir.

4                MR. COOK:  Well, you can come down, Detective

5          Moser.

6                MR. SIMPSON:  Not quite yet.

7                     * * * * * * * * * * * * * * * * *

8                        REDIRECT EXAMINATION

9     BY MR. SIMPSON:

10         Q     Mr. Moser, did you in your own mind dismiss Joseph

11    Boyd as a suspect in this case?

12         A     Upon not being able to corroborate what Mr. Hudgins

13    said, yes.

14         Q     Did Mr. Hudgins ever tell you directly that Joseph

15    Boyd had confessed to the crime?

16         A     No.

17                MR. SIMPSON:  That's all I have, Your Honor.

18                     * * * * * * * * * * * * * * *

19                        RECROSS-EXAMINATION

20    BY MR. COOK:

21         Q     And even if he had, you wouldn't have put that

22    down; would you?  You wouldn't have recorded that; would you?

23         A     That's an unfair question.  I can't answer that.

24                THE COURT:  That's speculation because he says it

25         didn't happen.

                                -41-

1          MR. COOK:  All right.

2          THE COURT:  Any other questions?

3          MR. COOK:  I have nothing further from Detective

4     Moser.

5          THE COURT:  Well, I do.  What did -- what did Mr.

6     Hudgins tell you, if any, as to how Mr. Boyd had

7     accomplished this act?

8     A     That's correct.

9          THE WITNESS:  Well, he said that he just shoots

10    quite often from his house and that on January the 11th,

11    he heard one shot and he could not, that I recall,

12    specify as to the time of day.

13         THE COURT:  That who shoots from whose house?

14         THE WITNESS:  Mr. Boyd shoots from his house.  Mr.

15    Boyd and Mr. Hudgins live -- at the time lived in a

16    close proximity of each other, I believe by apartment-

17    wise,

18         THE COURT:  And tell me where they lived.

19         THE WITNESS:  2250 Cave Spring Road.

20         THE COURT:  Was that in the vicinity of this

21    shooting?

22         THE WITNESS:  Between a mile and two miles from the

23    accident scene, yes.

24         THE COURT:  And did you ever investigate what kind

25    of automobile or vehicle Mr. Boyd drove?

-42-

1          THE WITNESS:  I don't recall, no, sir.

2          THE COURT:  Okay.  But what you're telling Mr.

3     Hudgins says is that he thought the shots were fired

4     from the vicinity of his residence, a mile and a half or

5     two miles from where the shooting occurred?

6          THE WITNESS:  Yes.

7          THE COURT:  All right.  Any other questions?

8          MR. SIMPSON:  No, Your Honor.

9          THE COURT:  Thank you.  Step down, Detective.  Mr.

10    Simpson?

11         MR. SIMPSON:  We call Joseph Boyd.

12         THE COURT:  Joseph Boyd.  Come up.  Come all the

13    way around over here, Mr. Boyd.

14              **********************

15                   **JOSEPH BOYD**

16    was called as a witness by and on behalf of the State, and

17    after having been first duly sworn, was examined and

18    testified as follows:

19                 **DIRECT EXAMINATION**

20    **BY MR. SIMPSON:**

21         Q    Would you tell us your name, please?

22         A    My name is Joseph John Boyd.

23         THE COURT:  Pull that down and point it at you.

24         A    My name is Joseph John Boyd.

25         Q    Okay.  Mr. Boyd, first of all let me ask you: why

                              -43-

1     are you in custody?

2          A     Child support.

3          Q     Do you know James Hudgins?

4          A     Yes, sir.

5          Q     How do you know him?

6          A     That's my neighbor.

7          Q     All right.  What kind of relationship do you have

8     with Mr. Hudgins?

9          A     A fairly good relationship.

10               MR. COOK:  If he would be kind enough to speak up

11          loud and clear so I can hear you.

12          Q     Speak up some.

13          A     It's a fairly good relationship with Mr. Hudgins.

14    He -- he's kind of getting old and senile but he's mad at me.

15          Q     Why is he mad at you?

16          A     For shooting his guineas.

17          Q     All right.  Did you do that?

18          A     Yes, sir, and I went down there and he accused a

19    bunch of other people for that and I offered to replace his

20    guineas and he won't forgive me for it.  I went down there

21    and apologized many a times and I'm still going to go down

22    there and apologize for that matter.

23          Q     All right.  Mr. Boyd, did you ever tell Mr. Hudgins

24    that you had shot the boy down on the highway?

25          A     No, sir.

-44-

1      Q    Do you know -- did you know an Isaac Dawkins?

2      A    No, sir.

3      Q    Did your wife know Isaac Dawkins?

4      A    As far as my knowledge, I don't think so.

5          MR. COOK:  I object to that as being -- asking for

6   a conclusion of this witness.

7          MR. SIMPSON:  I asked if he's aware, Your Honor.

8          THE COURT:  Well, he can ask only to the extent

9   he's aware.

10     Q    Are you aware if she knew him?

11     A    I don't have really any idea.

12     Q    Well, let me ask you this.  Were you jealous of

13  Isaac Dawkins for dating your wife?

14     A    I don't even know Isaac.

15     Q    Okay.  You don't know if Isaac Dawkins -- did Isaac

16  Dawkins date your wife?

17     A    I don't even know that.

18     Q    You don't know the name?

19     A    No, sir.  I don't even know if she knew it.

20     Q    Okay.  Did you have anything to do with the death

21  of Isaac Dawkins?

22     A    No, sir.

23     Q    Do you know anything about it other than what was

24  in the papers?

25     A    No, sir.  All I know is he left the college and he

1    got shot.

2         Q    Do you have occasion to shoot guns around your

3    house?

4         A    Yes, sir.

5         Q    How far is your house from let's say the Coca-Cola

6    plant where -- about where the shooting took place?

7         A    Maybe a mile, something like that.

8         Q    Are there hills around there?

9         A    Yes, sir.

10        MR. SIMPSON:  That's all I have, Your Honor.

11                 ********************

12                 **CROSS-EXAMINATION**

13   **BY MR. COOK:**

14        Q    Good morning, Mr. Boyd.  I'm Bobby Lee Cook and I

15   represent Watkins.  I have just a few questions.  Are you in

16   jail?

17        A    Yes, sir.

18        Q    What for?

19        A    Child support.

20        Q    What?

21        A    Child support.

22        Q    And is that child support as a result of the wife

23   that we're talking about here?

24        A    Yes, ma'am [sic].

25        Q    What is her name?

                              -46-

```
1      A     Her name is Christa L. Boyd.

2      Q     How long have you been in jail?

3      A     Since Thursday.

4      Q     I'm sorry.

5      A     Since Thursday.

6      Q     Since Thursday?  How much are you behind?

7      A     Around 6,000.  I'm working now and I've got $252 a

8  week coming out of my check and they --

9      Q     Are you and your wife divorced?

10     A     Yes, sir.

11     Q     And when did that divorce take place?

12     A     Approximately three years ago.

13     Q     Three years ago?

14     A     Yeah, in November.

15     Q     That would have been November of when?

16     A     Three years ago, about November it will be three

17  years ago.

18     Q     Of 1999?

19     A     Yes, sir, something like that.

20     Q     Of 1999?

21     A     Yes, sir.

22     Q     So you and your wife were divorced a little bit

23  before this boy was killed?

24     A     I reckon.  I don't know exactly when he was killed.

25     Q     And you don't know whether your wife was dating
```

-47-

```
1    Isaac Dawkins or not?

2         A    No, sir.

3         Q    You don't know; do you?

4         A    No, sir.

5         Q    One way or the other?

6         A    No, sir.

7         Q    And you and Mr. Hudgins you say have had a little

8    problem?

9         A    Well --

10        Q    That he doesn't like you?

11        A    Well, he -- he's coming around.  His wife -- he'll

12   go to sleep and his wife comes up and apologizes for his

13   actions but -- and the only reason I went -- like I say, went

14   down there and told him because he's done accused a bunch of

15   other people of doing this and doing that.  And I went down

16   and told him, I said, Mr. Hudgins, I said, I done that and I

17   told you.

18        See what it is the reason I got rid of these guineas is

19   I had some roosters.  I had them on tie cords and his guineas

20   would come up there and I kept telling him about it.

21        Q    Did you shoot his guineas?

22        A    Yes, sir.

23        Q    You shot his guineas?

24        A    Yes, sir.

25        Q    How many guineas did you shoot?
```

-48-