```
1        A     Four or five.

2        Q     And you told him that?

3        A     Yes, sir.

4        Q     And you told him you were saved?

5        A     Yes, sir.

6        Q     Did you tell him that?

7        A     Yes, sir.  I went down there and --

8        Q     You told him you were saved?

9        A     Yes, sir.

10       Q     When he said to this Court that you told him that

11  he -- you said he was saved, that's a correct statement;

12  right?

13       A     Yes, sir.

14       Q     And when he told this Court that you said that --

15  admitted that you were shooting his guineas, that's a correct

16  statement; wasn't it?

17       A     Yes, sir.

18       Q     But you deny that you said anything about killing

19  Dawkins?

20       A     Yes, sir.  I deny it because I don't know anything

21  about Mr. Dawkins.

22       Q     You don't know anything about that?

23       A     No, sir.

24       Q     Do you remember having any conversation with Mr.

25  Hudgins about that?
```

-49-

```
1          A      No, sir.

2          Q      Mentioning it at the time?

3          A      No, sir.

4          Q      You just don't remember one way or the other?

5          A      Yes, sir, I remember real -- that I didn't say

6    anything about that.  I don't know where he comes up with

7    this at or not.  He's just mad, I guess and he's accused a

8    lot of people for a lot things.

9          Q      He was mad but when he accused you of shooting your

10   guineas, that was the truth; wasn't it?

11         A      Yes, sir.

12         Q      And why did --

13         A      No, I mean, he didn't know.  He just -- he accused

14   a bunch of other people and I went down there and confronted

15   him about that I done it because he was accusing this and my

16   neighbor and my other neighbor down there and my other

17   neighbor and --

18         Q      How many did you shoot?

19                MR. SIMPSON:  Your Honor, that's been asked and

20         answered.

21                MR. COOK:  I haven't asked him how many.

22                THE COURT:  Yes, sir, he said --

23         A      Four or five.

24         Q      Four or five?  Where were they when you shot them?

25         A      In my yard.
```

-50-

1      Q     In your yard.  I have nothing further, Mr. Boyd.

2      Do you have any other -- been convicted of anything?

3      A     No, sir.

4            MR. SIMPSON:  Objection, Your Honor.

5            THE COURT:  All right.  Step down, Mr. Boyd.

6            MR. SIMPSON:  Your Honor, we'll call Stanley Sutton

7      to the stand, please.

8                      ******************

9                        STANLEY SUTTON

10     a witness called by and on behalf of the State, and after

11     being first duly sworn, was examined and testified as

12     follows:

13                     DIRECT EXAMINATION

14     BY MR. SIMPSON:

15     Q     Tell us your name, please.

16     A     My name is Stanley Sutton.

17     Q     Move up. please.  And what's your occupation?

18     A     Investigator with the Floyd County Police

19     Department.

20     Q     And you were the lead investigator for the County's

21     involvement in the Dawkins' case?

22     A     That's correct.

23     Q     When did you become aware of Mr. Hudgins and this

24     information he has concerning Mr. Boyd?

25     A     During the July -- of the trial of Joey Watkins --

                              -51-

1    the day Tami Colston had talked to me concerning Mr. Hudgins

2    going to Hal Goldin and talking to him concerning -- about

3    the neighbor, Joseph Boyd.

4         Q    Now was this before or after the trial that you

5    found out that?

6         A    It was at the end of the trial, around I'd say the

7    latter part of the trial that we talked about it.

8         Q    All right.  Now as a result of getting this

9    information from Ms. Colston, did you interview Mr. Hudgins?

10        A    I did.

11        Q    All right.  What were the circumstances behind

12   that?

13        A    Well, I went to his residence, which he lives off

14   Sims Avenue and set up a time to interview him and I told him

15   I would come by and pick him up.  And he said, no that he was

16   insistent that he'll come up to the police station.  He came

17   up in August of 2001 and we did the interview and like I

18   said, I was nice and polite to him.

19        Q    Did you ever threaten him?

20        A    I never threatened him in one way, shape or form I

21   recall.

22        Q    Well, how did you act towards him?

23        A    I was completely showing him my utmost respect.  I

24   was nice to him, polite to him and wasn't out of the way,

25   wasn't rude to him or nothing and was never disrespectful.

                              -52-

1    Q    Did you threaten his mother?

2    A    No, I don't even know them.  This is the first time

3  I ever had an opportunity to meet Mr. Hudgins, the first I

4  ever met him, didn't know his mother, didn't know anything

5  about him or his mother or anything about Mr. Hudgins at all.

6         THE COURT:  Where's -- oh, there's Mr. Cook.

7         **********************

8         CROSS-EXAMINATION

9  BY MR. COOK:

10   Q    Mr. Sutton, when did you interview Mr. Hudgins?

11   A    It was in August, sir.

12   Q    After the trial?

13   A    That's correct.

14   Q    After the Watkins' trial?

15   A    That's correct.

16   Q    When did you learn that Mr. Hudgins had been to Mr.

17 Goldin, Hal Goldin, and had said --

18        MR. COOK:  Just a minute, let me finish.

19   Q    -- and had reported -- had reported that he had had

20 a conversation with Mr. Boyd and Boyd said that he killed

21 Dawkins?

22   A    This is in July.  I want to say at the end of the

23 trial.

24   Q    Pardon?

25   A    The end of the trial, the end of the Joey Watkins'

-53-

1    trial that Tami told me that supposedly Mr. Hudgins had went

2    to Hal Goldin.

3          Q    Who told you that?

4          A    Tami Colston and I believe John Harkins was

5    present.

6          Q    That's the first time that you had heard that?

7          A    That is correct.

8          Q    You had not heard it prior to the trial?

9          A    No, sir.

10         Q    That's all.

11         THE COURT:  Any other questions?

12         MR. SIMPSON:  That's all I have, Your Honor.

13         THE COURT:  Step down, Sgt. Sutton.

14         SGT. SUTTON:  Thank you.

15         MR. SIMPSON:  That's all I have in the way of

16    witnesses, Your Honor.

17         THE COURT:  All right.  Mr. Cook, any further

18    witnesses?

19         MR. COOK:  No, sir.

20         THE COURT:  All right.  Is there anything further,

21    Counsel?

22         MR. COOK:  I'd like to be heard from.

23         MR. SIMPSON:  So would the State but nothing else

24    by way of evidence, Your Honor.

25         THE COURT:  All right.  Testimony is concluded then

1    her to lie.  We're talking about an offense that took

2    place in January, her first testimony occurring in July

3    of 01 and then her second testimony occurring, I

4    believe, six months, seven months after in February of

5    02 and people being people, there's room for

6    contradictions between different times and we take that

7    position.

8         I would also like to point out insofar as Mr.

9    Hudgins is concerned and, you know, this gets into trial

10   strategy and so forth but I do need to remark upon the

11   fact that Mr. Hudgins was not called to testify at the

12   Free trial and counsel was certainly aware of that at

13   that time and that involved the same circumstances.

14        That's all I have, Your Honor.

15        MR. COOK:  Thank you, Your Honor.  I'm not going to

16   be very long.  I would like to address, if I may, the

17   Yvonne Agan, what I refer to as ground number two of the

18   Yvonne Agan prong in my first argument.

19        I did not try either --

20        THE COURT:  I think I need to ask a question at

21   this point and then I'll let you have free rein.

22        MR. COOK:  Sure.

23        THE COURT:  At what point in time did the defense

24   become aware of -- the defense became aware of Mr.

25   Hudgins' statement by virtue of this memorandum in July

-56-

1    of 01; is that correct?

2         MR. COOK:  That's the first time I'm aware of it.

3         MR. SIMPSON:  That's correct, Judge.

4         THE COURT:  Okay.  That's fine.  Thank you.  I

5    thought that was right but I wanted to make sure.

6         MR. COOK:  That's the first time.  I was not --

7    as the Court knows, I was not counsel of record in

8    either --

9         THE COURT:  Mr. Abernathy in your office was.

10        MR. COOK:  -- case but my colleague and partner,

11   Mr. Abernathy, was.  In the first trial the Yvonne Agan

12   testimony was in my opinion from having read the record

13   in this case and not having been present in the trial,

14   one of the areas that was indeed in my opinion

15   catastrophic to the defendant's case, she testified

16   unequivocally as follows and I'd just like to run over

17   it briefly.

18        Question by the district attorney: When he left,

19   did he tell you what happened after he put it in reverse

20   and left the driveway?

21        Answer:  He said, I could hear them shooting at me,

22   Vonne, and he reached up and grabbed me and he said,

23   Vonne, I know they were shooting at me.

24        I said, are you sure?

25        He said, I am positive.  I heard it.  He said, that

1   is all he knew, to come here and I didn't want to bring

2   them straight here because I knew you were here a lot by

3   yourself.

4       She tells the jury and the Court that she is --

5   that what he said; that he was positive that they were

6   shooting at him.  There was a conviction in the Watkins'

7   trial.

8       In the second trial in which there was an acquittal

9   based upon the same general factual evidentiary

10  background to the record I have read, the district

11  attorney asked the question of Yvonne Agan: Another

12  thing Mr. Abernathy asked you was about Isaac saying

13  something about someone shooting at him.  Did he tell

14  you that too?

15      Answer: He told me he thought they were shooting at

16  him but he said, I don't know if I was hearing right or

17  not.  Maybe they weren't.  Maybe they were just throwing

18  things at me but said, Vonne, it sounds like they are

19  but I can't swear to it.

20      There is a total absolute contradiction between

21  trial one and trial two with reference to the part of

22  her testimony that is critical or that was critical to

23  the State's case.

24      Call it -- I characterize it as perjury.  It

25  doesn't make any difference actually how I characterize

-58-

1    it.  It on its face, each instance is a contradiction to

2    the other.

3        I suggest to the Court that in light especially of

4    the acquittal in case two, if a jury had had this same

5    testimony in case one, that there is a strong

6    probability, a strong probability that a verdict of not

7    guilty would have been returned in the first case.  I'm

8    not a prophet and, of course, you know and I know that

9    all you can deal with is probabilities and not absolutes

10   in this business.

11       I address that issue first because frankly I think

12   it is one of the critical issues in this case and

13   probably in my opinion the most defining one.

14       I'll refer the Court to an old case.  Sometimes old

15   cases speak with more eloquence than new cases.  It's

16   the case of McDaniel versus The State, 74 Georgia

17   Appeals, page 5 where the gist of that case is as

18   follows: The Court said the real ultimate criteria by

19   which the merit of such testimony, referring to newly

20   discovered evidence, should be measured is the

21   probability of a different result and when that

22   probability appears, the ends of justice require that

23   new trial be granted.

24       I'm not going to stand here and tell you that I

25   know as much about the evidence in these two cases as

1    the other.

2         I suggest to the Court that in light especially of

3    the acquittal in case two, if a jury had had this same

4    testimony in case one, that there is a strong

5    probability, a strong probability that a verdict of not

6    guilty would have been returned in the first case.  I'm

7    not a prophet and, of course, you know and I know that

8    all you can deal with is probabilities and not absolutes

9    in this business.

10         I address that issue first because frankly I think

11    it is one of the critical issues in this case and

12    probably in my opinion the most defining one.

13         I'll refer the Court to an old case.  Sometimes old

14    cases speak with more eloquence than new cases.  It's

15    the case of McDaniel versus The State, 74 Georgia

16    Appeals, page 5 where the gist of that case is as

17    follows: The Court said the real ultimate criteria by

18    which the merit of such testimony, referring to newly

19    discovered evidence, should be measured is the

20    probability of a different result and when that

21    probability appears, the ends of justice require that a

22    new trial be granted.

23         I'm not going to stand here and tell you that I

24    know as much about the evidence in these two cases as

25    you do because you heard both trials and I will leave

1     the importance of these contradictions or discrepancies

2     or whatever -- however you wish to characterize them to

3     the Court but in my opinion, having done this for a

4     little while, this is one case that more so than any

5     that I have seen in many years that jumps out at me to

6     where the ends of justice certainly in my honest opinion

7     require that a new trial be granted.

8          I am aware that the grant -- that the first grant

9     of a new trial is a matter of which adjusts itself to

10    the wise discretion of the trial judge and I am also

11    aware that there would be no reversal unless it was

12    clearly erroneous.  So my argument here is one that

13    addresses itself to the wise discretion and the wisdom

14    of the Court that heard both of these cases.

15         I will now briefly address what I refer to as the

16    Brady violation.  I don't want to lecture to this Court

17    on the importance of Brady except to say that in all

18    modesty that I've had a little bit of experience in the

19    area and in one of the most extraordinary, unusual

20    miscarriage of justice that's ever happened in this

21    state in what is referred to as the old Matthews cases

22    in Cobb County which went all the way from the lower

23    court to our State Supreme Court and it affirmed and

24    ultimately after an 18-day evidentiary hearing before a

25    very conservative judge, Judge Moye, the convictions

-60-

1   were set aside and invalidated upon serious

2   Constitutional grounds, which spoke to the proposition

3   of Brady.

4        It is the uncontradicted evidence before this Court

5   that Mr. Hudgins reported what he said that he reported

6   to Mr. Goldin.  It is the uncontradicted evidence that

7   that was not revealed to the defense in this case prior

8   to the trial.

9        Whether or not at this point in time what Mr.

10  Hudgins had revealed would have been admissible or not

11  admissible, whether or not what he revealed was

12  considered to be important or unimportant, whether or

13  not it was concerned at the time as to whether they

14  checked it out later after the trial and found out that

15  they didn't believe it, that's not the test in this

16  case.

17       There was a Constitutional obligation within the

18  meaning of Brady and within the meaning especially of

19  the last case that the Supreme Court has addressed on

20  the Brady issue, Kyles v Whitley, to have reported that

21  to the defendant.

22       Kyles v Whitley, and I have a copy of every

23  decision that the Supreme Court of the United States has

24  addressed on the Brady question, starting with Brady

25  versus Maryland, Agurs, the Agurs case, Bagley versus

-61-

1    the United States and lastly Kyles v Whitley.   The

2    Supreme Court of the United States in Kyles v Whitley

3    has held in no uncertain terms that anything that is

4    within the bosom of anyone within the investigating

5    agency, within their knowledge or anything in the

6    district attorney's office or anything in the sheriff's

7    office with reference to this case, it is indeed Brady

8    material if it is exculpatory and there's no question

9    about that.   And if the Court wishes, I will hand you

10   copies of those decisions and especially the Kyles'

11   decision.

12        It is unimportant, it is quite unimportant as to

13   whether or not Mr. Simpson or Mr. Sutton or whomever

14   heard this placed any credence or any stock in it.   That

15   is not the important thing.   The fact even that what he

16   said might have been inadmissible as a matter of law is

17   unimportant because it was said in Giles v Maryland, a

18   very similar Brady case, reported in 87 Supreme Court at

19   page 792, which follows the Brady decision by three

20   years in a concurrent concurrence -- concurring opinion

21   by Justice Forbes on page 809, where he said, the

22   dissenters asserted that the majority erroneously

23   substituted its appraisal or the weight to be attached

24   to the suppressed evidence for a jury's possible

25   evaluation and that it erred in applying this stringent

-62-

1         -- too stringent a test of admissibility.

2         I do not agree that the State may be excused from

3         its duty to disclose material facts known to it prior to

4         trial solely because of a conclusion that they would not

5         be admissible at trial.  The State's obligations is not

6         to convict but to see that so far as possible truth

7         emerges.

8         I'm troubled also not only by the nondisclosure but

9         I'm troubled with the fact that no effort was made and

10       it too is the uncontradicted evidence to place anything

11       in the file and they say there was an open file policy

12       where you can come and look at everything that's in it

13       but yet there's nothing in it with reference to the fact

14       that Mr. Hudgins made that direction.  I am troubled

15       indeed.

16       As Kyles v Whitley points out in the body of the

17       opinion, the good faith or the bad faith of the

18       prosecution is irrelevant. It is what has occurred.  But

19       let me hit this point and then I'm going to -- I'm going

20       to rest. If this had been reported at least we would

21       have had the opportunity to have checked it out.  We

22       could have followed it out.  It may have been at that

23       point in time, even Mr. Boyd might have said, well, I

24       take the Fifth Amendment.  I mean, I'm not suggesting

25       that he would or that he wouldn't.  Let's assume that he

1   did.  Then it could very well be admissible under the

2   necessity exception to the hearsay.  He would be

3   unavailable if he took the Fifth Amendment.  Then the

4   next question would be for the Court to determine

5   whether or not under the circumstances there was a

6   reasonable indicia of trustworthiness for it to be

7   admissible under the hearsay exception.  But all of that

8   has been short circuited and we have not had that

9   opportunity.  Fair is fair and what has happened here

10  for whatever reason that it has happened is it just

11  turns logic upside down.

12      We feel that under the facts of this case that it

13  is in the interest of justice and interest of fairness

14  for this young man to be awarded a new trial by this

15  Court.  Thank you for your kindness and I'm sorry about

16  Your Honor's loss.  I didn't know about it until today.

17      THE COURT:  Thank you, Mr. Cook.  All right,

18  Counsel.  Thank you.  I've received the motion and the

19  evidence and I'll be ruling on this shortly.

20      MR. SIMPSON:  Thank you, Judge.

21      MR. COOK:  Thank you, Your Honor.

22              ***********************

23

24

25

1                              C E R T I F I C A T E

2

3        STATE OF GEORGIA)

4        COUNTY OF FLOYD)

5              The foregoing transcript of the proceedings was

6        taken by me as a certified court reporter for the State of

7        Georgia and reduced to typewriting by me or under my

8        direction, and I hereby certify that it is a true and correct

9        transcript of said proceedings.

10             This May 21, 2002.

11

12

13                           _Melodie E. Taylor_

14                           Melodie E. Taylor, CCR #B-1057

# IN THE SUPREME COURT

# FOR THE STATE OF GEORGIA

| | | |
|---|---|---|
| JOSEPH SAMUEL WATKINS, | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | **SUPREME COURT** |
| | ) | **CASE NO. S03A0034** |
| STATE OF GEORGIA, | ) | |
| | ) | |
| Appellee. | ) | |

---

## BRIEF OF APPELLANT

---

**BOBBY LEE COOK**
Georgia Bar No. 183100

**L. BRANCH S. CONNELLY**
Georgia Bar No. 181825



RESPONDENT EXHIBIT 4

**COOK & CONNELLY**
P. O. Box 370
Summerville, GA  30747
(706) 857-3421

**ATTORNEYS FOR APPELLANT**

## IN THE SUPREME COURT

## FOR THE STATE OF GEORGIA

| | | |
|---|---|---|
| JOSEPH SAMUEL WATKINS, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | **SUPREME COURT** |
| | ) | **CASE NO. S03A0034** |
| STATE OF GEORGIA, | ) | |
| | ) | |
| Appellee. | ) | |

## BRIEF OF APPELLANT

Joseph Samuel Watkins, Appellant herein, respectfully files this Brief, and shows this Court as follows:

## INTRODUCTION

This case involves the direct appeal of the conviction of Joseph Samuel Watkins in Floyd County Superior Court, Judge Walter Matthews presiding, for the offenses of felony murder, aggravated assault, possession of a firearm during the commission of a felony and stalking.

## STATEMENT OF JURISDICTION

The Supreme Court of Georgia, rather than the Court of Appeals, has jurisdiction of this case on appeal for the reason that jurisdiction is specifically conferred upon the Supreme Court by the 1983 Constitution, Article 6, Paragraph 3(8), and it involves the correction of errors of law.

2

## STATEMENT OF MATERIAL FACTS

For purposes of this Brief, the following shall be used as abbreviations for trial transcript and trial record pages:

T:     Trial Transcript

R:     Record

MT:    Motion for New Trial Transcript.

On the evening of January 11, 2000, Isaac Dawkins was driving home from college classes when he was involved in a single vehicle accident. Mr. Dawkins was alone in the vehicle. Subsequent forensic examination of his body revealed that Mr. Dawkins had been struck by a single bullet shot through his pickup truck's rear window (T. 358, et seq.). Dr. Carl Herring opined that the bullet struck the deceased and did "devastating" damage to the deceased's brain (T. 361). Following a long investigation, after the shooting, Appellant came under suspicion because of his alleged animosity toward Mr. Dawkins, because the deceased had been dating Appellant's ex-girlfriend. Over a year after the shooting, on January 26, 2001, Appellant was charged with the crime in a five count Indictment (R. 4). Count One of the Indictment charged murder; Count Two charged felony murder. The remaining Counts charged aggravated assault, possession of a firearm during the commission of a felony and stalking.

On the same day, one Timothy Mark Free was indicted by the same Floyd County Grady Jury for the identical offenses, along with an additional count alleging possession of a firearm by a convicted felon (see Exhibit "B" to Amendment to Motion for New Trial, R. 103; see also T. 774).

3

Appellant pled not guilty to each of the foregoing charges.  Following the filing of motions, including a comprehensive "Brady" Motion (R. 10), a jury trial was commenced on June 25, 2001.  As indicated above, following a six-day trial, Appellant was convicted on July 1, 2001, of Counts Two, Three. Four and Five (T. 1461).  The Court imposed a life sentence for the offense of felony murder, together with five years consecutive for possession of a firearm during the commission of a felony and twelve months for stalking (T. 1471; R. 99).

A Motion for New Trial was timely filed on July 3, 2001 (R. 100). and amended on April 5, 2002.  Following an evidentiary hearing on said Motion held on May 15, 2002, the Court denied the Amended Motion for New Trial in an Order dated July 25, 2002 (R. 107).  The Notice of Appeal was filed August 21, 2002 (R. 1).

For purposes of clarity, it will be noted that Timothy Mark Free, charged as a co-defendant in a separate indictment, was subsequently tried before a jury and acquitted of all charges (Page 2 of Order on Motion for New Trial As Amended, R. 103).

As referenced above, Isaac Dawkins was involved in a single car accident on the evening of January 11, 2000.  Initially assuming only that an accident had occurred, emergency personnel were called and extracted Mr. Dawkins from his truck and transported him to Floyd Medical Center.  It was only after a CAT scan of his brain that police realized a crime had occurred.

Wayne Benson, a witness to the crash, testified that prior to the accident he observed a "blue car" pull on the roadway and then commence following the Dawkins vehicle (T. 286).  Some brief time later, the witness observed the Dawkins pickup truck

"veer off" to the left across the median and start up the southbound lane of Highway 27/411 in a northerly direction (T. 290). The truck ultimately flipped over twice and came to a rest upside down (T. 292). The witness stated he observed "a flash of some kind....it could have been dirt or something" prior to the truck crossing the median (T. 291). He did not equate the flash with gunfire at the time of the occurrence.

One Barry Mullinax, now a prisoner at Clayton County Correctional Institute, testified that on the evening of Mr. Dawkins' death he was traveling on Highway 27/411 and observed a "white four-wheel drive pickup" being chased by a "green car" (T. 246). He states that there were three occupants of the car (T. 251), that he believed an occupant to be female (T. 257) and that he recognized Appellant as the driver (T. 251). Mr. Mullinax further testified that he "seen that man draw that gun" (T. 255), and heard the shot (T. 256). The truck then left the roadway (T. 257). The witness did not call 911 or any emergency personnel at the time of the crash (T. 258).

Sergeant Perry Maynard of the Floyd County Police Department testified that he did not act upon the information provided by Mr. Mullinax as he "found discrepancies" and was unable to corroborate the information provided (T. 408).

While Appellant was in jail awaiting trial, numerous "reward posters" were placed in the Floyd County Jail seeking information concerning the death of Isaac Dawkins (T. 811-813). Not surprisingly, several inmates came forward alleging that Appellant and/or his co-defendant, Mark Free, had made incriminating statements. Appellant's cellmate, Winford Ellis, stated in a taped interview with detectives that Appellant told him that "...if they wouldn't have done it, they wouldn't be in this mess" (T. 714). At trial,

however, Mr. Ellis totally recanted that testimony, and stated that in fact Appellant had never made any such incriminating remarks (T. 656-657).

Inmate Joey Samples testified co-defendant Mark Free was concerned that police were going to find out that he and Appellant had shot and killed Isaac Dawkins' dog (T. 814). Yet another inmate, David Jones, testified that he overheard co-defendant Free and some unknown person talking through the ventilation system. The witness stated he heard Free state Appellant had pulled the trigger while he (Free) was asleep in the car (T. 865).

In testimony taken at trial under a grant of use immunity (T. 774-776), co-defendant Mark Free admitted his friendship with Appellant (T. 778), but denied being with him at any time on January 11, 2000 (T. 780), and stated that at no time did he make incriminating admissions to anyone (T. 782-783). The witness denied any direct knowledge whatsoever of who killed Isaac Dawkins (T. 784), and further denied any involvement in the killing of Isaac Dawkins' dog prior to his death (T. 786).

In an odd twist of fate, Corey Jacobs, the great nephew of the State's lead investigator (T. 757), reported overhearing Appellant make incriminating statements regarding shooting Isaac Dawkins with a shotgun, in the parking lot of the Home Depot in Rome, Georgia (T. 760). Although not incarcerated at the time he professed to have heard Appellant, Mr. Jacobs had pending criminal charges and admittedly "came forward" motivated by the possibility of reward money (T. 756).

Taken as it now must be, in a light now favoring the prosecution, the State also established by expert testimony (T. 561-565) that the Appellant's cell phone, at the time

6

the killing occurred, was in a coverage zone that included the place of the shooting (T. 584 et seq.). That evidence was vigorously disputed by a defense expert (T. 1377-1389).

As there was no other direct evidence of the guilt of Appellant, much of the remainder of the State's case concerned so-called "prior difficulties" between Appellant and Mr. Dawkins, and "similar transaction" evidence relating to Appellant's behavior offered pursuant to Uniform Superior Court Rule 31.3. This testimony was apparently offered to bolster the State's theory that Appellant was consumed over the break-up with a long-term girlfriend, one Brianna Scarbrough. To this end, the State offered <u>numerous</u> witnesses who detailed various episodes of confrontation between Appellant and others fueled by jealousy over Ms. Scarbrough.

Jay Barnett, a patrolman with the Floyd County Police Department and professedly the closest friend of Isaac Dawkins (T. 74-75), stated the deceased began dating Ms. Scarbrough in June, 1999 (T. 76). He was aware that her former boyfriend was Appellant (T. 77). The witness detailed a vocal altercation at a local gas station wherein Appellant physically threatened Mr. Dawkins over dating "his girlfriend" (T. 78-79). The confrontation continued some minutes later after the deceased was followed to his home and became openly physical when Appellant attempted to "hit" Dawkins through an open window of his vehicle (T. 80-84).

The witness detailed another episode between Appellant and Dawkins, sometime during the summer of 1999, wherein Appellant began following and reportedly passing Dawkins and Barnett on Highway 27. Appellant was alleged to have "shot them birds" during this chase (T. 88). Shortly thereafter, Appellant stopped his truck as if to

7

precipitate a confrontation; however, when Appellant realized that Dawkins was not alone, he is alleged to have sped off (T. 89).

Finally, the witness detailed that, in November, 1999, while he was dating Ms. Scarbrough, Dawkins came home to find his dog had been shot in her pen (T. 96).

Paul Allen testified that Appellant had threatened him for "hooking Brianna and Isaac up" (T. 134), and that Dawkins had no other known enemies (T. 135). Clay Burkhalter, who dated Appellant's sister, told the trial jury that Appellant said on more than one occasion that he "wanted to fight Isaac and he was looking for him" (T. 173). Another witness, Brad Nolan, confirmed that Appellant professedly disliked Dawkins, and he wanted to fight him (T. 188).

Yet another former friend of Appellant, Adam Elrod, testified that Appellant told him he did not like the deceased because he was "with his girlfriend" (T. 907). This dislike was spoken of often, and included statements that he wanted to fight, even to kill, Isaac Dawkins (T. 907-908). The witness testified that on one occasion he observed Appellant strike Dawkins three time while Dawkins was sitting in his automobile (T. 911), and that it was a "big amusement" for the Appellant to chase Dawkins while in his automobile (T. 920). The witness further alleged that Appellant had thrown a rock at Ms. Scarbrough's mother's van breaking out the rear window (T. 921-922), and that Appellant acquired a blue steel pistol from a "straggly old man" at a used car store in Cedartown, Georgia (T. 926-928).

Over objection, and relying on the "necessity exceptions" (T. 1117), the Court allowed Yvonne Agan to testify that the deceased arrived at her home one evening in

8

early December, 1999, upset and anxious.  The witnesses stated that Dawkins was loved by her "like he was my own son" (T. 1140), and that on the evening in question he was physically shaking (T. 1144).  When she asked what was wrong, the witness told the jury that the deceased told her "they are looking for me with lights" (T. 1144).  The deceased later revealed to Ms. Agan that "they" was allegedly Appellant (T. 1146), and that he could "hear them shooting at me," as he fled from his home[1] (T. 1148).  Ms. Agan stated that the deceased refused to call the police as "they will not believe me...because we don't even date anymore" (T. 1149).

Ms. Agan reported that she came forward with the aforesaid information on the Friday night before trial was to commence on Monday, because she just "found out the hearing had been scheduled" (T. 1150), and the fact that she now had "charges" pending against her did not motivate her testimony (T. 1157).  Defense counsel was <u>absolutely precluded</u> by the Court from examining the witness as to the nature of the "charges" pending against her (T. 1130-1132).

Following a Rule 31.3 hearing, the Court admitted additional testimony from several witnesses relating to so-called "similar transactions."  Jeremy Shuler testified he dated Ms. Scarbrough in 1997 or 1998 (T. 1182), and that Appellant threatened him with a knife at a local club (T. 1183-1184).  Chad Redden, the current boyfriend of Ms. Scarbrough, testified that in December, 1999, he observed Appellant punch Ms.

---

[1] It will be noted that in the subsequent trial of co-defendant Mark Free, Ms. Agan could not confirm that the deceased heard shots.  Ms. Agan stated only that the deceased told her he "thought" they were shooting, but maybe they were throwing things (See Exhibit "G" to Amendment to Motion for New Trial, R. 103; see also pages 6-10 Order on Motion for New Trial as Amended, R. 107).

9

Scarbrough in the ribs at Mt. Berry Square Mall during a verbal alteration concerning Mr. Redden dating Ms. Scarbrough (T. 1194-1196). Brianna Scarbrough confirmed both of the incidents in testimony before the trial jury (T. 1218-1219; 1219-1223). The witness stated that Appellant had threatened many of the "guys" she had dated after she broke up with Appellant (T. 1228).

Appellant was convicted as indicated hereinabove; subsequent to that date a hearing was held on Appellant's Amended Motion for New Trial. During said hearing, James Arnold Hudgins testified that approximately one month prior to Appellant's trial he spoke with a detective of the City Police Department office as well as Assistant District Attorney Hal Goldin (MT. 9-10). During these conversations he advised both gentlemen that one Joseph or John Boyd told him that he "killed that boy on the highway (MT. 11). This information was not reported to the defense until July 18, 2001, some sixteen days after the conviction of Appellant. At the hearing, Mr. Boyd denied making such a statement to James Hudgins (MT. 45).

The State disputed this alleged Brady violation, pointing out that the credibility of Mr. Hudgins was in question. The trial court agreed, noting further as defense counsel did not call Mr. Hudgins to testify in the subsequent trial of co-defendant Mark Free the Court had "....the distinct impression that defense counsel determined his testimony would not be helpful to the defense (Pages 4-5 of Order on Motion for New Trial as Amended, R. 107).

10

## ENUMERATION OF ERRORS

### I.

THE TRIAL COURT ERRED IN ADMITTING THE HEARSAY TESTIMONY OF WITNESS YVONNE AGAN PURSUANT TO THE "NECESSITY EXCEPTION."

### II.

THE TRIAL COURT ERRED IN RESTRICTING THE CROSS-EXAMINATION OF WITNESS YVONNE AGAN CONCERNING THE NATURE OF THE CRIMINAL CHARGES PENDING AGAINST HER.

### III.

THE TRIAL COURT ERRED IN FAILING TO OVERTURN THE CONVICTION OF APPELLANT IN LIGHT OF THE STATE'S FAILURE TO DISCLOSE EXCULPATORY MATERIAL TO THE DEFENSE, PURSUANT TO REQUEST, UNTIL WELL AFTER THE TRIAL WAS COMPLETED.

## MEMORANDUM OF LAW

### I.

THE TRIAL COURT ERRED IN ADMITTING THE HEARSAY TESTIMONY OF WITNESS YVONNE AGAN PURSUANT TO THE "NECESSITY EXCEPTION."

As detailed hereinabove, the State was allowed to introduce, over objection, the hearsay testimony of the deceased through witness Yvonne Agan. The testimony concerned an evening approximately one month before the murder when Appellant allegedly followed the deceased in his automobile, and the deceased went to the home of

11

Ms. Agan to seek refuge. Ms. Agan was allowed to testify as to what the deceased told her concerning the events of the evening.

The testimony was permitted by the trial court under the "necessity exception" to the hearsay rule (T. 1128-1129), after the trial court found "particularities that would guarantee the trustworthiness" of the statements (T. 1129). This finding was made despite the fact the witness offering the alleged declarations of the deceased did not come forward until the Saturday prior to the commencement of trial (T. 1122-1123), and had unresolved criminal charges pending at the time she came forward (T. 1129).

As this Court is well aware, to be admissible under the "necessity exception" the declarant must be unavailable, and the trial court must initially determine that the statement has "particularized guarantees of trustworthiness." Abraha v. State, 271 Ga. 309, 313, 518 S.E.2d 894 (1999); Miller v. State, 275 Ga. 32, 34, 561 S.E.2d 810 (2002). Here, those required guarantees are at best suspect. The witness offering the declarations did not come forward on a timely basis, and was herself the subject of pending criminal charges in the same District Attorney's office. Thus, it was not sufficiently clear from the surrounding circumstances that the "test of cross-examination" would be a marginal utility, and as such the declarations should not have been admitted.

Yet even more significantly, the trial court utterly failed to consider the final test for admissibility: that the hearsay evidence "is more probative on a material fact than other evidence that may be procured and offered at trial." Willis v. State, 274 Ga. 699, 700, 558 S.E.2d 393 (2002). The mere unavailability of the declarant is not sufficient; the added requirement that the statement is more probative on a material fact than other

12

direct evidence ensures that the exception "...does not render the rules of evidence meaningless and allow the conduct of trials by hearsay." Chapel v. State, 270 Ga. 151, 155, 510 S.E.2d 802 (1998).

Looking critically at the trial record in the instant matter, as did Chief Justice Fletcher in Willis, supra, one must conclude that the victim's hearsay statements were not more probative about the prior difficulties between the deceased and Appellant than the direct evidence offered by the State. As detailed in the factual statement above, much of this trial was consumed by testimony relating to alleged acts of Appellant, directed toward the deceased, his indicating desire to thereafter even harm Isaac Dawkins. The trial judge noted in his Order on Motion for New Trial as Amended that:

> Ms. Agan's testimony was only a small part of an overall picture of the relationship between this Defendant and the victim, Mr. Dawkins, shown by the testimony of a number of witnesses who testified consistently as to an ongoing series of what only can be called incidents of stalking and physical confrontations between this Defendant and the victim. These witnesses testified to these confrontations as having been initiated by the Defendant, Watkins, in an apparent effort to get back at the victim who dated Watkin's ex-girlfriend.

(Page 8, Order on Motion for New Trial as Amended, R. 107).

The declarations of the deceased to Ms. Agan were no more probative as to the fundamental nature of the relationship between the deceased and Appellant than the reams of direct evidence offered at trial. As such, it should not have been admitted.

Nor can it be suggested that this error was harmless, as this testimony, although repudiated at the subsequent trial of Mark Free, was the only allegation of "shooting" offered by the State in the trial of Appellant. As such, the error demands that the conviction be reversed and a new trial ordered.

13

witness who is facing a pending charge of loitering may have some expectation of benefit

if he pleases the State in providing testimony against another Defendant. But, even more

surely, the Defendant facing a long prison sentence has more to gain by satisfying the

prosecutor. The jury must know, and it is logical for them to believe, that a witness who

perceives a substantial benefit is more likely to support the prosecution than a witness

whose potential benefit is a one-month reduction in sentencing. The jury must know this

background in order that the witness's veracity can be evaluated in light of the realities

surrounding the witness.

In the instant matter, those guiding principles were wholly abridged. Yvonne

Agan, as disclosed by the prosecution, had "some charges pending, she has not been

convicted" (T. 1129). Upon motion of the prosecution (T. 1129-1130), the trial judge

ruled that the defense could not "bring up the nature of any charges" (T. 1130). In

reaching that ruling, the trial court relied on "the district attorney's statement in her place

that they have made no promises of any kind whatsoever..." (T. 1134). Such reliance by

the trial court was misplaced; it is not the existence of any deal, but the possible

perception of benefit by the witness that could potentially color her testimony.

While it is readily conceded that the trial court has discretion as to the extent of

inquiry on cross-examination, it is respectfully submitted that the preclusion of any

inquiry into the nature of the criminal charges pending against a witness constitutes an

abuse of that discretion, and prejudicial error. As such, a new trial should properly be

ordered.

III.

THE TRIAL COURT ERRED IN FAILING TO OVERTURN THE

CONVICTION OF APPELLANT IN LIGHT OF THE STATE'S FAILURE TO

DISCLOSE EXCULPATORY MATERIAL TO THE DEFENSE, PURSUANT TO

REQUEST, UNTIL WELL AFTER THE TRIAL WAS COMPLETED.

In Tessmer v. State, 273 Ga. 220, 539 S.E.2d 816 (2000), this Court considered

the requirements for a criminal defendant to successfully assert a violation of the mandate

of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Noting that

the burden is on the defendant (Hicks vs. State, 232 Ga. 393, 396, 207 S.E.2d 30 (1974)),

this Court mandated that it must be shown that:  (1) the State possessed information

favorable to the defendant; (2) the defendant did not possess the information favorable to

the defendant; (3) the prosecution suppressed the evidence; and (4) a reasonable

probability exists that the outcome of the trial would have been different if the evidence

had been disclosed.  See also Burgeson v. State, 267 Ga. 102, 475 S.E.2d 580 (1996);

Zant v. Moon, 264 Ga. 93, 100, 440 S.E.2d 657 (1994).

In the instant matter, it is respectfully submitted that each of the four prongs stated

above had been met with regard to the undisclosed witness, James Hudgins. Mr. Hudgins

had material exculpatory evidence, which was withheld from the defense. As stated

hereinabove, Mr. Hudgins testified at the hearing held with regard to Appellant's

Amended Motion for New Trial. Mr. Hudgins, a long-term resident of Floyd County

(MT. 7) and the brother of the Chief Assistant District Attorney for the Lookout

Mountain Judicial Circuit (MT. 8), stated that approximately one month prior to

16

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a true and correct copy of the foregoing Brief of Appellant upon the Rome Judicial Circuit Assistant District Attorney, Mr. Fred Simpson, and upon the Attorney General, Mr. Thurbert E. Baker, via United States first-class mail with adequate postage affixed thereto to carry same to its destination and properly addressed as follows:

Mr. Fred Simpson
Assistant District Attorney
Rome Judicial Circuit
401 Tribune Street
Suite 302
Rome, GA 30161

Mr. Thurbert E. Baker
Attorney General
40 Capitol Square, S.W.
Atlanta, GA 30334-1300

This 31st day of October, 2002.



L. BRANCH S. CONNELLY

MMH
1019630

# IN THE SUPREME COURT

## STATE OF GEORGIA

| | | |
|---|---|---|
| **JOSEPH SAMUEL WATKINS,** | * | |
| | * | |
| **Appellant,** | * | **CASE NO.  S03A0034** |
| -vs.- | * | |
| | * | |
| **STATE OF GEORGIA,** | * | |
| | * | |
| **Appellee.** | * | |
| | * | |
| _____ | * | |

---

## BRIEF OF APPELLEE

---

**BRYANT SPEED**
**DISTRICT ATTORNEY**



**FRED R. SIMPSON**
**Chief Assistant District Attorney**
**Rome Judicial Circuit**
**State Bar of Georgia**
**Membership No. 647625**

**OFFICE OF THE DISTRICT**
   **ATTORNEY**
**3 Government Plaza**
**Suite 302**
**Floyd County Courthouse**
**Rome, GA 30161**
**(706) 291-5210**

# PART ONE

## STATEMENT OF THE FACTS

Amy Suddeth and twenty-year-old Isaac Dawkins, the victim herein, were both students at Floyd College in January of 2000. On January 11, she saw Isaac Dawkins leave the campus around 7:00 p.m. He didn't seem to be having problems with anyone. (T.237-239; State Exhibit 18).

A few minutes later, Wayne Benson was traveling on U.S. 27, when he noticed a pick-up truck stopped in the outside lane. (T.281-283). Another car was in front of the truck, then it darted off to the side. The truck then took off and charged to the inside lane, with both vehicles picking up speed. (T. 285-287). A short while later, he saw the truck veer off the highway and cross the median. As it left the roadway, the truck was still in the inside lane, with the car being in the outside lane to the back of the truck. (T. 290-291). Records shows that 911 received the first call at 7:19 p.m. (T. 335).

The truck crossed the southbound lanes of US 27, rolling over as it reached the edge of some woods. The truck came to rest with the front facing into the woods. (T. 316, 317). From the roadway, you could not see the front of the truck. (T. 321).

The driver of the vehicle, Isaac Dawkins, was taken to Floyd Medical Center. Once examined, it was determined that a bullet had entered the

2

right side of Dawkins' brain, traveling almost straight across to the left side. (T. 358-361). He was pronounced dead at 12:25 p.m. on January 12, 2000. (T. 363).

At approximately 8:00 p.m. on the 11th, the Rome Police were called in to investigate, with Detective Jim Moser being assigned to the case. (T. 312, 328). Moser recovered a spent 9mm cartridge a few hundred feet from where the vehicle left the roadway. (T. 421). The cartridge was not oxidized, leading firearms expert Jay Jarvis to conclude that the cartridge had not been exposed to the elements for very long. The cartridge was manufactured by Federal Ammunition. (T. 373). A metal jacket fragment was also recovered. Jarvis concluded that it was consistent with a 9mm manufactured by Federal Ammunition. (T. 374).

Within a few days, Moser's investigation led him to speak with Appellant Watkins' father and sister. They stated Appellant had been with them all night. (T. 426m 427). Detective Mike Key conducted a formal interview with Appellant on February 11, 2000. During the course of the interview, Appellant stated that he passed the wreck on the other side of US 27, as he was returning from seeing his girlfriend, Aislyn Hogue. (T. 497, 498). He knew it was Isaac Dawkins' truck because he could see the brushguard and foglights on the front of the vehicle. (T. 493).

Appellant had gone to see Ms. Hogue. He arrived at her house around 8 p.m. and appeared nervous. (T. 521, 524). Ms. Hogue's father overheard him tell her that "his friend had just got killed." (T. 547).

As time went by, Detective Moser ran into difficulties in the investigation. People were hesitant to come forward and give information. Moser did not make any arrests as a result of his investigation. (T. 1349).

After some time, Sammy Dawkins, Isaac's father, visited his son's grave in a little country cemetery. He found the grave covered with hundreds of flies, and having a bad odor. No other graves, including another recent one, had the problem of flies and bad odor. (T. 229, 230). Looking around the cemetery, he found a garbage bag with a dead dog inside. It had the same odor as his son's grave. (T. 231). Asking the Floyd County Police Department for help, the bag and dog carcass were retrieved and taken to the crime lab. (T. 232-234). There, firearms expert and crime lab manager, Jay Jarvis, concluded that the dog had what appeared to be a gunshot wound to the head. (T. 382). This was significant because, in October or November of 1999, Isaac's dog was found dead in his pen, shot between the eyes. (T. 95, 96, 220).

According to Jay Barnett, his best friend, Isaac had no enemies, other than Appellant. (T. 99). Brad Nolan and Adam Elrod testified as to the same. (T. 201, 925). Appellant had become antagonistic toward Isaac as a result

4

of Isaac dating Appellant's former girlfriend, Brianne Scarbrough. (T. 78, 184).

Brianne had dated Appellant off and on two and a half years. She dated Isaac

from June until September of 1999. The animosity toward Isaac continued even

after he stopped dating Brianne. (T. 93, 909).

Appellant made a number of direct and indirect threats concerning

Isaac. He told Paul Allen that he was going to "get" Allen and Isaac, because

Allen brought Isaac and Brianne together. (T. 134). A co-worker, Tiffany

Sledge, overheard Appellant say "that Isaac would pay if he had to kill the son

of a bitch." (T. 115). He told Brad Nolan that he wanted to fight Isaac and

would like to catch him somewhere when Appellant wouldn't get into trouble.

(T. 188, 190). He talked a great deal about doing something to Isaac. (T. 908).

There were several instances of Appellant chasing Isaac in his car or trying to

get Isaac to chase him, in order to fight him. (T. 79, 80, 86, 91, 132, 919, 920,

1226).

After the shooting, Appellant and co-defendant Mark Free spoke

to Billy Pasley. Appellant told Pasley that he had been in Florida at the time of

the shooting. Free said "the dog was taken care of." (T. 207). He also said

"they taught him a lesson that day," referring to Isaac. (T. 208). Corey Jacobs

overheard Appellant bragging about shooting Isaac, giving details of how it

happened. (T. 754, 755).

5

Josh Flemister was a close friend to Appellant. He admitted that he had probably made the statement that Appellant was like a brother to him and he wouldn't testify against him. (T. 991). While he denied the veracity of his previous statements, he had told police Appellant wanted Flemister to provide him an alibi for the day Isaac was shot. (T. 985, 1055). Flemister also told the police that Appellant had admitted that he wanted to kill Isaac. (T. 1060). While testifying, Flemister denied that had he had ever told anyone that he had been involved in the shooting. Yet, Lacy Lambert testified that he had told her that he "was an accessory to a murder," and that he was with Appellant when he shot Isaac. (T. 1023).

Co-Defendant Mark Free was given use immunity at trial and called to testify. (T. 774). He testified that he and Appellant were real good friends, but that he had not been with him at any time on the day of the shooting. (T. 778, 780). David Jones, however testified that Free told him that he had been driving with Appellant that day, and woke up to gunshots. (T. 864, 865). Free also denied saying anything to Keri Wilkey about the shooting. (T. 785). Keri Wilkey testified that when asked him about the shooting, his response was "that is between me and Joey." (T. 853). Finally, Free also denied having made certain statements about the shooting to Joey Samples, a jail cellmate. (T. 786). Samples, on the other hand testified that Free had talked about killing the dog.

6

(T. 814).  Samples also testified that Free made threats to "knock off" Brianne Scarbrough because she was talking too much.  (T. 816, 820).

Finally, Yvonne Agan testified that Isaac Dawkins had been a close friend of her son, and that she loved Isaac like her own son.  Isaac would often come by and talk to her about things on his mind.  (T. 1140, 1141).  According to Agan, Isaac had come to her house sometime in December, around 9 p.m.  He said he needed to talk.  (T. 1142, 1143).  He had hidden his truck behind her house, because when he had gone home, he found Joey Watkins backed into his driveway.  He said they were shooting at him.  (T. 11441, 1146, 1148).  He said it was over a girl.  (T. 1147).

After hearing testimony from a number of defense witnesses, the jury convicted Joey Watkins of felony murder and related offenses.  (T. 1461).

7

# PART TWO

# ARGUMENT AND CITATION OF AUTHORITY

## 1.

## IT WAS NOT ERROR TO ADMIT HEARSAY TESTIMONY

## UNDER THE NECESSITY EXCEPTION.

Appellee respectfully agrees with and adopts Paragraph A (answer to Enumeration of Error No. 1) of the Attorney General's brief submitted on behalf of Appellee.

## 2.

## IT WAS NOT ERROR TO RESTRICT CROSS-EXAMINATION

## OF MS. AGAN AND THE ISSUE WAS NOT PRESERVED

## FOR APPEAL.

Appellee respectfully agrees with and adopts Paragraph B (answer to Enumeration of Error No. 2) of the Attorney General's brief submitted on behalf of Appellee.

Appellee further notes that Ms. Agan was found not guilty of the pending charges at issue here. (MNT. 24).

8

3.

## THE TRIAL COURT DID NOT ERR IN FAILING TO GRANT

## A NEW TRIAL DUE TO AN ALLEGED BRADY VIOLATION.

Appellee respectfully agrees with and adopts Paragraph C (answer to Enumeration of Error No. 3) of the Attorney General's brief submitted on behalf of Appellee.

### CONCLUSION

The judgment and rulings of the trial court should be affirmed.

Respectfully Submitted,

BRYANT SPEED
DISTRICT ATTORNEY

FRED R. SIMPSON
**Chief Assistant District Attorney**
**Rome Judicial Circuit**
**State Bar of Georgia**
**Membership No.: 647625**

**OFFICE OF THE DISTRICT ATTORNEY**
**Floyd County Courthouse**
**3 Government Plaza**
**Suite 302**
**Rome, Georgia 30161**
**(706) 291-5210**

9

## CERTIFICATE OF SERVICE

I, FRED R. SIMPSON, Chief Assistant District Attorney for the Rome Judicial Circuit hereby certify that I have, before filing same, served a copy of the BRIEF OF APPELLEE on Appellant's attorney, by mailing a copy of same by first class mail with sufficient postage affixed thereto:

Mr. L. Branch S. Connelly
Attorney at Law
Cook & Connelly
PO Box 370
Summerville, GA 30747

Madonna Heinemeyer
Assistant Attorney General
40 Capitol Square, SW
Atlanta, GA  30334-1300

This 27th day of November, 2002.

FRED R. SIMPSON
Chief Assistant District Attorney
Rome Judicial Circuit
State Bar of Georgia
Membership No.: 647625

# BRYANT SPEED

■

OFFICE OF THE
## DISTRICT ATTORNEY
### ROME JUDICIAL CIRCUIT

| | |
|---|---|
| FRED SIMPSON | JOHN HARKINS |
| *CHIEF ASSISTANT DISTRICT ATTORNEY* | *CHIEF INVESTIGATOR* |

December 3, 2002

**Clerk of the Supreme Court of Georgia**
**State Judicial Building**
**Room 572**
**244 Washington Street**
**Atlanta, GA 30334**

> RE:   Watkins v. State of Georgia
>        Case # S03A0034

Dear Madam:

Today, I was advised by the Clerk of the Court of Appeals that the brief our office filed in the above matter was received in their office, rather than yours. Apparently, we inadvertently mailed the brief to that office.

I spoke with Mr. Branch Connelly, counsel for Appellant, and he advises me to represent to you that he has no objection to you granting an extension for the filing of our brief. Please consider this letter as my request for an extension of twenty (20) days for the filing of our brief.

Enclosed herewith is the original and seven copies of same.

Thank You.

Sincerely,

*Bryant Speed*

**Bryant Speed**
**District Attorney**

BS/gw

cc: Branch Connelly
     Madonna Heinemeyer
     Clerk, Court of Appeals

FLOYD COUNTY COURTHOUSE • 3 GOVERNMENT PLAZA • SUITE 302 • ROME, GEORGIA 30161-2802 • 706/291-5210 • FAX 706/291-5163

IN THE SUPREME COURT
STATE OF GEORGIA

JOSEPH SAMUEL WATKINS,           *
                                 *
          Appellant,             *   CASE NO. S03A0034
                                 *
     v.                          *   ON APPEAL FROM THE SUPERIOR
                                 *   COURT OF FLOYD COUNTY
                                 *
STATE OF GEORGIA,                *   MALICE MURDER, AGGRAVATED
                                 *   ASSAULT
          Appellee.             *

---

BRIEF ON BEHALF OF APPELLEE
BY THE ATTORNEY GENERAL

---

THURBERT E. BAKER                033887
Attorney General

MARY BETH WESTMORELAND           750150
Deputy Attorney General

PAULA K. SMITH                   662160
Senior Assistant
Attorney General

**Please serve:**

MADONNA HEINEMEYER               343698
Assistant Attorney General

MADONNA HEINEMEYER
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia  30334-
1300
(404) 656-5172

RECEIVED BY HAND DELIVERY
AND FILED:

RESPONDENT
EXHIBIT
6

_M. Haleman_
SUPREME COURT OF GEORGIA

IN THE SUPREME COURT
STATE OF GEORGIA

JOSEPH SAMUEL WATKINS,        *
                             *
         Appellant,          *
                             *  CASE NO. S03A0034
         v.                  *
                             *  ON APPEAL FROM THE SUPERIOR
                             *  COURT OF FLOYD COUNTY
STATE OF GEORGIA,            *
                             *  MALICE MURDER, AGGRAVATED
         Appellee.           *  ASSAULT

BRIEF OF ON BEHALF OF APPELLEE
BY THE ATTORNEY GENERAL

PART I

STATEMENT OF THE CASE

Appellant, Joseph Samuel Watkins was indicted on
January 26, 2001, by the Floyd County grand jury for the
malice murder of Isaac Dawkins; felony murder of Mr.
Dawkins, with aggravated assault as the underlying felony;
aggravated assault of Mr. Dawkins with a handgun, a deadly
weapon; possession of a firearm during the commission of a
crime; and stalking Mr. Dawkins.  (R. 4-8).  At a jury
trial commencing June 25, 2001, Appellant was found not
guilty of malice murder and guilty of the remaining
charges.  (R. 98-A).  The aggravated assault conviction
merged with the felony murder, and Appellant received a

2

life sentence for felony murder, a 5 year consecutive
sentence for possession of a firearm during the commission
of a crime, and a 12 month sentence for stalking.  (R. 99).

Appellant filed a motion for new trial on July 3,
2001, and amended it on April 5, 2002.  (R. 100; 103-06).
After a hearing, and the trial court denied the motion for
new trial on July 25, 2002.  (R. 107-16).

Appellant filed a timely notice of appeal.  (R. 1-2).
This appeal follows.

## PART II

### STATEMENT OF FACTS

On January 11, 2000, Amy Suddeth was in class with
Appellant until about 7:00.  (T. 237).  They talked for a
few minutes, then Appellant left.  Id.

Barry Mullinax did not know the victim.  (T. 245).  On
January 11, 2000, between 6:30 and 7:30 he saw a white
pick-up truck being chased down the highway by a blue-gray-
green car.  Id.  He saw Appellant, in the car with two
other people, raise a gun and shoot, and the truck veered
off the road.  (T. 245, 251).  Mr. Mullinax said he was
scared for his safety and kept driving.  (T. 249).  He had
seen Appellant before.  (T. 251).

On January 11, 2000, Wayne Benson, who is colorblind,
saw a pick-up truck stop and a "blue" car dart off the

3

road.  (T. 281).  The truck immediately sped up and passed the car, and the car followed.  Id.  The vehicles were out of sight briefly, then Mr. Benson saw them ahead of him. Id.  There was some sort of flash, and the truck crossed the median, going north in the southbound lane, then flipped.  (T. 291-92).  Mr. Benson called 911.  (T. 292).

The glass in the middle section of the truck's rear window was splintered.  (T. 331).  A 9 millimeter cartridge casing found on the side of the road was fired from a Ruger 9 millimeter pistol.  (T. 371, 373; 420).  The victim, Isaac Dawkins, was originally treated for accident injuries.  (T. 356).  A CT scan revealed a bullet in his head and a devastating brain injury.  (T. 356).  He was pronounced dead the day after the accident.  (T. 363).

Aislinn Hogue called Appellant between 6:30 and 6:50. (T. 513).  He arrived at her house near 8:00, left between 10:30 and 11:00 and was nervous.  (T. 521-24).  Her father heard Appellant tell her that a friend "just got killed." (T. 547).

Appellant's cell phone received a call on the downtown Rome tower at 11:18 a.m.  (T. 578).  A short time later, a call was placed on his cell phone using another Rome tower. (T. 595).

Jay Barnett, an officer with the Floyd County Police Department, was the victim' best friend. (T. 75). The victim dated Brianne Scarbrough for a month or two month beginning in June 1999. (T. 76-77). The victim broke up with her due to Appellant's actions. (T. 99). Officer Barnett also knew Appellant through a friend and that he used to date Ms. Scarbrough. (T. 77). Officer Barnett was with the victim in July 1999, when he pulled into a gas station and asked Appellant why he was harassing Ms. Scarbrough. (T. 78). Appellant said, "You want your ass whipped; don't you?" and told them to follow him, which they did. (T. 79). The victim would not fight Appellant in his yard, and Appellant and his father kept trying to get the victim to go into the back yard. (T. 80-81). When the victim got back in his truck to leave, Appellant tried to punch him through the open window. (T. 83-84). In a separate incident, Appellant followed officer Barnett and the victim down the road for a long distance and repeatedly stared at them. (T. 86-87). About 30 minutes later, Appellant passed them, made an obscene gesture, and waived his arm for them to follow. (T. 88). The victim followed Appellant for a while then stopped. (T. 89). In October, Appellant kept tailgating then getting in front of the victim's truck and slamming on his breaks in an apparent

5

effort to cause an accident. (T. 91-92). In November, the victim's coon dog was shot between the eyes while chained in her pen. (T. 95-96). To officer Barnett's knowledge, Appellant was the victim's only enemy. (T. 97). The victim would often chat with officer Barnett's mother and Mrs. Agan. (T. 97-98).

The victim's father testified that Appellant's dog was shot between her eyes on October 3, 1999. (T. 219-20). In February 1999, he visited the victim's grave and saw flies all over his grave only. (T. 229). He then noticed flies around a garbage bag in a nearby ditch. Id. Inside was a dog shot between the eyes. (T. 231). The bag had the same odor as was on the victim's grave. (T. 234).

Paul Allen was with the victim when Appellant and other friends when they started chasing them. (T. 131). Appellant told the Mr. Allen, "If I ever see you in town, you know, I'm going to get you." (T. 134). Mr. Allen believed this threat was for him setting the victim up with Ms. Scarbrough. Id. Appellant threatened Mr. Allen whenever he saw him about three times a week, and tried to run him off the road. (T. 135).

Clay Burkhalter was friends with Appellant and they chased Mr. Allen when Mr. Burkhalter was told that Mr. Allen had thrown rocks. (T. 171-72). On a few occasions,

Appellant told Mr. Burkhalter that he was looking for the victim and wanted to fight him. (T. 173). A few days after the shooting, Appellant was nervous and afraid he would be accused. (T. 174-76). He initially told Mr. Burkhalter that he was on his way to Cedartown when the shooting occurred, but later said that he was on his was back and saw the wreck on the highway. (T. 177-78).

Appellant told Billy Pasley that the victim was messing with the wrong person and that he was in Florida at the time of the shooting. (T. 206, 209). Mark Free told Mr. Pasley that the victim's dog was taken care of and they taught the victim a lesson that day. (T. 206-08).

Numerous other witnesses testified to prior difficulties between Appellant and the victim. Appellant's co-worker, Tiffany Sledge, heard him say regarding his broken nose, "If it was the last think that he had to do that Isaac would pay if he had to kill the son of a b---h." (T. 113-15). Brad Nolan heard Appellant say the he wanted to fight the victim sooner or later and he would get the victim somewhere Appellant would not get in trouble. (T. 188-91). The victim came to Yvonne Agan's home around 9:15 one night within the month before his murder. (T.. 1142-43). The victim was shaky and said that when he pulled into his own driveway, the victim shined lights on him,

7

chased and shot at him, and was looking for him.   (T. 1143-48).   Ms. Agan concealed the victim's truck with a tarp and let him sleep in the living room looking out the window, as he requested.   Id.   Adam Elrod heard Appellant threaten the victim and saw him chase him down in the car.   (T. 908).   He witnessed Appellant tell the victim and officer Barnett to follow him, then Appellant hit the victim through the open truck window in front of Appellant's house.   (T. 910-11).

At some point, Mr. Elrod dropped Appellant off in Cedartown, he talked to a straggly guy, and got back in the car with an automatic Berretta pistol.   (T. 926-28).   Josh Flemister said that Appellant would look for the victim and try to fight him, but recanted his earlier statement that Appellant had asked him for an alibi.   (T. 976-76, 985-86).   Mr. Flemister had told Lacy Lambert that he was an accessory to the victim's murder.   (T. 1022-23).   Mr. Flemister also reported that he knew Appellant had a .22.   (T. 1078).

Corey Jacobs told to his uncle, investigator Stanley Sutton, that in a Home Depot parking lot, he heard Appellant bragging to his friends about how he killed the victim and then went to Mark Free's house.   (T. 748, 752).

Mr. Jacobs admitted that he was interested in the reward money.  (T. 749).

Winford Ellis, whose jail cell was next to Appellant, reported hearing Appellant say, "If they wouldn't have done it, the wouldn't have been—be in all this mess."  (T. 651-C, 655).  Mr. Ellis recanted this at trial.  (T. 656).

Also while in jail, when reward posters were put up in the jail, Mark Free told Joey Samples that he was afraid they were catching on to him.  (T. 813).  Codefendant Free said Ms. Scarbrough was talking too much.  Id.  Codefendant Free told Kevin Wilkey that the victim's death was between him and Appellant.  (T. 853).  Codefendant Free told David Jones that Appellant shot the victim when codefendant Free was asleep in the backseat.  (T. 865).

Mr. Elrod told investigator Moser that Appellant had a 9 millimeter pistol.  (T. 1347).  Appellant's father told investigator Moser that Appellant was home with him all night.  (T. 427).  Appellant's sister has a turquoise car. (T. 443).  Appellant gave a statement in his attorney's office claiming the he got home from fishing in Alabama at 6:45 or 7:00, called Aislinn Hogue, and showered.  (T. 486).  He said he called her again at 7:15 or 7:20 and went to see her in Cedartown.  Id.  Appellant claimed he saw an ambulance and the victim's truck on the side of the road.

9

Id. Appellant said he had an SKS, .20 gauge, and a .30-60, but no handguns. Id.

Appellant asked Jeremy Shuler what he was doing dating Ms. Scarbrough, and while he had a knife in his hand, that he ought to cut him up. (T. 1184). Appellant eventually left. (T. 1185). Ms. Scarbrough, who had dated Appellant for 2 ½ years, heard the confrontation through Mr. Shuler's cell phone. (T. 1217-18).

While Chad Redden dated Ms. Scarbrough, Appellant tried to start a fight with him at the mall on December 24, 1999. (T. 1195). When she tried to pull Appellant away, Appellant punched her in the ribs. Id. At another time, Appellant told him that if Mr. Redden waited for Appellant to get out of trouble, he would wind up like the victim. (T. 1199). Ms. Scarbrough confirmed that Appellant had punched her in the ribs. (T. 1221-23). Appellant harassed her which she was dating the victim and followed her. (T. 1223). He also threatened two other boyfriends. (T. 1228).

Appellant presented witnesses that testified that he was defending himself at the mall, that Erica Evans had told Appellant and the victim to stop it the night of the incident at Appellant's house and that she saw Appellant hit the victim that night, and that during one of the

confrontations, the victim had started following him and Appellant and got a baseball bat from his truck.  (T. 1260-65; 1281-88; 1301-03).  Appellant's uncle testified that Appellant fished with him and left his house around 2:00 to get home before dark, around 5:00 or 5:30, the day of the shooting, because he was riding a motorcycle.  (T. 1324-28).  Tim Hughes and Appellant's sister said they were there when Appellant came home that evening, before going to Cedartown.  (T. 1352-67).  Appellant also presented evidence disputing the location of the cell phone calls the day of the murder.  (T. 1377).

   Further facts will be added as necessary to address Appellant's enumerations of error.

PART III

ARGUMENT AND CITATION OF AUTHORITY

**A.   MS. AGAN'S TESTIMONY WAS PROPERLY ADMITTED UNDER THE NECESSITY EXCEPTION TO THE HEARSAY RULE. (Enumeration of Error No. 1)**

   Appellant contends that the trial court erred in allowing Ms. Agan to testify under the necessity exception to the hearsay rule as to what the victim told her about a shooting incident.  Appellant argues that there were no particularized guarantees of trustworthiness as Ms. Agan did not come forward until the Saturday before trial and had pending criminal charges, and the court failed to

11

consider whether the evidence was more probative than prejudicial.  Appellee submits these claims lack merit.

Prior to Ms. Agan's taking the witness stand, Appellant objected to her testimony as hearsay.  (T. 1117). The prosecutor indicated that Ms. Agan would testify that a few weeks prior to his death, the victim came to her house around 9:00 p.m., shaking and upset.  (T. 1118).  The victim told her that they were chasing and shooting at him and "when I pulled out in my driveway and my bright lights went up, they went into the windshield and there was Joey [Watkins]."  Id.  The prosecutor argued that it was admissible under the necessity exception as the declarant was deceased and the testimony related to a similar incident.  (T. 1120).  The statements were relevant to show Appellant's state of mind and the victim's fear for his personal safety, and the statements were more probative than any other evidence to demonstrate this.  The prosecutor showed that the statements were trustworthy as they were made to someone in whom the declarant placed great trust and confidence and Ms. Agan said that the victim was like a son to her.  (T. 1121-22).

Appellant informed the court that the information only came out the Saturday before trial, and the prosecutor informed him immediately.  (T. 1122).  Appellant stated

that "the trustworthiness is all that is in issue here."
(T. 1123).  He argued that the testimony was inadmissible,
because Ms. Agan was a close friend of the family and did
not come forward until the eve of trial.  Id.  The
prosecutor noted that Ms. Agan tried to tell Stanley Sutton
about the incident at a wedding, but he told her to wait as
that was not the time or place.  (T. 1124).  Ms. Agan had
not realized the trial was beginning and thought she had
plenty of time.  Id.

The trial court noted that the delay was not from the
time of the victim's death, but from November 2000, when
Appellant was charged.  Id.  The court found that the
declarant was certainly unavailable, that the existence of
bad blood between Appellant and the victim was corroborated
by other testimony, and that there was sufficient
trustworthiness to allow the jury to consider the evidence.
(T. 1124-29).  Appellant then objected that the prejudicial
impact outweighs its probative value.  (T. 1133).  The
trial court determined that the evidence was entirely
material to the issue.  (T. 1134).  The court did take Ms.
Agan's pending charges into consideration.  Id.

Prior to her testimony, the court reminded the jury
that witness credibility and the trustworthiness of the
evidence was for them to determine.  (T. 1136-39).  Ms.

13

Agan testified that sometime in the month prior to his death, the victim came to her house around 9:15 p.m. (T. 1142). He was he son's best friend, like a son to her, and they had a trusting and loving relationship. (T. 1140-41). The victim had a frightful look, was very shaky and told her they were chasing him and looking in the woods with lights. (T. 1142-44). She went outside to move and cover his truck with a tarp, so it could not be recognized. (T. 1144-46). When she returned, he had his head down on the table. (T. 1146). He told her that when he went home Joey Watkins had backed into the victim's driveway, he left, and drove the back roads to Ms. Agan's house. (T. 1146). He told Ms. Agan that he heard them shooting at him. (T. 1148). The victim said that it was all over a girl he was no longer dating. (T. 1147). The victim asked to sleep on the sofa to be able to see outside, so she moved her Christmas tree and opened the window blinds. (T. 1148).

Ms. Agan stated that she tried to report this to Stanley Sutton at a wedding, but he told her that was not the place and they would talk later. (T. 1149). Mr. Sutton never contacted her, so Ms. Agan called him the Saturday before trial when she realized that the trial had been scheduled. (T. 1150). Ms. Agan admitted that she had pending charges at the time of her testimony. (T. 1152).

After Ms. Agan testified, Appellant moved for a mistrial based on her trustworthiness. (T. 1163). The trial court stated that her trustworthiness was sufficient for him, but really up to the jury, and after her testimony, he found that she was even more trustworthy. (T. 1162-63). This issue was not raised in the motion for new trial. (R. 103-06).

Evidence that would otherwise be hearsay is admissible under the necessity exception when it is necessary and when there are particular guarantees of trustworthiness. Chapel v. State, 270 Ga. 151, 510 S.E.2d 802 (1998). The necessary prong is met when the declarant is dead. Id. The party seeking to admit the evidence "must show that the statement is relevant to a material fact and that the statement is more probative on that material fact than other evidence that may be procured and offered." Id.

When considering the sufficiency of the indicia of reliability, the court "must examine the totality of the circumstances surrounding the making of the statements." Id. Indicators of reliability vary depending on the nature of the statements sought to be introduced. Id. They may include the declarant's consistency in his statements, whether the declarant has a motive to fabricate the statement, and if there is a possibility that the declarant

15

had a faulty recollection.  Id.  Because the determination of reliability is subjective, the admission of the evidence is reviewed for abuse of discretion.  Gissendaner v. State, 272 Ga. 704, 532 S.E.2d 677 (2000).

There is no evidence that the victim ever made a contradictory statement.  Given the circumstances under which it was made, the victim had no reason to fabricate his story.  As far as the victim knew he was telling only Ms. Agan, and she might possibly relate it to her son and husband.  He specifically told her he did not want to call the police, because no one would believe him.  (T. 1148-49).  Since it was a statement based on a traumatic event that had just occurred, there is no chance that his statement was based on a faulty recollection.

Ward v. State, 271 Ga. 648, 520 S.E.2d 205 (1999) allowed the admission of uncontradicted statements made by the victim to someone in whom she placed confidence and turned to for help.  As in Ward, the victim, who was like a son, went to Ms. Agan's house for help when he thought he was in great danger.  In Gissendaner, this Court held that the admission of a statement made when the declarant, like the present victim, was "really scared and jolted" was not an abuse of discretion.  Id.

16

Additionally, this was definitely more probative than any other evidence that could have been procured. As far as the record shows, Ms. Agan was the person to whom Appellant confided immediately after the incident. There is no evidence that there were any witnesses or any other evidence of the shooting incident. Appellant argues that there was ample other evidence of bad blood between the victim and Appellant, so Ms. Agan's testimony was more prejudicial than probative. Ms. Agan's testimony was the only evidence of Appellant chasing and shooting at Appellant in his truck, which was exactly how he died. Furthermore, the witnesses that offered other testimony of the acrimonious relationship between the two either recanted their stories or there was contradictory evidence as to the instigator of the incidents.

Appellant claims that the hearsay statement was not admissible, because Ms. Agan was not trustworthy due to her pending charges, close relationship to the victim, and that she only came forward on the eve of trial. In determining the admissibility of evidence under the hearsay exception, the trial court examines the trustworthiness of the declarant at the time he made the statement, not the trustworthiness of the witness. 'The test [for determining reliability] is whether "the declarant's truthfulness is so

17

clear from the surrounding circumstances that the test of cross-examination would be of marginal utility."' Chapel v. State, 270 Ga. 151, 155.  After all, the witness is in court and subject to cross-examination, so the jury can judge her credibility for themselves.  Whether Ms. Agan was credible was a jury question and not a basis for excluding her testimony.

Ms. Agan's testimony regarding the victim's statements to her were properly admitted under the necessity exception.  Accordingly, Appellant's first enumeration of error is without merit.

**B.  APPELLANT'S ARGUMENT REGARDING THE TRIAL COURT'S LIMITATION ON CROSS-EXAMINATION ABOUT MS. AGAN'S PENDING CHARGES WAS NOT PRESERVED FOR APPEAL. (Enumeration of Error No. 2)**

Appellant asserts that his rights under the Confrontation Clause were violated, and the trial court erred in restricting his cross-examination of Ms. Agan about the nature of her pending charges in order to show that, even without an agreement with the prosecutor, she might be biased in her testimony in an effort to curry favor for a favorable disposition of her own charges, especially if she faced a long prison term.  Appellee submits this claim is not preserved.

18

Outside the presence of the jury, the prosecutor asked that Appellant be prevented from asking about the nature of Ms. Agan's pending charges. (T. 1129). The trial court held that Appellant could ask if Ms. Agan had pending charges from that District Attorney's office and if she had been promised anything in return for her testimony, but not what the charges were. (T. 1130). The pending charge had "something to do with selling a driver's license." Id. Appellant argued that "her crime goes to trustworthiness." (T. 1131). The court replied that the problem was that she did not have a crime. Id. It explained that Appellant could ask her about bias, but he could not try to impeach her with the type of charge since she had not been convicted. Id. Appellant argued that he should be allowed to go into her crime, because it went directly to trustworthiness. (T. 1132). The court told Appellant that he could ask Ms. Agan about the age of the charge, if she was promised anything, if she hoped to get a favorable disposition, "You can go into all that, but you simply can't go into the nature of it." Id. Just prior to Ms. Agan's testimony, the trial court instructed the jury that witness credibility was for them to determine. (T. 1136-39).

19

Ms. Agan testified that the victim and her son were like brothers and that she loved the victim like her son. (T. 1140).  On cross-examination the following transpired:

> Q:   Okay.  All right.  Let me ask you this—and I am not going to embarrass you and ask you what the charges are, but you have some pending charges right now; don't you?
>
> A:   I sure do.
>
> Q:   Where do you work now, Ms. Agan?
>
> A:   I work at Advanced Communications.
>
> Q:   Where did you work—where have you worked in the past?  Did you use to work up here at the Georgia State Patrol?
>
> A:   I did.

(T. 1152-53).  Further questioning revealed that she left that job in February 1999 after 15 ½ years, she was indicted in June 1999, and her testimony had nothing to do with her pending charges.  (T. 1153, 1156, 1158).  This issue was not raised in the motion for new trial.  (R. 103-06).

Appellee submits that the argument that he raises on appeal, that questions about the nature of Ms. Agan's charges would reveal her potential bias in her testimony in an effort to gain favor with the prosecutor, is not preserved for appeal.  In order to preserve and argument for this Court's review, the same argument must have been

raised in the trial court.  Sterling v. State, 267 Ga. 209, 477 S.E.2d 807 (1996).  In the trial court, Appellant argued that he should have been allowed to ask about the nature of Ms. Agan's charges, because the nature of her charges themselves went directly to her credibility and trustworthiness.  As that is not the same as his present argument that he should have been allowed to ask about the nature of the charges to show that she might have been trying to please the prosecutor with her testimony to get favorable treatment for herself, Appellant's present argument is not preserved for appeal.

If this Court should find that the present argument is preserved, the trial court did not err in restricting Appellant's questions.  "The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."  Hines v. State, 249 Ga. 257, 290 S.E.2d 911 (1982).  Appellant asserts that questioning about the pending charges was permissible under Garcia v. State, 267 Ga. 257, 477 S.E.2d 112 (1996); Byrd v. State, 262 Ga. 426, 420 S.E.2d 748 (1992); Kinsman v. State, 259 Ga. 89; 376 S.E.2d 845 (1989); Hines v. State; Nealy v. State, 239 Ga. App. 651, 522 S.E.2d 34 (1999); and Hurston v. State, 206 Ga. App. 570; 426 S.E.2d 196 (1992).

21

Unlike in Garcia, the trial court here did not cut off all inquiry into the pending charges. The court's ruling allowed Appellant to establish the fact that charges were pending, when they were filed, and that they were still unresolved, but would not permit him to go into details regarding the circumstances. There was no abuse of discretion as Appellant was able to establish that Ms. Agan did have unresolved pending charges that might influence her testimony.

Nealy is inapposite to the present case. The court in that case had granted a motion in limine to prevent any cross-examination regarding a witness's pending charges and the defendant was not permitted to introduce any evidence of those pending charges. Id. The Court of Appeals reasoned that a defendant is entitled to attack the credibility of a witness by showing that he has pending charges which may reveal a possible bias or motive of the witness to shade his testimony, even if he has made no deal with the prosecution. Here, although Appellant could not ask about the nature of the pending charges, Appellant was allowed to establish that pending charges existed, just as Nealy requires.

Similarly, in Byrd, Kinsman, Hines, and Hurston the appellate courts held that the existence of pending charges

22

is an appropriate matter for inquiry to show bias or a tendency to curry favor with the prosecution.  Unlike in those cases, the trial court in Appellant's case did not cut off all inquiry into Ms. Agan's charges, and Appellant was able to show possible bias by establishing that she had unresolved charges.  None of the above cases require that Appellant be allowed to go into the circumstances of the pending charges.

Appellant has not preserved the argument that he now raises for appellate review.  If this Court finds that it is preserved, the trial court did not abuse its discretion by allowing Appellant to establish that Ms. Agan had pending charges but not the nature of those charges.  Therefore, this enumeration of error is without merit.

C. **THE TRIAL COURT DID NOT ERR IN FINDING THAT THE ALLEGED BRADY VIOLATION DID NOT REQUIRE A NEW TRIAL.**
(Enumeration of Error No. 3)

Appellant contends that the trial court erred in denying his motion for mistrial based on the state's alleged failure to disclose exculpatory evidence, Mr. Hudgins' pretrial statement to an investigator and possibly a prosecutor, to Appellant prior to the conclusion of the trial.  Appellee submits that based on the evidence, the trial court did not err in determining that Mr. Hudgins'

story was not exculpatory and there is no reasonable probability that the outcome of the trial would have been different.

At the motion for new trial hearing, Appellant asked that the trial court take judicial notice of the transcript from Appellant's trial and the trial of his separately indicted codefendant, Mark Free. (MNT 3). The court agreed to do so. (MNT 4). Sixty-six year old James Hudgins testified at the motion for new trial that he is the brother of Grover Hudgins, the Chief Assistant District Attorney for the Lookout Mountain Judicial Circuit, and through him met Steve Cox. (MNT 7-8). Mr. Hudgins also knew Hal Goldin, an Assistant District Attorney in the Rome Judicial Circuit. (MNT 8). Mr. Hudgins remembered not being able to attend Appellant's trial due to double pneumonia, but could not recall the exact dates. (MNT 9). Mr. Hudgins stated that about a month before Appellant's trial, he talked to Mr. Goldin about running for District Attorney and about Appellant. (MNT 10). He said he told Mr. Goldin that Joseph (aka John) Boyd killed some of Mr. Hudgins guineas, said he "got saved," and as a licensed minister, Mr. Hudgins told him that if he was truly saved, he forgave him for the guineas. (MNT 10). Mr. Boyd allegedly said, "I killed that boy down on the highway, I

24

killed Joey Dawkins.  He was dating my wife, and I would have killed her if she had been down there."  (MNT 11). Mr. Hudgins said that he had talked to Mr. Goldin for about 10-15 minutes in his office.  Id.  Mr. Hudgins said that after the trial he also told the same thing to Mr. Cox and Tami Colston.  (MNT 12-13).  Mr. Hudgins confirmed that Mr. Boyd said "Joey Dawkins."  (MNT 14).  Mr. Hudgins also stated that "back in August" he did not tell investigator Sutton that "Boyd told me that his wife told him," despite it being in a recorded statement.  (MNT 15, 17-19).  Mr. Hudgins has provided information on several other murders, and asked about others, because he is concerned about them not being closed.  (MNT 19-20).

The victim was killed January 11, 2000; Appellant was convicted on July 2, 2001; and codefendant Free was found not guilty on February 22, 2002.  (MNT 21-22).  Mr. Hudgins spoke to District Attorney Colston on July 18, 2001.  (MNT 23).

John Harkins, chief investigator for the Rome District Attorney's office, testified that during the pendency of Appellant's case, there was an open file policy in the office.  (MNT 25).  Appellant's attorneys, Mr. O'Dell and Mr. Abernathy, came to view Appellant's file several times

25

and were given complete access to it.  Id.  There was
nothing in the file regarding Mr. Hudgins.  (MNT 26).

Hal Goldin testified that Mr. Hudgins came to his
office to talk about the impending split of the Tallapoosa
Circuit and election or appointment of a district attorney.
(MNT 27).  Mr. Hudgins also reported having problems with a
neighbor about some guineas, and that the neighbor said
"that he had killed a boy down on the highway."  (MNT 27-
28).  Mr. Goldin did not remember if Isaac Dawkins' name
was mentioned.  (MNT 28).  The conversation was in close
proximity to the trial, but Mr. Goldin did not remember if
it was before or after.  Id.  Mr. Hudgins said that he had
already reported it to the police, so they continued their
conversation about the original topic.  Id.  Mr. Goldin
took no part in Appellant's prosecution.  Id.  Mr. Hudgins
also mentioned that he had given information in other
murder cases.  (MNT 29).

Police investigator Jim Moser testified that he spoke
with Mr. Hudgins around April 2000, and Mr. Hudgins said he
felt that Joseph Boyd shot the boy on the highway.  (MNT
31-32).  Mr. Hudgins never said that Mr. Boyd told him that
he had done so.  Id.  Mr. Hudgins said he thought Mr. Boyd
had done it, because he would often be shooting and he
thought the victim was seeing Mr. Hudgins ex-wife.  Id.  As

26

a result of this information, investigator Moser interviewed Mrs. Boyd, her son, Jay Barnett, and several other people involved in the case. (MNT 33). Mrs. Boyd denied even knowing the victim and did not think Mr. Boyd was violent, and her son admitted he and his father shot on their property, but he did not know the victim. (MNT 33-34). Mr. Barnett and the victim's other friends had never heard of Mrs. Boyd or any relationship between her and the victim. (MNT 34). The investigator could not establish any connection between Mr. Boyd and the victim. Id. The investigator put two or three sentences in his report about Mr. Hudgins information and gave the report to his supervisor. (MNT 36). In his report he noted that Mr. Hudgins told him that he often heard shots from the area so Joe and Stephen Boyd, and since January 11, he heard a one-time shot. (MNT 37). He did not note that Mr. Hudgins thought the victim was killed by Mr. Boyd. (MNT 38). He did not know if he verbally reported that to his supervisor. (MNT 39). Mr. Hudgins, who lived one to two miles from the murder scene, reported hearing one shot from Mr. Boyd's property on January 11, but could not give a time of day. (MNT 42).

Joseph Boyd testified that he had a fairly good relationship with Mr. Hudgins, who is getting old and

senile, but Mr. Hudgins was mad at him for killing his guineas. (MNT 44). Mr. Boyd never told Mr. Hudgins that he had shot the boy on the highway. Id. Mr. Boyd did not know the victim and did not think Mrs. Boyd knew him either. (MNT 45). He and Mrs. Boyd were divorced in November 1999. (MNT 47).

In denying Appellant's motion for new trial, the trial court noted that Appellant and codefendant Free were represented by the same counsel, and their cases were tried separately before the same judge. (R. 108). The trial court found that Mr. Hudgins claimed that Mr. Boyd confessed to the killing, Mr. Boyd denied either confessing or killing the victim, and the place from which Mr. Hudgins claimed the fatal shot was filed was over a mile, with hilly terrain, from the murder scene. (MNT 110). The court further found that Mr. Cox immediately reported to Appellant a conversation he had with Mr. Hudgins about two weeks after the trial. (R. 110). Investigator Moser found nothing to substantiate any part of Mr. Hudgins' story, and Mr. Goldin could not remember when in regard to Appellant's trial he spoke with Mr. Hudgins. Id. The trial court noted that Mr. Hudgins purported to have inside information about numerous high profile murders in the area. (R. 111). The trial court also took into consideration that at the

time of codefendant Free's trial, counsel was well aware of Mr. Hudgins statement, which if believable, would also have been exculpatory for codefendant Free. Id. As counsel did not call Mr. Hudgins' at codefendant Free's trial, the trial court was left with the "distinct impression that defense counsel determined his testimony would not be helpful to the defense in this case." Id.

Brady v. Maryland, 373 U.S. 83 (1963), requires the prosecution to disclose material exculpatory to the defense. Applying Tessemer v. State, 273 Ga. 220, 539 S.E.2d 816 (2000), the trial court found that Appellant failed to prove that the state possessed information favorable to Appellant and that there was not a reasonable probability of a different outcome if Mr. Hudgins' statement had been disclosed. (R. 111). The trial court concluded that if the information had been favorable to Appellant, the same counsel would have found it favorable to codefendant Free and used it at his trial. Id. The trial court found that the reason that it was not used was readily apparent, Mr. Hudgins' story was not credible when compared to the uncontradicted objective evidence. (MNT 111-12). Finally, the trial court also found that there was no reasonable probability that the result of the trial would have changed, because if Appellant had tried to

"present Mr. Hudgins' testimony as credible, the likelihood

is that a jury would have discounted the credibility of any

other theory advanced by Defendant."   (R. 112).

> [I]n order to establish a <u>Brady</u> violation, a
> defendant has the burden of showing that: "(1)
> the State possessed information favorable to the
> defendant; (2) the defendant did not possess the
> evidence nor could he obtain it with due
> diligence; (3) the prosecution suppressed the
> evidence; (4) a reasonable probability exists
> that the outcome of the trial would have been
> different if the evidence had been disclosed."

<u>Cook v. State</u>, 274 Ga. 891, 893 (2), 561 S.E.2d 407 (2002)

(citing <u>Tessemer v. State</u>).

Appellee submits that Appellant has not shown that the

trial court erred in applying the <u>Tessemer</u> analysis.   The

trial court's conclusion that the evidence was not

favorable to Appellant is supported by the evidence.   Mr.

Hudgins alleged that he heard one shot from Mr. Boyd's

property on the day of the shooting, but he did not know

when.   He also claimed that Mr. Boyd confessed to killing

the victim.   However, the victim was killed while driving

one to two miles away.   Hilly terrain separated Mr. Boyd's

property from the murder scene.   Furthermore, the victim

was shot around 7:20 on a January evening, and witnesses

indicated that it was dark.   Coupled with the fact that the

same attorneys did not feel that Mr. Hudgins' testimony was

reliable or important enough to call him in codefendant

30

Free's trial, the above evidence shows that the trial court did not err in finding that Mr. Hudgins' story was not exculpatory.

For the same reasons, Appellant also has not shown that the trial court erred in its conclusion that there is no reasonable probability that Mr. Hudgins' story would have changed the trial's outcome.  That no connection between Mr. Boyd and the victim could be established, Mr. Mullinax testified that he saw Appellant fire the shot into the victim's truck, and the long history of animosity between Appellant and the victim further support the trial court's findings.

Appellee submits that Appellant has failed to show that the trial court erred in determining that Mr. Hudgins' story did not demand a new trial.  Therefore, this enumeration of error is without merit.

## CONCLUSION

WHEREFORE, for all of the above and foregoing reasons, Appellee prays that this Court affirm Appellant's convictions and sentences.

Respectfully submitted,

THURBERT E. BAKER                    033887
Attorney General

MARY BETH WESTMORELAND               750150
Deputy Attorney General

PAULA K. SMITH                       662160
Senior Assistant
Attorney General

MADONNA HEINEMEYER                   343698
Assistant Attorney General

Please serve:

MADONNA HEINEMEYER
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia  30334-1300
(404)656-5172

32

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served the within and foregoing BRIEF, prior to filing the same, by depositing a copy thereof, postage prepaid, in the United States Mail, properly addressed, upon:

> Mr. Bobby Lee Cook
> Mr. L. Branch S. Connelly
> Cook & Connelly
> P.O. Box 370
> Summerville, Georgia 30747

> Mr. Fred Simpson
> Assistant District Attorney
> Rome Judicial Circuit
> 401 Tribune Street
> Suite 302
> Rome, Georgia 30161

This _18th_ day of November, 2002.

> _Madonna Heinemeyer_
> MADONNA HEINEMEYER
> Assistant Attorney General



**PETITIONER'S EXHIBIT**

*1*

### AFFIDAVIT OF CYNTHIA COOPER
### ASSISTANT DIRECTOR OF FLOYD COUNTY 911

Comes now the Affiant, Cynthia Cooper, and after being duly sworn, affirms the following, which is true to the best of my knowledge, information and belief.

1.

My name is Cynthia Cooper, and I am employed as Assistant Director of Floyd County 911. My address at work is 5 Government Plaza, Suite 232, Rome, Georgia 30161. My telephone number there is 706-236-4543.

2.

On January 11, 2000, I was employed as an operator in the Floyd County 911 office. The practice and pattern in our office at that time was to call the U.S. Naval Observatory once a week on the third shift and to make sure that all of the Floyd County 911 Motorola consoles were synched to the time at the U.S. Naval Observatory. I observed and participated in this practice.

FURTHER AFFIANT SAYETH NOT.

*Cynthia Cooper*

Cynthia Cooper
Affiant

STATE OF GEORGIA

COUNTY OF _Floyd_

Sworn to and subscribed before me this 30th day of July 2009.

*Maureen McLaughlin*      7/30/09

Notary Public                                  Date

My commission expires: _____

MAUREEN McLAUGHLIN
NOTARY PUBLIC, ATHENS-CLARKE COUNTY, GA
MY COMMISSION EXPIRES MAY 4, 2010



PETITIONER'S EXHIBIT

2

GEORGIA, FULTON COUNTY:


I, Earl Mahfuz, Assistant Treasurer of the Georgia Department of Transportation, do hereby certify and attest that the attached twenty (20) pages, numbered 000001-000020, are true and correct copies of the Georgia Department of Transportation's District Six/Cartersville Office records.

These documents are further identified as follows:

- Pages from Contract Diary for Project ID BHF-017-2 (55) in Floyd County, 8 pages; Bates Numbered 000001-000008
- Project Concept Report for Project ID BHF-017-2 (55) in Floyd County, 5 pages; Bates Numbered 000009-000013
- Preliminary Cost Estimate for Project ID BHF-017-2 (55) in Floyd County, 7 pages; Bates Numbered 000014-000020




This _16_ day of _June_____, 2009.


_____
Earl Mahfuz, Assistant Treasurer
Georgia Department of Transportation

# DEPARTMENT OF TRANSPORTATION
# STATE OF GEORGIA

## INTERDEPARTMENT CORRESPONDENCE

|  |  |
|---|---|
| **OFFICE** | **Cartersville** |
| **DATE** | **June 5, 2009** |

**FILE**

**FROM**     Stacy Cornwell, District 6 Legal Services

**TO**     Earl Mahfuz, Assistant Treasurer

**SUBJECT**     **Certification of GDOT Documents**

Enclosed you will find copies of Georgia Department of Transportation records for which certification by your office has been requested.  A copy of this record was received by me from the District Six, Construction Office in response to a Open Records Request made by attorney August F. Siemon in Atlanta, Georgia.  The documents consist of the following:

- Pages from Contract Diary for Project ID BHF-017-2 (55) in Floyd County, 8 pages; Bates Numbered 000001-000008
- Project Concept Report for Project ID BHF-017-2 (55) in Floyd County, 5 pages; Bates Numbered 000009-000013
- Preliminary Cost Estimate for Project ID BHF-017-2 (55) in Floyd County, 7 pages; Bates Numbered 000014-000020

Please certify these documents and return them to me as soon as possible.  Should you have any questions, please call me at (770) 387-3627.

Thank you,


Enclosures: 20 sheets total

## DEPARTMENT OF TRANSPORTATION
## STATE OF GEORGIA



# CONTRACT DIARY

Project No. _BHF-017-2(55)_

County _Floyd_

Book No. _1 of 10_

T00000

PROJECT NO. BHF-017-2(55)

DATE 1-4-2000

WEATHER Clear

TEMPERATURE 49°                    A.M. 68°          P.M.

DAY CHARGED _____ NO WORKING DAYS _____

CONTRACTOR'S REPRESENTATIVE:

Simpson Bridge, Holcomb & Wilson

CONTRACTOR'S ACTIVITIES:

Simpson placed Lane Closure in
South bound Lane.
Holcomb received pipe for Lane
Cross over.

INSTRUCTIONS GIVEN OR RECEIVED AND VISITORS:

000002

REMARKS:

SIGNED Leonard Sheggart          TITLE ET

PROJECT NO. BAF - 017 (2 (525)

DATE 1 - 5 - 2000

WEATHER: Clear

TEMPERATURE 52° A.M. 70° P.M.

DAY CHARGED: NO. WORKING DAYS:

CONTRACTOR'S REPRESENTATIVE:

Simpson Bridge, Holcomb
& Wilson

CONTRACTOR'S ACTIVITIES:

Holcomb & Wilson placed pipe
in median AT Station south of
bridge SR 27 for Cross Over

INSTRUCTIONS GIVEN OR RECEIVED AND VISITORS:

000003

REMARKS:

SIGNED _Surwad Shaggard_ TITLE ET

PROJECT NO. DHF-017

DATE 1-6-2000

WEATHER Clear

TEMPERATURE 45° ___A.M. 69° ___P.M.

DAY CHARGED _____ NO. WORKING DAYS _____

CONTRACTOR'S REPRESENTATIVE:

Simpson Bridge, Holcomb
& Wilson

CONTRACTOR'S ACTIVITIES:

Holcomb & Wilson back Fill pipe
AT South End of bridge 27 South
and Nort End of bridge,

INSTRUCTIONS GIVEN OR RECEIVED AND VISITORS:

REMARKS:

SIGNED _____ TITLE E.I.

PROJECT NO. BHF-01

DATE 1-7-2000

WEATHER Clear

TEMPERATURE 32° A.M. 72° P.M.

DAY CHARGED: _____ NO. WORKING DAYS: _____

CONTRACTOR'S REPRESENTATIVE:

Simpson Bridge, Holcomb
& Wilson

CONTRACTOR'S ACTIVITIES:

Holcomb & Wilson back fill pipe
At North End of bridge 27 South
of bridge.

INSTRUCTIONS GIVEN OR RECEIVED AND VISITORS:

REMARKS:

000005

SIGNED _____ TITLE ET

PROJECT NO. _B H F - 0 1 7 - 2 ( 5 8 )_

DATE _1 - 10 - 2000_

WEATHER _Clear_

TEMPERATURE _45°_ _____ A.M. _69°_ _____ P.M.

DAY CHARGED _____ NO. WORKING DAYS _____

CONTRACTOR'S REPRESENTATIVE:

_Simpson Bridge, Holcomb_
_& Wilson_

CONTRACTOR'S ACTIVITIES:

_No work to wet._

INSTRUCTIONS GIVEN OR RECEIVED AND VISITORS:

900000

REMARKS:

SIGNED _Leonard Shippel_ _____ TITLE _ET_

PROJECT NO. BHF - 017 2(39)

DATE 1 - 11 - 2000

WEATHER Clear

TEMPERATURE 50° A.M. 65° P.M.

DAYS CHARGED ____ NO. WORKING DAYS ____

CONTRACTOR'S REPRESENTATIVE:

Simpson Bridge, Holcomb
& Wilson

CONTRACTOR'S ACTIVITIES

No work to WeT.

INSTRUCTIONS GIVEN OR RECEIVED AND VISITORS:

REMARKS:

SIGNED _____ TITLE ET

000007

PROJECT NO. BHF - 017 - 2 (55)

DATE 1 - 12 - 2000

WEATHER Clear

TEMPERATURE 48° A.M. 72° P.M.

DAY CHARGED _____ NO. WORKING DAYS _____

CONTRACTOR'S REPRESENTATIVE:

Simpson Bridge, Holcomb
& Wilson

CONTRACTOR'S ACTIVITIES:

Surveyors plotted center line for
lane cross over,

INSTRUCTIONS GIVEN OR RECEIVED AND VISITORS:

00000008

REMARKS:

SIGNED _____ TITLE ET

# DEPARTMENT OF TRANSPORTATION
# STATE OF GEORGIA

## PROJECT CONCEPT REPORT

BRIDGE WIDENING ON SR 1/US 27 OVER
SILVER CREEK

### BHF-017-2(55) FLOYD COUNTY

Federal Route No.:  27
State Route No.:   1
Ga. D.O.T. P.I. No.:  621890



000009

DATE OF REPORT: JUNE 19, 1995

## RECOMMENDATION FOR APPROVAL

| | |
|---|---|
| 6/23/95 | _(signature)_ |
| DATE | DISTRICT ENGINEER |
| DATE | STATE ENVIRONMENTAL ENGINEER |
| DATE | STATE                    ENGINEER |

# PROJECT CONCEPT REPORT

DATE: __JUNE 16, 1995__

PROJECT NUMBER: __BHF 017 2 (55)__   COUNTY: __FLOYD__

PROJECT NAME: __BRIDGE WIDENING ON SR 1 OVER SILVER CREEK__  LENGTH: __0.45 km__

P. I. NUMBER: __621890__  U.S. ROUTE NO.: __27__   STATE ROUTE NO.: __1__

## LOCATION

SR 1/ US 27 OVER SILVER CREEK

## TRAFFIC

| | CURRENT | | | PROJECTED | |
| YEAR | | AADT | YEAR | | AADT |
| --- | --- | --- | --- | --- | --- |
| 2000 | | 21,550 | 2020 | | 34,500 |

| PDP CLASSIFICATION | NON-CA | CA | EXEMPT | FUNCTIONAL CLASSIFICATION |
| --- | --- | --- | --- | --- |
| MINOR | ( ) | ( ) | (XX) | URBAN PRINCIPALARTERIAL |

## EXISTING TYPICAL SECTION

7.3 m PAVING EASTBOUND AND WESTBOUND, WITH 3 m GRADED SHOULDERS INSIDE AND OUTSIDE, 2.4 m PAVED OUTSIDE, 1.2 m PAVED INSIDE.

| POSTED SPEED | MIN EXIST RADIUS OF CURVE | MAX EXIST GRADE |
| --- | --- | --- |
| 55    mph | 582.27 m | 4.16% |

## EXISTING MAJOR STRUCTURES

| RANK: | N.RTG | S.RTG | FEATURES INTERSECTED | LENGTH | WIDTH |
| --- | --- | --- | --- | --- | --- |
| | | 77.5 | 115-0006-0 | 82.01 m | 8.53 m |
| | | 66.7 | 115-0007-0 | 84.15 m | 8.53 m |

EXISTING AND REQUIRED RIGHT OF WAY: __EXISTING R/W IS 60.98 m. NO ADDITIONAL R/W WILL BE REQUIRED.__

PROJECT NEED: __THE SOUTH SPAN OF 115-0007-0 WAS CONSTRUCTED SHALLOW. REINFORCING STEEL IS EXPOSED IN THIS SPAN. MAINTENANCE RECOMMENDS THAT THE DECK ON THIS SPAN BE REPLACED. ALSO, THESE TWO BRIDGES, (115-0006-0 & 11500007-0) NEED TO BE CLEANED AND PAINTED.__

Page 1 of 4

000010

PROJECT CONCEPT REPORT

PROJECT NUMBER: BHF 017 2 (55) FL D

## PROPOSED TYPICAL SECTION

7.2 m PAVING EASTBOUND AND WESTBOUND; 3 m GRADED SHOULDERS INSIDE & OUTSIDE;

2.4 m PAVED OUTSIDE; 1.2 m PAVED INSIDE. THE TYPICAL SECTION MATCHES THE

ORIGINAL TYPICAL SECTION. GUARDRAIL CAN BE ADDED WHERE CLEAR ZONE IS NOT MET.

| DESIGN SPEED | MIN RADIUS OF CURVE | MAX GRADE |
|---|---|---|
| 90 km/h | ALLOWABLE: 291.14 m | ALLOWABLE: 4.5% |
| | PROPOSED: 582.27 m | PROPOSED: 4.16% |

## MAJOR STRUCTURES

PROPOSE TO WIDEN BRIDGES 115-0006-0 AND 115-0007-0 TO 13.2 m. ALSO PROPOSE

TO REPLACE THE SOUTH SPAN OF 115-0007-0.

TYPE ACCESS: LIMITED ACCESS

TRAFFIC CONTROL DURING CONSTRUCTION: STAGE CONSTRUCTION

## ESTIMATED COST:

| | | | |
|---|---|---|---|
| CONSTRUCTION: | 617,675 | RIGHT-OF-WAY: | NONE REQUIRED |
| E & C (10%): | 61,757.50 | ACQUIRED BY: | NONE REQUIRED |
| INFLATION: | 67,944.25 | UTILITIES: | 0 |
| | 2 yrs at 5% per yr | ADJUSTED BY: | N/A |

* SEE COMMENTS PAGE 4   TOTAL CONST COST: _____   * SEE COMMENTS PAGE 4

## DESIGN VARIATIONS REQUIRED

| | YES | NO | UNDETERMINED |
|---|---|---|---|
| SUBST HORIZ ALIGNMENT | ( ) | (X) | ( ) |
| SUBST ROADWAY WIDTH | ( ) | (X) | ( ) |
| SUBST SHOULDER WIDTH | ( ) | (X) | ( ) |
| SUBST VERT GRADES | ( ) | (X) | ( ) |
| SUBST CROSS SLOPES | ( ) | (X) | ( ) |
| SUBST STOPPING SIGHT DIST | ( ) | (X) | ( ) |
| SUBST SUPERELEV RATES | ( ) | (X) | ( ) |
| SUBST HORIZ CLEARANCE | ( ) | (X) | ( ) |
| SUBST SPEED DESIGN | ( ) | (X) | ( ) |
| SUBST VERT CLEARANCE | ( ) | (X) | ( ) |
| SUBST BRIDGE WIDTH | ( ) | (X) | ( ) |
| SUBST BR STRUCT CAPACITY | ( ) | (X) | ( ) |

Page 2 of 4

PROJECT NUMBER: __BHF 017 2 (55) F1  D__

DISPLACEMENTS: __NONE__

LEVEL OF ENVIRONMENTAL ANALYSIS: __CATEGORICAL EXCLUSION__

LEVEL OF PUBLIC INVOLVEMENT: __NONE__

TIME SAVING PROCEDURES APPROPRIATE: ____XX____ YES _____ NO

DESIGN VARIATIONS REQUIRED: __NONE ANTICIPATED__

OTHER PROJECTS IN AREA: _____

CONCEPT TEAM MEETING DATE: __MAY 17, 1995__

LOCATION INSPECTION DATE: __MAY 17, 1995__

PERMITS REQUIRED (COE 404, etc.): __CORPS OF ENGINEERS 404__

UNDERGROUND STORAGE TANKS: __NONE ANTICIPATED__

HAZARDOUS WASTE SITES: __NONE ANTICIPATED__

OTHER ALTERNATES CONSIDERED: __NO BUILD__

**000012**

PROJECT CONCEPT REPORT

PROJECT NUMBER:  BHF 017 2 (55) FL D

COMMENTS:  BRIDGES 115-0004-0 AND 115-0005-0 OVER SOUTHERN R/R ARE ONLY 97 m

SOUTH OF THE TWO BRIDGES ORIGINALLY PROPOSED IN THIS PROJECT. THE SUFFICIENCY

RATINGS OF BOTH BRIDGES ARE 77.8: 115-0004-0 IS 71.34 m X 8.53 m , AND

115-0005-0 IS 73.17 m X 8.53 m. THIS PROXIMITY WILL NECESSITATE TRAFFIC BEING

STAGED ACROSS THESE BRIDGES. DISTRICT 6 PROPOSES TO ADD THESE TWO BRIDGES TO

THIS PROJECT, BY WIDENING THEM AT THIS TIME, THE DEPARTMENT CAN REALIZE A

SAVINGS BY ELIMINATING THE COST OF TRAFFIC CONTROL SOMETIME IN THE FUTURE

WHEN THESE BRIDGES ARE WIDENED.

ATTACHMENTS:  TYPICAL SECTION

Prepared By: Dennis Thompson

THE COST SHOWN ABOVE IS FOR THE BRIDGES OVER SILVER CREEK ONLY.  IF THE

BRIDGES OVER THE SOUTHERN R/R ARE ADDED TO THIS PROJECT THE COST IS:

| | | | |
|---|---|---|---|
| CONSTRUCTION: | 424,255 | RIGHT OF WAY: | NOT REQUIRED |
| E & C (10%): | 42,255.50 | ACQUIRED BY: | NOT REQUIRED |
| INFLATION: | 46,668.05 | UTILITIES: | 0 |
| | 2 YRS @ 5% PER YR | ADJUSTED BY: | N/A |
| TOTAL CONST. COST: | 513,178.55 | | |

000013

Case 4:12-cv-00298-HLM  Document 7-17  Filed 01/22/13  Page 94 of 134

DATE  JUNE 16, 1995

PROJECT  BRF 017 2 (55) FLOYD

P.I. NO.  621890

PROJECT DESCRIPTION  BRIDGE WIDENING AND DECK REPLACEMENT OVER SILVER

 CREEK ON SR 1/US27.

PROPOSED CONCEPT  BRIDGE WIDENING

EXISTING ROAD (If Applicable)  7.3 m PAVING EASTBOUND AND WESTBOUND

TRAFFIC:  Existing  21,550 (2000)          Design  34,500 (2020)

( )  PROGRAMMING PROCESS  (X)  CONCEPT DEVELOPMENT  ( )  DURING PROJECT
                                                         DEVELOPMENT

PROJECT COST

A.  RIGHT OF WAY

   1.   PROPERTY (Land and Easements)                       $     N/R

   2.   DISPLACEMENTS                                        $     N/R

   3.   OTHER COSTS                                          $     N/R

                                                       SUBTOTAL   $     N/R

B.  REIMBURSABLE UTILITIES

   1.   RAILROAD                                             $

   2.   TRANSMISSION LINES                                   $

   3.   SERVICES                                             $

                                                       SUBTOTAL   $   NONE

C.  MAJOR STRUCTURES

   1.   WALLS                                                $

   2.   BRIDGE STREAM CROSSINGS - 8608 SF WIDENING @         $   452,800
       $50/SF-1120 SF DECK REPLACEMENT @ $20/SF

   3.   BRIDGE OVER/UNDERPASS                                $

   4.   BOX CULVERTS                                         $

                                                       SUBTOTAL   $   452,800

000014

D.  GRADING AND DRAINAGE

   1.  EARTHWORK – 3000 CY @ $4.50/CY     $___13,500___

   2.  DRAINAGE

      a.  Cross Drain Pipes (exc. Box Culverts)    $_____

      b.  Curb and Gutter     $_____

      c.  Logitudinal System (incl. Catch Basins)   $_____

                                  SUBTOTAL   $___13,500___

E.  BASE AND PAVING

   1.  AGGREGATE BASE     $_____

   2.  ASPHALT PAVING – 150T @ $40/T (BRIDGE FLARES)   $___9,600___
       90 T (OVERLAY) @ $40/T
   3.  CONCRETE PAVING     $_____

   4.  OTHER     $_____

                                  SUBTOTAL   $___9,600___

F.  LUMP ITEMS

   1.  TRAFFIC CONTROL – LUMP     $___75,000___

   2.  CLEARING AND GRUBBING – 1 ACRE @ $5000/AC   $___5,000___

   3.  LANDSCAPING     $_____

   4.  EROSION CONTROL – 800LF SILT FENCE @ $3.50/LF   $___4,800___
       TEMP MULCH–TEMP GRASS– GRASSING
   5.  DETOURS – 750T ASP CONC @ $40/T (REMOVE AS   $___30,000___
       UNCLAS EXCAV)
                                  SUBTOTAL   $___114,800___

G.  MISCELLANEOUS

   1.  LIGHTING     $_____

   2.  SIGNING – STRIPING     $_____

   3.  GUARDRAIL – 950 LF@ $10.50/LF– 4 TP 11 ANCH @   $___16,975___
       $1000 EA– 4 TP 1 ANCH @ $750 EA
   4.  OTHER – CLEAN & PAINT     $___10,000___

                                  SUBTOTAL   $___26,975___

H.  SPECIAL FEATURES     $_____

000015

# ESTIMATE SUMMARY

A.  RIGHT OF WAY                              $_____N/R_____ __

B.  REIMBURSABLE UTILITIES                    $_____N/A_____

## CONSTRUCTION COST SUMMARY

C.  MAJOR STRUCTURES                          $__452,800_____

D.  GRADING AND DRAINAGE                      $___13,500_____

E.  BASE AND PAVING                           $____9,600_____

F.  LUMP ITEMS                                $__114,800_____

G.  MISCELLANEOUS                             $___26,975_____

H.  SPECIAL FEATURES                          $_____

     SUBTOTAL CONSTRUCTION COST            $__617,675_____

      E & C (10%)                         $___61,757.50___

2 YRS. INFLATION (5% per year)                $___67,944.25___

     TOTAL CONSTRUCTION COST               $__747,376.75___

           GRAND TOTAL PROJECT COST   $_747,376.75___

NOTE: THIS COST IS FOR REPLACING THE SOUTH SPAN OF 115-0007-0, AND WIDENING
BOTH 115-0006-0 AND 115-0007-0.

IF BRIDGES 115-0004-0 AND 115-0005-0 OVER THE SOUTHERN R/R ARE ADDED TO
THIS PROJECT AS PROPOSED, THE COST FOR WIDENING THEM WOULD BE $513,178.55,
WHICH IS BASICALLY THE SAME QUANTITIES AND PRICES AS ABOVE, BUT WITHOUT
THE DECK REPLACEMENT, CLEANING AND PAINTING, TRAFFIC CONTROL, CONSTRUCTION
AND REMOVAL OF DETOUR.

CONSTRUCTION COST          $___424,255_____
E & C                      $____42,255.50
2 YRS INFLATION            $____46,668.05

TOTAL CONSTRUCTION COST    $____513,178.55

000016



TYPICAL CROSS SECTION

# DEPARTMENT OF TRANSPORTATION

## STATE OF GEORGIA

### INTERDEPARTMENT CORRESPONDENCE

| | | | |
|---|---|---|---|
| FILE | **BHF-017-2(55) FLOYD COUNTY**<br>**P.I. NO. 621890** | OFFICE | District Six<br>Cartersville, GA |
| | | DATE | June 19, 1995 |

FROM    Charles E. Law, P.E., District Engineer

TO      Bobby Mustin, P.E., Project Review Engineer

SUBJECT   **CONCEPT REPORT APPROVAL**

Attached is the approval sheet with the Concept Report on the above file project for your further handling.

If we may be of further assistance, please advise.

BY: Dennis Thompson
    Road Design Engineer

CEL:DT:djd

Attachment

000018

FILE

P02

05-16-95 02:27 PM   TO DIST.CT-6

.O.T. 65

# DEPARTMENT OF TRANSPORTATION
# STATE OF GEORGIA

## INTERDEPARTMENT CORRESPONDENCE

| | |
|---|---|
| FILE | BHF-017-2(55) FLOYD<br>P.I.# 621890 |
| OFFICE | Environment/Location |
| DATE | March 14, 1995 |

FROM   David Studstill, P.E., State Environmental/Location Engineer

TO   Charles Law, P.E., District Engineer Cartersville
  Attn:  Bill McVey

SUBJECT   Design Traffic for S.R. 1/US 27 @ Silver Creek

We are furnishing estimated traffic assignments for the above
project as follows:

```
        2000 ADT = 21550
        2020 ADT = 34500
             K = 11%
             D = 66%
             T =  5%
     24 Hr. T =  7%
         S.U. =  2%
         Comb. =  5%
```

DS/JCG

670000

05-16-95 02:27 PM    TO DISTRICT-6

.O.T. 48

# DEPARTMENT OF TRANSPORTATION
## STATE OF GEORGIA

### INTERDEPARTMENT CORRESPONDENCE

FILE    BHF-017-2(55) FLOYD
       P.I.# 621890

OFFICE    Environment/Location

DATE    March 14, 1995

FROM    David Studstill, P.E., State Environmental/Location Engineer

TO    Charles Law, P.E., District Engineer Cartersville
      Attn:  Bill McVey

SUBJECT    Design Traffic for S.R. 1/US 27 @ Silver Creek

We are furnishing estimated traffic assignments for the above project as follows:

$$\begin{aligned}
2000 \text{ ADT} &= 21550 \\
2020 \text{ ADT} &= 34500 \\
K &= 11\% \\
D &= 66\% \\
T &= 5\% \\
24 \text{ Hr. T} &= 7\% \\
S.U. &= 2\% \\
Comb. &= 5\%
\end{aligned}$$

DS/JCG

670000

D.O.T. 66

# DEPARTMENT OF TRANSPORTATION
# STATE OF GEORGIA

## INTERDEPARTMENT CORRESPONDENCE

FILE    BHF-017-2(55) FLOYD         OFFICE  Environment/Location
         P.I.# 621890

DATE  March 14, 1995

FROM    David Studstill, P.E., State Environmental/Location Engineer

TO    Charles Law, P.E., District Engineer Cartersville
      Attn:  Bill McVey

SUBJECT  Design Traffic for S.R. 1/US 27 @ Silver Creek

We are furnishing estimated traffic assignments for the above project as follows:

```
        2000 ADT = 21550
        2020 ADT = 34500
               K = 11%
               D = 66%
               T =  5%
       24 Hr. T =  7%
            S.U. =  2%
           Comb. =  5%
```

DS/JCG

000020

I.O.T. 66

# DEPARTMENT OF TRANSPORTATION
## STATE OF GEORGIA

### INTERDEPARTMENT CORRESPONDENCE

FILE      BHF-017-2(55) FLOYD         OFFICE  Environment/Location
            P.I.# 621890

DATE   March 14, 1995

FROM     David Studstill, P.E., State Environmental/Location Engineer

TO       Charles Law, P.E., District Engineer Cartersville
         Attn:  Bill McVey

SUBJECT  Design Traffic for S.R. 1/US 27 @ Silver Creek

We are furnishing estimated traffic assignments for the above
project as follows:

$$
\begin{array}{rl}
2000\ ADT = & 21550 \\
2020\ ADT = & 34500 \\
K = & 11\% \\
D = & 66\% \\
T = & 5\% \\
24\ Hr.\ T = & 7\% \\
S.U. = & 2\% \\
Comb. = & 5\%
\end{array}
$$

DS/JCG

000020

05-16-95 02:27 PM   TO DIST...T-6

# DEPARTMENT OF TRANSPORTATION
## STATE OF GEORGIA

### INTERDEPARTMENT CORRESPONDENCE

FILE   BHF-017-2(55) FLOYD           OFFICE   Environment/Location
       P.I.# 621890                  DATE     March 14, 1995

FROM   David Studstill, P.E., State Environmental/Location Engineer

TO     Charles Law, P.E., District Engineer Cartersville
          Attn:  Bill McVey

SUBJECT   Design Traffic for S.R. 1/US 27 @ Silver Creek

We are furnishing estimated traffic assignments for the above
project as follows:

```
             2000 ADT = 21550
             2020 ADT = 34500
                    K = 11%
                    D = 66%
                    T =  5%
           24 Hr. T =  7%
                 S.U. =  2%
               Comb. =  5%
```

DS/JCG

670000

Case 4:12-cv-00298-HLM   Document 7-17   Filed 01/22/13   Page 104 of 134

# DEPARTMENT OF TRANSPORTATION
# STATE OF GEORGIA

## INTERDEPARTMENT CORRESPONDENCE

FILE    BHF-017-2(55) FLOYD       OFFICE   Environment/Location
       P.I.# 621890           DATE    March 14, 1995

FROM    David Studstill, P.E., State Environmental/Location Engineer

TO    Charles Law, P.E., District Engineer Cartersville
      Attn:  Bill McVey

SUBJECT    Design Traffic for S.R. 1/US 27 @ Silver Creek

We are furnishing estimated traffic assignments for the above project as follows:

$$2000 \text{ ADT} = 21550$$
$$2020 \text{ ADT} = 34500$$
$$K = 11\%$$
$$D = 66\%$$
$$T = 5\%$$
$$24 \text{ Hr. } T = 7\%$$
$$S.U. = 2\%$$
$$Comb. = 5\%$$

DS/JCG

000020

IN THE SUPERIOR COURT OF FLOYD COUNTY

ROME, GEORGIA

| | |
|---|---|
| THE STATE OF GEORGIA, | ) |
|     Plaintiff | ) 01-CR-16706-JFLWJM |
| VS | ) |
| TIMOTHY MARK FREE, | ) |
|     Defendant | ) |

**CERTIFIED COPY**


PETITIONER'S EXHIBIT
3

FELONY JURY TRIAL
**PARTIAL TRANSCRIPT**
**YVONNE AGAN'S TESTIMONY**
PAGES 1 - 28

APPEARANCES:

| FOR THE PLAINTIFF: | FOR THE DEFENDANT: |
|---|---|
| FRED SIMPSON, ESQ. | REX ABERNATHY, ESQ. |
| | WILLIAM O'DELL, ESQ. |

FEBRUARY 20, 2002, Rome, Georgia

BE IT REMEMBERED, the above-styled case came up for hearing on this date before the HON. WALTER J. MATTHEWS, Judge of said Court, when all parties announced ready.

WHEREUPON, the following proceedings were held, to wit: A FELONY JURY TRIAL WAS HELD.

Melodie E. Taylor, CCR-1057, 3 Government Plaza, Suite 212, Rome, Georgia 30161
(706)291-5166, 5120; fax (706)291-5166, 5120

1                    ****************

2                    YVONNE AGAN,

3    a witness being called upon to testify on behalf of the State,

4    and after first being duly sworn, is examined and testifies as

5    follows:

6                    DIRECT EXAMINATION

7    BY MR. SIMPSON

8         Q    For the record, tell us your name, please.

9         A    Yvonne Agan.

10        Q    Ms. Agan, let me just simply start off by asking

11   whether or not you knew Isaac Dawkins?

12        A    Yes.

13        Q    How did you know him?

14        A    He was a very good friend of our youngest son, Joe,

15   who he visited our house very often.

16        Q    How old is Joe?

17        A    Joe is 23.

18        Q    Okay.  How about Isaac?  Do you know about how old he

19   was?

20        A    He would have been 23, I think in December of this

21   year.  I think that's right.

22        Q    Now, in December of 1999, who all was living with you

23   at that time?

24        A    Joe; Nobel, my husband; and me.

25        Q    Okay.  Ms. Agan, let me ask you to look at what has

                                                        Page -2-

1    been marked as State's Exhibit Number 1.  If you could, tell me
2    what that is.
3         A    Isaac.
4         Q    Okay.  Is that a fairly recent photo?
5         A    Yes, it seems -- it seems to be fairly recent.
6              MR. SIMPSON:  Okay.  Your Honor, we would move to
7         admit State's Exhibit Number 1.
8              THE COURT: Any objection?
9              MR. O'DELL: No objection, Your Honor.
10             THE COURT: Admitted without objection.
11             MR. SIMPSON: And to demonstrate, I'll show it to the
12        jury, Your Honor.
13             THE COURT: I'll remind the jury that you'll have this
14        photograph with you in the jury room at the appropriate
15        time.
16        Q    Ms. Agan, is that pretty much how he appeared shortly
17    before his death?
18        A    Yes, it is.
19        Q    And you said, I believe, that Isaac was a friend of
20    Joe's.  Would he come by your house very often?
21        A    Yes.  Sometimes every night, two or three times a
22    week.
23        Q    How did Isaac react with you?  How did he treat you?
24        A    Well, I felt like he was part of the family.  He
25    would always hug my neck when he came in the door and when he

1    left he'd hug my neck and told me goodbye.

2          Q     How did you treat him?

3          A     Just like one of my sons.

4          Q     How well did you know Isaac yourself?

5          A     Pretty well.  He and I had sat down several times and

6    just talked about general things, things that was on his mind.

7          Q     Would he talk to you about problems?

8          A     Yes.

9          Q     Just if something was bothering him he'd talk to you

10   about it?

11         A     If something was bothering him, yes.  He would talk.

12         Q     Did you consider yourself as having a trusting

13   relationship with Isaac?

14         A     We did, because we laughed and said, uh-oh, I think

15   we know too much about each other, you know, kind of laughed.

16         Q     Did y'all have a loving relationship?

17         A     Yes.  He was part of the family.  He was like my son.

18         Q     Now I believe you have mentioned in another hearing

19   that Isaac has even cut firewood for you?

20         A     He brought me a load of firewood, yes.  He just had

21   this -- he was hyper.  I was hyper.  And I'd get out with him

22   and we'd unload firewood at night.

23         Q     Okay. Ms. Agan, I'm going to show you what has been

24   marked as State's Exhibit Number 2.  And, if you would, tell us

25   what that is.

1        A     That's his truck.

2        Q     Okay.  Was that the truck he would come over to your

3   house in?

4        A     That's it.

5        Q     Now within that photo appears to be a trailer.  Was

6   that what he used to cut firewood with?

7        A     Yeah.  That's what he used to cut firewood with.

8   That's what we unloaded at the house that night.

9             MR. SIMPSON:  Okay.  Your Honor, we move to admit

10        State's 2.

11             MR. ABERNATHY: That'd be in without objection, Judge.

12             THE COURT: It's admitted.

13        Q     Now, Ms. Agan, how familiar were you with his truck?

14   Had you seen it a number of times?

15        A     Oh, yes, several times, ridden in it, ridden in the

16   back.

17        Q     Okay.  Now, on the front of the truck here there

18   appears to be something attached to the grill.  What was that?

19        A     I don't know if they were fog lights.  I don't really

20   remember.  I remember a couple of times he wrecked the truck

21   and the front would have to be redone, and I didn't know if he

22   had something newer put on the front.

23        Q     Well, it was a grill of some type, was it not?

24        A     Yeah, something was there, but I can't really

25   remember.

1       Q    Okay.  You can't really see it from this side photo,
2    can you?
3       A    No, sir.
4       Q    Now, in December, roughly around -- just shortly
5    before Christmas, did Isaac come over unannounced to your house
6    one night?
7       A    Yes.  He sure did.  I was on the phone with my
8    husband.  My husband traveled during the week and would call,
9    and I was on the phone with him, and there was this knock,
10   knock, knock at the door.
11      Q    Was Joe there at the time?
12      A    Joe was not there.  He was on his way home from
13   school, and I thought he had left his key.  I thought it was
14   him, because it happened so quick.
15      Q    So, when you heard the knocking on the door, what
16   happened?
17      A    I got up and headed toward the door, and he was
18   pushing on the door and he was hollering, Vonne, let me in, let
19   me in, let me in.
20           And I opened the door, and it was Isaac.
21      Q    Okay.  Was he excited?
22      A    Yes.
23      Q    All right.  So you let him in.  What did he do?
24      A    I said, Isaac, what's wrong?
25           He said, they're chasing me.

1        And I said, what?  What do you mean, they are chasing you?
2    I said, where's your truck?  What are you driving?
3        He said, I pulled it around behind your house.
4        We have a double carport with a -- the wooden deck with
5    the lattice work.  And I said, you pulled it behind the house?
6        He said, yeah.
7        And I said, who is chasing you?
8        And he said, well, I went home a while ago, and I pulled
9    down the driveway, and they were backed down my driveway, Joey
10   Watkins and them.
11       And I said, who is Joey Watkins?
12       Well, you know, that girl I dated that one time?
13       And I said, yeah.
14       And he said, well, maybe it was two times, and we did go
15   to the show once but not together.
16       And I said, why are you hiding?
17       He said, they're chasing me through the woods, said
18   they've been -- he said, I can't tell.  It sounds like they --
19   I just don't know.
20       He was trying to say he didn't know what they were
21   throwing at him, doing, I don't know.  And I said, give me the
22   keys to your truck.
23       He said, what are you going to do?
24       I said, I'm going to move it, because if they're going --
25   he said, they're shining lights through the woods trying to

1    find my truck, and it having that chrome on it would have

2    bounced really good, and I said, give me the keys to the truck.

3        I'll move it.

4        And I said, no, you don't know where the septic tank is

5    and you're liable to fall in that septic tank.

6        Q    So you went out and moved the truck?

7        A    And I went out and moved the truck under my kitchen

8    window, took the covering off the woodpile, laid two pieces of

9    wood on it just to cover up the shiniest part of the truck, and

10    I came back in, and he was just pacing around my kitchen table,

11    just pacing and just sweating, and I said, what is wrong?  I

12    grabbed him and he was just shaking so bad I couldn't hold him

13    down.

14        And he said, where's Joe?

15        And I said, he's supposed to be on his way home.  And then

16    I said, no, wait a minute.  Joe's not coming home tonight.  I

17    said, he was going over and spending the night at John

18    Thacker's house.  He was on his way to John's house.  I said,

19    do you want me to get him on the phone?

20        No.  No.  I'll talk to you.  I'd rather talk to you.

21        And I said, well, sit down.

22        So I --

23        Q    Now, when he was -- as you were going through this

24    with him and he was talking to you, again, how was he acting?

25    Was he --

1       A    Scared to death.  Just scared.  Pacing.  I can't --

2  you know, whatever he did, it was just -- like he'd sit a chair

3  in the floor and walk around the chair.

4       Q    Nervous energy?

5       A    Nervous energy.  Again, the hyperness came out, you

6  know, and he straightened up everything in the house.  I mean,

7  you know, we was in that one room.

8       Q    Well, did you ever get him to just -- Isaac, sit

9  down, calm down?

10       A    Yes.  I said, come here.

11      I grabbed him up and held him, and I said, now, shake as

12  much as you need -- you know, just shake, and he just shook

13  just like this.

14      And I finally got him to calm down, and I sat him in the

15  chair, threw a washcloth over his face, and I said, now, tell

16  me -- let's go ahead and call the police.  If they're -- if

17  somebody is chasing you with a light and you think they're

18  doing something else to you, let's call the police.

19       Q    What did he do?  What did he say?

20       A    He said, no, they're not going to believe me.

21      I said, let's call your mom and dad, and I can't remember

22  where they were at.  I don't know if they were home in the bed

23  or out of town.  I just -- I can't remember.

24      And he said, I want to spend the night here with you.

25      And I said, well, now, you know Joe's not going to be

1   here.

2       He said, I want to sleep -- I said, you can sleep in Joe's

3   bed.

4       And he said, I want to sleep on the couch in the

5   livingroom and I want the front blinds pulled up so I can see

6   the cars.

7       Q    And did he do that?

8       A    Yes, he did that.  And I went and got in the bed and

9   threw the covers back, and I said, uh-huh.  I've got to sit up

10  with somebody that's that scared.  I mean, -- so I went in

11  there, and I said, well, what do you think happened?

12      And he says, I don't know.  I just don't know.

13      And I said, -- not too long before this he had become a

14  Christian, and I said, have you got you a cross with you?

15      And he said, yes.

16      I said, just hold it in your hand.

17      Q    How long did you sit with him?

18      A    Probably off and on all night long, because I didn't

19  -- I'd go lay down and I'd get up, and then he would be sitting

20  up looking at me.  He never laid down.  So I just --

21      Q    Did you ever see him sleeping that night?

22      A    No, none.  I did not.  He got up that next morning.

23  I had dozed off kind of like this, and he got up the next

24  morning early like five something to go and he was going to go

25  start cutting wood, and I said, did you even go to sleep last

Page -10-

1    night?

2         And he said, no.  And he said, you just went to sleep

3    awhile ago and said, I'm going to take my shower.  And then I

4    said, are you going call the -- are you going to talk to your

5    dad about this?  You going to go ahead and talk to him, I said,

6    because, you know, you can tell them more -- I'm just -- mine's

7    just what you've told me.

8         And I said, talk to them, and he said, they're not going

9    to believe me.

10        I said, talk to them.  Tell them to call me.  I'll go with

11   you.

12        So every time I'd see him, I'd tell him, have you talked

13   to your Mom and Daddy?

14        But they're not bothering me.

15        I said, are you sure?

16        I'm sure.

17        And I said, --

18   Q    So he never told his Mom and Dad?

19   A    [Shakes head negatively.]

20   Q    Ms. Agan, how shortly before Christmas was this?

21   A    This was probably, I'd say the -- it was after the --

22   he brought a load of wood to the house in November, so it would

23   probably be around the first full week of December.  I'd say

24   around the first full week.

25   Q    Yeah.

Page -11-

1     A     Somewhere around there.

2     Q     Ms. Agan, forgive me, but let me just simply ask you

3     this.  You currently have pending criminal charges in the

4     district attorney's office?

5     A     Yes, I do.

6     Q     Has anyone promised you anything or shown you the

7     slightest hope or benefit for your testimony?

8     A     No, sir.  No one has mentioned anything, and I

9     haven't either.  This is for Isaac.

10    Q     You loved Isaac too, didn't you?

11    A     I loved him.  I have his graduation pictures.  I have

12    pictures -- he was supposed to be Joe's best man at his wedding

13    last fall, and all we could use was a candle and a picture, and

14    we did that.  But he was there.

15    Q     Thank you, Ms. Agan.

16    A     Okay.

17          THE COURT: Mr. Abernathy?

18          MR. ABERNATHY: Thank you, Judge.   Thank you, Mr.

19    Simpson.

20                    * * * * * * * * * * * * * * * * * *

21                         CROSS-EXAMINATION

22    BY MR. ABERNATHY:

23    Q     Ms. Agan, I'm Rex Abernathy, representing, assisting

24    Mr. O'Dell with the representation of Mr. Mark Free.

25    A     Yes, sir.

Page -12-

1        Q    You and I had, I think, two occasions to talk before?

2   Once on Saturday?

3        A    Uh-huh.

4        Q    Back before --

5        A    That's correct.

6        Q    -- the trial of Joey Watkins?

7        A    Uh-huh.  Yes.

8        Q    The Saturday before the trial started on Monday?

9        A    Yes, sir.

10       Q    And we had an occasion to talk during the trial?

11       A    Yes, sir.

12       Q    Now, you say that you're -- and I don't dispute this

13   -- you're real good friends with the Dawkins and their family?

14       A    Well, mostly Isaac.  I knew of his mom and dad, but

15   just Isaac because of Joe.

16       Q    Mostly -- mostly Isaac Dawkins?

17       A    Yes.  Yes, sir.

18       Q    And, when this event you've just described to the

19   ladies and gentlemen of the jury, you say that was Christmas of

20   '99?

21       A    Yes.

22       Q    Somewhere before Christmas?

23       A    Yes.  Uh-huh.

24       Q    And you didn't tell anyone about this, did you?

25       A    My husband.

1      Q    When did you tell him?

2      A    Well, he was on the phone that night when Isaac was

3  trying to get in the backdoor, and he talked to Isaac for a

4  little bit.

5      Q    He talked to Isaac?

6      A    Just for a moment.  He just said, hey, I'm going to

7  let you go so you can talk to Vonne.

8      Q    And that's the only person you ever told?

9      A    Uh-huh.

10     Q    Until Friday, almost -- well, the Friday before the

11  trial of Joey Watkins?

12     A    That's correct. I --

13     Q    And that was June the 25th of 2001?

14     A    Yeah, I guess.  That's -- I saw Stanley Sutton at a

15  wedding, and -- but I never --

16     Q    And you didn't bother to tell him then, did you?

17     A    Well, I needed to talk to him, but that wasn't the

18  place to do it.  His nephew.

19     Q    Okay.  And you didn't tell your good friends, the

20  Dawkins, what had happened?

21     A    No.

22     Q    Didn't tell Mr. Dawkins and Ms. Dawkins about what

23  happened to their son, someone was shooting at him?

24     A    Well, no, I did not.

25     Q    Did it ever cross your mind to tell them?

Page -14-

```
1          A     Yes, it did.

2          Q     Before a year and a half?

3          A     Oh, yes, it did.

4          Q     But you decided not to?

5          A     That's correct.

6          Q     And you also decided not to call the police when this

7    happened?

8          A     Right.  I left it up to him.

9          Q     All right.  And then, after December of '99, when

10   this incident you say happened, you described, --

11         A     Uh-huh.

12         Q     -- when your friend, Isaac Dawkins, was killed, you

13   didn't think to tell anyone then either, did you?

14         A     Oh, yes, I did.

15         Q     Well, you didn't tell anyone, did you?

16         A     I did not.

17         Q     Well, these pending charges that you have, --

18         A     That's correct.

19         Q     -- when were they brought?

20         A     They were brought up June -- well, it was Father's

21   Day weekend of '99.

22         Q     So they were pending?

23         A     Uh-huh.

24         Q     When all of this incident you described happened?

25         A     Correct.
```

Page -15-

1       Q      And where were you working at back when you got these
2   charges levied against you?
3       A      Georgia State Patrol.
4       Q      Working out at the Georgia State Patrol on Martha
5   Berry Highway?
6       A      That's correct.
7       Q      And in regards to these charges, they are still
8   pending in the court?
9       A      That is correct.
10      Q      In this court?
11      A      That is correct.
12      Q      Floyd County?  And you -- that's -- they were brought
13  June of '99?
14      A      June of '99 is when I was indicted by the grand jury.
15      Q      Okay.  And today they're still pending, February of
16  2003?
17      A      That is correct.
18      Q      And isn't it true, Ms. Agan, that you talked to --
19  you're friends with Mr. Sutton, too, aren't you?
20      A      Uh-huh.
21      Q      What?  I'm sorry?
22      A      Yes.
23      Q      Pretty good friends with him, aren't you?
24      A      Yes.
25      Q      And isn't it true that you talked to Mr. Sutton and I

Page -16-

1  think then Ms. Colston, the district attorney, former district

2  attorney, about a deal to be worked if you could testify in

3  this case, didn't you?

4       A    No.

5       Q    Never mentioned it?

6       A    Never mentioned it.

7       Q    Did you -- well, when did you first tell them?  Was

8  it the Friday before Joey Watkins' trial started on a Monday?

9       A    My husband called Mr. Sutton.  Our son came home and

10  told us the trial was supposed to start, I guess on a Monday,

11  and I said, well, evidently what I needed to say goes along

12  with my other pending charges.  No one seems to care.  I said,

13  -- Stanley never got around to calling me.

14       Q    Well, no one knew to care, because you hadn't told

15  anyone, had you?

16       A    I told Stanley at the wedding.

17       Q    You told him what happened at this wedding you

18  attended?

19       A    I told him I needed to talk with him about what

20  happened to Isaac, it was very important.

21       Q    And, of course, this was all about Joey Watkins?  You

22  don't know Mr. Free, do you?

23       A    No, I do not.

24       Q    Never heard of him?

25       A    Well, only just through --

1      Q    Only through --

2      A    -- names.  Yeah, just the name.

3      Q   And, when you decided -- well, let me ask you this.

4  The charges are still pending.  They have not been

5  dispositioned.  And you say you have not talked to anyone about

6  any favors in regards to those charges?

7      A    That's correct.  My attorney cannot seem to get it

8  brought to trial.  It keeps being pulled out of the stack for

9  some reason.

10     Q    It wouldn't have anything to do with your testimony

11  in this case, would it?

12     A    You'd have to ask them.  I would not know.

13     Q    You just don't know.  And, when you -- this night --

14  let's go back to the night you've described when Isaac came in

15  your house.

16     You said you were on the phone with your husband?

17     A    Yes.

18     Q    And did you and your husband discuss this in detail?

19     A    Oh, yes.

20     Q    And who was at your home that night when Isaac

21  Dawkins showed up?

22     A    Isaac.  No one -- no one was there, just me by

23  myself.

24     Q    All right.  Now, where did you tell the ladies and

25  gentlemen of the jury your son had gone?

Page -18-

1   A He had gone to a friend's house to spend the night,
2 probably two miles away.

3   Q Two miles away?  And did you call -- you never told
4 him about this, did you?

5   A Yes, I told him about it.

6   Q You did tell him about it?

7   A I told Joe about it.

8   Q When did you tell him?

9   A I told him immediately after it happened, when he
10 came home the next night.

11   Q Well, do you recall your testimony in the prior case?
12 You said you told no one?

13   A I told Joe because of Isaac talking to him.  Isaac
14 had already cornered him and told him that he had spent the
15 night at the house on the couch.

16   Q Who had said he'd spent the night on --

17   A Isaac told Joe that.

18   Q And when was this that he told you?

19   A I don't really know.  I know it's probably within a
20 couple of weeks after the original visit by Isaac.

21   Q And so your testimony now is that you told your
22 husband?

23   A Uh-huh.

24   Q And you told your son, Joe?

25   A Uh-huh.

Page -19-

1      Q    And, as far as the pending charges you have in this
2  court, Ms. Agan, is it a felony charge?

3      A    Oh, yeah.  One is a felony.

4      Q    And is it involving your work out at the State
5  Patrol?

6           MR. SIMPSON: Your Honor, --

7      A    You've already said that, sir.

8           MR. SIMPSON: The Court ruled on the other.

9           THE COURT: You can't -- you can't go into that.

10          MR. ABERNATHY: Okay, Judge.  I'm not particularly --

11          THE COURT: You can't go into the specifics of --

12          MR. ABERNATHY: All right.

13          THE COURT:  -- the alleged offense.

14          MR. ABERNATHY: I understand.  For the record, if I
15  may state my objection, Your Honor?  If I -- I'm not
16  attempting to impeach her with her felony charge.  What
17  I'm attempting to do is question her regarding her bias
18  and motive through a thorough and sifting cross-
19  examination about her bias and motive with regards to her
20  pending charges.

21          THE COURT: You've already done that.  The specifics
22  of the charge are not admissible --

23          MR. ABERNATHY: Thank you, Judge.

24          THE COURT:  -- as impeachment.

25          MR. ABERNATHY: -- for the objection.

1    Q    Now, when -- and you told this story to Ms. -- to Mr.

2    Sutton and Ms. Colston the Friday before the other trial

3    started on Monday?

4    A    That's correct.

5    Q    And do you recall me calling you or Ms. Colston

6    calling me Saturday before the trial started Monday?

7    A    I recall you calling.

8    Q    You recall me calling you?

9    A    Yes.  Uh-huh.

10   Q    And do you recall telling me at that time that you

11   had read it in the paper?

12   A    No, I didn't -- I told you I had not read it in the

13   paper.  You kept asking me had I read it in the paper, and I

14   told you I did not read Saturday's paper, and you kept telling

15   me it was printed in Saturday's paper, and I said, no, my son

16   told me that.  Now, you said, but you read it in Saturday's

17   paper, and I said, no, I didn't read it in the paper.  My son

18   came home and told me the trial was supposed to start.

19   Q    When did he tell you that?

20   A    He came home and told me Friday night.

21   Q    Did you tell -- do you recall testifying earlier that

22   you were reading Wednesday's paper?

23   A    I read -- yes, I read Wednesday's paper.

24   Q    You read Wednesday's paper.  And, Ms. Agan, when I

25   asked you how you knew about it, you didn't tell me you had

1    read it in the paper?

2         A    No, I did not.  Just like I told you before, I did

3    not.

4         Q    And you don't know Mr. Free over here?

5         A    No.

6         Q    Never heard his name mentioned in regards to this

7    case?

8         A    I've heard his name mentioned.

9         Q    Well, I mean, you didn't know anything about it until

10   you talked to the police?

11        A    I didn't know anything about it until the paper had

12   his name in it.

13        Q    I believe that's all I have, Judge.  Mr. Simpson.

14             THE COURT: Mr. Simpson, anything further?

15             MR. SIMPSON: Yes, sir.

16                  ************************

17                      REDIRECT EXAMINATION

18   BY MR. SIMPSON:

19        Q    Ms. Agan, Mr. Abernathy has asked you why your

20   charges have not gone forward.  In fact, you have gone through

21   a change of attorney, have you not?

22        A    Yes.  I had to go through a change of attorney, plus

23   I had to wait on a merit hearing.  I went through a merit

24   hearing trial, a conference, whatever.  It started in May and

25   then was supposed to hear back in three weeks and got the

1   results from it in December after the grand jury indicted me

2   Father's Day weekend in June.

3       Q    Okay.  Did you have trouble with you former attorney?

4       A    Oh, yes.

5       Q    All right.  So that led you to seek a second

6   attorney?

7       A    Yes, sir, it did.

8       Q    And has that attorney been in talks with the district

9   attorney's office?

10      A    He has.  We have gotten one court date and for some

11  reason it was at the end of November.  It was supposed to be in

12  December, go to court, and just right before the court date,

13  got canceled.  He went up to check on it and he said, it's

14  gone.  It's gone from the stack.

15      Q    Okay.  Have you had any indication that someone in

16  the DA's office has held your case back for your testimony?

17      A    I don't know.  That's what I asked my attorney.  I

18  said, why is it being held back?  I said, I want this over

19  with.  You know, this is too long to have to wait on anything.

20      Q    Okay.  And, if you know, do you know whether or not I

21  am the district attorney handling that case?

22      A    I don't know who is --

23      Q    Okay.

24      A    I don't know.

25      Q    Okay.  In so far as your not calling the police at

Page -23-

1    the time that this happened, were you treating Isaac as an

2    adult that he was?

3         A    I don't guess I was, not really.  Maybe I was

4    treating him more like a scared son.

5         Q    Yeah.

6         A    Maybe that was what -- why I didn't immediately pick

7    up the phone.  He -- my main goal was to get him calmed down,

8    and I look back on it and, you know, I should have called the

9    police, but I felt like he should talk to his parents and then

10   I would have called them then.

11        Q    Another thing Mr. Abernathy asked you was about Isaac

12   saying something about someone shooting at him.  Did he tell

13   you that too?

14        A    He told me he thought they were shooting at him, but

15   he said, I don't know if I was hearing right or not.  Maybe

16   they weren't.  Maybe they were just throwing things at me, but

17   said, Vonne, it sounds like they are, but I can't swear to it.

18        Q    Okay.  Thank you, Ms. Agan.

19        A    Okay.

20             THE COURT: Anything else, Mr. Abernathy?

21             MR. ABERNATHY: Just a couple of questions, Judge.

22                    *********************

23                    RECROSS-EXAMINATION

24   BY MR. ABERNATHY:

25        Q    Ms. Agan, in your testimony in the prior case?

1          A      Yes, sir.

2          Q      Do you recall me asking you that you still told no

3    one about this incident and you said that is correct?

4          A      That is --

5          Q      Do you recall that testimony?

6          A      That is -- that's -- yes, I do.

7          Q      And there's nowhere -- you didn't ever say that you

8    had told your son, Joe, about it, did you?

9          A      No.   I never did.

10         Q      Okay.   That's what you're telling today?   Is that

11   right? Testimony as to that?

12         A      After I -- he came to me after Isaac talked to him

13   about it.

14         Q      How long ago -- how long after this incident was

15   that?

16         A      It was -- it was a while afterwards.

17         Q      But you still never thought to tell your good

18   friends, his parents?

19         A      They're not my good friends, sir.   I'm telling you

20   they're not.

21         Q      Okay.

22         A      I mean, they are -- I know them.   They are friends.

23   But, I knew Isaac more than them.

24         Q      And do you recall when I asked you before about you

25   telling me you read it in Saturday's paper, --

Page -25-

1          MR. SIMPSON: Your Honor, if it'd please the Court,

2      the proper way would be -- I think would be to show the

3      witness the testimony, the transcript.

4          MR. ABERNATHY: Judge, I have to ask her first.  If

5      she doesn't remember, then we'll show her the transcript,

6      I think is the proper way, but I'll be happy to do it any

7      way the Court wants me to.

8          THE COURT: Well, you've already -- you've already

9      asked her this a couple of times.  You can show her --

10      show her that and see if she remembers it, and ask her if

11      that's what she said.

12      Q    Do you recall me asking you: I thought you told me

13  you read the Saturday paper?  You said, no, I didn't have a

14  Saturday paper.  Is that correct?

15      A    That's correct.  I did not read it in Saturday's

16  paper.

17      Q    And I said, you didn't have Saturday's paper?

18      A    I had it, but I didn't -- had not read it.

19      Q    And you said what?

20      A    I was looking at Wednesday night's paper.

21      Q    You didn't say anything here about I told you that it

22  was in Saturday's paper?

23      A    You told me it was in Saturday's paper.

24      Q    But you never mentioned that before, did you?

25      A    No, but you just told me -- you knew it was in

Page -26-

1    Saturday's paper, Ms. Agan.

2         Q    I have nothing else for this witness, Judge.

3                   ************************

4                FURTHER REDIRECT EXAMINATION

5    BY MR. SIMPSON:

6         Q    Continue with your answer, if you would, Ms. Agan.

7         A    You told me it was in Saturday's paper.  Why do you

8    read Wednesday's paper on Saturday?

9         I said, because I went back and re-read something.

10        Q    I have nothing further.

11             THE COURT: All right.  Ms. Agan, you can step

12        outside.  You may not discuss your testimony with anybody.

13        A    Yes, sir.

14             [Ms. Agan's testimony concludes.]

15                   ****************************

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3                       STATE OF GEORGIA)

4                       COUNTY OF FLOYD)

5

6      The foregoing transcript of the proceedings was taken by Brenda

7          Watson, former official for Judge Walter J. Matthews of the

8      Rome Judicial Circuit.  I, Melodie E. Taylor, worked under Ms.

9          Watson for over 10 years and am now the official for Judge

10     Matthews and therefore all tapes, recordings, transcripts and

11     evidence are under my jurisdiction and control and I have gone

12     over and reviewed said transcript and do hereby certify that it

13         is a true and correct copy of transcript of the proceedings

14         taken down by Ms. Watson and reduced to typewriting by her.

15                        This May 5, 2009.

16

17

18                    Melodie E. Taylor
19                    Certified Court Reporter
20                        CCR #105

1-877-389-6679

<u>COURT REPORTER'S CERTIFICATE</u>

GEORGIA, COFFEE COUNTY

I, Gwen Ricketson, being a Notary Public and Certified Court Reporter in and for the State of Georgia at large, certify that I reported the proceedings as stated in the caption and that the within and foregoing transcript, VOLUME III OF VOLUME III, is a true and accurate record of the proceedings as held therein.

I further certify that I bear no relationship to any of the parties in this cause, that I am not of counsel and have no personal or financial interest in the pending events or the outcome of this matter.

In witness whereof, I affix my hand and official seal this 26th day of February 2010.


Gwen Ricketson, CCR
Certificate Number B-2254

61

## CLERK'S CERTIFICATE

GEORGIA, CHARLTON COUNTY

     I, Kay Carter, Clerk of Charlton County Superior Court, do hereby certify that the within and foregoing TRANSCRIPT, VOLUME III OF VOLUME III, is the original copy filed in this office.

     Given under my hand and official seal this _____day of _____2010.


                             _____
                             Kay Carter, Clerk
                             Charlton County Superior Court