IN THE SUPERIOR COURT OF CHARLTON COUNTY
STATE OF GEORGIA

CHARLTON COUNTY, GEORGIA
FILED IN OFFICE
2011 DEC 28 AM 8: 14

JOSEPH WATKINS,　　　　　　　　*　　CIVIL ACTION NO.
GDC-1086941,　　　　　　　　　　*　　09-V-233
　　　　　　　　　　　　　　　　　*
　　　Petitioner,　　　　　　　*
　　　　　　　　　　　　　　　　　*
vs.　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
MICHELLE MARTIN, WARDEN,　　　*　　HABEAS CORPUS
　　　　　　　　　　　　　　　　　*
　　　Respondent.　　　　　　　*
　　　　　　　　　　　　　　　　　*

## FINAL ORDER

Petitioner, Joseph Watkins, filed a petition for writ
of habeas corpus, challenging the validity of his July 2001
Floyd County jury trial convictions for felony murder,
possession of a firearm during the commission of a crime,
and stalking.  Based upon the record as established at the
evidentiary hearing conducted on October 29, 2009, this
Court makes the following findings of fact and conclusions
of law and denies relief.

### I.　PROCEDURAL HISTORY

Petitioner, Joseph Samuel Watkins, was indicted on
January 26, 2001, by the Floyd County grand jury for the
malice murder of Isaac Dawkins; felony murder of Mr.
Dawkins, with aggravated assault as the underlying felony;
aggravated assault of Mr. Dawkins with a handgun, a deadly
weapon; possession of a firearm during the commission of a



crime; and stalking Mr. Dawkins.[1]   (Trial Court Record, pp. 4-8).   At a jury trial on June 21-July 2, 2001, Petitioner was found not guilty of malice murder and guilty of the remaining charges.   (Trial Court Record, p. 98-A).   The aggravated assault conviction merged with the felony murder, and Petitioner received a life sentence for felony murder, a five year consecutive sentence for possession of a firearm during the commission of a crime, and a twelve month sentence for stalking.   (Trial Court Record, p. 99). Petitioner's convictions and sentences were affirmed on May 19, 2003.   Watkins v. State, 276 Ga. 578, 581 S.E.2d 23 (2003).

On April 27, 2004, Petitioner filed a habeas corpus action in Gwinnett County with assistance of counsel, which was later transferred to this Court.   On or around July 15, 2009, Petitioner amended his claims, through new habeas counsel.   An evidentiary hearing was held on October 29, 2009, at which Petitioner amended the petition to proceed on two grounds only:   (1) ineffective assistance of counsel for failing to procure evidence showing Petitioner could not have been at the crime scene; and (2) Petitioner is "actually innocent" of the crimes of which he was convicted.   (HT. 3-4).

---

[1] Citations to testimony adduced at the October 29, 2009, habeas corpus hearing are "HT"; citations to documents admitted at that hearing are to the name and page number(s) within the document.

## II.  STATEMENT OF FACTS

The Georgia Supreme Court made the following findings of fact in Petitioner's appeal:

> Viewing the evidence in the light most favorable to the verdict, the jury was authorized to find that after Brianne Scarbrough ended her relationship with appellant, he began threatening and harassing anyone who subsequently dated her. After Dawkins began seeing Scarbrough in the summer of 1999, numerous incidents occurred during which appellant made threatening comments about Dawkins, attempted to get him to fight and followed Dawkins whenever he saw him, even when Dawkins was not with Scarbrough. A friend of appellant told police that it was appellant's "main goal every day" to find Dawkins. Evidence was presented from which the jury could find that as part of this threatening behavior appellant with his friends shot Dawkins' dog between the eyes while it was chained in its pen in the victim's yard. Witness Yvonne Agan testified that in late November or December 1999 Dawkins arrived at her home, terrified, and related that while driving to his own home, appellant had chased and fired a gun at him. Agan hid the victim's white Toyota truck and allowed him to sleep on her couch. Dawkins declined to let Agan report the matter because he believed the incidents would stop since he had stopped dating Scarbrough.
>
> Shortly after 7:00 p.m. on January 11, 2000, Dawkins was driving his truck north on Highway 27 after leaving his class at Floyd College. An occupant in a blue or green passenger car fired a shot through the truck's back window and hit Dawkins in the head. One eyewitness identified appellant as the shooter. The truck veered off the highway, crossed the median, crashed into a side rail and after rolling over came to a stop with its rear end facing north. While modifications to the front of the truck made it identifiable as belonging to Dawkins, only the rear of the vehicle was visible to traffic. An eyewitness to the crash phoned 911 and an

3

emergency vehicle was at the scene within three
minutes of the call. Appellant's cell phone
records established that he was in the area at
the time of the attack and when he arrived at his
destination, he was overheard telling his new
girlfriend that "his friend had just got killed."
It required medical scans at the hospital to
reveal the presence of the bullet in Dawkins'
head; the victim was pronounced dead the
following day.

The jury heard testimony that appellant initially
asked friends to give him an alibi for the time
of the shooting. Thereafter in his comments to
others, appellant gave conflicting stories
regarding what direction he was heading at the
time of the shooting, with appellant claiming
that he saw the victim's truck on the side of the
road and thought Dawkins had possibly had a flat
tire. Later comments by appellant reflected the
fact that emergency vehicles were promptly at the
crash scene, although appellant had difficulty
explaining how he recognized that the crashed
truck was the victim's. Appellant was later
overheard in the local Home Depot parking lot
bragging about shooting the victim and witnesses
testified to comments made by appellant's
friends, who claimed to be in the car with
appellant, indicating that appellant shot the
victim. After the shooting, appellant told a
witness who was dating Scarbrough that if the
witness did not stop seeing her, "he [the
witness] would end up just like Isaac [Dawkins]."

Watkins, 276 Ga. at 578-79.

### III.   THE GROUNDS FOR RELIEF

#### GROUND ONE

In ground one, Petitioner claims he received

ineffective assistance of counsel because counsel did not

procure evidence necessary to show he could not have been

at the crime scene.  Specifically, Petitioner alleges that

4

cell phone tower evidence showed that he could not possibly
have been at the murder scene, the time logs for phone
calls showed that Petitioner would have to cover distances
in, basically, impossible periods of time, and trial
counsel did not introduce this evidence at trial to secure
an acquittal.  (HT. 5-8).

<u>Findings of Fact and Conclusions of Law</u>

"The benchmark for judging any claim of
ineffectiveness must be whether counsel's conduct so
undermined the proper functioning of the adversarial
process that the trial cannot be relied on as having
produced a just result."  <u>Strickland v. Washington</u>, 466
U.S. 668, 686 (1989).

> A convicted defendant's claim that counsel's
> assistance was so defective as to require
> reversal of a conviction or death sentence has
> two components.  First, the defendant must show
> that counsel's performance was deficient.  This
> requires showing that counsel made errors so
> serious that counsel was not functioning as the
> 'counsel' guaranteed the defendant by the Sixth
> Amendment.  Second, the defendant must show that
> the deficient performance prejudiced the defense.
> This requires showing that counsel's errors were
> so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable.  Unless a
> defendant makes both showings, it cannot be said
> that the conviction or death sentence resulted
> from a breakdown in the adversary process that
> renders the result unreliable.

<u>Strickland</u>, 466 U.S. at 687.

Since a petitioner must satisfy both prongs of the Strickland test, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

As to the first or the attorney performance prong, this Court's scrutiny of an attorney's performance must be "highly deferential."  Strickland, 466 U.S. at 689.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Id.

A petitioner must identify the acts or omissions of counsel which he contends are unreasonable, while this Court determines "whether, in light of all the circumstances," the challenged action was outside the range of professional competent counsel. Id. at 690. Counsel is "strongly presumed" to have rendered effective assistance and made "all significant decisions in the exercise of reasonable professional judgment." Id. A defendant has the burden of proof to overcome the "strong presumption" that counsel's conduct falls within the range of reasonable

professional conduct and affirmatively show that the purported deficiencies in counsel's performance were indicative of ineffectiveness and not examples of a conscious, deliberate trial strategy.  Morgan v. State, 275 Ga. 222, 227, 564 S.E.2d 192 (2002).

At the habeas hearing, Petitioner presented the testimony of Dr. Paul Steffes, who is a professor of electrical and computer engineering at Georgia Tech in Atlanta.  (HT. 16).  Dr. Steffes asserted that he informed Petitioner's trial counsel that cell phone coverage maps and information supported Petitioner's defense theory, and he informed counsel of this opinion.  (HT. 18-19).  Dr. Steffes claimed that he offered to perform more precise testing on cell phone tower coverage; however, according to Dr. Steffes, trial counsel did not accept this offer because there was insufficient time and resources for this. (HT. 19-20).  Dr. Steffes did perform these tests over seven years later.  (HT. 21-22).

On cross-examination, Dr. Steffes admitted that he testified at Petitioner's criminal trial that Petitioner could not have made a cell phone call from the Floyd College area that hit off the Kingston Tower.  (HT. 28-29, 31).  This was consistent with the testimony he also provided to this Court.  (HT. 29, 34).

Bill O'Dell was Petitioner's co-counsel at trial.
(HT. 35, 36).  Part of the defense strategy was to show
that Petitioner could not have covered the distances
alleged by the State based on cell phone call evidence, and
they had retained a former Georgia state trooper to testify
about distances between key points near and at the murder
scene.  (HT. 37, 38, 39-42).  However, lead counsel Rex
Abernathy opted not to use the state trooper at trial,
which was contrary to Mr. O'Dell's thinking.  (HT. 43-44).

Lead counsel Rex Abernathy testified via a deposition
on November 17, 2009.  (Deposition of Rex Abernathy,
hereinafter "DRA.," p. 1).  Counsel stated that he spoke
with an expert witness about the cell phone tower evidence,
hired two investigators to look into the evidence, and
drove the distances involved himself.  (DRA. 17-18).
Counsel believed the cell phone tower evidence was "pretty
good" in supporting the defense's theory.  (DRA. 26, 47).
However, counsel did travel with an investigator the
distances involved and concluded that the state's theory
could also be supported by the cell phone tower evidence.
(DRA. 33, 34, 36, 38, 43).  Counsel had strategic reasons
for not putting forward certain evidence at Petitioner's
trial regarding the distances traveled and the cell phone
tower locations.  (DRA. 19-20).  He opted not to rely upon

the investigator-timed driving evidence because it was too
close to base the entire defense theory upon that alone.
(DRA. 43).  Counsel also opted to not put up evidence from
Petitioner's sister about when Petitioner left her house
because of certain discrepancies that would have called
into question the defense's credibility.  (DRA. 42).
Counsel did put up Dr. Steffes as a witness because he
thought he provided good evidence to support the defense's
theory of the case and Dr. Steffes indicated that he was
prepared to testify at Petitioner's trial.  (DRA. 47, 51).
Counsel also believed that Petitioner's co-defendant, Mark
Free, got a different trial result than Petitioner because
Petitioner had a lengthy and troublesome past history with
the victim, the cell phone at question near the crime scene
belonged to Petitioner, and the evidence was more strongly
stacked against Petitioner.  (DRA. 18-19).

     In Petitioner's criminal case, the record bears out
that trial counsel did argue at trial that the state's
theory was not born out by the cell phone tower evidence.
This included putting forward evidence from Dr. Paul
Steffes that Petitioner could not possibly have covered the
distances alleged by the prosecution according to the cell
phone towers.  (Trial Transcript, pp. 1383-84, 1385, 1386-
87, 1388).

This Court concludes that counsel did get the information before the trial jury that he now claims he did not: namely, that there was no way Petitioner could have been near the murder scene based on the cellular tower evidence.

The remaining question is whether counsel had a duty to put all evidence before the jury.  As mentioned above, counsel did not use testimony from the investigator who drove the distances because counsel thought the driving evidence was not as strong, and could even possibly support the state's case.

> Decisions about which witnesses to call and whether to object to a particular jury charge are generally matters of trial strategy, *Nicely v. State*, 277 Ga. App. 140, 142 (2) (625 SE2d 538) (2006), and provide no grounds for reversal unless they are so patently unreasonable that no competent attorney would have chosen that tactic. *Godfrey v. State*, 274 Ga. App. 237, 239 (1) (a) (617 SE2d 213) (2005).

*Allen v. State*, 281 Ga. App. 294, 296, 635 S.E.2d 884 (2006).

Petitioner alleges that trial counsel's decision to not tie up the distances alleged with the time records from the cell phone calls was a key error that contributed to the jury's verdict.  (Brief In Support Of Petition, pp. 5-6).  What Petitioner does not acknowledge is that evidence of the distances involved was put before the trial jury via

maps.  (Trial Transcript, State's Ex. 29 and 30).  The issues of Petitioner making a cell phone call that hit off the Kingston cell tower at 7:15 p.m. and the 911 call being made to dispatch at 7:19 p.m. were also put before the jury by witness testimony.  (Trial Transcript, pp. 335-37, 578, 594-95; State's Ex. 31, p. 1).

Furthermore, Petitioner ignores the similar transaction evidence introduced by the prosecution to show the deep-seated animosity that Petitioner had for the victim.  Trial counsel believed this was a far more significant factor in the jury finding Petitioner guilty at trial.  (DRA., p. 11).  Counsel tried to exclude this similar transaction evidence from trial.  (Trial Transcript, pp. 15-17, 21-53).

Thus, counsel made a reasonable strategic decision when he opted not to put up the investigator about the time-distance evidence.  This evidence was indirectly put before the jury through exhibits and testimony, an expert witness already discussed the impossibility of Petitioner's cell phone being near the crime scene, and this evidence was not the major part of the prosecution's case that lead to Petitioner's convictions.  This Court concludes that counsel was effective and ground one provides no relief.

Petitioner also alleges that the time-distance evidence was critical to refute Barry Mullinax's testimony that Petitioner was observed shooting into the victim's truck on the night of the murder. (Post-Hearing Brief of Petitioner, p. 13). However, the record bears out that trial co-counsel instead sought to refute Mr. Mullinax's testimony by showing its factual impossibility. He characterized it as an "intriguing story," questioning why Mr. Mullinax did not call the police after seeing the shot fired, how he could have seen what he did while traveling at a high rate of speed, why Mr. Mullinax cannot remember key details like who was in the car with him, why he did not stop for the victim after his vehicle crashed, and why he told no one else about the events he witnessed that night. (HT. 260, 261, 262-63, 267-68, 270, 271, 276-77, 279). Petitioner's own brief cites to additional evidence presented by Detective Jim Moser regarding the inconsistencies in Mr. Mullinax's testimony. (Post-Hearing Brief of Petitioner, p. 13). The time-date evidence would merely have been cumulative of other evidence that counsel used to discredit Mr. Mullinax's testimony.

Petitioner takes note that the Georgia Supreme Court opinion highlights Mr. Mullinax as the one party who identified Petitioner as the shooter. (Brief of

Petitioner, p. 13).  However, this detail does not reflect the other evidence cited by the Georgia Supreme Court which stated: "Appellant was later overheard in the local Home Depot parking lot bragging about shooting the victim and witnesses testified to comments made by appellant's friends, who claimed to be in the car with appellant, indicating that appellant shot the victim."  276 Ga. at 579.  Counsel was not ineffective for failing to submit additional evidence to the jury regarding the unreliability of Mr. Mullinax's testimony that would have been cumulative of that already before the trial court.

Petitioner next claims that counsel was ineffective for not showing discrepancies between witness Yvonne Agan's testimony at Petitioner's trial and that offered at co-defendant Mark Free's trial.  (Brief of Petitioner, pp. 8-9).  The difference cited by Petitioner was that, in Petitioner's case, Ms. Agan testified that the victim told her that Petitioner had shot at him, whereas at Free's trial she testified that Petitioner threw something at the victim.  Id.

Trial counsel thought Ms. Agan's testimony was fabricated.  (DRA. 22).  Counsel took great lengths to show her testimony was fabricated.  (Trial Transcript, pp. 1151, 1154, 1155-56, 1157, 1160).  It should also be noted that

Ms. Agan provided testimony in Petitioner's case *before* she testified at Mr. Free's trial.   (Trial Transcript, p. 1139; Free Trial Transcript Excerpt, Petitioner's Ex. 3, p. 1). Thus, there is no reasonable way that counsel could have known about any purported change in Ms. Agan's testimony. Counsel could not possibly be found ineffective on this issue.

Based upon the facts and argument cited above, Petitioner has failed to meet either prong of the Strickland test to show that counsel was ineffective. Ground one is denied.

GROUND TWO

In ground two, Petitioner claims he is "actually innocent" of the crimes for which he was convicted.

Findings of Fact and Conclusions of Law

The Georgia Supreme Court specifically found on direct appeal that the evidence authorized Petitioner's convictions beyond a reasonable doubt.   Watkins, 276 Ga. at 578(1).

Moreover, Georgia does not recognize an "actual innocence" exception in habeas corpus; "actual innocence" is a federal habeas corpus principle, as discussed below. Georgia has a "miscarriage of justice" exception in O.C.G.A. § 9-14-48(d).   "The miscarriage of justice

exception is an extremely high standard and is very
narrowly applied." <u>Walker v. Penn</u>, 271 Ga. 609, 611, 523
S.E.2d 325 (1999).   "[T]he term 'miscarriage of justice
exception' is not synonomous with procedural irregularity
or even reversible error." <u>Moore v. Kemp</u>, 254 Ga. 279,
280, 328 S.E.2d 725 (1985).

> To the contrary, it demands a much greater
> substance, approaching perhaps the imprisonment
> of one who, not only is *not* guilty of the
> specific offense for which he is convicted, but,
> further, is not even culpable in the
> circumstances under inquiry. (A plain example is
> a case of mistaken identity.)

<u>Valenzuela v. Newsome</u>, 253 Ga. 793, 694, 325 S.E.2d 370
(1985) (emphasis in original).

Petitioner cites to multiple federal court decisions
which all specify that "actual innocence" may be a basis
for federal habeas corpus relief. <u>See</u> Post-Hearing Brief
of Petitioner, p. 14 (*citing* <u>Schlup v. Delo</u>, 513 U.S. 298
(1995); <u>Herrera v. Collins</u>, 506 U.S. 390 (1993); and <u>Felker
v. Turpin</u>, 83 F.3d 1303 (11th Cir. 1996)).

The federal courts do recognize a narrow exception to
procedurally defaulted claims in a 28 U.S.C. § 2254
petition when a federal habeas corpus petitioner can
demonstrate that he is "actually innocent" of the
underlying convictions. <u>Dretke v. Haley</u>, 541 U.S. 386
(2004).

An "actual innocence" claim per se is not a basis for federal habeas corpus relief. <u>Herrera v. Collins</u>, 506 U.S. 390 (1993). A claim of "actual innocence" is ordinarily tied to the federal "miscarriage of justice" exception, which lies for a narrow category of cases where the petitioner has been unable to establish cause and actual prejudice to overcome the procedural default of another constitutional claim, and is a "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." <u>Schlup v. Delo</u>, 513 U.S. at 314-15, 321.

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

<u>Id.</u> at 325.

Georgia law specifies that habeas corpus is not to serve as a "second appeal." <u>Thompson v. Stinson</u>, 279 Ga. 196, 611 S.E.2d 29 (2005). Furthermore, Georgia courts have never explicitly recognized "actual innocence" as a viable remedy for procedurally defaulted claims. <u>Id.</u>

Consequently, ground two does not state a claim for

relief in habeas corpus pursuant to O.C.G.A. § 9-14-42. This Court denies relief accordingly.

CONCLUSION

Wherefore, this petition is DENIED.

If Petitioner desires to appeal this order, Petitioner must file a notice of appeal with the Clerk of the Superior Court of Charlton County within thirty (30) days from the date this order is filed. Petitioner must also file within the same thirty (30) day period a written application for a certificate of probable cause to appeal with the Clerk of the Supreme Court of Georgia.

The Clerk of the Superior Court of Charlton County is hereby DIRECTED to mail a copy of this order to Counsel for Petitioner, Respondent and the Office of the Attorney General.

SO ORDERED, this _21_ day of _Dec_____, 2011.

_____
MICHAEL DEVANE
Judge, Waycross Judicial Circuit

Prepared by:

_____
Jay C. Fisher
Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, Georgia 30334
(404) 656-3331

**SUPERIOR, STATE & JUVENILE COU**
KAY CARTER, Clerk
P.O. Box 760  ● 1520 A Third Street
Folkston, Georgia  31537



UNITED STATES POSTAGE
PITNEY BOWES
02  1P    $000.84⁰
0001054993   DEC 29 2011
MAILED FROM ZIP CODE 31537



JAN 03 2012

PAULA K. SMITH
SENIOR ASSISTANT ATTORNEY GENERAL
40 CAPITOL SQUARE, S.W.
ATLANTA,, GA 30334