Page 1

IN THE SUPERIOR COURT OF CHARLTON COUNTY
STATE OF GEORGIA

JOSEPH WATKINS,
    Petitioner,
                    CIVIL ACTION FILE
vs.
                          NO. 09-V-233
MICHELLE MARTIN, Warden,
    Respondent.

DEPOSITION OF
REX B. ABERNATHY

November 17, 2009
11:00 a.m.

40 Capitol Square
Atlanta, Georgia

Reported by: Michelle M. Boudreaux, CCR, RPR

Page 2

APPEARANCES OF COUNSEL

On behalf of the Petitioner:
    AUGUST "BUD" SIEMON, Esq.
    The Siemon Law Firm
    347 Dahlonega Street
    Building 100
    Cumming, Georgia 30040
    (770) 521-4316

On behalf of the Respondent:
    JASON C. FISHER, Esq.
    Office of the Attorney General
    40 Capitol Square, SW
    Atlanta, Georgia 30334
    (404) 656-3331

[RESPONDENT EXHIBIT 5]

Page 3

INDEX

EXAMINATION

Witness Name                      Page

REX B. ABERNATHY

    Examination By Mr. Fisher .................... 4

    Examination By Mr. Siemon .................... 24

    Further Examination By Mr. Fisher ............ 49

    Further Examination By Mr. Siemon ............ 53

Page 4

    REX B. ABERNATHY,
being first duly sworn, was examined and testified as
follows:
    MR. FISHER: This is going to be the
deposition of Rex Abernathy taken in the
matter of Watkins versus Martin. It's a
civil action that's pending in Charlton
County. The case number is 09-V -- Victor --
233.
    This deposition is taken for all
purposes allowed under the Georgia Civil
Practice Act. If it's all right with you,
we'll waive all objections except to the form
of question and responsiveness of the
answer.
    MR. SIEMON: That's fine.
    MR. FISHER: I haven't done this in a
while. Are there any other stipulations we
need to put on the record ahead of time or --
    MR. SIEMON: Well, we can -- if a
problem comes up, we can deal with it.
    MR. FISHER: All right, very good.
Okay. Mr. Abernathy has already been sworn.
    EXAMINATION
BY MR. FISHER:

Page 5

1  Q  If you could state your name for the record,
2  please.
3  A  Rex Barron Abernathy.
4  Q  Okay. And, Mr. Abernathy, what's your
5  occupation, please?
6  A  I'm an attorney.
7  Q  And can you state your business address for
8  the record?
9  A  9899 Commerce Street, Summerville, Georgia.
10 Q  Okay. Where did you attend law school, sir?
11 A  John Marshall.
12 Q  What year did you graduate?
13 A  '95.
14 Q  And what year were you admitted to the
15 Georgia Bar?
16 A  Passed the Bar the first time and was
17 admitted, I think, early '96.
18 Q  Okay. And since becoming a member of the
19 Georgia Bar, have you been consistently employed as an
20 attorney from that time up until the present?
21 A  I've worked from that time with Cook &
22 Connelly in Summerville, Georgia. I've been a criminal
23 defense attorney since that time.
24 Q  Okay. Did you represent Mr. Joseph Watkins
25 in a criminal matter in Floyd County?

Page 6

1  A  I did.
2  Q  Okay. And can you please describe for the
3  record the composition of your practice, what
4  percentage was devoted to civil matters and what
5  percentage was criminal matters?
6  A  My practice is devoted about 90 percent
7  criminal matters and 10 percent general practice.
8  Q  Okay. Prior to representing Mr. Watkins in
9  the matter in Floyd County, had you represented other
10 clients with similar charges to the one that -- or ones
11 that he was facing in Floyd?
12 A  I have. I've represented numerous people
13 charged with various offenses, from small offenses to
14 murder cases, and several murder cases.
15 Q  Okay. In this particular matter, was there a
16 co-counsel?
17 A  Yes.
18 Q  What was that individual's name?
19 A  Bill O'Dell.
20 Q  Okay. Can you describe for the record at
21 what stage of the proceedings -- or actually, if you
22 could strike that, please.
23     Were you retained or appointed in this
24 particular matter?
25 A  Retained.

Page 7

1  Q  Okay. And can you please describe at what
2  stage of the proceedings you were retained? Was there
3  already an indictment, or was it pre-indictment?
4  A  I don't remember at this time, but I was
5  retained early on.
6  Q  Okay.
7  A  I think -- I just -- I don't know if it was
8  prior to indictment or not, but it was early enough
9  that all motions were filed, accepted in a timely
10 manner, and we moved forward with quite a lengthy
11 investigation, so we had plenty of time.
12 Q  Okay. And do you happen to recall the names
13 of any witnesses that Mr. Watkins wanted you to
14 interview on his behalf?
15 A  I do not recall any names, but we left no
16 stone unturned and we interviewed many people, many who
17 were not witnesses at trial. But we had two
18 investigators, as I recall, on the case; and we, you
19 know, investigated the case in detail.
20 Q  Okay. There was also a co-defendant in this
21 particular matter, was there not?
22 A  There was what?
23 Q  A co-defendant.
24 A  Yes.
25 Q  And that individual's name was Mark Free; is

Page 8

1  that correct?
2  A  I think that's correct.
3  Q  Okay. And were you involved at all in
4  Mr. Free's case as well?
5  A  Yes, I was counsel on that case as well.
6  Q  Okay. Going back specifically to
7  Mr. Watkins' case, you said that you conducted a
8  lengthy investigation. Is this something that you did
9  individually, or did you retain an investigator to do
10 the legwork?
11 A  We have an investigator at our office that
12 works full-time; and I retained a separate
13 investigator, as well, for this case.
14 Q  Okay. And were these the individuals who
15 did the interviews with the witnesses, et cetera,
16 et cetera?
17 A  Yes.
18 Q  Okay. Regarding the --
19 A  And I interviewed some witnesses as well.
20 Q  Okay. Regarding the discovery in this
21 matter, amongst the motions you said you filed in this
22 particular case, do you recall filing any discovery
23 motions as well?
24 A  I recall that I did file motions. I'm not
25 sure what all -- the motions I filed at this point in

Page 9

1  time. I don't remember what I filed, but I filed
2  numerous motions.
3      Q   Okay. And do you have any kind of
4  relationship with the district attorney's office in
5  that particular area that would permit you access to
6  their file under what's called, I guess, typically an
7  open file policy or --
8      A   They do have one, and I do have a
9  relationship with them, and I have that and I had that
10 at the time with Ms. Colston, who was the district
11 attorney.
12     Q   Okay. Do you recall taking advantage of the
13 open file policy in this particular matter?
14     A   I do.
15     Q   Okay. Regarding your discovery and
16 investigation of this matter, were you able to
17 formulate any particular defense on Mr. Watkins' behalf
18 to the charges against him in the case?
19     A   Yes, we formed a defense in the case. It's
20 been quite some time. I don't recall all of the issues
21 regarding the case and the defense, but we formulated
22 what I thought at the time the best defense for
23 Mr. Watkins.
24     Q   Okay. And what was that defense, if you can
25 just identify it in particular, please?

Page 10

1      A   He didn't do it, or at least there was
2  reasonable doubt that he didn't do it.
3      Q   Okay.
4      A   And we also hired an expert and we, you know,
5  used that to prop up our defense.
6      Q   Okay. And do you recall the nature of this
7  expert? What was that particular person's field of
8  expertise?
9      A   Yes. This was one of -- I don't know that I
10 could say the similar case, but this was one of the
11 early cases with the use of cell phone and towers
12 related to that. And this was a full professor at
13 Georgia Tech. I don't recall his name.
14     MR. SIEMON: Paul Steffes?
15     THE WITNESS: Steffes, I think maybe --
16     MR. SIEMON: Does that refresh your
17 recollection?
18     THE WITNESS: That may be correct. And
19 he was a professor at Georgia Tech and a
20 leader in the field at the time, and he was
21 very assistful in this case.
22     Q   (By Mr. Fisher) Okay. And --
23     A   It may have been Steffen.
24     MR. SIEMON: It was Steffes,
25 S-t-e-f-f-e-s.

Page 11

1      THE WITNESS: Okay.
2      Q   (By Mr. Fisher) Now, regarding your
3  investigation in this particular matter, were you able
4  to formulate an opinion as to what you felt the
5  strength of Mr. Watkins' defense in this matter -- did
6  you feel it was a very strong case that you were able
7  to afford? Was it a weak defense?
8      A   Well, it was not a weak defense. I thought
9  we put forth a good defense. However, the case -- I
10 think the State's case was strengthened, in my opinion,
11 by several similar transaction incidents and, in my
12 opinion, a lot of hearsay. But the main thing, I
13 believe, that the State relied on or, I think, the jury
14 relied on -- and, of course, I'm not mind-reader, but
15 was the similar transaction and just all of the issues
16 between the deceased and Mr. Watkins.
17     Q   I think you started to describe it there.
18 When you say "similar transaction," you're talking
19 about incidents of -- I mean, to describe it loosely,
20 bad blood between Mr. Watkins and --
21     A   Yeah. And I would correct that. Similar
22 transaction hearings we had, they were both similar
23 transactions and prior bad acts between the parties.
24 And that was quite a bit.
25     Q   Okay. Did the district attorney's office

Page 12

1  ever offer you any plea offers in this particular case
2  prior to trial?
3      A   No.
4      Q   Okay.
5      A   Nothing other than plea to murder, which
6  carries a life sentence anyway. So, you know, I felt
7  like I would be remiss to take that.
8      Q   Certainly. You already mentioned that there
9  was Mr. O'Dell working on the matter with you as
10 co-counsel. Were there any other attorneys that you
11 consulted with, prior to the start of trial, to
12 formulate any kind of defense theories or tactics at
13 trial?
14     A   Well, yes, the -- you know, Bill and I worked
15 in his office and my office both. I don't recall what
16 attorneys he talked with, but, of course, we both
17 talked with, in particular myself, with my law partner,
18 Bobby Lee Cook, and my law partner at the time, Branch
19 Connelly, and we all looked at the case, talked to
20 witnesses, looked at witnesses, talked to our
21 investigators, you know, did an in-depth study and, you
22 know, hashed it out amongst us like we do on all cases.
23     Q   Okay. Regarding your interaction with
24 Mr. O'Dell, do you happen to recall if you and
25 Mr. O'Dell had any disagreements about particular

tactics he wanted to take at Mr. Watkins' trial?

A   It seems we had a couple of disagreements. I don't recall. Specifically, I remember one thing that occurred. He went to the DA's office and, I think, revealed some information that I wouldn't have revealed, and I told him at the time. And I think it was involving our expert. And lo and behold, the next few days, the State's experts had a change of opinion and a different chart they showed up with. And I think that's a mistake. But, of course, I'm a defense attorney and, you know, I'm just trying to read between the lines, and I'm very suspect of district attorneys and prosecutors.

I don't recall any other specific areas that we discussed. I remember discussing with Mr. O'Dell about the route-taking and putting up a particular investigator, which the investigator's opinion, my opinion, and all others that we consulted with's opinion would have been extremely detrimental because the mapping of the cell phone towers worked out against us. And we did the best we could with it, and I think Mr. O'Dell had a different opinion on that, but I don't really recall.

Q   Regarding the Watkins trial in particular, was there any kind of agreement between you and

Mr. O'Dell as to who would take lead in that particular matter, if there was any such agreement?

A   Well, I remember discussing it because the first issue with co-defendants we had to address was that of any conflict. And I remember addressing that with the clients, of course, as we did and should have, and upon any potential legal conflicts arising, which were waived on the record.

And I remember Mr. O'Dell telling me that he would prefer -- and we both talked about it, and we knew we had a weaker case with Mr. Watkins than the other -- the co-defendant because of all the similar transaction, all the bad blood between them. The other guy, in our opinion, they had no evidence against.

And I think after discussing it with the Watkins', who were -- Mr. O'Dell, in the beginning, was more familiar with the Watkins' because they were acquaintances of his. And I think after discussing it with them, they wanted me to take the lead in the Watkins trial. And, you know, I don't know if you would call it taking the lead; we sort of divided it up. But if and when asked, I would have been the lead counsel in the Watkins trial.

Q   Okay. Conversely, would that have made Mr. O'Dell the lead in the pretrial?

A   Probably.

Q   Okay. Do you happen to recall at Mr. Watkins' trial if there were any issues that arose that, in hindsight, you felt you should have objected to or handled differently or anything along that line?

A   Not that I recall.

Q   Okay.

A   I think there was some issues arose in the courtroom that I disagreed with, but I don't recall any strategy or other issues that I would have changed.

Q   Okay. In the event that something arose at trial that Mr. O'Dell thought was objectionable and you did not, was there any agreement between you and Mr. O'Dell that all objections would go through you, or were either of you allowed to object as you saw fit?

A   Well, we sat side by side and we handled those as they arose, but -- I don't know how much criminal trial work you do, but usually the court handles that, in that the lawyer handling a particular witness must do the objections to that witness. And I don't mean to --

Q   No, I understand.

A   -- say that, but, you know, that's the way it works in --

Q   Sure.

A   -- all the courts that I've attended. You know, you can't have like popcorn going off, both lawyers jumping up and objecting. You know, the judges generally require you to stay -- the lawyer handling the witness handles the objections.

Q   Okay. Now, Mr. --

A   And that's the way it was in this case. I said in general, but that's the way it was in this case.

Q   Sure. Just briefly, going on to the appeal, now, the appeal was handled by Mr. Branch Connelly of your office; is that correct?

A   That's correct.

Q   And Mr. Connelly is no longer alive; is that correct?

A   That's correct.

Q   Okay. Did you have any involvement in determining what issues were to be raised on Mr. Watkins' appeal in this matter?

A   Well, I had no selection, but I gave my opinion, as did Bobby Lee and all of us discussing the case again, as we did in the trial --

Q   Right.

A   -- and talking. You know, I told the Watkins' like I tell every client, if I try a case, I

Page 17

1  always suggest they get another set of eyes, another
2  lawyer to appeal it.
3     Q   Right.
4     A   But Mr. Watkins, at the time, Joey's father,
5  wanted Branch to appeal it. And, of course, we
6  discussed -- again, he's in our office, but he wanted
7  him to appeal it. And then he wanted me on the case.
8  He talked to me at the time and said, you know, "I
9  don't want to make you mad. I think you did a good
10 job, and I want you to work on this, too." But, you
11 know, I told him I thought it would be good to let new
12 eyes look at it.
13    Q   Okay. Do you recall specifically advising
14 either Mr. Watkins or one of his relatives that in the
15 event they wanted to raise ineffective assistance of
16 counsel, that they would need a new firm to handle that
17 particular matter?
18    A   Absolutely.
19    Q   Okay.
20    A   That's one of the reasons I always suggest to
21 get new counsel.
22    Q   Sure. Mr. Watkins has alleged that you were
23 ineffective because you took no steps to conclusively
24 prove that Mr. Watkins' cell phone could not have been
25 in the murder scene area at the time the crimes were

Page 18

1  committed. Do you have any specific response to this
2  allegation?
3     A   That allegation is totally false. Besides
4  talking with an expert, besides traveling to the scene,
5  beside having two investigators, the fact of the matter
6  is his cell phone could have been there and, you know,
7  we did the best. And that's why we hired an expert to
8  try to show otherwise and to show reasonable doubt.
9  But, you know, that's false and it's a question of fact
10 for the jury.
11    Q   Okay. Do you happen to -- he's also alleged
12 that the cell phone evidence presented at trial was
13 incomplete. And obviously, I'm sure Mr. Siemon will
14 have some questions for you to, you know, address that
15 particular matter, but do you believe that you
16 presented the best and fullest evidence you could to
17 the jury to show reasonable doubt about the cell phone
18 being in the area of the murders at the time?
19    A   Well, best and fullest is not always best for
20 a criminal defendant. I presented what I thought
21 needed to be, and I left out quite a bit because it
22 needed to be left out.
23    Q   Okay.
24    A   So best and fullest is not always best.
25    Q   Regarding Mr. Free's trial versus

Page 19

1  Mr. Watkins' trial, do you recall any different
2  evidence being presented at those two particular
3  proceedings that you feel would have had any kind of
4  sway with the jury as to why Mr. Free was acquitted and
5  Mr. Watkins was convicted?
6     A   It's two totally different cases. It wasn't
7  the way the cases were presented. It was the
8  defendants. And again, going back to prior bad acts,
9  the automobile, the cell phone, everything stacked
10 against Joey, where it didn't against Mr. Free. That's
11 the difference. It's not the lawyers or the legal
12 strategy. It's the difference in the two defendants in
13 the two cases.
14    Q   Okay. Mr. Watkins has alleged
15 ineffectiveness on trial counsel's part because, as he
16 claims, the distances as alleged by the State, you
17 know, regarding the cell phone towers and the time
18 allotted, as presented by the State at trial, should
19 have presented that Mr. Watkins could not have covered
20 that distance in the evidence shown.
21        Do you have any response to this particular
22 allegation, sir?
23    A   Well, that's, again, false. After looking at
24 my investigation and the experts and evidence we had,
25 we presented our best case and, you know, made some

Page 20

1  strategic decisions as to what evidence to put in and
2  what to take out. And, you know, to claim that he
3  couldn't have been is not true.
4     Q   Okay. Mr. Watkins has also alleged a claim
5  that the testimony of a witness at trial by the name of
6  Yvonne Agan was apparently false. Do you happen to
7  have any independent recollection of the testimony of
8  Yvonne Agan?
9     A   If you could refresh my memory as to who
10 Yvonne Agan is or was. I believe Ms. Agan, if my
11 memory serves me correctly -- and it's been a few
12 years -- may be an ex-license examiner.
13       MR. FISHER: Do you want to do this on
14    the record or off the record?
15       MR. SIEMON: It doesn't matter.
16       MR. FISHER: Why don't we just go off
17    the record and I'll give a brief summary, and
18    then if Bud wants to correct...
19       (Discussion off the record.)
20    Q   (By Mr. Fisher) Earlier I was asking you
21 about an allegation that Ms. Yvonne Agan provided false
22 testimony at Mr. Watkins' trial. Do you happen to
23 recall ever interviewing Ms. Agan prior to trial or
24 having your investigator interview her?
25    A   I remember interviewing her very briefly

Page 21

1  right before trial on the phone at Bill O'Dell's
2  office.
3      Q   Okay.
4      A   I believe, too, that Ms. Agan's testimony was
5  a flat lie. I recall from -- my recollection is that I
6  was at Bill O'Dell's office the Saturday before trial.
7  And if I remember correctly, Ms. Colston, the district
8  attorney at the time, contacted Bill's office and told
9  us she had this new witness, that this new witness had
10 seen something in the newspaper and she wanted to tell
11 us about it. So she told us briefly and then she said,
12 "If you want to interview her, I'll put her on the
13 phone." I said, "Of course." She put her on the
14 phone, and I talked with her briefly and concluded at
15 that time that she was lying.
16     And we worked very hard, from that moment to
17 trial, to show that she was lying. I think to this day
18 she's a liar. She, I believe, used inadmissible
19 hearsay in the trial. I think she lied. And when I
20 say "inadmissible hearsay," if her story had been true,
21 it would have still been inadmissible hearsay, in my
22 opinion, but it was not under the death hearsay rule in
23 Georgia with an unavailable witness.
24     And the judge allowed it in. I think under
25 the Washington decision since that time, now it would

Page 22

1  be inadmissible. And I think it was a terrible,
2  terrible, damaging -- prior bad acts between the
3  parties that was very damaging to Watkins. And I think
4  it was a lie, too.
5      Q   Okay. Would you please describe for the
6  record what steps that your office undertook to show
7  that Ms. Agan's testimony was fabricated or untrue?
8      A   Well, we cross-examined Ms. Agan as to her
9  bias. And we, of course, investigated and I tried --
10 I've got papers to show she was lying when she said her
11 memory was she knew nothing about the case and had not
12 contacted the DA's office for the year this case had
13 been going on, but then the week before trial she all
14 of a sudden contacts them saying she saw it in the
15 paper. And it was not in the paper the day she said,
16 but she lied at trial and said she didn't say it was in
17 the paper.
18     And we were at Bill O'Dell's office, you
19 recall me stating earlier, who had no tape-recorder.
20 And I tried to interview her later and she wouldn't
21 speak to me. And, you know, we did all that we could
22 to show that she was lying, but the lie popped up at
23 trial and, I think, was very misleading.
24     Q   Okay. Ms. Agan also testified at the trial
25 of Mark Free; is that correct?

Page 23

1      A   I don't recall.
2      Q   Okay.
3      A   I don't recall and I don't know that she
4  would. I don't think it would be -- I don't think she
5  did.
6      Q   Okay, that's fine.
7      A   But, you know, I'm just working off of
8  memory.
9      Q   That's fine.
10     A   I don't think Free was with Joey when this
11 event occurred.
12     Q   Okay. Do you happen to recall an issue
13 arising at trial about allegedly incriminating
14 statements that were made by Mark Free while he was
15 incarcerated.
16     A   I do not remember, but, you know, it probably
17 occurred.
18     Q   Okay. Do you happen to recall if you took
19 any steps to investigate Mr. Free's whereabouts at the
20 time those incriminating statements were made?
21     A   I do remember investigating Mark Free's
22 statements, because I think they turned out to be false
23 as well. And I think that was one of the important
24 things in this trial investigation, is removing those
25 incriminating statements by Free, and I think we did

Page 24

1  that.
2      Q   Okay. Do you recall Mr. Free testifying at
3  Mr. Watkins' trial?
4      A   I do not recall specifically, no.
5      Q   That's fine. Just a couple more. Do you
6  believe that you represented Mr. Watkins to the best of
7  your abilities throughout your involvement in this
8  case?
9      A   Absolutely, I think that I did. I think Bill
10 O'Dell did a good job. I think he was represented very
11 well. I think his problem, again, was the bad blood
12 between the parties, the prior bad acts, the similar
13 transaction evidence, and the conservative jurors in
14 Floyd County.
15     Q   Okay.
16     A   And the expert witnesses. You know, I just
17 think it was a tough case by them.
18     Q   Okay.
19         MR. FISHER: I don't have any further
20     questions at this time, and I'm sure
21     Mr. Siemon will have some for you.
22              EXAMINATION
23 BY MR. SIEMON:
24     Q   Do you recall -- you've already testified
25 about that you-all brought in an expert witness from

Page 25

1  Georgia Tech?
2  A  Yes.
3  Q  And I think we've refreshed your recollection
4  that that witness's name was Professor Steffes?
5  A  I believe that's correct. That's what you
6  said. It's something like that.
7  Q  Okay. And do you recall why you brought him
8  into the case?
9  A  Yes, I brought him in to advise me and to
10 testify as to cell phone towers and the whereabouts of
11 Mr. Watkins.
12 Q  Okay. And was he able to provide that
13 information to you?
14 A  Yes.
15 Q  And how did Mr. -- or Professor Steffes get
16 involved in the case? Was he retained by you?
17 A  Yes.
18 Q  And who provided the resources to retain him?
19 A  I think I did, if I remember correctly.
20 Q  Was it -- so the resources for Mr. Steffes
21 came from you?
22 A  I think that's correct.
23 Q  Do you recall whether or not the Watkins
24 family provided you resources to hire Mr. Steffes,
25 Professor Steffes?

Page 26

1  A  I don't believe they did. That would be the
2  routine course. I would generally get an expert, tell
3  the family how much. In this case, I don't remember if
4  I was reimbursed for that or not.
5  Q  Okay.
6  A  I don't think so, but I'm not sure.
7  Q  Okay. If more resources could have been
8  utilized to strengthen Professor Steffes's testimony,
9  would those resources -- would you have made those
10 resources available?
11 A  Absolutely.
12 Q  Now, you testified that you feel as if the
13 cell phone evidence was not supportive of your defense?
14 A  No, I didn't testify to that. I didn't feel
15 that way.
16 Q  Okay.
17 A  I testified maybe the jury didn't feel that
18 way.
19 Q  Okay. How did -- what did you feel the
20 strength of the cell phone evidence was?
21 A  Well, I thought it was pretty good. That's
22 why we presented it.
23 Q  Okay. And do you recall -- I know it's been
24 a long time, but do you recall generally what the
25 evidence of the cell phone towers was?

Page 27

1  A  You know, I recall generally, at that point
2  in time, cell phones placed people in areas by
3  triangulation and various areas, and they couldn't get
4  it too tight. And I remember seeing the maps of the
5  state and discussed it with our investigator, things of
6  that nature.
7  Q  Okay. Do you recall Professor Steffes
8  telling you that the -- and I'm referring to a map of
9  Rome here, that the closest that Mr. Watkins's cell
10 phone could have been to the scene of the crime and
11 still connected to the Kingston tower, which is the
12 tower that the 7:15 phone call was picked up, was in
13 the area of Callier Springs Road?
14 A  I don't remember anything Mr. Steffes told me
15 a few years ago, Mr. Siemon. If it's in the form of
16 testimony, if you could refresh my memory, I would be
17 happy to look at it.
18    MR. FISHER: Do you need a transcript or
19    anything?
20 Q  (By Mr. Siemon) Well, do you recall that
21 what -- that the testimony was that at 7:15,
22 Mr. Watkins made a phone call that was picked up by the
23 Kingston tower?
24 A  I do not remember that testimony. Again, I
25 would have to see the transcript.

Page 28

1  Q  Okay. Do you recall the district attorney
2  arguing in her closing argument to the jury that at
3  7:15, there's no doubt that he was picked up on
4  Kingston tower?
5  A  I do not recall that. Again, you know, if
6  you show me the testimony, I -- you know, whatever the
7  record speaks, I would not argue with it.
8  Q  All right. And if, in fact -- do you recall
9  the district attorney making the argument in her
10 closing argument, at page 1577 of the transcript, that
11 Mr. Watkins made the call from the Chulio Road area and
12 he traveled four minutes and he got down around --
13 somewhere around Floyd College and saw Isaac Dawkins
14 and turned around? If that was her closing argument,
15 you wouldn't dispute that that's -- if that's what the
16 records shows, if that's what the transcript shows?
17 A  If that's what the transcript shows, I would
18 not argue with it.
19 Q  Okay. And the Chulio Road is in this area
20 right there (indicating) on the map. Can you see it?
21 A  Where does it say Chulio?
22 Q  Chulio Road (indicating).
23 A  Yes, I see it.
24 Q  Okay. And there's already been testimony in
25 this case that it's 7.1 miles from Callier Springs

Page 29

1  Road, which is --
2     A   Which is further than Chulio Road on the map.
3     Q   Yeah, which is further back than Chulio Road.
4     A   Right.
5     Q   But it's 7.1 miles from Callier Springs Road
6  down to Floyd College.
7     A   Okay.
8     Q   And there's also been testimony already in
9  this case that the murder scene is represented by the
10 No. 2 on this map.
11    A   Yeah, which looks like about half the
12 distance.
13    Q   That's right.
14    A   So it would be about 3 and a half miles?
15    Q   Well, actually, it's 4.4, but --
16    A   Four miles, okay.
17    Q   Yeah, 4 point -- 4 and a half miles.
18    A   So how far would it be from Chulio?
19    Q   Well, it's about -- it's several -- it's
20 about half a mile from Callier Springs Road to
21 Chulio Road.
22    A   So somewhere less than 4 miles.
23    Q   Somewhere around 4 miles.
24    A   And it would take how long to travel that
25 distance? I don't know what your question is to me.

Page 30

1     Q   My question to you is -- well, my original
2  question to you was: Do you recall the district
3  attorney's closing argument saying that he went from
4  the Chulio Road area down to around Rome College --
5  somewhere around Floyd College, saw Isaac Dawkins, and
6  turned around?
7     A   I do not recall that, but I do not dispute
8  it.
9     Q   Okay. So if you had information -- did you,
10 yourself, did you get out and travel these distances?
11    A   I did.
12    Q   Okay. So you know generally how far it would
13 be from --
14    A   I did at the time. I don't know today.
15    Q   Okay. And if you want to look at the -- if
16 you want to look at the -- and I'm not asking you to
17 make precise measurements. There's already been
18 testimony about that. But if you want to look at the
19 key to the map to get estimates --
20    A   I don't want to look at anything.
21 Mr. Siemon, if you have a question, ask me and I'll see
22 if I can answer it.
23    Q   Do you remember from the testimony -- do you
24 remember a witness by the name of Wayne Benson?
25    A   The name sounds familiar, but I don't

Page 31

1  remember that.
2     Q   Okay. Do you recall a witness testifying
3  that he was coming home from work that night when he
4  saw two vehicles, a pickup truck and another car,
5  stopped in the middle of the road?
6     A   I think I remember that vaguely.
7     Q   Okay. And that as he approached, the two
8  vehicles took off and he lost sight of them?
9     A   I do remember that.
10    Q   But he saw them again at Walker Mountain
11 Road, stopped at the traffic light?
12    A   I don't remember that either.
13    Q   Okay.
14    A   But I remember Wayne Benson. I remember
15 investigating that thoroughly because it was very
16 important to our defense.
17    Q   Yeah. And he was the witness that was behind
18 the vehicles as they were driving north on Highway 27.
19    A   Ever what you say. I don't remember.
20    Q   Okay. And he was the witness that saw the
21 vehicles -- saw the truck veer off the side of the road
22 and he called 911.
23    A   Maybe so.
24    Q   Okay. And actually, you were questioning the
25 witness Marshall Smith, and you got Mr. Smith to admit

Page 32

1  that the first 911 call came in at 7:19. Do you recall
2  that?
3     A   I don't, but I remember this sort of
4  testimony. And I thought it was important and, I
5  thought, covered very well.
6     Q   Okay. So, in effect, would you agree, if, in
7  fact, that I've correctly related the record to you,
8  that the testimony -- and the district attorney's
9  position at trial was that the phone call was made down
10 in the Chulio area and -- at 7:15, and that
11 Mr. Watkins, according to the State's evidence,
12 traveled down to around Floyd College, saw Isaac
13 Dawkins, the victim, turned around, and followed him
14 back up to the scene of the murder. Would you agree
15 that that was generally what the testimony at trial
16 was?
17    A   I would not agree with that being the general
18 testimony at trial.
19    Q   Okay. So when the district attorney argued
20 in her closing argument, made the call from the Chulio
21 Road area and he traveled four minutes and he got down
22 around -- somewhere around Floyd College and he saw
23 Isaac Dawkins and turned around, you don't think that
24 her closing argument was supported by the evidence?
25    A   I don't remember if her argument was

Page 33

1  supported by the evidence.
2      Q  Okay.  But looking at the map, would you
3  agree that it would be impossible between 7:15 and 7:19
4  for somebody to make a phone call in the Chulio Road
5  area, travel down to around Floyd College, turn around
6  and drive back to the scene of the crime in four
7  minutes?
8      A  Well, I know the area quite well, but I
9  don't -- you know, I just can't answer that.  I don't
10 know.
11     Q  Okay.
12     A  I remember looking at all those issues at
13 trial.  I remember traveling it myself, traveling it
14 with the investigator, having the investigator travel
15 it.  And the time frame, according to experts and the
16 cell towers, could have fit.  Now, what the DA argued,
17 I don't know.
18     Q  Okay.  In your opinion, it could have fit?
19     A  In my opinion at trial or in preparation for
20 trial, it was very dangerous.
21     Q  Okay.  So you believe that, in fact, if the
22 district attorney was right and the call was made from
23 the Chulio Road area and he traveled down to the Floyd
24 College area, turned around and went back to the scene
25 of the crime, a distance of approximately 8 and a half

Page 34

1  miles, that he could have done that in four and a half
2  minutes?
3      A  No, I didn't say that, now.  I didn't even
4  say I even agree with the district attorney' argument.
5  I don't remember what she argued.  I don't know what
6  could have been done.  I'm saying in preparation for
7  trial, I remember the timing, the real evidence,
8  looking at documents, calls.  It could have worked out.
9  That's what I'm saying.
10        But now, the district attorney's argument is
11 not evidence, and I think that was told at trial.  And
12 I don't agree with most of what district attorneys say,
13 nor did I agree with most of what this district
14 attorney said.
15     Q  Would you agree that a person could not drive
16 between Chulio Road area down to Rome College, turn
17 around and drive back to the scene of the crime in four
18 and a half minutes?
19     A  I don't even remember how far the scene of
20 the crime is.  You've got it marked on that map, but
21 I'm not so sure that's accurate.
22     Q  Okay.  But if there's been testimony in the
23 case that that, in fact, was the scene of the crime,
24 you wouldn't have any information that would dispute
25 that?

Page 35

1      A  Dispute what?
2      Q  That this was where the crime scene was.
3      A  I don't have any today that would dispute
4  that.  Is this the map that was used at trial?
5      Q  No.  This is a map that was used at the
6  habeas hearing in --
7      A  Okay.
8      Q  Now, did you have a witness that had
9  driven -- do you recall whether or not Professor
10 Steffes essentially told you before trial that the
11 closest the phone call could have been made to the
12 crime scene and still pick up on the Kingston tower was
13 in this general area, the Callier Springs Road/Chulio
14 Road area?
15     A  I will have to answer the same as the last
16 time you asked me that question.  I don't remember
17 anything about what Steffes told me.
18     Q  Okay, okay.
19     A  If you refer to a transcript, what he
20 testified to, now, I could have my memory refreshed.
21     Q  But you don't remember him telling you that
22 before the trial?
23     A  No.  I remember talking with him, providing
24 maps, he providing maps, us looking at the State maps.
25 I remember going through all that in detail, sifting it

Page 36

1  out thoroughly.
2      Q  And do you recall Dr. Steffes telling you
3  before the trial that there was really no place between
4  the Chulio Road area and Rome College where a cell
5  phone call could connect to the Kingston tower?  Do you
6  recall him telling you --
7      A  I do not recall that.  I recall the State had
8  some maps that we went over with Dr. Steffes; and then
9  a day or two later, the State let us know that they had
10 other maps, those maps were in error.  I remember that.
11     Q  And it's your testimony today, to the best of
12 your recollection, that the State maps did not support
13 the theory that Mr. Watkins could not have reached the
14 scene of the crime?
15     A  The State maps did not -- ask that question
16 again.
17     Q  That the State map -- that the maps the State
18 provided you did not preclude Mr. Watkins being in the
19 area of the crime scene as the State's witnesses
20 testified?
21     A  The State map did not.  They concluded that
22 he could have been there, and that was the argument at
23 trial.  Now, when you ask me, are you talking about the
24 first State map or the second one?
25     Q  Either of them.

Page 37

1  A  The first ones, in my opinion, and after
2  going over those first ones with Dr. Steffes, I think
3  we had adequate preparation, reasonable doubt, and I
4  thought we were in good shape.  Then they came up with
5  some new maps.  And going over those with Dr. Steffes,
6  I thought we were all right, but they had changed their
7  maps with their expert.
8      I'm not trying to -- Judge Colston or, at the
9  time, District Attorney Colston, I'm not trying to say
10 there was anything, you know, fishy.  I'm just saying
11 the second maps, I thought, benefited them more after
12 they went over that with their expert.
13     And I recall Dr. Steffes looking at them and
14 was troubled more by those second maps, but I don't
15 recall in what way at this time and why.  I just
16 remember -- you know, they're were very sporadic, and
17 there was a lot of testimony about how cell phones, you
18 could be on one, it will tie into another one while
19 you're moving, or it will drop off; and then sometimes
20 you can be in one round area, triangulation round area,
21 and while you're in that area, you can pick up even on
22 another cell phone tower.  I remember all that kind of
23 testimony.
24  Q  Whatever maps you had, you went over it with
25 Dr. Steffes?

Page 38

1  A  Absolutely.
2  Q  Do you recall whether or not you had a
3  witness available to testify as to the driving
4  distances and the driving times?
5  A  I did.
6  Q  And you did not call that witness at trial?
7  A  No.
8  Q  Do you recall why you did not call him?
9  A  Yes, because he's -- it was our investigator.
10 I don't even recall his name.  He's deceased now.  But
11 it would have been very devastating to us, in his
12 opinion and my opinion, and --
13 Q  Based upon what?  I'm sorry, you can finish.
14 A  Well, when you tied it up with experts' cell
15 towers and opinions and the distance -- for instance --
16 again, I've never seen this map used in the habeas, but
17 the cell phone maps had little spots all over them, and
18 you could go in and out spots based on the
19 topographical area of the domain, just topographical
20 setup, trees and so forth, you could be in one area and
21 be picked up by another tower.  And where he was at
22 certain times had those splotches in there.  It was
23 very problematic.
24 Q  If Dr. Steffes has testified in this case
25 already, you wouldn't put your expertise on the ability

Page 39

1  of the cell phone towers that -- you wouldn't put your
2  expertise on the ability of cell phone towers to
3  receive calls over Dr. Steffes's, would you?
4  A  I am no expert and, no, I would not put my
5  opinion over Dr. Steffes at any time in this area.  I
6  think he is one of the foremost experts, but I would
7  put my opinion over strategy and trial work with the
8  whole picture above his in an instant.
9  Q  Okay.  Do you recall during the -- do you
10 remember whether or not you -- during your
11 investigation, your pretrial investigation, do you
12 recall whether or not you made any effort to see if the
13 cell phone -- if the times connected to the cell phone
14 records and the times connected to the 911 records were
15 in synchronization?
16 A  I did.
17 Q  And was that evidence presented at trial?
18 A  I remember, you know, going into the 911 -- I
19 think the 911 witnesses testified, and they were
20 cross-examined, and I remember all of these issues at
21 trial.  I don't remember specific statements, but yeah,
22 I remember all of that, Mr. Siemon.
23     I also recall the time that Mr. Watkins left
24 was based on not just cell towers, but that he was
25 taking a shower and maybe his sister or some other

Page 40

1  closely related person was there, and there were some
2  real issues about the timing in the case based on that
3  too.
4  Q  Do you recall whether or not it came out in
5  evidence that there was -- that the 911 times and the
6  cell phone times were synchronized?
7  A  I don't recall, but if you show me, I'd be
8  happy to have my memory refreshed.
9  Q  So if the district attorney argued at trial
10 that there was no evidence that Verizon and 911 were
11 sync'd, you don't recall specifically whether or not,
12 you, in fact, presented that kind of evidence at trial?
13 A  I don't recall the trial and I don't recall
14 the district attorney's argument.  Again, if you want
15 to refresh my memory, I would be glad to --
16 Q  Well, I can't refresh your memory from
17 something that's not in the record unless you want to
18 read the whole transcript.
19 A  No, I'm saying if you have a specific
20 question, I'd be happy --
21 Q  Well, my question is: Did you present that
22 evidence?  Did you present the evidence of
23 synchronization at trial?
24 A  I presented all evidence that I thought would
25 be beneficial to my client.  And I recall presenting

Page 41

1 the best evidence we had with the -- and arguing
2 against the State's case and what they had. What that
3 evidence was, I don't know and I don't recall it this
4 day.
5    Q  Do you recall presenting any evidence -- do
6 you recall whether or not, in fact, at the time of the
7 murder, that there was bridge construction going on
8 on Highway 27 between the point that the Kingston --
9 the Kingston tower could pick up a cell phone and the
10 murder scene?
11    A  I don't recall that.
12    Q  Okay.
13    A  I wouldn't argue against it either.
14    Q  Well -- so you don't recall that information
15 arising during your investigation?
16    A  I don't recall that arising, but if it was
17 there, I'm sure it did because we investigated it
18 thoroughly.
19    Q  Okay. But would you have presented -- as
20 part of your defense, was -- you put up Dr. Steffes
21 because there was a question at the time -- of the
22 timing in all of this case, wasn't there?
23    A  I put up Dr. Steffes to attempt to argue
24 against the State's expert witnesses in regard to time.
25    Q  Okay.

Page 42

1    A  Because had I not put up anything, their case
2 would have just been laid out without any rebuttal. So
3 I put him up to rebut the State's evidence, and we did
4 the best we could with that.
5    Q  Okay. So the timing of all this, of the cell
6 calls and the 911 calls, you recall that as being a
7 part of your defense?
8    A  Very important.
9    Q  Okay. And part of that -- would you agree
10 with this statement, that part of that evidence would
11 entail the driving time that it would take Joey Watkins
12 to drive from one point to another?
13    A  I remember that driving time was important,
14 as well, and I remember the pitfalls, various pitfalls
15 that we had with that.
16    Q  Okay. What were those pitfalls?
17    A  Well, one was him -- what time he left the
18 house, according to his sister, and the cell phone. I
19 think we would have gotten into a lot of trouble
20 arguing about that at trial or putting that evidence up
21 at trial. I think it was his sister, the witness that
22 was at home with him before he left. I think there
23 were discrepancies there that would have killed us and
24 make us look fraudulent and lost our credibility in
25 front of a jury.

Page 43

1 I remember the timing with the investigator
2 driving it and then having me to go out and drive it
3 with him and then going back out with Bill to drive it.
4 I think the timing was too close to base our entire
5 defense on that.
6    Q  When you say that you drove these distances,
7 what distances did you drive? At what point did you
8 start the clock running?
9    A  I drove them and I started at numerous
10 locations. Started it from his house, where he left
11 from -- I think it was his house. I don't remember.
12 But the location, I believe his house, there over to
13 Chulio, and Chulio out to the scene and the college and
14 out to where he eventually ended up at another girl's
15 house, all those were driven several times and compared
16 with the cell phone charts, all cell phone charts, the
17 calls. All of this was put together over and over and
18 over.
19    Q  Okay. So --
20    A  And it's --
21    Q  I'm sorry.
22    A  And to sit and talk about it today is one
23 thing, but looking at it at the time of trial is a
24 whole other thing.
25    Q  So during that -- so let me ask you: Based

Page 44

1 on the driving and the timing that you did at the time,
2 do you believe it would be possible to drive from the
3 Chulio Road area down to Floyd College, turn around and
4 drive back to the crime scene? Do you think that that
5 would be possible based on your --
6    A  In four minutes?
7    Q  -- investigation? Yeah.
8    A  You didn't ask the question in four minutes,
9 but you're talking about in that four minutes?
10    Q  In four and a half minutes.
11    A  I doubt -- it doesn't sound like that would
12 be possible. But I also would say this, Mr. Siemon,
13 that drive that you just described is not, was not
14 dispositive of this case, was not the big issue in this
15 case.
16       Breaking those up to certain distances and
17 the true evidence in the case based on the transcript,
18 if you would look at, those issues are what's
19 important. Making this drive in that time was not
20 dispositive of this case.
21    Q  Okay. So you don't think that the district
22 attorney's argument, if she made this -- if the record
23 reflects that she made the argument that he made the
24 call from the Chulio Road area and he traveled four
25 minutes and he got down around -- somewhere around Rome

Page 45

1  College and he saw Isaac Dawkins and turned around, you
2  don't think that disproving that argument would have
3  been important in this case?
4      A   This drive would not have been important.
5  Your argument, the Chulio Road area to the college, I
6  think could probably be done in four minutes.  Now,
7  now, turning around and whatever else happened would
8  have taken longer than four minutes, but that
9  argument -- just the Chulio Road area is a big area.
10 That drive could be made to the scene of the shooting,
11 in my opinion today, without going out there.  I
12 haven't been out there in a while.
13     I remember that we worked very diligently and
14 very hard on it.  But the map that you have, the
15 argument that you're making and tying it to the
16 district attorney's argument, I think, is totally
17 unequivocally fraudulent as laying it out as a defense
18 for this case or an argument that the defense was not
19 laid.  That's what I think.
20     Q   Okay.  So you think it's -- making the
21 argument that it would be fraudulent if, in fact --
22 that it would be -- it would be a fraudulent argument
23 to argue that somebody couldn't drive from Chulio Road
24 down to Floyd College, turn around, and go back in four
25 and a half minutes, you think that --

Page 46

1      A   No, I don't think that argument is
2  fraudulent.
3      Q   Discrediting that argument --
4      A   I don't think that's fraudulent.
5      Q   Okay, okay.
6      A   I think your argument today is.  That
7  argument, I don't think, was put forth in a strong way
8  at trial.  And the district attorney's one little
9  sentence you have there was not the case.  And what
10 you're reading from her argument is not what you're
11 adding to when you ask the question to me.  Her
12 argument is Chulio Road area down to where she saw
13 someone at Floyd College area, and that's it, according
14 to what you read me.
15     Now, when you extrapolate and say going
16 further and coming back, that's not what she said,
17 according to what you've shown me.
18     Q   Traveled down, got down somewhere around
19 Floyd College, saw Isaac Dawkins, and turned around,
20 that's what she argued at trial.
21     A   That's one little sentence.
22     Q   Okay.
23     A   But then how long did it take and where and
24 how far --
25     Q   Okay.  And you don't feel like the evidence

Page 47

1  at trial supported her argument, then; that's what
2  you're saying?
3      A   No, that's not what I'm saying.  She had
4  evidence at trial to support her argument.  I had
5  evidence to support mine.
6      Q   Okay.  And if, in fact, Dr. Steffes's
7  testimony is that the closest the 7:15 call could have
8  been to the scene of the crime and still be picked up
9  on the Kingston tower, as it was, would have been back
10 close to Callier Road -- I'm sorry, Callier Springs,
11 that's C-a-l-l-i-e-r, Callier Springs Road, you
12 wouldn't dispute that if, in fact, that's what
13 Dr. Steffes's testimony is?
14     A   Again, I don't remember his testimony, but I
15 remember putting --
16     Q   I'm --
17     A   Let me finish.
18     Q   Sure.
19     A   I remember putting him up to rebut the
20 State's evidence.  Sounds like it's a pretty good
21 rebuttal from what you're saying.  And that's what we
22 did, is try to rebut and put forth a different
23 argument.
24     Q   And certainly if that evidence had been
25 available, you would have used it?

Page 48

1      A   What evidence?
2      Q   The evidence that the closest he could have
3  been to the scene of the crime and still get picked up
4  on the Kingston tower at 7:15 would have been the
5  Callier Springs Road -- would have been shortly past,
6  about a tenth of a mile past the Callier Springs --
7      A   I would have used every bit of evidence
8  assistful to us at trial, and I think I did use what
9  was assistful that would not have created problems in
10 other regards.
11     Q   Okay.  So you have -- if you have the
12 testimony that at 7:15 he was here (indicating) because
13 he was picked up -- that's the closest he could have
14 been --
15     A   Callier Springs?
16     Q   The closest he could have been to the scene
17 of the crime at 7:15, and then you have Wayne Benson's
18 testimony that he saw these vehicles, the vehicles
19 involved in this case, down around about half a mile
20 north of Floyd College and followed them up to the
21 crime scene, the driving distances of about 8.6 miles,
22 you think that Joey Watkins could have driven 8.6 miles
23 in four and a half minutes on January --
24     A   No.
25     Q   -- the 11th, 2000?

Page 49

1  A   No, I don't think that's the evidence in this
2  case.
3  Q   Okay.
4      MR. SIEMON:  That's all I have.
5      MR. FISHER:  Just a couple of follow-ups
6  here.
7          FURTHER EXAMINATION
8  BY MR. FISHER:
9  Q   Mr. Abernathy, regarding the selection of
10 jurors in the particular case and your preparation for
11 selecting those jurors in voir dire, do you recall
12 whether you and your co-counsel made knowledge of the
13 area or the areas that were traveled, as stated by
14 Mr. Siemon in his cross-examination, whether that was
15 an issue that you wanted the jurors to have knowledge
16 of when you were selecting them?
17 A   I do not recall.  That would not have been
18 the -- that would not have been the gravamen issue I'd
19 be concerned about, but that would --
20 Q   But you can't recall whether it was even an
21 issue?
22 A   You know, I don't recall.
23 Q   Okay.  Sir, the record reflects that the
24 crimes occurred on January 11, 2000.  Do you have any
25 independent recollection of that being the date, or

Page 50

1  would you have any reason to contest that particular
2  date from the record?
3  A   I would not.
4  Q   Okay.  And that the trial in this matter
5  started sometime around late June 2001.  Is that
6  approximately accurate?
7  A   You know, I don't know.
8  Q   That's fine.  So that's a span --
9  A   It's all in the record.
10 Q   Yeah.  That's a little bit less than about a
11 year and a half between when the crime occurred and
12 when Mr. Watkins went on trial.  Do you agree with
13 that?
14 A   Probably.
15 Q   Okay.  And you already said that you drove
16 this route a number of times in preparation for trial;
17 is that correct?
18 A   I did.
19 Q   And you said your investigators also drove
20 that route?
21 A   They did.
22 Q   Did you see any evidence of bridge
23 construction that was going on at that particular time
24 along that route?
25 A   You know, I'm trying to think.  I really --

Page 51

1  you know, I can't remember.  I just don't remember.
2  Q   Okay.  Regarding Dr. Steffes, prior to
3  putting him up on the stand at Mr. Watkins' trial, did
4  you have a chance to discuss with him the nature of his
5  testimony prior to him actually taking the stand?
6  A   Yes.
7  Q   Okay.  Did he ever make any representations
8  to you that he was not fully prepared to render any
9  opinions in Mr. Watkins' case?
10 A   No.
11 Q   Okay.  And Mr. Watkins' case, was it tried
12 before Judge Matthews?  Is that correct?
13 A   You know, I was trying to think earlier.  I
14 don't really remember.
15     MR. FISHER:  Do you happen to recall who
16 it was?  That's fine.  The record --
17     MR. SIEMON:  I think it was Matthews.
18 That's my recollection.
19     MR. FISHER:  Okay, yeah, the record
20 will --
21     THE WITNESS:  Sounds right, because I'm
22 trying to -- I remember a little story, but I
23 won't get into now, but it probably was
24 him.
25     MR. FISHER:  That's fine.

Page 52

1  Q   (By Mr. Fisher)  If the record reflects that
2  it was Judge Matthews, had you tried cases, prior to
3  Mr. Watkins, before this particular judge?
4  A   You know, I probably have.  I don't remember.
5  Q   Okay.
6  A   He would not be my choice judge, but let me
7  say this on the record since I've said that -- you
8  never know who reads these things -- but Judge
9  Matthews, I think, is very intelligent and probably the
10 intellect of the court in Floyd County.  But I think it
11 would be the discernment of defense lawyers that he
12 would be, you know, tougher to try a case with than the
13 other judges there at the time.
14 Q   Okay.
15 A   But Judge Matthews, I think, is fair and
16 judicious and knows the law fairly well and, I think,
17 the least reversed judge there.
18 Q   Okay.  And do you recall if the judge in this
19 matter, whoever that is, gave a charge to the jury that
20 any argument of counsel, either in opening or in
21 closing, is not to be considered by them in
22 deliberations?
23 A   You know, I don't specifically remember it,
24 but I'm sure they would have because that's always
25 given.  And if it had not been, it would have been

Page 53

1  surprising to me.
2  Q  Okay. Do you recall if this is a standard
3  charge that you request when you're giving a --
4  A  It's a standard charge that's required in all
5  criminal cases.
6  Q  Okay.
7  A  When you look in the criminal law trial
8  charge book, then that's one that's required in all
9  cases.
10 Q  Okay.
11 A  If they didn't give it, I think it would be
12 an error. Well, I don't know if it would be plain
13 error, but it would be wrong.
14      MR. FISHER: I don't have any further
15 questions.
16      FURTHER EXAMINATION
17 BY MR. SIEMON:
18 Q  Certainly when you're contemplating your
19 defense in a case, though, you consider what the
20 district attorney might argue in her closing argument
21 and try to present evidence that would refute her
22 arguments?
23 A  Well, you do, you try to make the district
24 attorney lose their credibility in every way you can.
25 That's what I tried to do in this case, Mr. Siemon.

Page 54

1      MR. SIEMON: That's all.
2      MR. FISHER: Okay.
3      THE WITNESS: Thank you so much.
4      (Deposition concluded at 12:01 p.m.)

Page 55

1           CERTIFICATE
2  STATE OF GEORGIA
3  COUNTY OF FULTON
4
5      I HEREBY CERTIFY that the foregoing
6  deposition was taken down by me in stenotype, and the
7  questions and answers thereto were transcribed by means
8  of computer-aided transcription, and that the foregoing
9  transcript represents a true and correct transcript of
10 the testimony given by said witness.
11
12     I FURTHER CERTIFY that I am not kin or
13 counsel to the parties in the case; am not in the
14 regular employ of counsel for any of said parties; nor
15 am I in any way financially interested in the result of
16 said case.
17
18     _____
        MICHELLE M. BOUDREAUX, RPR
19      CCR-B-2165

Page 56

1           DISCLOSURE
2
   STATE OF GEORGIA
3
   COUNTY OF FULTON
4
5  Deposition of REX B. ABERNATHY
6
   Pursuant to Article 10.B of the Rules and
7  Regulations of the Board of Court Reporting of the
   Judicial Council of Georgia, I make the following
8  disclosure:
9      I am a Georgia Certified Court Reporter.
   I am here as a representative of Merrill Legal
10 Solutions.
11     I am not disqualified for a relationship of
   interest under the provisions of O.C.G.A. §9-11-28©.
12
   Merrill Legal Solutions was contacted by the
13 Office of the Attorney General to provide court
   reporting services for this deposition.
14
   Merrill Legal Solutions will not be taking this
15 deposition under any contract that is prohibited by
   O.C.G.A §15-14-37 (a) and (b).
16
   Merrill Legal Solutions has no exclusive contract
17 to provide reporting services with any party to the
   case, any counsel in the case, or any reporter or
18 reporting agency from whom a referral might have been
   made to cover this deposition.
19
   Merrill Legal Solutions will charge its usual and
20 customary rates to all parties in the case, and a
   financial discount will not be given to any party to
21 this litigation.
22
23
      _____
      MICHELLE M. BOUDREAUX, RPR
24    CCR-B-2165
25